ACCEPTED
03-14-00735-CV
5514413
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/2/2015 3:37:34 PM
JEFFREY D. KYLE
CLERK

NO. 03-14-00735-CV

IN THE
TEXAS COURT OF APPEALS
THIRD COURT OF APPEALS DISTRICT
AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/2/2015 3:37:34 PM
JEFFREY D. KYLE
Clerk

ENTERGY TEXAS, INC., ET AL.,

APPELLANTS,

V.

PUBLIC UTILITY COMMISSION OF TEXAS, ET AL.,

APPELLEES

ON APPEAL FROM THE FINAL JUDGMENT
IN CAUSE NO. D-1-GN-13-000121 (CONSOLIDATED),
353RD JUDICIAL DISTRICT COURT,
TRAVIS COUNTY, TEXAS,
HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

APPELLANT'S REPLY BRIEF AND APPENDIX OF
THE OFFICE OF PUBLIC UTILITY COUNSEL

OFFICE OF PUBLIC UTILITY COUNSEL
Tonya Baer
Public Counsel
State Bar No. 24026771

Sara J. Ferris
Senior Assistant Public Counsel
State Bar No. 50511915

P.O. Box 12397
Austin, Texas 78711-2397
512/936-7500
512/936-7525 (Fax)
Sara.Ferris@opuc.texas.gov

ORAL ARGUMENT REQUESTED

June 2, 2015

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................... i

INDEX OF AUTHORITIES ....................................................................................... iv

ARGUMENT AND AUTHORITIES ......................................................................... 1

A.   Standards of Review ......................................................................................... 1

B.   Either the Commission weighed the evidence and concluded that it
     was not sufficient to allow a determination as to what portion of the
     storm expenses were due to the negligent state of the Company's
     system, or the Commission did not weigh the evidence and decided not
     to address the issue based upon the irrelevant factor of the passage of
     time.  Either way, the Commission committed reversible error by
     failing to hold ETI to its burden of proof under PURA § 36.006 and
     allowing one hundred percent of the $13,014,379 1997 storm restoration
     expenses to be included in the storm reserve and reflected in rates.  .................. 4

C.   Indisputably, the issue of determining what amount of 1997 storm
     restoration expenses was prudent, appropriate, and includable in the
     storm reserve and rates was an issue to be decided in Docket No.
     39896.  That fact does not render the Commission's Orders in Docket
     Nos. 18249 and 16705 irrelevant or properly disregarded........................................ 8

D.   The Commission inappropriately focused on only one aspect of the
     prudence question and ignored the genesis of the expenses. ................................. 11

E.   The 60-basis-point reduction to the Company's return on equity
     assessed in Docket No. 18249 was not intended to be in lieu of
     identifying and accounting for the portion of the cost of cleaning up
     and repairing the damage caused by the Company's imprudent
     vegetation management.   The Commission acted arbitrarily and
     capriciously by considering this irrelevant factor and including the
     entirety of the $13,014,379 in ETI's storm reserve reflected in rates. .................... 13

F.   The Commission erred in approving the recovery of imprudent costs................ 16

i

G. Some of ETI's storm costs were "reasonably anticipated," and it was reversible error for the Commission to fail to consider this statutorily required criterion. The Commission's Order violates PURA § 36.064 and is the result of the Commission acting arbitrarily and through unlawful procedure. ...................................................................... 20

H. ETI's 420-page spreadsheet was properly excluded from the evidentiary record. (Response to ETI's Conditional Cross-Point). ................... 25

PRAYER ................................................................................................................ 29

CERTIFICATE OF COMPLIANCE .................................................................. 30

CERTIFICATE OF SERVICE ............................................................................ 30

APPENDIX

1. PURA, Chapter 36, Subchapters A and B

2. APA, Tex. Gov't Code § 2001.174

3. PUC Substantive Rule on Cost of Service-Allowable Expenses: 16 Tex. Admin. Code § 25.231(b)

4. PUC Docket No. 18249, Order on Rehearing

5. Excerpts from PUC Docket No. 16705, Second Order on Rehearing

6. PUC Docket No. 39896, Hearing on the Merits Transcript: Excerpts of Direct and Cross-Examination of ETI Witness Shawn Corkran

7. PUC Docket No. 39896 Hearing on the Merits Transcript: Excerpts re. Optional Completeness

8. *Tex. Health Facilities Comm'n v. Charter Medical-Dallas*, 665 S.W.2d 446 (Tex. 1984)

9. *City of El Paso v. Public Util. Comm'n*, 839 S.W.2d 895 (Tex. App.—Austin 1992) *aff'd in part, rev'd in part on other grounds*, 883 S.W.2d 179 (Tex. 1994).

10. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179 (Tex. 1994)

11. *Helena Chemical Co. v. Wilkins*, 47 S.W.3d 486 (Tex. 2001)

12. *Texas Utilities Electric Company v. Public Utility Commission*, 881 S.W.2d 387 (Tex. App. – Austin 1994) *aff'd in part, rev'd in part on other grounds*, 935 S.W.2d 109 (Tex. 1997)

13. *Gilmore v. State*, 744 S.W.2d 630 (Tex. App.—Dallas 1987, pet. ref'd)

14. *Crosby v. Minyard Food Stores*, 122 S.W.3d 899 (Tex. App. – Dallas 2003, no pet.)

# INDEX OF AUTHORITIES

## CASES

*City of El Paso v. Public Util. Commission,*
839 S.W.2d 895 (Tex. App.—Austin 1992) *aff'd in part, rev'd in part on other grounds,* 883 S.W.2d 179 (Tex. 1994). ........................................... 17, 18

*City of El Paso v. Public Util. Commission,*
883 S.W.2d 179 (Tex. 1994). ................................................................ 3, 23

*Crosby v. Minyard Food Stores,*
122 S.W.3d 899 (Tex. App.—Dallas 2003, no pet.) ............................. 27-28, 28

*Entergy Gulf States, Inc. v. Public Utility Commission,*
112 S.W.3d 208 (Tex. App.—Austin 2003, pet. denied). ................................. 17

*Finder v. Texas Medical Board,*
2010 WL 4670510 (Tex. App.—Austin, pet denied) ........................................ 23

*General Motors Corp. v. Bray,*
243 S.W.3d 678 (Tex. App.—Austin 2007, no pet.) .................................. 23-24

*Gilmore v. State,*
744 S.W.2d 630 (Tex. App.—Dallas 1987, pet. ref'd.) ........................ 25, 26, 27

*Helena Chem. Co. v. Wilkins,*
47 S.W.3d 486 (Tex. 2001). ..................................................................... 15

*Mentis v. Barnard,*
870 S.W.2d 14 (Tex. 1994) ......................................................................... 25

*Office of Public Utility Counsel v. Public Utility Commission,*
185 S.W.3d 555 (Tex. App.—Austin 2006, pet. denied) ................................. 25

*Public Utility Commission v. Gulf States Utilities,*
809 S.W.2d 201 (Tex. 1991). .................................................................. 3, 24

*Roman v. State,*
     503 S.W.2d 252 (Tex. Crim. App. 1974) ......................................................... 27

*Texas Health Facilities Comm'n v. Charter Medical-Dallas,*
     665 S.W.2d 446, 452 (Tex. 1984). ........................................................ 1-2, 22, 23

*Texas Utilities Electric Company v. Public Utility Commission,*
     881 S.W.2d 387 (Tex. App.—Austin 1994) *aff'd in part, rev'd in part*
     *on other grounds,* 935 S.W.2d 109 (Tex. 1997). ......................................... 17, 18, 19

## ADMINISTRATIVE PROCEEDINGS

*Application of Entergy Texas for Approval of its Transition to Competition Plan and*
*the Tariffs Implementing the Plan, and for the Authority to Reconcile Fuel Costs,*
     Docket No. 16705, Second Order on Rehearing
     (Oct. 14, 1998). ...................................................................... 8, 9, 10, 14, 16

*Entergy Gulf States, Inc. Service Quality Issues (Severed from Docket No. 16705),*
     Docket No. 18249, Order on Rehearing
     (Apr. 22, 1998). .................................... 4-5, 6, 8, 9, 10, 13, 14, 19, 20, 21

## TEXAS STATUTES

Tex. Gov't Code § 311.021 (2), (3) .............................................................. 1, 15
*Administrative Procedure Act,* APA, Tex. Gov't Code Ann. §§ 2001.001-.902 ................. 1
APA § 2001.141(b) ............................................................................... 23
APA § 2001.141(d) ............................................................................... 23
APA § 2001.174 ................................................................................ 1, 3
APA § 2001.174(2) ................................................................................ 1
APA § 2001.174(2)(A),(B),(D),(E) and (F) .................................................... 23, 25
APA § 2001.174(2)(C) ..................................................................... 13-14, 15, 27
*Public Utility Regulatory Act* PURA, Tex. Util. Code §§ 11.001-66.017 ........................... 2
PURA § 36.006 ........................................................................ 4, 5, 7, 12, 16-17
PURA § 36.051 .......................................................................... 15, 16-17, 19

PURA § 36.052 .............................................................................................. 15

PURA § 36.062 .......................................................................................... 13, 15

PURA § 36.064 ................................................ 15, 16-17, 19, 20, 23

PURA § 36.064(a) ................................................................ 20-21

PURA § 36.064(c) ............................................................................ 16

## TEXAS RULES OF COURT

Tex. R. Civ. P. 197.3 ................................................................................ 25

Tex. R. Evid. 107 ...................................................................................... 26

## PUBLIC UTILITY COMMISSION OF TEXAS RULES

16 Tex. Admin. Code § 22.202(c) ........................................................ 26

16 Tex. Admin. Code § 22.207 ............................................................. 26

16 Tex. Admin. Code § 25.231(b)(1)(G) ............................................ 21, 23

16 Tex. Admin. Code § 25.231(b)(2)(J) ........................................... 15, 19

## REPLY BRIEF OF APPELLANT,
## OFFICE OF PUBLIC UTILITY COUNSEL

TO THE HONORABLE THIRD COURT OF APPEALS:

The Office of Public Utility Counsel (OPUC), Appellant, submits this reply to the briefs of the Public Utility Commission (Commission or PUC), and Entergy Texas, Inc. (ETI).

## ARGUMENT AND AUTHORITIES

### A. Standards of Review

Several standards of review are implicated by the Commission's Order and each, standing on its own, provides a sufficient basis for reversal. Contrary to the PUC's and ETI's focus on the substantial evidence standard, the Commission's Order is subject to reversal under additional standards of review listed under Section 2001.174 of the Administrative Procedure Act.[1] The six standards of review listed in Subsection 2001.174(2) offer independent grounds for reversal as evidenced by the use of the word "or" in the subsection. Texas law is clear that these standards of review are separate and distinct. For instance, the Supreme Court has expressly stated that "instances may arise in which the agency's action is supported by substantial evidence, but is arbitrary and capricious nonetheless" and that the Legislature intended to "distinguish between agency action that is

---

[1] Administrative Procedure Act (APA), Tex. Gov't Code §§ 2001.001-.902.

not supported by substantial evidence and agency action that is arbitrary and capricious." *Texas Health Facilities Comm'n v. Charter Medical-Dallas*, 665 S.W.2d 446, 452 (Tex. 1984).

In addition to the substantial evidence standard, and the arbitrary and capricious standard acknowledged by the Commission as having been invoked in this appeal, Appellant OPUC's substantial rights have been prejudiced because the administrative findings, inferences, conclusions, or decisions violate statutory provisions, are made through unlawful procedure, and are affected by other error of law.[2] The Commission has violated PURA and the APA by failing to consider and set forth findings on statutory criteria for the inclusion of storm costs in the self-insurance reserve and rates.[3] The Commission also committed reversible error in making its decision through unlawful procedure by failing to include underlying findings of fact in support of statutorily required criteria.[4] Additionally, the Commission's Order is affected by other error of law in that it failed to give effect to the plain, unambiguous language of the Commission's rules.

The arbitrary and capricious standard applies as well; however, in its Appellee's brief, the Commission improperly mixes the arbitrary and capricious

---

[2] APA § 2001.174(2)(A)(D)(E) and (F). APA Section 2001.174 is submitted as Appendix 2.
[3] *Public Utility Regulatory Act*, PURA, TEX. UTIL. CODE ANN. §§ 11.001-66.017. PURA Chapter 36, Subchapters A and B are submitted as Appendix 1.
[4] OPUC also notes that this standard of review is applicable to ETI's "conditional cross point" because ETI's challenge is procedural in nature, i.e., the exclusion from evidence of an exhibit.

standard with the substantial evidence standard of review. The Commission contends that under the arbitrary and capricious standard, "Courts must uphold a Commission decision if 'some reasonable basis exists in the record for the action taken by the agency.'"[5] However, the quoted language from *City of El Paso* comes from the Court's discussion of the substantial evidence standard, not the arbitrary and capricious standard of review. OPUC's Appellant brief includes a discussion on pages 37-39 as to how the Commission's Order was arbitrary and capricious or resulting from an abuse of discretion in three of the four ways possible under the arbitrary and capricious standard of review.[6] Under the standards articulated in APA § 2001.174, the Commission's Order should be reversed and the case remanded for determination based upon the existing evidentiary record to determine rates consistent with the Court's decision.

---

[5] PUC's Brief of Appellee at 11, *quoting City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 186 (Tex. 1994) (*City of El Paso* is submitted as Appendix 10).

[6] An administrative agency's decision is arbitrary or results from an abuse of discretion if the agency: (1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994). Also, when an agency fails to "follow the clear, unambiguous language of its own regulation," it acts arbitrarily and capriciously. *Public Util. Comm'n v. Gulf States Utilities*, 809 S.W.2d 201, 207 (Tex. 1991).

B. Either the Commission weighed the evidence and concluded that it was not sufficient to allow a determination as to what portion of the storm expenses were due to the negligent state of the Company's system, or the Commission did not weigh the evidence and decided not to address the issue based upon the irrelevant factor of the passage of time. Either way, the Commission committed reversible error by failing to hold ETI to its burden of proof under PURA § 36.006 and allowing one hundred percent of the $13,014,379 1997 storm restoration expenses to be included in the storm reserve and reflected in rates.

In their respective Appellee's briefs, ETI and the PUC focus on the evidence presented in the Commission proceeding related to the processes ETI went through in repairing damage and restoring service following the 1997 ice storm. Their arguments focus on the "substantial evidence" supporting the Commission's decision to include one hundred percent of the 1997 storm restoration expenses into the storm reserve reflected in rates, and assert that OPUC seeks to have the Court reweigh the evidence to reach a different result. Their contention misses the mark. The weighing of the evidence was indisputably done during the contested case by the Commission and the Administrative Law Judges (ALJs) who authored the Proposal for Decision (PFD) adopted by the Commission. The result of their weighing of the evidence on the issue of what costs were caused by ETI's negligent, imprudent or deficient quality of service,[7] is encapsulated in the

---

[7] The service quality deficiencies related to the costs at issue in this appeal included inadequate distribution maintenance policies, inadequate vegetation management practices, distribution poles in poor condition or in need of comprehensive vegetation clearing, and inadequate pole inspection and repair work cycles. *See* Docket No. 18249, *Entergy Gulf States, Inc. Service Quality Issues (Severed from Docket No. 16705)*, Order on Rehearing at 8-19 (Apr. 22, 1998); OPUC's

4

Commission-adopted PFD's statement that, "[i]t is not feasible to accurately determine now what portion of ice storm damage that occurred 15 years ago was caused by preventative maintenance issues."[8]   With this statement, the Commission, through its adopted PFD, acknowledged the issue of what part of the storm damage was caused by ETI, not solely by an Act of God, and not caused by ratepayers.  With this statement, the Commission also concluded its weighing of evidence on the issue, and found that with the evidence presented, it was not "feasible" to determine what portion was caused by the negligent state of the Company's preventative maintenance, including vegetation management.

Upon arriving at this conclusion, after having weighed the evidence on the issue, the Commission had to then decide what to do with the proposed $13,014,379 in 1997 ice storm costs.  The Commission had several options, but one option it did not legally have was to allow the inclusion of the entire requested $13,014,379 in the storm reserve reflected in rates.  When faced with no feasible way of determining what part was due to the Company's action or inaction, the Commission had a duty under PURA § 36.006 to disallow the expenses.  ETI had the burden of proof on the issue and the Commission expressly stated that it could not determine what portion was caused by the Company's "preventative

---

Appellant's Brief at 5-7 (Submitted as Appendix 5).
[8] AR, Binder 5, Item No. 185, PFD at 56.

maintenance issues" that the Commission earlier had found to be a "major factor" in the outages and to have "greatly exacerbated" the extent of the damage.[9] If the evidence cannot be shown to support the Company's case, ETI fails to meet its burden of proof necessary to include the entirety of the 1997 storm expenses. The Commission committed reversible error by approving the inclusion of one hundred percent of the 1997 storm costs.

Alternatively, if the quoted passage from the Commission-adopted PFD is not a determination based upon the weight of the evidence, then it should be interpreted as discussed in OPUC's Appellant's Brief[10] as a refusal, based on an irrelevant factor - the passage of time, to hold ETI to its burden to prove that either one hundred percent of the costs would have been incurred, regardless of the state of the Company's system at the time of the storm, or provide evidence on what portion should be disallowed. Contrary to the PUC's implied argument, OPUC does not argue that the Company was required to break out, line by line, each imprudent cost. Rather, as noted in OPUC's Appellant's Brief, there were a variety of ways available to the Company in which to propose an appropriate division between the costs that would have occurred regardless of the state of its

---

[9] *Entergy Gulf States, Inc. Service Quality Issues (Severed from Docket No. 16705)*, Docket No. 18249, Order on Rehearing at 18-19 and 47, FoF No. 97 (Apr. 22, 1998) (Submitted as Appendix 4) (Hereinafter, "Docket No. 18249 Order on Rehearing").
[10] OPUC's Appellant's Brief at 25-27, 31-32, 38.

system, and what was actually incurred. The Company did not, and it was error to allow the entirety of the $13,014,379 in the storm reserve and rates. Likewise, OPUC does not contend that the Company had to disallow all or require a line by line accounting. Instead, as discussed in OPUC's Appellant's Brief,[11] if the Commission wished to grant the inclusion of the prudent portion of the costs, the Commission had multiple options available to it, including but not limited to using a third party review and basing a disallowance on the third party report, or remanding the case back to SOAH for further evidence in a supplemental hearing phase. However, the one option not legally available to the Commission was the path the Commission chose to take. If, as argued in the PUC's Appellee's Brief, the Commission did weigh the evidence, it concluded that there was not sufficient evidence to allow a determination as to what portion of the storm expenses were due to the negligent state of the Company's system. On the other hand, if the Commission did not weigh the evidence and refused to address the issue based upon the passage of time, Commission considered an irrelevant factor. Either way, the Commission committed reversible error by failing to hold ETI to its burden of proof under PURA § 36.006 by including unreasonable, unnecessary and imprudent costs in the storm reserve reflected in rates.

---

[11] *Id.* at 18-19.

7

**C. Indisputably, the issue of determining what amount of 1997 storm restoration expenses was prudent, appropriate, and includable in the storm reserve and rates was an issue to be decided in Docket No. 39896. That fact does not render the Commission's Orders in Docket Nos. 18249 and 16705 irrelevant or properly disregarded.**

At various points in their respective briefs, Appellees ETI and PUC allege that OPUC contends that the prudence of these storm restoration expenses was decided in Docket No. 18249. The Appellees' briefs minimized what the Commission stated in Docket No. 18249; however, the Commission in its Order in that docket does not mince words. The Commission expressly stated that a "major cause of the outages during the storm" were trees overhanging wires.[12] The Commission also stated "[t]ree limbs in ROW overhanging distribution lines pose a threat to system reliability, **and are largely within EGS' control.**"[13] The Commission continued and stated that the "Company's failure to clear the limbs before the storm was a **major factor** in the number and duration of outages experienced by customers" and that "vegetation management failures **greatly aggravated** the situation."[14] The Commission wasn't done discussing how ETI's negligent or poor quality of service impacted the extent of the storm damage. The Commission found that the "impact of the January 1997 ice storm was **greatly exacerbated by the Company's failure** to maintain its ROW clear of excessive

---

[12] Docket No. 18249 Order on Rehearing at 18-19.

[13] *Id.* at 18-19 (emphasis added). "EGS" is Entergy Gulf States, Inc., the predecessor to ETI and was the name the Company operated under during Docket Nos. 16705 and 18249.

[14] *Id.* at 18-19 (emphasis added).

vegetation."[15] These statements very clearly address the cause of a portion of the damages which ETI was obligated to repair and restore. ETI presented testimony through its witness Shawn Corkran on the processes ETI used in repairing and restoring the system. While the issue of the prudence of the $13,014,379 in restoration costs and the question of their inclusion in the storm reserve was *not* at issue in Docket No. 18249, the Commission did make a determination that impacts the prudence review of those costs in this case; the Commission in Docket No. 39896 was not free to disregard the finding in its prior order that a portion of the storm damage for which the restoration expenses were incurred was caused by the Company's unacceptable actions or inactions. Likewise, once the Commission made its findings that the Company was responsible for greatly exacerbating the damage, ETI knew or should have known that it must address the issue when presenting its storm restoration costs for inclusion in the storm reserve and rates.

The Commission's Order in Docket No. 16705 also made it clear that the issue of what amount of 1997 storm restoration costs are properly includable in the storm reserve and reflected in rates remained in Docket No. 16705 and was not severed into the separate quality of service docket, Docket No. 18249. The final order (Second Order on Rehearing) in Docket No. 16705 very plainly shows that the Commission considered the Company's proposal to include a post-test-year

---

[15] *Id.* at FoF No. 97.

adjustment for the January 1997 ice storm expenses. The Docket No. 16705 final order, which was issued after Docket No. 18249's final order, stated in pertinent part in Finding of Fact No. 147 that, "**EGS did not prove** a reasonable post-test year level for its existing reserve fund or **that the amount expended in 1997 to reduce the fund was prudent or appropriate**."[16] The Commission continued and expressed its intent for the issue to be addressed in the Company's next rate case: "Reserve fund levels following the test year in this case can be addressed in EGS' November 1998 rate filing when all parties will have the opportunity to evaluate the reasonableness of changes to the reserve fund." Clearly, the Commission's Docket No. 16705 final order anticipated that the issue of what amount of 1997 ice storm costs was prudent and appropriate and includable in the storm reserve fund would be addressed in the next rate case. Docket No. 39896 was the next fully litigated rate case and the first opportunity to give effect to Docket No. 16705's expectation and address the prudence of including the 1997 storm costs in the Company's storm reserve reflected in rates. On this issue, the parties in Docket No. 39896 effectively stood in the same position as if it was November 1998, and it was error for the Commission to treat the issue, and the parties, as if it were otherwise.

---

[16] *Application of Entergy Texas for Approval of its Transition to Competition Plan and the Tariffs Implementing the Plan, and for the Authority to Reconcile Fuel Costs*, Docket No. 16705, Second Order on Rehearing (Oct. 14, 1998) (An excerpt of this order is submitted as Appendix 5).

**D. The Commission inappropriately focused on only one aspect of the prudence question and ignored the genesis of the expenses.**

ETI did not address the issue of what amount of 1997 ice storm costs was prudent and appropriate and includable in the storm reserve fund, despite the Commission's prior findings that the Company caused much of the damage. Instead, ETI presented its case on the 1997 storm restoration costs as if the damage and the resulting restoration costs were incurred in a business as usual manner. ETI presented testimony on its storm preparation and processes in general to support its requested storm costs for the entire period of 1996-2011, including testimony about practices that were put into place in 1998 and thereafter; ETI also offered the rebuttal testimony of Shawn Corkran to specifically address how the 1997 ice storm restoration process was carried out, including what damage was repaired and restored. However, none of this evidence went to the issue of what amount of the damage and resulting costs were due to the "preventative maintenance" issues or negligent state of the Company's system.[17]

---

[17] The PUC asserts on pages 27-29 of its Appellee's Brief that substantial evidence supports the inclusion of the expenses. However, the evidence cited by the PUC goes to the undisputed fact that once the system was damaged and down, it needed to be restored and repaired. OPUC does not dispute that the clean-up process was done properly; however, it is not the sole issue to be considered when determining what amount of the 1997 ice storm restoration costs are includable in the storm reserve and rates. Nor can the evidence cited by the PUC in its brief be construed to be evidence on the question at issue, given Mr. Corkran's statement that he was unaware of any attempt by the Company to identify or quantify the portion of damage and expenses related to the poor vegetation management. AR, Binder 43, Vol. D, Transcript at 579:15-19. The transcript of Mr. Corkran's cross-examination is submitted as Appendix 6.

11

Proof that ETI did not present evidence on the issue is found in the admission by ETI's expert witness, Shawn Corkran during cross-examination during the hearing on the merits in Docket No. 39896. Asked if the Company had identified or quantified the level of expenses attributable to ETI's negligence, Mr. Corkran stated that he is not aware of any attempt by the Company to try and quantify which costs or how much were attributable to the Company's poor vegetation management.[18] Under PURA § 36.006, the Company holds the burden of proof and it was error for the Commission to include the entirety of the $13,014,379 in 1997 Storm Restoration costs in the storm reserve based upon the existing evidentiary record. It was not feasible, based upon the case presented by the Company, to determine what portion of the $13,014,379 was due to the exacerbated level of damage and what portion would have been incurred regardless. The Company failed to carry its burden of proof that would allow the Commission to legally find that the entire amount is properly included in the storm reserves and rates.

---

[18] AR, Binder 53, Vol. D, Transcript at 579:15-19.

E. The 60-basis-point reduction to the Company's return on equity assessed in Docket No. 18249 was not intended to be in lieu of identifying and accounting for the portion of the cost of cleaning up and repairing the damage caused by the Company's imprudent vegetation management. The Commission acted arbitrarily and capriciously by considering this irrelevant factor and including the entirety of the $13,014,379 in ETI's storm reserve reflected in rates.

As noted in OPUC's Appellant's brief, the Commission imposed a 60-basis-point reduction in Docket No. 18249 pursuant to PURA § 36.062 expressly intended to reflect the poor level of service provided by the Company, to incentivize the Company to improve its service quality, and to provide the ratepayers a remedy for such things as billing rate error and call center response time.[19] As acknowledged by ETI during the hearing on the merits in Docket No. 39896, the 60 basis point reduction levied in Docket No. 18249 was used by the Commission as part of an incentive plan created to help the Company achieve much needed service quality improvements.[20]

Moreover, the Company's quality of service was a statutorily required consideration under PURA § 36.062 when determining the Company's return on equity (ROE). The 60-basis-point reduction was more of a penalty in nature and was not intended to be a cure-all for the attendant impacts of the poor service.

---

[19] *See* Docket No. 18249 Order on Rehearing at 1-2; *See also Id.* at 28-29, 35 and Ordering Paragraph 8.

[20] AR, Vol. D, Transcript at 570:22-572:2; *See* Docket No. 18249 Order on Rehearing at 28 and 28-31. The plan also allowed the Company the opportunity to "earn back" some of its basis point reduction going forward, if it met certain specific performance targets. *Id.* at 29.

Specifically, contrary to the statement on page 57 of the Commission-adopted PFD and the Appellees' argument, the 60 basis point reduction was not intended as a remedy in whole or in part for the extra restoration costs the Company expended in cleaning up the exacerbated damage caused by the imprudent state of its system.

First, the issue of the recovery of the 1997 storm restoration costs through the storm reserve was not one of the issued severed out of Docket No. 16705 into Docket No. 18249.[21] Therefore, the issue was not before the Commission at the time it assessed the 60 basis point penalty. Second, the Order in Docket No. 16705 was issued six months after the Order in Docket 18249 in which the Commission ordered the 60-basis-point reduction. The Commission was clearly aware of its own order reducing the Company's ROE and yet, the above-quoted Finding of Fact No. 147 from the later order clearly indicates that the Commission anticipated that the prudence, propriety and reasonableness of the 1997 storm costs and their inclusion in the storm reserve would be litigated in a future rate case. The Commission would not have made such a finding if it considered any imprudence to have been remedied by the 60-basis-point reduction.

The PUC and ETI seem to be arguing that the 60-basis-point reduction

---

[21] *Id.* at 2-3.

trumps the regulatory and statutory requirements that storm costs included in the plan be "reasonable and necessary" and "not reasonably anticipated."[22] Such an argument is without merit and contrary to law. Reducing the Company's ROE under PURA § 36.062 does not absolve the Company or the Commission from PURA's requirements that imprudent costs not be charged to ratepayers. Nor does the reduction to the ROE convert unreasonable costs into reasonable costs, and anticipated costs into unanticipated costs. The requirement in PURA § 36.062 that the Commission address the Company's service quality when setting its ROE does not negate the statutory requirement that only reasonable and necessary expenses be charged to ratepayers under PURA § 36.051 and 36.064.[23] Courts "should not give one provision a meaning out of harmony or inconsistent with other provisions, although it might be susceptible to such a construction standing alone."[24] Courts must "presume that the Legislature intends an entire statute to be effective and that a just and reasonable result is intended."[25]

Although PURA § 36.052 authorizes the Commission to take the quality of a utility's services into account in establishing a reasonable return, the

---

[22] PURA §§ 36.051 and 36.064; 16 Tex. Admin. Code § 25.231(b)(2)(J). Rule 25.231(b) is submitted as Appendix 3.

[23] *See* 16 Tex. Admin. Code § 25.231(b)(2)(J).

[24] *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001) (Submitted as Appendix 11).

[25] *Id. citing* Tex. Gov't Code § 311.021(2), (3).

provision should not be interpreted to negate the requirements of PURA §§ 36.051 and 36.064(c) that only reasonable and necessary expenses are permitted for recovery through rates. In other words, a penalty imposed upon a utility's authorized return for poor service quality should not be viewed as a license to permit the utility to now charge customers for the portion of the damages resulting from the Company's poor service quality.[26] The end result of the Commission's decision is that unreasonable and unnecessary expenses are being charged to customers through the storm reserve and rates. The Commission's Order violates PURA, is arbitrary and capricious and is affected by other error of law.

## F. The Commission erred in approving the recovery of imprudent costs.

The PUC in its Appellee's Brief asserts that a utility is not obligated to carve out imprudence from its request, and specifically, that ETI was not obligated to identify the portion of its requested storm expenses that were due to the exacerbated damage caused by its imprudent system management. These contentions are incorrect. First, it is indisputably the Company's burden to prove each element of its case, including the reasonableness and necessity of including

---

[26] *Application of Entergy Texas for Approval of its Transition to Competition Plan and the Tariff Implementing the Plan, and for the Authority to Reconcile Fuel Costs*, Docket No. 16705, Second Order on Rehearing at FoF No. 147.

16

restoration costs into the storm reserve.[27]  Imprudent costs are neither reasonable

nor necessary; imprudently incurred costs may not be recovered in the utility's

base rates.[28] Moreover, prudence is a statutorily required criterion.[29]  The utility

bears the burden of proving the prudence of costs it seeks to recover, and if some

but not all of the requested costs are imprudent, the imprudent costs must be

removed either by separating them out, adopting another reasonable method to

account for the imprudence, or disallowing the intermingled requested costs.[30]  In

the 1992 *City of El Paso* decision, the court addressed a case in which imprudence

had been found.  The court stated that the Commission should "generally disallow

project costs to the extent of the imprudence."[31]  The court continued, stating that

a "determination that an expenditure is imprudent carries the legal consequence of

its exclusion from rate base" and that prudence question "embodies one of the

---

[27] PURA §§ 36.006, 36.051 and 36.064.

[28] *See Entergy Gulf States, Inc. v. Public Utility Commission*, 112 S.W.3d 208, 214 (Tex. App.—Austin 2003, pet. denied) ("[I]n order to raise the price of its product, the utility must . . . bear the burden of proving that each dollar of cost incurred was reasonably and prudently invested.").

[29] *See Texas Utilities Electric Company v. Public Utility Commission*, 881 S.W.2d 387, 406 (Tex. App.—Austin 1994) *aff'd in part, rev'd in part on other grounds*, 935 S.W.2d 109 (Tex. 1997) (Imprudence finding "must be supported by underlying findings because *it embodies one of the criteria the Commission must consider* in deciding whether to include the particular expenditure in rate base.") (emphasis added).

[30] Adopting another reasonable method to account for the imprudent costs intermingled with prudent costs is precisely what the Commission did in the case underlying *Texas Utilities Electric Company v. Public Utility Commission*, 881 S.W.2d 387.

[31] *City of El Paso v Public Utility Commission*, 839 S.W.2d 895, 908 (Tex. App.—Austin 1992) *aff'd in part, rev'd in part on other grounds*, 883 S.W.2d 179 (Tex. 1994) (Submitted as Appendix 9).

criteria the PUC must consider."[32]  The *City of El Paso* case was relied upon by the court in *Texas Utilities Electric Company* which dealt with a nuclear power plant.  In *Texas Utilities Electric Company*, the Texas Third Court of Appeals found that, where a portion of the utility's $537.90 million in costs for the Comanche Peak nuclear project were imprudently incurred, the Commission acted properly in disallowing some but not all of the costs due to imprudence.[33]  In the originating Commission docket, the utility had argued that all of its Comanche Peak costs were prudently incurred, while intervening parties had argued that the costs should be disallowed entirely, line by line.[34]  The Commission had then brought in a third party to evaluate the prudence of the costs.   The court rejected the contention that if the Commission were to disallow some but not all of the costs, it must require a detailed breakdown.   Instead of doing so, based upon the third party recommendation, the Commission disallowed part of the costs because they were imprudent but allowed other costs.[35]  In particular, the Commission made a $90.5 million disallowance for the response team, a $79.9 million disallowance related to the corrective action program, plus other disallowances due to delays in licensing,

---

[32] *Id.*

[33] *Texas Utilities Electric Company v. Public Utility Commission*, 881 S.W.2d 387, 405-406 (Tex. App.— Austin 1994) *aff'd in part, rev'd in part on other grounds*, 935 S.W.2d 109 (Tex. 1997) (Submitted as Appendix 12).

[34] *Id.* at 404.

[35] *Id.* at 403-406.

including 54.1 million for "time-driven" indirect costs and $167.3 million in AFUDC.[36] The Austin court reviewed the Commission's decision to reject an all-or-nothing approach and disallow the imprudent portion of expenses as just described; the Court stated that "it is the Commission that is charged with sifting through the evidence and deciding whether imprudent conduct caused certain expenditures."[37] While recognizing the Commission's role in weighing evidence (and recognizing the need to determine whether imprudent conduct caused certain expenditures), nowhere in the *Texas Utilities Electric Company* case does the court hold that the Commission may allow unreasonable or imprudently incurred expenses to be included in rates in contravention of PURA §§ 36.051 and 36.064, and the PUC's substantive rule, 16 Tex. Admin. Code § 25.231(b)(2)(J), based on the inability to segregate imprudent costs.

As discussed on pages 17-20 of OPUC's Appellant's Brief, the instant case is distinguishable from *Texas Utilities Electric Company* because it was already established as a matter of fact that imprudent conduct caused much of the storm damage. Finding of Fact 97 from PUC Docket No. 18249 provided the Commission with the starting point in its decision-making process, and it was the Commission's job at that point to either deny ETI's requested 1997 storm expenses

---

[36] *Id.* at 404-405. In total, the Commission disallowed $316.5 million as imprudent expenses. *Id.* at 405-406 n. 34.

[37] *Id.* at 404.

19

in their entirety, determine what portion was imprudently caused by the exacerbated damages (by a variety of possible methods, or find that one hundred percent of the expenses would have been incurred, regardless of the imprudent system management and exacerbated level of damage.[38]   The Commission instead chose to focus solely on the prudence of how the storm restoration was carried out and erroneously failed to take any reasonable approach to considering what expenses were related to the exacerbated damages.  Consequently, the imprudent costs became part of the approved rates through their inclusion in the storm reserve.

**G. Some of ETI's storm costs were "reasonably anticipated," and it was reversible error for the Commission to fail to consider this statutorily required criterion.  The Commission's Order violates PURA § 36.064 and is the result of the Commission acting arbitrarily and through unlawful procedure.**

PURA Section 36.064 allows storm costs to be included in a self-insurance plan to the extent they are "not reasonably anticipated."   PURA Subsection 36.064(a) states that, an electric utility "may self-insure all or part of the utility's potential liability or catastrophic property loss, including windstorm, fire, and explosion losses, that could not have been reasonably anticipated and included under operating and maintenance expenses."[39]   In a prior Commission Order in

---

[38] Docket No. 18249 Order on Rehearing at 47, FoF No. 97.

[39] The Commission's substantive rule on self-insurance plans, 16 Tex. Admin. Code § 25.231(b)(1)(G), states in pertinent part: "The reserve accounts are to be charged with

Docket No. 18249, the Commission found that the damage resulting from the 1997 ice storm was much greater than it would otherwise have been due to the Company's imprudent vegetation management. Vegetation management is a program designed to keep the rights of way surrounding power lines clear; the very purpose of vegetation management is to anticipate and prevent or mitigate storm damage and outages in bad weather.[40] The Commission's Order in Docket No. 39896 fails to demonstrate that the Commission considered the imprudent genesis of the storm damage and the fact that much of the damage and corresponding expenses were reasonably anticipated and preventable.

Both the PUC and ETI defend the Commission's order by claiming that the "not reasonably anticipated" requirement for inclusion of storm costs in the self-insurance reserve and rates was considered by the Commission either because the PFD mentioned a witness's discussion of the severity of the storm or because a single Q&A that appeared in another witness's rebuttal testimony said so (despite not being cited in the PFD or Order). Neither contention even if read in the best light would be sufficient. The "not reasonably anticipated" requirement is a statutorily required consideration that requires support by underlying findings of

---

property and liability losses which occur, and which could not have been reasonably anticipated and included in operating and maintenance expenses, and are not paid or reimbursed by commercial insurance."

[40] Docket No. 18249 Order on Rehearing at 14.

21

fact in order to show that the Commission properly gave consideration to the statutorily required criterion.[41] It is not enough to merely infer consideration through other findings of fact or statements; clear, specific findings are required in order to prove that the Commission fulfilled its duty under the statute.[42] The Court in *Charter Medical* explained that underlying findings of fact have "substantial statutory purpose" and serve to "restrain any disposition on the part of the agency to grant [a certificate] without a full consideration of the evidence and a serious appraisal of the facts."[43] Such findings of fact also serve to inform the parties and the courts of the basis for the agency's decision so that the parties may intelligently prepare an appeal and so that the courts may properly exercise their function of review.[44]

The Commission's Order fails to show the statutorily required consideration that storm costs included in the self-insurance plan only be those "that could not have been reasonably anticipated," and further fails to provide underlying findings, either in the findings of fact or in the body of the Order, that constitute material basic facts that relate to the statutory finding of "not reasonably anticipated." The failure to include underlying findings of fact to

---

[41] *See Texas Health Facilities Comm'n v. Charter Medical-Dallas*, 665 S.W.2d at 451-452 (Submitted as Appendix 8).
[42] *Id.*
[43] *Id.* at 452.
[44] *Id.*

22

support the "not reasonably anticipated" finding violates APA § 2001.141(d), but is also procedural and a violation of APA § 2001.174(2)(C). Texas courts will reverse an agency order when underlying fact findings are legally insufficient.[45] Additionally, the omission of an ultimate finding (or statutorily required criteria) when underlying findings are absent violates PURA § 36.064, APA § 2001.141(b), is arbitrary and capricious, and the resulting order is made through unlawful procedure. An expressly stated factor in determining whether the agency's decision is arbitrary or results from an abuse of discretion is whether the agency "failed to consider a factor the Legislature directs it to consider."[46]

Finally, the Commission's own regulation, 16 Tex. Admin. Code § 25.231(b)(1)(G), requires that only those property and liability losses which could not have been reasonably anticipated may be included in the self-insurance plan. Failing to give effect to its own unambiguous regulation is reversible as other error of law and is also arbitrary and capricious. This Court has stated that an agency decision is arbitrary when its final order "fails to demonstrate a connection between the agency decision and the factors that are made relevant to

---

[45] *See Texas Health Facilities Comm'n v. Presbyterian Hospital North*, 690 S.W.2d 564, 566 (Tex. 1985); *See also Finder v. Texas Medical Bd.*, 2010 WL 4670510 *6 (Tex. App.—Austin, pet. denied) ("The findings of fact in Dr. Finder's case do not require the inferential leap necessary in Presbyterian Hospital.").
[46] *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994).

that decision by the applicable statutes and regulations."[47]  More directly, our Supreme Court has stated that "if the Commission has failed to follow the clear, unambiguous language of its own regulation, we must reverse its action as arbitrary and capricious."[48]

Pages 20-22 of OPUC's Appellant's brief discusses why costs related to the 1997 ice storm were in fact reasonably anticipated, including that much of the damage was found by the Commission to have been caused by imprudent vegetation management.  As noted in OPUC's Appellant's brief, the very purpose of vegetation management requirements is to prevent or mitigate foreseeable damage after storms due to vegetation in the rights of way coming into contact with conductors and wires, causing wire breakage or ground faults.  The Order is legally deficient to support the inclusion of the entirety of 1997 ice storm costs in the storm reserve as "not reasonably anticipated" costs; to the contrary, the record shows that the 1997 storm costs were in fact reasonably anticipated.  It was reversible error to include these costs in the storm reserve and rates.

---

[47] *General Motors Corp. v. Bray*, 243 S.W.3d 678, 684 (Tex. App.—Austin 2007, no pet.)

[48] *Public Util. Comm'n v. Gulf States Utilities*, 809 S.W.2d 201, 207 (Tex. 1991).

## H. ETI's 420-page spreadsheet was properly excluded from the evidentiary record. (Response to ETI's Conditional Cross-Point)

ETI offers as a conditional cross-point that the Commission erred by excluding from evidence a 420-page spreadsheet ETI produced in discovery. ETI's complaint is procedural in nature and falls under the "made through unlawful procedure" standard of review.[49] ETI's conditional cross-point is meritless. First, the excluded spreadsheet was not controlling on a material issue but was instead merely cumulative and thus, its exclusion from evidence, if error, was harmless and does not warrant reversal under APA § 2001.174(2)(c).[50] Here, the spreadsheet only shows that expenditures were made. Five pages are in evidence as part of OPUC's Exhibit No. 6; these pages show the nature of the information provided and, because the accounting itself is not challenged, the remaining 415 pages are unnecessary to the rendition of a proper order.[51]

ETI contends it was error to deny the admission the 420-page spreadsheet on the basis that ETI failed to reserve its right to exercise optional completeness.[52] ETI attempts to support its contention by citing to *Gilmore v. State*, which was a

---

[49] APA § 2001.174(2)(c).

[50] *Mentis v. Barnard*, 870 S.W.2d 14, 16 (Tex. 1994); *Office of Public Utility Counsel v. Public Utility Comm'n*, 185 S.W.3d 555, 576-77 (Tex. App.—Austin 2006, pet. denied).

[51] ETI also presented rebuttal testimony explaining the processes it went through in the storm restoration.

[52] It appears from ETI's pleadings that it does not contest the validity of the other basis for the ALJ's ruling which was that the document violates Tex. R. Civ. P. 197.3. *See* AR, Binder 43, Vol. K, Transcript at 1705-1706.

25

criminal case wherein the Dallas Court of Appeals held that a party does not have to exercise optional completeness at the time the document being "completed" is admitted; a party can wait until "cross-examination, or during the development of [its] own case."[53] However, there is a difference between having the right to exercise optional completeness later in the proceeding rather than contemporaneously with the document being completed, and failing to reserve the right to do so later. The "permissive grant" language quoted by ETI deals with the fact that Appellant in *Gilmore* had argued that the language of Rule 107 of the Texas Rules of Evidence required the court to admit the complete document immediately.[54]

SOAH ALJs have been charged with the duty to conduct the contested case hearing on the merits when referred from the Commission.[55] When the SOAH ALJ acts as the presiding officer, he has "broad discretion in conducting the course, conduct, and scope of the hearing," including the power to "rule upon the admissibility of evidence and amendments to pleadings."[56] When conducting hearings referred from the Commission, it is the established practice that parties are required to reserve the right of optional completeness if not exercising it

---

[53] *Gilmore v. State*, 744 S.W.2d 630, 631(Tex. App.- Dallas 1987, pet. ref'd) (Submitted as Appendix 13).
[54] *Id.*
[55] 16 Tex. Admin. Code § 22.207.
[56] 16 Tex. Admin. § 22.202(c).

contemporaneously with the admission of the document being completed. In the case below, Docket No. 39896, ETI itself "reserved" optional completeness nine times over the course of the hearing on the merits and exercised that right once.[57] Notably, seven of the times the Company reserved optional completeness for later admission occurred prior to the ALJ's ruling on the spreadsheet. ETI knew what was required to exercise optional completeness in a PUC case at SOAH and cannot properly complain now that the spreadsheet's exclusion from evidence was error.

Further, the purpose behind optional completeness would not apply to the spreadsheet and OPUC Exhibit No. 6. The purpose behind the rule of optional completeness is "to reduce the possibility of the fact finder receiving a false impression from hearing the evidence of only a part of a writing."[58] There are two threshold requirements to invoke the rule of optional completeness: (1) an incomplete statement was introduced into evidence, and (2) the party offering the

---

[57] ETI reserved optional completeness on the following exhibits: Cities Exhibit No. 7 (Transcript (Tr.) at 69, ll. 1-2); TIEC Exhibit No. 9 (Tr. at 183, ll. 17-21); OPUC Exhibit No. 10 (Tr. at 282, l. 21-283, l. 1); Cities Exhibit No. 41 (Tr. at 968, ll.14-17); Cities Exhibit No. 43A (Tr. at 1456, ll. 4-5 and 15-20); Cities Exhibit No. 43B (Tr. at 1456, l. 21-1457, l.4); Cities Exhibit No. 48 (Tr. at 2082, ll. 19-22); and OPUC Exhibit No. 35 (Tr. at 2095, ll. 1-25). ETI exercised its reserved right to optional completeness as ETI Exhibit No. 98 (Tr. at 1505, l. 16- 1507, l. 15). Cities also reserved optional completeness on one ETI Exhibit (ETI Exhibit No. 83, Tr. at 1190, l. 22-1191, l. 5) and exercised that reservation as Cities Exhibit No. 49 (Tr. at 1686, l. 15-1687, l. 7). These transcripts are found in the Administrative Record in Binder 43, Volumes B, C, F, G, I, K, and M, and the cited excerpts are submitted here as Appendix 7.
[58] *Gilmore v. State*, 744 S.W.2d at 631; *See Roman v. State*, 503 S.W.2d 252, 253 (Tex. Crim. App. 1974).

remainder must show that the remainder is on the same matter and "is necessary to fully understand or explain the matter."[59] In *Crosby v. Minyard Foods*, the Dallas Court of Appeals found that the Defendant, Minyard Food Stores, may have satisfied the first requirement but failed to meet the second. The court concluded that, "Minyard clearly failed to meet the second requirement. . . . Minyard has made no attempt to show how Rayshell's testimony could have confused or misled the jury regarding the contents of Kern's affidavit or its meaning. . . . [T]he trial court erred in admitting the document."[60] Like in *Crosby*, admitting the remainder of the writing (here, the spreadsheet) would not serve to correct any false impression or otherwise add to the Commission's understanding. The five-page excerpt was included as part of OPUC's testimony to illustrate the naked granularity of the data. Five pages of line-by-line accounting entries paint the picture with sufficient clarity. Since the accuracy of the entries was not in dispute, "completing" the spreadsheet with the remaining 415 pages would not serve the purpose for which the optional completeness rule was intended to address.

---

[59] *Crosby v. Minyard Food Stores*, 122 S.W.3d 899, 903 (Tex. App.—Dallas 2003, no pet.) (Submitted as Appendix 14).
[60] *Id.*

# PRAYER

For the reasons stated in this brief and in OPUC's Appellant's Brief, the Office of Public Utility Counsel respectfully prays that the Court reverse the district court's judgment insofar as it upholds the Commission's decision in the respects discussed above. OPUC further prays that the Court remand the case to the Commission for further proceedings, based upon the existing evidentiary record, to determine rates consistent with the Court's decision. Finally, OPUC respectfully prays that this Court grant the OPUC such other and further relief to which it may be justly entitled.

Respectfully submitted,

Tonya Baer
Public Counsel
State Bar No. 24026771


_____/s/ *Sara J. Ferris*_____
Sara J. Ferris
Senior Assistant Public Counsel
State Bar No. 50511915

OFFICE OF PUBLIC UTILITY COUNSEL
1701 N. Congress Avenue, Suite 9-180
P.O. Box 12397, Capitol Station
Austin, Texas 78711-2397
512/936-7500 (Telephone)
512/936-7525 (Facsimile)

## CERTIFICATE OF COMPLIANCE

I certify that the Appellant's Reply Brief of the Office of Public Utility Counsel contains 5,805 words, as measured by the undersigned counsel's word-processing software, and therefore complies with the word limit found in Tex. R. App. P. 9.4(i)(2)(B).

_____/s/ *Sara J. Ferris*_____
Sara J. Ferris

## CERTIFICATE OF SERVICE

I certify that the Appellant's Reply Brief and Appendix of the Office of Public Utility Counsel was electronically filed with the Clerk of the Court using the electronic case filing system of the Court, and that a true and correct copy of the Appellant's Reply Brief and Appendix of the Office of Public Utility Counsel was served upon counsel for each party of record, listed below, by electronic service or 1st Class U.S. Mail, on this 2nd day of June, 2015.

ENTERGY TEXAS, INC.
Marnie A. McCormick
John F. Williams
Duggins, Wren, Mann & Romero, LLP
P.O. Box 1149
Austin, Texas 78767-1149
(512) 744-9300
mmcormick@dwmrlaw.com
jwilliams@dwmrlaw.com

CITIES OF ANAHUAC,
BEAUMONT, ET. AL
Daniel J. Lawton
Lawton Law Firm PC
12600 Hill Country Blvd, Suite R275
Austin, Texas 78738
(512) 322-0019
dlawton@ecpi.com

**PUBLIC UTILITY COMMISSION OF TEXAS**
Elizabeth R. B. Sterling
Assistant Attorney General
Environmental Protection Division
Office of the Attorney General
P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 475-4152
elizabeth.sterling@texasattorneygeneral.gov

**TEXAS INDUSTRIAL ENERGY CONSUMERS**
Rex VanMiddlesworth
Benjamin Hallmark
Thompson Knight LLP
98 San Jacinto Blvd, Suite 1900
Austin, Texas 78701
(512) 320-9200
rex.vanm@tklaw.com
benjamin.hallmark@tklaw.com

**STATE AGENCIES OF TEXAS**
Katherine H. Farrell
Assistant Attorney General
Admin Law Div. – Energy Rates Section
Office of the Attorney General
P. O. Box 12548
Austin, Texas 78711-2548
(512) 475-4173
katherine.farrell@texasattorneygeneral.gov

_____/s/ *Sara J. Ferris*_____
Sara J. Ferris

# Appendix to the Appellant's Reply Brief of the Office of Public Utility Counsel

1. PURA, Chapter 36, Subchapters A and B

2. APA, Tex. Gov't Code § 2001.174

3. PUC Substantive Rule on Cost of Service-Allowable Expenses: 16 Tex. Admin. Code § 25.231(b)

4. PUC Docket No. 18249, Order on Rehearing

5. Excerpts from PUC Docket No. 16705, Second Order on Rehearing

6. PUC Docket No. 39896, Hearing on the Merits Transcript: Excerpts of Direct and Cross-Examination of ETI Witness Shawn Corkran

7. PUC Docket No. 39896 Hearing on the Merits Transcript: Excerpts re. Optional Completeness

8. *Tex. Health Facilities Comm'n v. Charter Medical-Dallas*, 665 S.W.2d 446 (Tex. 1984)

9. *City of El Paso v. Public Util. Comm'n*, 839 S.W.2d 895 (Tex. App.— Austin 1992) *aff'd in part, rev'd in part on other grounds*, 883 S.W.2d 179 (Tex. 1994).

10. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179 (Tex. 1994)

11. *Helena Chemical Co. v. Wilkins*, 47 S.W.3d 486 (Tex. 2001)

12. *Texas Utilities Electric Company v. Public Utility Commission*, 881 S.W.2d 387 (Tex. App. – Austin 1994) *aff'd in part, rev'd in part on other grounds*, 935 S.W.2d 109 (Tex. 1997)

13. *Gilmore v. State*, 744 S.W.2d 630 (Tex. App.—Dallas 1987, pet. ref'd)

14. *Crosby v. Minyard Food Stores*, 122 S.W.3d 899 (Tex. App. – Dallas 2003, no pet.)

# Appendix 1

# PURA, Chapter 36, Subchapters A and B

# PUBLIC UTILITY REGULATORY ACT

Title II, Texas Utilities Code

(As Amended)

Effective as of September 1, 2013

# PUBLIC UTILITY COMMISSION
# OF TEXAS

# FOREWORD

The Public Utility Code was enacted by Acts 1997, 75th Leg., R.S., ch. 166, § 1 as a new and separate code effective September 1, 2007. Title 2 of the code is properly cited as the Public Utility Regulatory Act.

This edition of the Public Utility Regulatory Act contains amendments adopted through the 83rd Legislature, Third Called Session.

In general, the effect of amendments has been clear and the resulting text changes were straightforward and did not require any editorial discretion. Except as explained below, editorial discretion was exercised in reconciling multiple amendments to the same section. In the majority of these cases, there was no irreconcilable conflict and all of the amendments could be given effect. In some cases, an act expressly amended a provision as added or amended by another act. In the few cases where an irreconcilable conflict was found, the act with the later date of enactment was given effect, with the other provisions italicized below. In addition, a note explaining the conflict is provided following the section annotation.

The annotations following each section have two components. The first annotation shows the derivation of the section, either citing to the Public Utility Regulatory Act of 1995 (V.A.C.S. Art. 1446c-0), Acts 1997, ch. 166, or showing the section as added to the code and citing the relevant act. The second component identifies subsequent amendments, cites the amending act (and originating bill), provides a brief summary of each of the amendments, and, where appropriate, provides a reference to related provisions or material.

This publication is maintained by the Commission Advising and Docket Management Division of the Public Utility Commission of Texas. Suggestions or corrections may be submitted to that division.

# CHAPTER 36. RATES

## SUBCHAPTER A. GENERAL PROVISIONS

### Sec. 36.001. AUTHORIZATION TO ESTABLISH AND REGULATE RATES.

(a)   The regulatory authority may establish and regulate rates of an electric utility and may adopt rules for determining:

(1)   the classification of customers and services; and

(2)   the applicability of rates.

(b)   A rule or order of the regulatory authority may not conflict with a ruling of a federal regulatory body.

(V.A.C.S. art. 1446c-0, Sec. 2.201.)

### Sec. 36.002. COMPLIANCE WITH TITLE.

An electric utility may not charge or receive a rate for utility service except as provided by this title.

(V.A.C.S. art. 1446c-0, Sec. 2.153 (part).)

### Sec. 36.003. JUST AND REASONABLE RATES.

(a)   The regulatory authority shall ensure that each rate an electric utility or two or more electric utilities jointly make, demand, or receive is just and reasonable.

(b)   A rate may not be unreasonably preferential, prejudicial, or discriminatory but must be sufficient, equitable, and consistent in application to each class of consumer.

(c)   An electric utility may not:

(1)   grant an unreasonable preference or advantage concerning rates to a person in a classification;

(2)   subject a person in a classification to an unreasonable prejudice or disadvantage concerning rates; or

(3)   establish or maintain an unreasonable difference concerning rates between localities or between classes of service.

(d)   In establishing an electric utility's rates, the commission may treat as a single class two or more municipalities that an electric utility serves if the commission considers that treatment to be appropriate.

(e)   A charge to an individual customer for retail or wholesale electric service that is less than the rate approved by the regulatory authority does not constitute an impermissible difference, preference, or advantage.

(V.A.C.S. art. 1446c-0, Secs. 2.202, 2.214 (part).)

### Sec. 36.004. EQUALITY OF RATES AND SERVICES.

(a)   An electric utility may not directly or indirectly charge, demand, or receive from a person a greater or lesser compensation for a service provided or to be provided by the utility than the compensation prescribed by the applicable tariff filed under Section 32.101.

(b)   A person may not knowingly receive or accept a service from an electric utility for a compensation greater or less than the compensation prescribed by the tariff.

(c)   Notwithstanding Subsections (a) and (b), an electric utility may charge an individual customer for wholesale or retail electric service in accordance with Section 36.007.

(d) This title does not prevent a cooperative corporation from returning to its members net earnings resulting from its operations in proportion to the members' purchases from or through the corporation.

(V.A.C.S. art. 1446c-0, Secs. 2.215(a), (b).)

## Sec. 36.005. RATES FOR AREA NOT IN MUNICIPALITY.

Without the approval of the commission, an electric utility's rates for an area not in a municipality may not exceed 115 percent of the average of all rates for similar services for all municipalities served by the same utility in the same county as that area.

(V.A.C.S. art. 1446c-0, Sec. 2.213.)

## Sec. 36.006. BURDEN OF PROOF.

In a proceeding involving a proposed rate change, the electric utility has the burden of proving that:

(1)  the rate change is just and reasonable, if the utility proposes the change; or

(2)  an existing rate is just and reasonable, if the proposal is to reduce the rate.

(V.A.C.S. art. 1446c-0, Sec. 2.204.)

## Sec. 36.007. DISCOUNTED WHOLESALE OR RETAIL RATES.

(a)  On application by an electric utility, a regulatory authority may approve wholesale or retail tariffs or contracts containing charges that are less than rates approved by the regulatory authority but not less than the utility's marginal cost. The charges must be in accordance with the principles of this title and may not be unreasonably preferential, prejudicial, discriminatory, predatory, or anticompetitive.

(b)  The method for computing the marginal cost of the electric utility consists of energy and capacity components. The energy component includes variable operation and maintenance expense and marginal fuel or the energy component of purchased power. The capacity component is based on the annual economic value of deferring, accelerating, or avoiding the next increment of needed capacity, without regard to whether the capacity is purchased or built.

(c)  The commission shall ensure that the method for determining marginal cost is consistently applied among utilities but may recognize the individual load and resource requirements of the electric utility.

(d)  Notwithstanding any other provision of this title, the commission shall ensure that the electric utility's allocable costs of serving customers paying discounted rates under this section are not borne by the utility's other customers.

(V.A.C.S. art. 1446c-0, Secs. 2.001(b), (c), (d) (part), 2.052(b), (c).)

## Sec. 36.008. STATE TRANSMISSION SYSTEM.

In establishing rates for an electric utility, the commission may review the state's transmission system and make recommendations to the utility on the need to build new power lines, upgrade power lines, and make other necessary improvements and additions.

(V.A.C.S. art. 1446c-0, Sec. 2.051(w) (part).) (Amended by Acts 1999, 76th Leg., R.S., ch. 405 (SB 7), § 23.)

## Sec. 36.009. BILLING DEMAND FOR CERTAIN UTILITY CUSTOMERS.

Notwithstanding any other provision of this code, the commission by rule shall require a transmission and distribution utility to:

(1)  waive the application of demand ratchet provisions for each nonresidential secondary service customer that has a maximum load factor equal to or below a factor set by commission rule;

(2)  implement procedures to verify annually whether each nonresidential secondary service customer has a maximum load factor that qualifies the customer for the waiver described by Subdivision (1);

(3)   specify in the utility's tariff whether the utility's nonresidential secondary service customers that qualify for the waiver described by Subdivision (1) are to be billed for distribution service charges on the basis of:

(A)   kilowatts;

(B)   kilowatt-hours; or

(C)   kilovolt-amperes; and

(4)   modify the utility's tariff in the utility's next base rate case to implement the waiver described by Subdivision (1) and make the specification required by Subdivision (3).

(Added by Acts 2011, 82nd Leg., R.S., ch. 150 (HB 1064), § 1.)

## SUBCHAPTER B.  COMPUTATION OF RATES

### Sec. 36.051.  ESTABLISHING OVERALL REVENUES.

In establishing an electric utility's rates, the regulatory authority shall establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of the utility's reasonable and necessary operating expenses.

(V.A.C.S. art. 1446c-0, Sec. 2.203(a).)

### Sec. 36.052.  ESTABLISHING REASONABLE RETURN.

In establishing a reasonable return on invested capital, the regulatory authority shall consider applicable factors, including:

(1)   the efforts and achievements of the utility in conserving resources;

(2)   the quality of the utility's services;

(3)   the efficiency of the utility's operations; and

(4)   the quality of the utility's management.

(V.A.C.S. art. 1446c-0, Sec. 2.203(b).)  (Amended by Acts 1999, 76th Leg., R.S., ch. 405 (SB 7), § 24 (repealed former subd. (1) and renumbered former subds. (2) to (5) as subds. (1) to (4)).)

### Sec. 36.053.  COMPONENTS OF INVESTED CAPITAL.

(a)   Electric utility rates shall be based on the original cost, less depreciation, of property used by and useful to the utility in providing service.

(b)   The original cost of property shall be determined at the time the property is dedicated to public use, whether by the utility that is the present owner or by a predecessor.

(c)   In this section, the term "original cost" means the actual money cost or the actual money value of consideration paid other than money.

(d)   If the commission issues a certificate of convenience and necessity or, acting under Section 39.203(e), orders an electric utility or a transmission and distribution utility to construct or enlarge transmission or transmission-related facilities to facilitate meeting the goal for generating capacity from renewable energy technologies under Section 39.904(a), the commission shall find that the facilities are used and useful to the utility in providing service for purposes of this section and are prudent and includable in the rate base, regardless of the extent of the utility's actual use of the facilities.

(V.A.C.S. art. 1446c-0, Secs. 2.206(a) (part), (c).)  (Amended by Acts 2005, 79th Leg., 1st C.S., ch. 1 (SB 20), § 1 (added subsec. (d)).)

81

## Sec. 36.054. CONSTRUCTION WORK IN PROGRESS.

(a)  Construction work in progress, at cost as recorded on the electric utility's books, may be included in the utility's rate base.  The inclusion of construction work in progress is an exceptional form of rate relief that the regulatory authority may grant only if the utility demonstrates that inclusion is necessary to the utility's financial integrity.

(b)  Construction work in progress may not be included in the rate base for a major project under construction to the extent that the project has been inefficiently or imprudently planned or managed.

(V.A.C.S. art. 1446c-0, Secs. 2.206(a) (part), (b).)

## Sec. 36.055. SEPARATIONS AND ALLOCATIONS.

Costs of facilities, revenues, expenses, taxes, and reserves shall be separated or allocated as prescribed by the regulatory authority.

(V.A.C.S. art. 1446c-0, Sec. 2.207.)

## Sec. 36.056. DEPRECIATION, AMORTIZATION, AND DEPLETION.

(a)  The commission shall establish proper and adequate rates and methods of depreciation, amortization, or depletion for each class of property of an electric or municipally owned utility.

(b)  The rates and methods established under this section and the depreciation account required by Section 32.102 shall be used uniformly and consistently throughout rate-setting and appeal proceedings.

(V.A.C.S. art. 1446c-0, Secs. 2.151(a) (part), (d).)

## Sec. 36.057. NET INCOME; DETERMINATION OF REVENUES AND EXPENSES.

(a)  An electric utility's net income is the total revenues of the utility less all reasonable and necessary expenses as determined by the regulatory authority.

(b)  The regulatory authority shall determine revenues and expenses in a manner consistent with this subchapter.

(c)  The regulatory authority may adopt reasonable rules with respect to whether an expense is allowed for ratemaking purposes.

(V.A.C.S. art. 1446c-0, Secs. 2.208(a), (e).)

## Sec. 36.058. CONSIDERATION OF PAYMENT TO AFFILIATE.

(a)  Except as provided by Subsection (b), the regulatory authority may not allow as capital cost or as expense a payment to an affiliate for:

(1)  the cost of a service, property, right, or other item; or

(2)  interest expense.

(b)  The regulatory authority may allow a payment described by Subsection (a) only to the extent that the regulatory authority finds the payment is reasonable and necessary for each item or class of items as determined by the commission.

(c)  A finding under Subsection (b) must include:

(1)  a specific finding of the reasonableness and necessity of each item or class of items allowed; and

(2)  a finding that the price to the electric utility is not higher than the prices charged by the supplying affiliate for the same item or class of items to:

(A)  its other affiliates or divisions; or

(B)  a nonaffiliated person within the same market area or having the same market conditions.

(d)   In making a finding regarding an affiliate transaction, the regulatory authority shall:

(1)   determine the extent to which the conditions and circumstances of that transaction are reasonably comparable relative to quantity, terms, date of contract, and place of delivery; and

(2)   allow for appropriate differences based on that determination.

(e)   This section does not require a finding to be made before payments made by an electric utility to an affiliate are included in the utility's charges to consumers if there is a mechanism for making the charges subject to refund pending the making of the finding.

(f)   If the regulatory authority finds that an affiliate expense for the test period is unreasonable, the regulatory authority shall:

(1)   determine the reasonable level of the expense; and

(2)   include that expense in determining the electric utility's cost of service.

(V.A.C.S. art. 1446c-0, Sec. 2.208(b).)  (Amended by Acts 1999, 76th Leg., R.S., ch. 405 (SB 7), § 25 (amended subsec. (d)); Acts 2005, 79th Leg., R.S., ch. 413 (SB 1668), § 1 (amended subd. (c)(2)).)

### Sec. 36.059. TREATMENT OF CERTAIN TAX BENEFITS.

(a)   In determining the allocation of tax savings derived from liberalized depreciation and amortization, the investment tax credit, and the application of similar methods, the regulatory authority shall:

(1)   balance equitably the interests of present and future customers; and

(2)   apportion accordingly the benefits between consumers and the electric or municipally owned utility.

(b)   If an electric utility or a municipally owned utility retains a portion of the investment tax credit, that portion shall be deducted from the original cost of the facilities or other addition to the rate base to which the credit applied to the extent allowed by the Internal Revenue Code.

(V.A.C.S. art. 1446c-0, Secs. 2.151(c), (d).)

### Sec. 36.060. CONSOLIDATED INCOME TAX RETURNS.

(a)   If an expense is allowed to be included in utility rates or an investment is included in the utility rate base, the related income tax benefit must be included in the computation of income tax expense to reduce the rates.  If an expense is not allowed to be included in utility rates or an investment is not included in the utility rate base, the related income tax benefit may not be included in the computation of income tax expense to reduce the rates.  The income tax expense shall be computed using the statutory income tax rates.

(b)   The amount of income tax that a consolidated group of which an electric utility is a member saves, because the consolidated return eliminates the intercompany profit on purchases by the utility from an affiliate, shall be applied to reduce the cost of the property or service purchased from the affiliate.

(c)   The investment tax credit allowed against federal income taxes, to the extent retained by the electric utility, shall be applied as a reduction in the rate-based contribution of the assets to which the credit applies, to the extent and at the rate allowed by the Internal Revenue Code.

(V.A.C.S. art. 1446c-0, Sec. 2.208(c).)  (Amended by Acts 2013, 83rd Leg., R.S., ch. 787 (SB 1364), § 1 (amended subsec. (a)).)

### Sec. 36.061. ALLOWANCE OF CERTAIN EXPENSES.

(a)   The regulatory authority may not allow as a cost or expense for ratemaking purposes:

(1)   an expenditure for legislative advocacy; or

(2) an expenditure described by Section 32.104 that the regulatory authority determines to be not in the public interest.

(b) The regulatory authority may allow as a cost or expense:

(1) reasonable charitable or civic contributions not to exceed the amount approved by the regulatory authority; and

(2) reasonable costs of participating in a proceeding under this title not to exceed the amount approved by the regulatory authority.

(c) An electric utility located in a portion of this state not subject to retail competition may establish a bill payment assistance program for a customer who is a military veteran who a medical doctor certifies has a significantly decreased ability to regulate the individual's body temperature because of severe burns received in combat. A regulatory authority shall allow as a cost or expense a cost or expense of the bill payment assistance program. The electric utility is entitled to:

(1) fully recover all costs and expenses related to the bill payment assistance program;

(2) defer each cost or expense related to the bill payment assistance program not explicitly included in base rates; and

(3) apply carrying charges at the utility's weighted average cost of capital to the extent related to the bill payment assistance program.

(V.A.C.S. art. 1446c-0, Secs. 2.152(b), (c), (d), (e).) (Amended by Acts 2013, 83rd Leg., R.S., ch. 597 (SB 981), § 1 (added subsec. (c)).)

## Sec. 36.062. CONSIDERATION OF CERTAIN EXPENSES.

The regulatory authority may not consider for ratemaking purposes:

(1) an expenditure for legislative advocacy, made directly or indirectly, including legislative advocacy expenses included in trade association dues;

(2) a payment made to cover costs of an accident, equipment failure, or negligence at a utility facility owned by a person or governmental entity not selling power in this state, other than a payment made under an insurance or risk-sharing arrangement executed before the date of loss;

(3) an expenditure for costs of processing a refund or credit under Section 36.110; or

(4) any other expenditure, including an executive salary, advertising expense, legal expense, or civil penalty or fine, the regulatory authority finds to be unreasonable, unnecessary, or not in the public interest.

(V.A.C.S. art. 1446c-0, Sec. 2.208(d).)

## Sec. 36.063. CONSIDERATION OF PROFIT OR LOSS FROM SALE OR LEASE OF MERCHANDISE.

In establishing an electric or municipally owned utility's rates, the regulatory authority may not consider any profit or loss that results from the sale or lease of merchandise, including appliances, fixtures, or equipment, to the extent that merchandise is not integral to providing utility service.

(V.A.C.S. art. 1446c-0, Secs. 2.151(b) (part), (d).)

## Sec. 36.064. SELF-INSURANCE.

(a) An electric utility may self-insure all or part of the utility's potential liability or catastrophic property loss, including windstorm, fire, and explosion losses, that could not have been reasonably anticipated and included under operating and maintenance expenses.

(b) The commission shall approve a self-insurance plan under this section if the commission finds that:

(1) the coverage is in the public interest;

(2) the plan, considering all costs, is a lower cost alternative to purchasing commercial insurance; and

(3) ratepayers will receive the benefits of the savings.

(c) In computing an electric utility's reasonable and necessary expenses under this subchapter, the regulatory authority, to the extent the regulatory authority finds is in the public interest, shall allow as a necessary expense the money credited to a reserve account for self-insurance. The regulatory authority shall determine reasonableness under this subsection:

(1) from information provided at the time the self-insurance plan and reserve account are established; and

(2) on the filing of a rate case by an electric utility that has a reserve account.

(d) After a reserve account for self-insurance is established, the regulatory authority shall:

(1) determine whether the reserve account has a surplus or shortage under Subsection (e); and

(2) subtract any surplus from or add any shortage to the utility's rate base.

(e) A surplus in the reserve account exists if the charges against the account are less than the money credited to the account. A shortage in the reserve account exists if the charges against the account are greater than the money credited to the account.

(f) The allowance for self-insurance under this title for ratemaking purposes is not applicable to nuclear plant investment.

(g) The commission shall adopt rules governing self-insurance under this section.

(V.A.C.S. art. 1446c-0, Sec. 2.210.)

### Sec. 36.065. PENSION AND OTHER POSTEMPLOYMENT BENEFITS.

(a) The regulatory authority shall include in the rates of an electric utility expenses for pension and other postemployment benefits, as determined by actuarial or other similar studies in accordance with generally accepted accounting principles, in an amount the regulatory authority finds reasonable. Expenses for pension and other postemployment benefits include, in an amount found reasonable by the regulatory authority, the benefits attributable to the service of employees who were employed by the predecessor integrated electric utility of an electric utility before the utility's unbundling under Chapter 39 irrespective of the business activity performed by the employee or the affiliate to which the employee was transferred on or after the unbundling.

(b) Effective January 1, 2005, an electric utility may establish one or more reserve accounts for expenses for pension and other postemployment benefits. An electric utility shall periodically record in the reserve account any difference between:

(1) the annual amount of pension and other postemployment benefits approved as an operating expense in the electric utility's last general rate proceeding or, if that amount cannot be determined from the regulatory authority's order, the amount recorded for pension and other postemployment benefits under generally accepted accounting principles during the first year that rates from the electric utility's last general rate proceeding are in effect; and

(2) the annual amount of pension and other postemployment benefits as determined by actuarial or other similar studies that are chargeable to the electric utility's operating expense.

(c) A surplus in the reserve account exists if the amount of pension and other postemployment benefits under Subsection (b)(1) is greater than the amount determined under Subsection (b)(2). A shortage in the reserve account exists if the amount of pension and other postemployment benefits under Subsection (b)(1) is less than the amount determined under Subsection (b)(2).

(d) If a reserve account for pension and other postemployment benefits is established, the regulatory authority at a subsequent general rate proceeding shall:

(1) review the amounts recorded to the reserve account to determine whether the amounts are reasonable expenses;

(2) determine whether the reserve account has a surplus or shortage under Subsection (c); and

(3) subtract any surplus from or add any shortage to the electric utility's rate base with the surplus or shortage amortized over a reasonable time.

(Added by Acts 2005, 79th Leg., R.S., ch. 385 (SB 1447), § 1.)

## SUBCHAPTER C. GENERAL PROCEDURES FOR RATE CHANGES PROPOSED BY UTILITY

### Sec. 36.101. DEFINITION.

In this subchapter, "major change" means an increase in rates that would increase the aggregate revenues of the applicant more than the greater of $100,000 or 2-1/2 percent. The term does not include an increase in rates that the regulatory authority allows to go into effect or the electric utility makes under an order of the regulatory authority after hearings held with public notice.

(V.A.C.S. art. 1446c-0, Sec. 2.212(b) (part).)

### Sec. 36.102. STATEMENT OF INTENT TO CHANGE RATES.

(a) Except as provided by Section 33.024, an electric utility may not change its rates unless the utility files a statement of its intent with the regulatory authority that has original jurisdiction over those rates at least 35 days before the effective date of the proposed change.

(b) The electric utility shall also mail or deliver a copy of the statement of intent to the appropriate officer of each affected municipality.

(c) The statement of intent must include:

(1) proposed revisions of tariffs; and

(2) a detailed statement of:

(A) each proposed change;

(B) the effect the proposed change is expected to have on the revenues of the utility;

(C) each class and number of utility consumers affected; and

(D) any other information required by the regulatory authority's rules.

(V.A.C.S. art. 1446c-0, Sec. 2.212(a) (part).)

### Sec. 36.103. NOTICE OF INTENT TO CHANGE RATES.

(a) The electric utility shall:

(1) publish, in conspicuous form and place, notice to the public of the proposed change once each week for four successive weeks before the effective date of the proposed change in a newspaper having general circulation in each county containing territory affected by the proposed change; and

(2) mail notice of the proposed change to any other affected person as required by the regulatory authority's rules.

(b) The regulatory authority may waive the publication of notice requirement prescribed by Subsection (a) in a proceeding that involves only a rate reduction for each affected ratepayer. The applicant shall give notice of the proposed rate change by mail to each affected utility customer.

# Appendix 2


# APA, Tex. Gov't Code § 2001.174



C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle A. Administrative Procedure and Practice
        Chapter 2001. Administrative Procedure (Refs & Annos)
          Subchapter G. Contested Cases: Judicial Review
            ➡➡ **§ 2001.174. Review Under Substantial Evidence Rule or Undefined Scope of Review**

If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

(1) may affirm the agency decision in whole or in part; and

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

  (A) in violation of a constitutional or statutory provision;

  (B) in excess of the agency's statutory authority;

  (C) made through unlawful procedure;

  (D) affected by other error of law;

  (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

  (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

CREDIT(S)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

## HISTORICAL AND STATUTORY NOTES

2008 Main Volume

Prior Laws:

Acts 1975, 64th Leg., p. 136, ch. 61.

Vernon's Ann.Civ.St. art. 6252-13a, § 19(e).

## CROSS REFERENCES

Groundwater management trial of suit, see V.T.C.A., Water Code § 36.253.

## LAW REVIEW COMMENTARIES

Administrative law 2004 update and analysis. Ron Beal, 57 Baylor L.Rev. 359 (Spring 2005).

Due process and local administrative hearings regulating public nuisances: Analysis and reform. Alex Cameron, 43 St. Mary's L.J. 619 (2012).

Mixing oil and gas with Texas water law. Edmond R. McCarthy, 44 Tex. Tech L. Rev. 883 (2012).

A shift in power: Why increased urban drilling necessitates a change in regulatory authority. Riley W. Vanham, 43 St. Mary's L.J. 229 (Nov. 2011).

## LIBRARY REFERENCES

2008 Main Volume

Administrative Law and Procedure ⟐ 763, 791.
Westlaw Topic No. 15A.
C.J.S. Public Administrative Law and Procedure §§ 213, 394, 418 to 420, 433 to 435, 444 to 450.

## RESEARCH REFERENCES

2015 Electronic Update

ALR Library

80 ALR 6th 1, Special Commentary: Recovery of "Stranded Costs" by Utilities.

30 ALR 6th 483, Validity, Construction, and Application of State Statutes Providing for Revocation of Driver's License for Failure to Pay Child Support.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Appendix 3

## PUC Substantive Rule on Cost of Service-Allowable Expenses:
## 16 Tex. Admin. Code § 25.231(b)


c

Texas Administrative Code Currentness
    Title 16. Economic Regulation
        Part 2. Public Utility Commission of Texas
            Chapter 25. Substantive Rules Applicable to
            Electric Service Providers
                Subchapter J. Costs, Rates and Tariffs
                    Division 1. Retail Rates
                        → → **§ 25.231. Cost of Service**

(a) Components of cost of service. Except as provided for in subsection (c)(2) of this section, relating to invested capital; rate base, and § 23.23(b) of this title, (relating to Rate Design), rates are to be based upon an electric utility's cost of rendering service to the public during a historical test year, adjusted for known and measurable changes. The two components of cost of service are allowable expenses and return on invested capital.

(b) Allowable expenses. Only those expenses which are reasonable and necessary to provide service to the public shall be included in allowable expenses. In computing an electric utility's allowable expenses, only the electric utility's historical test year expenses as adjusted for known and measurable changes will be considered, except as provided for in any section of these rules dealing with fuel expenses.

(1) Components of allowable expenses. Allowable expenses, to the extent they are reasonable and necessary, and subject to this section, may include, but are not limited to the following general categories:

(A) Operations and maintenance expense incurred in furnishing normal electric utility service and in maintaining electric utility

plant used by and useful to the electric utility in providing such service to the public. Payments to affiliated interests for costs of service, or any property, right or thing, or for interest expense shall not be allowed as an expense for cost of service except as provided in the Public Utility Regulatory Act § 36.058.

(B) Depreciation expense based on original cost and computed on a straight line basis as approved by the commission. Other methods of depreciation may be used when it is determined that such depreciation methodology is a more equitable means of recovering the cost of the plant.

(C) Assessments and taxes other than income taxes.

(D) Federal income taxes on a normalized basis. Federal income taxes shall be computed according to the provisions of the Public Utility Regulatory Act § 36.060.

(E) Advertising, contributions and donations. The actual expenditures for ordinary advertising, contributions, and donations may be allowed as a cost of service provided that the total sum of all such items allowed in the cost of service shall not exceed three-tenths of 1.0% (0.3%) of the gross receipts of the electric utility for services rendered to the public. The following expenses shall be included in the calculation of the three-tenths of 1.0% (0.3%) maximum:

(i) funds expended advertising methods of conserving energy;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(ii) funds expended advertising methods by which the consumer can effect a savings in total electric utility bills;

(iii) funds expended advertising methods to shift usage off of system peak; and

(iv) funds expended promoting renewable energy.

(F) Nuclear decommissioning expense. The following restrictions shall apply to the inclusion of nuclear decommissioning costs that are placed in an electric utility's cost of service.

(i) An electric utility owning or leasing an interest in a nuclear-fueled generating unit shall include its cost of nuclear decommissioning in its cost of service. Funds collected from ratepayers for decommissioning shall be deposited monthly in irrevocable trusts external to the electric utility, in accordance with § 25.301 of this title (relating to Nuclear Decommissioning Trusts). All funds held in short-term investments must bear interest. The level of the annual cost of decommissioning for ratemaking purposes will be determined in each rate case based on an allowance for contingencies of 10% of the cost of decommissioning, the most current information reasonably available regarding the cost of decommissioning, the balance of funds in the decommissioning trust, anticipated escalation rates, the anticipated return on the funds in the decommissioning trust, and other relevant factors. The annual amount for the cost of decommissioning determined pursuant to

the preceding sentence shall be expressly included in the cost of service established by the commission's order.

(ii) In the event that an electric utility implements an interim rate increase, including an increase filed under bond, an incremental change in decommissioning funding shall be included in the increase.

(iii) An electric utility's decommissioning fund and trust balances will be reviewed in general rate cases. In the event that an electric utility does not have a rate case within a five-year period, the commission, on its own motion or on the motion of the commission's Office of Regulatory Affairs, the Office of Public Utility Counsel, or any affected person, may initiate a proceeding to review the electric utility's decommissioning cost study and plan, and the balance of the trust.

(iv) An electric utility shall perform, or cause to be performed, a study of the decommissioning costs of each nuclear generating unit that it owns or in which it leases an interest. A study or a redetermination of the previous study shall be performed at least every five years. The study or redetermination should consider the most current information reasonably available on the cost of decommissioning. A copy of the study or redetermination shall be filed with the commission and copies provided to the commission's Office of Regulatory Affairs and the Office of Public Utility Counsel. An electric utility's most recent decommissioning study or redeterminations shall be filed with the commission within 30 days of the effective date of this subsec-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion. The five year requirement for a new study or redetermination shall begin from the date of the last study or redetermination.

(G) Accruals credited to reserve accounts for self-insurance under a plan requested by an electric utility and approved by the commission. The commission shall consider approval of a self insurance plan in a rate case in which expenses or rate base treatment are requested for a such a plan. For the purposes of this section, a self insurance plan is a plan providing for accruals to be credited to reserve accounts. The reserve accounts are to be charged with property and liability losses which occur, and which could not have been reasonably anticipated and included in operating and maintenance expenses, and are not paid or reimbursed by commercial insurance. The commission will approve a self insurance plan to the extent it finds it to be in the public interest. In order to establish that the plan is in the public interest, the electric utility must present a cost benefit analysis performed by a qualified independent insurance consultant who demonstrates that, with consideration of all costs, self-insurance is a lower-cost alternative than commercial insurance and the ratepayers will receive the benefits of the self insurance plan. The cost benefit analysis shall present a detailed analysis of the appropriate limits of self insurance, an analysis of the appropriate annual accruals to build a reserve account for self insurance, and the level at which further accruals should be decreased or terminated.

(H) Postretirement benefits other than pensions (known in the electric utility industry as "OPEB"). For ratemaking purposes, expense associated postretirement benefits other than pensions (OPEB) shall be treated as follows:

(i) OPEB expense shall be included in an electric utility's cost of service for ratemaking purposes based on actual payments made.

(ii) An electric utility may request a one-time conversion to inclusion of current OPEB expense in cost of service for ratemaking purposes on an accrual basis in accordance with generally accepted accounting principles (GAAP). Rate recognition of OPEB expense on an accrual basis shall be made only in the context of a full rate case.

(iii) An electric utility shall not be allowed to recover current OPEB expense on an accrual basis until GAAP requires that electric utility to report OPEB expense on an accrual basis.

(iv) For ratemaking purposes, the transition obligation shall be amortized over 20 years.

(v) OPEB amounts included in rates shall be placed in an irrevocable external trust fund dedicated to the payment of OPEB expenses. The trust shall be established no later than six months after the order establishing the OPEB expense amount included in rates. The electric utility shall make deposits to the fund at least once per year. Deposits on the fund shall include, in addition to the amount included in rates, an amount equal to fund earnings that would have accrued if deposits had been made monthly. The funding requirement can be met with deposits made in advance of the recognition of the expense for ratemaking

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

purposes. The electric utility shall, to the extent permitted by the Internal Revenue Code, establish a postretirement benefit plan that allows for current federal income tax deductions for contributions and allows earnings on the trust funds to accumulate tax free.

(vi) When an electric utility terminates an OPEB trust fund established pursuant to clause (v) of this subparagraph, it shall notify the commission in writing. If excess assets remain after the OPEB trust fund is terminated and all trust related liabilities are satisfied, the electric utility shall file, for commission approval, a proposed plan for the distribution of the excess assets. The electric utility shall not distribute any excess assets until the commission approves the disbursement plan.

(2) Expenses not allowed. The following expenses shall never be allowed as a component of cost of service:

(A) legislative advocacy expenses, whether made directly or indirectly, including, but not limited to, legislative advocacy expenses included in professional or trade association dues;

(B) funds expended in support of political candidates;

(C) funds expended in support of any political movement;

(D) funds expended promoting political or religious causes;

(E) funds expended in support of or mem-bership in social, recreational, fraternal, or religious clubs or organizations;

(F) funds promoting increased consumption of electricity;

(G) additional funds expended to mail any parcel or letter containing any of the items mentioned in subparagraphs (A)-(F) of this paragraph;

(H) payments, except those made under an insurance or risk-sharing arrangement executed before the date of the loss, made to cover costs of an accident, equipment failure, or negligence at an electric utility facility owned by a person or governmental body not selling power within the State of Texas;

(I) costs, including, but not limited to, interest expense, of processing a refund or credit of sums collected in excess of the rate finally ordered by the commission in a case where the electric utility has put bonded rates into effect, or when the electric utility has otherwise been ordered to make refunds;

(J) any expenditure found by the commission to be unreasonable, unnecessary, or not in the public interest, including but not limited to executive salaries, advertising expenses, legal expenses, penalties and interest on overdue taxes, criminal penalties or fines, and civil penalties or fines.

(c) Return on invested capital. The return on invested capital is the rate of return times invested capital.

(1) Rate of return. The commission shall allow each electric utility a reasonable opportunity to earn a reasonable rate of return, which is expressed as a percentage of invested capital, and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Appendix 4

# PUC Docket No. 18249, Order on Rehearing



| ENTERGY GULF STATES, INC. | § | PUBLIC UTILITY COMMISSION |
| SERVICE QUALITY ISSUES | § | |
| (SEVERED FROM DOCKET NO. 16705) | § | OF TEXAS |

## ORDER ON REHEARING

This Order addresses electric service quality issues relating to Entergy Gulf States, Inc. (EGS or the Company). The Commission concludes that the quality of EGS' electric service to its customers in Texas has been less than adequate, specifically since Entergy Corporation acquired Gulf States Utilities, Inc., in 1993. The record evidence reveals a lack of effective and prudent maintenance policies, uneven spending in the area of operations and maintenance (O&M), cuts in experienced personnel, and consequent deterioration in the quality of service. The management of EGS is structured in a way that fails to link resource availability with appropriate performance accountability.

The Commission further concludes that the difficulties EGS has experienced with its quality of service are not simply "customer perception" problems, as claimed by the Company.[1] The problems are real and must be addressed by the Company in a timely and serious manner. To motivate the Company to revise its current approach and promote long-term commitment toward service quality and reliability, the Commission orders a two-part solution designed both to deal with past problems and implement remedies for the future. First, the Company's authorized return on equity (ROE) that otherwise would be adopted in Docket No. 16705[2] will be reduced by 60-basis points and initially refunded to distribution-level customers. Second, going forward, the Company

---

[1] EGS Initial Brief (IB) at 4 (Dec. 2, 1997); *see also*, Tr. at 231.

[2] *Application of Entergy Texas for Approval of Its Transition to Competition Plan and the Tariffs Implementing the Plan, and for the Authority to Reconcile Fuel Costs, to Set Revised Fuel Costs, to Set Revised Fuel Factors, and to Recover a Surcharge for Underrecovered Fuel Costs*, Docket No. 16705 (pending).

will have an opportunity to earn back a portion of the ROE reduction, depending on whether its service quality meets specified benchmarks. These benchmarks will establish service reliability standards (outage frequency and duration) and customer service standards (billing errors, call-center performance, service installation, line extension, and street light replacement). The margin achieved above the benchmarks will reflect the level of improvement (or, if below, a lack thereof) and will be used to determine whether the Company is entitled to recoup a portion of the ROE reduction.

## I.    Procedural History

EGS filed its transition/rate case in Docket No. 16705 on November 27, 1996. The Commission referred the case to the State Office of Administrative Hearings (SOAH) on December 5, 1996. On January 24, 1997, the Commission issued a preliminary order in Docket No. 16705 directing parties, among other things, to "address specific service quality standards that will apply after the transition [proposed by EGS]."[3]

On March 7, 1997, the Commission issued a supplemental preliminary order in Docket No. 16705 that dealt specifically with service quality issues. This order required that Docket No. 16705 address, in addition to others, the following issues: (1) Does EGS have an effective and prudent management policy in place that devotes sufficient resources to ensure adequate and reliable service to its ratepayers? (2) Are there patterns of variable service quality in EGS' service territory, and if so, what is the cause and potential resolution of these variations? and (3) What procedures can and should the Commission implement to monitor service quality on EGS' system, and to respond to situations in which EGS' service quality falls below the service quality benchmark levels?

---

[3] Preliminary Order at 12 (January 24, 1997).

Proceeding with EGS' rate case, SOAH established a four-phased hearing schedule to address the numerous transition and rate issues in Docket No. 16705. The service quality issues were to be dealt with in the "Competitive Issues" phase, scheduled to begin in early November 1997.

After EGS and interested parties had filed written testimony and exhibits,[4] but before the Competitive Issues phase commenced at SOAH, the Commission determined that it would itself hear and resolve the service quality issues. Accordingly, on November 4, 1997, the Commission issued an order severing the pending service quality issues from Docket No. 16705, establishing Docket No. 18249 to deal with those issues, and establishing procedures by which the Commission would hear and rule on the case.

The Commission convened a hearing on the merits of EGS' service quality on November 20 and 21, 1997. Chairman Pat Wood and Commissioner Judy Walsh presided over the hearing. The participating parties included the Company, the Cities, the High Load Factor Commercial Customer Group (HLFCCG), and the General Counsel, all of whom presented their direct cases and conducted cross-examinations. Chairman Wood and Commissioner Walsh also directed questions to the witnesses. Observers from the Office of Public Utility Counsel (OPUC) and the Attorney General's Office attended the hearing. The active parties filed initial and reply briefs on December 2 and 9, 1997, respectively. OPUC filed a statement on December 2, 1997, supporting the briefs of the Cities and HLFCCG, and the Attorney General's Office filed a statement on December 9, 1997, in support of the same briefs.

The Commission issued the final order in this docket on February 13, 1998. On March 5, 1998, EGS and General Counsel filed motions for rehearing. The replies to the motions were due on March 16, 1998, but based on parties' request, the Commission

---

[4] Some of the testimony, particularly from the Company's witnesses, was originally pre-filed for the Revenue Requirement phase.

granted an extension for filing of replies until March 25, 1998. On March 19, 1998, the Commission ratified the extension of deadline to file replies and also extended until May 14, 1998, the time to rule on the motions for rehearing pursuant to Gov'T CODE 2001.146(e).

On March 25, 1998, the parties filed a joint reply to motions for rehearing and motion for entry of order consistent with the parties' stipulation and agreement (the Stipulation). General Counsel, EGS, OPUC, and HLFCCG signed the Stipulation. At the April 1, 1998 open meeting, the Commission granted rehearing and approved the Stipulation. The provisions of the Stipulation are reflected in this Order.

## II.   Background

Entergy Gulf States, Inc., is a public utility subject to the jurisdiction of this Commission in accordance with Public Utility Regulatory Act (PURA) §§ 14.001, 31.001, 32.001, 33.122, and 36.001 through 36.156.[5] EGS is a wholly-owned subsidiary of Entergy Corporation (Entergy), a holding company incorporated in Delaware and registered with the federal Securities and Exchange Commission in accordance with the Public Utility Holding Company Act. Entergy acquired Gulf States Utilities, Inc., to create EGS, effective on December 31, 1993.[6]

EGS operates in Louisiana and Texas, and is affiliated through its holding company with investor-owned electric utilities located in Louisiana, Mississippi, and

---

[5] Public Utility Regulatory Act, TEX. UTIL. CODE ANN. 11.001-63.063 (Vernon 1998).

[6] *Application of Entergy Corporation and Gulf States Utilities Company for Sale, Transfer, or Merger*, Docket No. 11292 (Mar. 25, 1994).

Arkansas.[7] The EGS service territory in Texas is located in the southeastern part of the state, and contains industrialized areas in the vicinity of Beaumont and Port Arthur, as well as a coastal zone. The differing geographic and climatic characteristics of the Company's service territory have led to the creation of three distinct sectors: Western I (suburban with dense trees), Western II (rural with fewer trees), and Gulf (both rural and urban).

Entergy's headquarters is in New Orleans; EGS' principal office in Texas is located in Beaumont. In Texas, the Company serves approximately 318,279 customers[8] and has 11,472 miles of distribution lines. There are 394,865 poles[9] in its system, with 431 feeders.[10] The transmission system--built as early as 1924, with approximately half of the lines added in the 1950's and 1960's and only 12 percent of lines built or rehabilitated after 1977--has shown generally good performance.[11] This Order is concerned predominantly with the state of the Company's distribution system.

### III.   Discussion and Analysis of Issues

#### A. General Concept of Reliability

Electricity plays a vital role in our lives. Most, if not all, aspects of our society, including industrial production, commerce, and individual lifestyles, are built around a reliable and adequate supply of electrical energy. People have come to depend on

---

[7] Entergy Arkansas (including the Arklahoma Corporation), Inc., Entergy Louisiana, Inc., Entergy Mississippi, Inc., and Entergy New Orleans, Inc. These companies, together with EGS, form the "Operating Companies."

[8] *Ice Storm '97 Field Investigations*, Project No. 16301, at V-25 (June 24, 1997).

[9] General Counsel Ex. 5, Burrows Direct Testimony at 33, Attachment JDB-2.

[10] General Counsel Ex. 24.

[11] General Counsel Ex. 1, Ethridge Direct Testimony at 6.

electricity being available when they need it.  In fact, for most customers, delivery of electrical power and reliability of its delivery have become two inseparable expectations. Electric utilities generally recognize and accept this dependence and have responded to it by constructing and operating generation and delivery systems of superior reliability.[12] State law formalizes the utilities' obligation to provide reliable service in PURA § 37.151.  Reliability, however, is not a static concept.  As customer bases grow and systems age, utilities face new challenges that must be acknowledged and resolved to maintain reliable service.

In addition to sufficient generating capacity, transmission and distribution facilities are built so that a specified degree of reliability is achieved.  The goal is to provide required amounts of energy with no, or few, interruptions, while maintaining a reasonable cost of the overall system.  Smooth and continuous interaction of the various elements of the electrical system results in reliable performance of the overall system. For consumers, this reliability is reflected in uninterrupted power supply, the degree of which may be measured by the frequency, duration, and magnitude of adverse effects on consumer service.

## B.  Legal Standards

PURA imposes various obligations on utilities and the Commission regarding the provision of electric service to Texas consumers.  Specifically, PURA § 37.151 requires that a regulated utility provide continuous and adequate service in its certificated service territory.  PURA § 38.001 directs utilities to furnish service, instrumentalities, and facilities that are safe, adequate, efficient, and reasonable.  Parallel responsibilities rest with the Commission.  In accordance with PURA § 36.052(3), the Commission must consider the quality of a utility's services in establishing a reasonable return on invested

---

[12]   NORTH AMERICAN ELECTRIC RELIABILITY COUNCIL, RELIABILITY CONCEPTS 1-2 (Feb. 1985).

capital.[13] This same section of PURA directs the Commission to consider the quality of the utility's management and the efficiency of its operations when establishing a reasonable return.  Moreover, PURA § 38.071 authorizes the Commission to order an electric utility to provide "specified" improvements in its service.

## C. Analysis of Issues

The Commission's analysis of the issues in this case is divided into five general topics:  (1) physical facilities, maintenance, and monitoring;  (2) vegetation management;  (3) emergency preparedness, response, outage restoration, and treatment of storm data;  (4) personnel levels, management practices, and spending levels; and (5) pockets of unreliable service and overall customer service.  The following narrative lays out essential points of the relevant issues; with additional, specific information contained in the Findings of Fact in Section IV.

## 1. Physical Facilities, Maintenance, and Monitoring

### a. Condition of Poles

As stated above, EGS' transmission system does not pose serious concerns since it has performed adequately over the last few years, during which only a minimal number of transmission-related outages or circuit-breaker operations occurred.  EGS' inspection and treatment programs relating to its transmission system seem to be working

---

[13] There are several precedent cases in which the Commission reduced ROE to address inadequate quality of service.  *See, e.g., Application of General Telephone Company of the Southwest for Authority to Increase Rates,* Docket No. 3094, Final Order, 6 P.U.C. BULL. 92, 123 (Aug. 8, 1980) (imposing penalty on company for inadequate service quality); *Application of General Telephone Company of the Southwest for Authority to Increase Rates,* Docket No. 3690, Final Order, 7 P.U.C. BULL. 11, 39 (June 18, 1981) (sustaining penalty due to persistence of poor service); *Application of General Telephone Company of the Southwest for Authority to Increase Rates,* Docket No. 4132, Final Order, 7 P.U.C. BULL. 646, 648 (Jan. 14, 1982) (lifting penalty after service was shown to improve for a sufficient period of time); *Application of Houston Lighting and Power Company,* Docket No. 4540, Final Order, 8 P.U.C. BULL 75 (Dec. 6, 1982) (reducing company's ROE because of service quality and reliability concerns).

satisfactorily, with transmission line rights-of-way (ROW) appearing generally clear.[14] For these reasons, the Commission concludes that the physical state of the Company's transmission system is adequate.  The remainder of this Order will address the Company's distribution system and related services.

Primary evidence for the condition of EGS' distribution system, including wires, poles, pole appurtenances, and transformers, comes from the Osmose Wood Preserving Company (Osmose) inspections conducted in 1995 and 1996, a report filed by Drash Consulting Engineering, Inc. (Drash), and limited Staff surveys.[15] In general, most of the poles in the Texas portion of the Company's distribution system are in good condition. There are, however, numerous poles with physical deficiencies or in need of extensive and comprehensive vegetation clearing.[16]

The Osmose inspectors, contracted by EGS in 1995 and 1996, examined approximately 37,000, or 10 percent, of the poles and crossarms and found that on average 17.9 percent of poles in eight different areas showed structural decay.[17] The actual percentages, however, varied greatly, with one area having more than 37 percent of the poles with some decay, a condition clearly impermissible for any transmission and distribution (T&D) system.[18] While the Osmose inspections were not random, and in fact, as the Company asserts, focused on particularly troubled spots, the results show that there are many poles in unsatisfactory condition.

---

[14] General Counsel Ex. 1, Ethridge Direct Testimony at 6-8, 41-43.

[15] General Counsel Ex. 1, Ethridge Direct Testimony at 15; General Counsel Ex. 4; General Counsel Ex. 5, Burrows Direct Testimony, Attachment JDB-3.

[16] *Id.* at 5.

[17] General Counsel Ex. 5, Burrows Direct Testimony at 17.

[18] *Id.,* Appendix Workpapers at 2.

The purpose of the Drash report, contracted for by the Commission, was to collect data regarding the condition of EGS' overhead distribution system. The survey was based on a sample of 33 uniformly distributed substations from the Texas portion of EGS distribution system.[19] The Drash inspectors examined 582 poles on various feeders originating at these substations.[20] The Drash survey found 59 poles with structural deficiencies and 72 poles with ROW encroachments.[21] During the hearing, EGS raised questions about the accuracy and statistical reliability of the Drash report. The Commission concludes that the Drash study lacked specific evaluation criteria and necessary randomness to draw conclusions about the entire EGS Texas system. The Commission, however, does not reject the Drash report, as requested by the Company;[22] rather, the Commission relies on the report to the extent that its findings have been confirmed by the Osmose inspections and Staff surveys. Considered together, the collected data persuasively indicate that numerous poles show decay, are in need of repair or replacement, and that vegetation growth poses a serious problem on some ROW.

### b. Pole Inspection Program

The Company conceded that it does not have a traditional pole inspection program in place.[23] Since the Osmose inspections in 1996, there have been no pole or crossarm inspections on Texas territory.[24] Post-merger, EGS reduced the number of inspections; for example, in 1995, 29,294 poles and 43,941 crossarms were inspected, but in 1996, only 7,939 poles and 11,908 crossarms underwent inspections.[25] The Company

---

[19] *Id.* at 19.

[20] *Id.* at 20.

[21] *Id.* at 21-22.

[22] Tr. at 552-60, 606-15.

[23] Tr. at 176, 751-52.

[24] Tr. at 170, 177-78.

[25] General Counsel Ex. 19 at Bates Stamp 0194741.

is now planning to hire Osmose to carry out a ten-year inspection program that will cover the entire system (35,000 poles inspected annually).[26] Evidence presented in the case makes it clear that EGS' pole inspection and repair work cycles have not been sufficiently rigorous, continuous, or frequent to maintain all of its facilities in the condition required to meet its reliability and service obligations under PURA.

### c. Maintenance Practices

A review of maintenance records shows that line maintenance and vegetation control are reactive in nature;[27] there is a lack of written, specific, and preventive maintenance policies;[28] and priority is given to capital additions to the detriment of adequate maintenance practices.[29] For example, total line-miles actively maintained by the Company's employees dropped 30 percent from 1994 to 1996.[30] The Company's internal risk assessment study points to an absence of a strategic plan, and consequent inadequacies in resource sharing and work planning.[31] Based on the evidence, the Commission concludes that EGS has failed to establish and carry out distribution maintenance policies in a manner sufficient to ensure adequate and reliable delivery of electric service.

### d. Data Collection

The Company presented a variety of data to support its claim of good performance; however, the accuracy of its data collection practices came under a great deal of scrutiny during the hearing, bringing into question the ability of the Company to

---

[26] Tr. at 751-52.

[27] General Counsel Ex. 4, Gonzalez Direst Testimony at 6-8, Drash Report at 45-46.

[28] Tr. at 59; HLFCCG Ex. 1, Patton Direct Testimony, Entergy Internal Audit and Risk Assessment.

[29] General Counsel Ex. 1, Ethridge Direct Testimony at 19-20; General Counsel Ex. 8; General Counsel Ex. 19.

[30] Tr. at 737.

[31] General Counsel Ex. 30 at 2.

monitor its performance fairly. The parties debated at length the merits and mechanics of various system monitoring tools and reporting standards. These include: (1) System Average Interruption Frequency Index (SAIFI), a measure of the number of interruptions per year for the average customer;[32] (2) System Average Interruption Duration Index (SAIDI), a measure of the total interruption time experienced by the average customer;[33] (3) Customer Average Interruption Duration Index (CAIDI), defined as the ratio of SAIDI/SAIFI;[34] (4) Distribution Interruption System (DIS), a database to capture reliability performance and indices for individual feeders;[35] (5) Average System Availability Index (ASAI),[36] a measure of the total time of service availability to the average customer; and (6) TACTICS, which captures data on every device down to the transformer level to measure each device's operational performance and impact on customers.[37] In addition, the Company utilizes a System Control and Data Acquisition device (SCADA) to measure data for large interruptions such as feeder breaker outages,[38] and the new Automatic Mapping and Facilities Management System (AM/FM), developed in order to determine where an outage occurred and what device caused it, which will be completed by the year 2000.[39]

General Counsel, Cities, and HLFCCG argued that the number of customers affected by outages and the duration of such outages are difficult to determine because

---

[32] HLFCCG Ex. 1, Patton Direct Testimony at 9-12.

[33] *Id.* at 10.

[34] *Id.*

[35] *Id.* at 11.

[36] General Counsel Ex. 3, Eckhoff Direct Testimony at 20.

[37] Tr. at 448-450.

[38] Tr. at 238, 443.

[39] Tr. at 429-30.

EGS excluded relevant information between 1994 and 1996.[40] For example, for the first six months of 1996, the Company reported 35 to 40 percent fewer outages than were reported on average during the first six months of the years 1991-94.[41] In trying to explain the discrepancies in the data, Company officials described changing data collection standards applied to the various outage-causing events. At different times, the Company excluded outages caused by equipment failures; outages affecting feeders with fewer than 500 customers; storms, generation or transmission outages; or trees falling into the ROW ("non-preventable" trees).[42] The Company data is generally confusing and comparisons over a period of several years are difficult to make because of changing standards;[43] in addition, the inaccuracies are further compounded because, for example, outages on feeders with fewer than 500 customers can nevertheless result in very long outage durations, especially when those feeders are energized last.[44]

The evidence shows that Company linemen sometimes made subjective determinations as to the cause, duration, or effect of an outage, thus causing the Company's SAIFI and SAIDI numbers to be unreliable.[45] The evidence also revealed that most historically deficient feeders serve rural customers.[46] This observation is supported by EGS' testimony that it prioritizes restoration of feeders serving the greatest numbers of customers, thus leaving those in lower-density areas (most likely rural) to experience recurring and longer service reliability problems.[47]

---

[40] See HLFCCG Ex. 2, Entergy Southwest Reliability Report 1994-1996; Tr. at 41-43.

[41] HLFCCG Ex. 3 at slide 9.

[42] Tr. at 41-44, 54, 62-66.

[43] Id.; HLFCCG Ex. 2 at Bates Stamp 0232514.

[44] Tr. at 67.

[45] Tr. at 47-48.

[46] Tr. at 707, 821

[47] The Rebuttal (redacted) Testimony of Dereck Hasbrouck on behalf of the Company contains this quote: "One important fact to keep in mind when considering a customer or group of customers who consistently

General Counsel, Cities, and HLFCCG asserted that the Company has manipulated information to show better performance.[48] A significant problem with the Company's use of performance and reliability indices is that they reflect outage frequency and duration on a system-wide rather than feeder-by-feeder basis which can mask poor performance of individual feeders.[49] For example, EGS reported a system-wide SAIDI of 133 minutes for 1996,[50] but this measure failed to reveal that 83 feeders or primary circuits experienced outage times in excess of 200 minutes.[51] The average customer on these circuits experienced an outage duration of 3.3 hours.[52] More notably, customers on feeder Tamina encountered 41.3 hours of outage time in one year.[53] It is apparent that system-wide averages used by the Company cannot be relied on to disclose many of the localized service difficulties.

The historic data presented by the Company is not accurate and consistent as the Company itself admitted to not collecting all relevant data,[54] changing the standards for data collection, and submitting inconsistent data for ASAI and SAIFI.[55] Even the

---

receive less reliable service than the average customer is that there are geographic and environmental conditions beyond the utility's control. These conditions, in combination with the construction cost considerations may effectively limit the realistic reliability expectations for customers in certain areas. In EGS Texas' service territory, the Bolivar Peninsula and Sabine Pass may be examples where these constraints come into play ." EGS Ex. 11, Hasbrouck Rebuttal Testimony at 39.

[48] Tr. at 278-79, General Counsel Ex. 3, Eckhoff Direct Testimony at 54.

[49] General Counsel Ex. 3, Eckhoff Direct Testimony at 18, Appendix H and I; Tr. at 41-67; HLFCCG Ex. 1, Patton Direct Testimony at 12-14.

[50] General Counsel says SAIDI in 1996 was 157 minutes. General Counsel Ex. 22; HLFCCG Ex. 1, Patton Direct Testimony at 13.

[51] HLFCCG Ex. 1, Patton Direct Testimony at Exhibit ADP-3.

[52] Id.

[53] General Counsel Ex. 3, Eckhoff Direct Testimony, Appendix H..

[54] Tr. at 706.

[55] General Counsel Ex. 3, Eckhoff Direct Testimony at 54.

Company's internal audit revealed that reporting of outages has not been consistent.[56] EGS cannot correctly measure how many individual customers lose service because of an outage affecting parts of a feeder.[57]

The Commission concludes that the types of information monitoring and reporting tools relied on by the Company are useful, but they must be employed uniformly and consistently to be meaningful measures of service quality.  The Commission finds that the level of EGS' service quality and reliability, as documented through the Company data, is unreliable because the data fail to record and report all events accurately and consistently.  Pockets of inadequate service are ignored by system-wide measures, and such measures do not identify recurring individual-feeder problems.

## 2. Vegetation Management

Vegetation management is the catch-all description for programs involving the removal of trees, bushes, or vines that overhang, grow into, or toward conductors strung along the Company's ROW.  The purpose of vegetation management is to ensure, to the greatest extent possible, that vegetation in, or near, the ROW does not come into contact with the conductors and thereby cause wire breakage or ground faults.[58]  During the hearing, Company witnesses referred to scheduled tree trimming, carried out on a three-year cycle in urban areas and a six-year cycle in rural areas.  The evidence presented, however, was not clear on whether EGS actually followed the stated cycles.[59] Nonetheless, the Company argued that its vegetation management has been adequate and

---

[56] Cities Ex. 1, Lawton Direct Testimony at 12.

[57] Tr. at 445-46.

[58] Tr. at 176-178.

[59] Tr. at 602, 728.

consistent with industry practice.[60] In fact, EGS asserted that it had improved vegetation management and introduced efficiencies when compared to the pre-merger period.[61]

General Counsel, Cities, and HLFCCG presented extensive evidence to document serious neglect of vegetation management and consequent heightened risk to the distribution system. The majority of incidents included in the evidence involve three types of vegetation-related damage: wires expanding down into vegetation due to increased load or lack of under-clearance; overhanging limbs breaking or growing into wires in non-inclement weather; and limbs or trees bending or breaking onto wires due to wind, ice build-up, or other adverse weather conditions. These parties also argued that the ROW surveyed were in need of extensive clearing and that vegetation encroachments posed unacceptable risks.[62] Cities claimed that neglected vegetation management multiplied the severity of the ice storm in January 1997.[63] The number and duration of vegetation-caused service interruptions almost doubled in the last four years,[64] and vegetation-related SAIDI and SAIFI have worsened since the merger.[65]

The author of a vegetation management study, commissioned by the Company, observed that there were areas where maintenance clearing had been deferred until brush reached the conductors.[66] The study proposed specific and comprehensive ways for

---

[60] EGS Ex. 10, Ervin Rebuttal Testimony at 55, 59. EGS states that more than 80 percent of the Company's vegetation management expenditures are allocated to trimming, which is above the industry norm.

[61] EGS Ex. 8, Ervin Supplemental Direct at 22.

[62] General Counsel Ex. 4, Gonzalez Direct Testimony at 6-8; General Counsel Ex. 1, Ethridge Direct Testimony at 8-11.

[63] Tr. at 305-08.

[64] HLFCCG Ex. 1, Patton Direct Testimony, Exhibits ADP-10, ADP-13 (illustrating values for system-wide SAIDI for Texas increased from 21.17 in 1994 to 40.36 in 1997, and SAIFI doubled, from .31 in 1994 to .63 in 1997).

[65] General Counsel Ex. 37.

ROW maintenance, but the Company presented no evidence that the study's findings had been implemented. An e-mail sent in August of 1997 by an EGS network manager in Beaumont identified trees touching conductors as one of the preventable root causes of several recent outages.[67]

The Commission concludes that the level of the Company's vegetation management is unacceptable and has significantly affected the reliability of the distribution system in recent years. While such a deficiency may not in itself impact a typical system severely, this deficiency is magnified when the inadequacy of the infrastructure and the nature of the weather in the Company's service area are taken into account.[68] The lack of preventive vegetation control efforts by the Company and neglect of regular vegetation clearing have led to the creation of unnecessary risks. The Commission does not suggest that "ground-to-sky" tree trimming is necessary, but the Company clearly has significant room for improvement. The recent hiring of 30 new vegetation clearance crews, while welcome, confirms the existence of an unacceptable backlog in vegetation control.[69] As will be discussed below, the Commission is also concerned that managers in Texas have no clear line of authority or resources necessary to implement effective vegetation management policies.

---

[66]  General Counsel Ex. 27, Environmental Consultants, Inc., Report on Distribution Line Clearance Program (Jul. 1994) at I-2-3.

[67]  HLFCCG Ex. 6.

[68]  Tr. at 308.

[69]  Tr. at 730-31, 787.

## 3. Emergency Preparedness, Response, Outage Restoration, and Treatment of Storm Data

### a. January 1997 Ice Storm

In mid-January 1997, many parts of Texas experienced a severe ice storm; disruptions of electric service were sustained by most utilities in the state.[70] The impact on EGS' territory was particularly hard. At one time, up to 120,000 of EGS' customers were without power and it took seven days to complete the restoration process.[71] Utilizing help from other utilities and contract workers, EGS had more than 2,700 personnel working to restore service.[72] In assessing the Company's performance, EGS officials compared it to that of other utilities and concluded that its efforts were not only adequate, but even "very good."[73] They blamed most of the damage on excessive ice.[74]

This view was not shared by the other parties.[75] HLFCCG played excerpts from taped conversations conducted by the Company's dispatchers during the storm, which highlighted insufficient numbers of personnel and initially inadequate efforts to repair the damage.[76] The Cities asserted that they had to use their own employees for repairs, including the handling of live wires,[77] and that in some instances they were unable to reach Company employees at all.[78] One of the Cities' exhibits was a letter, dated August

---

[70] General Counsel Ex. 2B, Hughes Workpapers, Ice Storm '97 Field Investigations Project 16301 at II-1.

[71] EGS Ex. 8, Ervin Supplemental Direct Testimony at 53.

[72] *Id.*

[73] *Id.* at 74.

[74] *Id.* at 74-75.

[75] Tr. at 379; Cities Ex. 1, Lawton Direct Testimony at 12.

[76] Tr. at 87-92.

[77] Tr. at 376.

[78] Cities Ex. 2, Kimler Direct Testimony at 2.

17, 1995, from several fire chiefs in EGS' service territory to the Company describing various problems with emergency procedures, such as not being able to reach the Company's 1-800 telephone number, and, apparently, this problem persisted.[79]   Some other cities' representatives testified, however, that the Company's restoration efforts were good.[80]   The significant disparities in the Company's response to the damage caused by the ice storm suggest a need for greater and clearer communication between the Company and all cities, including development of contacts before an emergency occurs.

The Company has an emergency plan on file with the Commission; the plan contains no obvious deficiencies.[81]   As is industry practice, EGS also has agreements with other utilities for emergency cooperation; those agreements, however, are not in writing.[82]

The January 1997 ice storm was certainly a severe storm that would have adversely affected even the best-maintained distribution system.   EGS' distribution system, however, is not the best-maintained.   A major cause of the outages during the storm were broken or bowed ice-laden tree limbs overhanging the wires.   Tree limbs in ROW overhanging distribution lines pose a threat to system reliability, and are largely within EGS' control.   The Company's failure to clear the limbs before the storm was a major factor in the number and duration of outages experienced by customers.[83]   While Company's initial efforts to mobilize and deploy additional non-EGS personnel were slow and cause concern,[84] vegetation management failures greatly aggravated the

---

[79] Cities Ex. 2, Kimler Direct Testimony at 7.

[80] Tr. at 377, 381, 391.

[81] General Counsel Ex. 2, Hughes Direct Testimony at 21.

[82] Tr. at 676-77.

[83] General Counsel Ex. 2, Hughes Direct Testimony at 17.

[84] Tr. at 379.

situation. The Company has experienced major storms in 1994, 1995, and 1997.[85] The weather, however, cannot be an excuse for poor service. While the Commission does not expect 100 percent reliability, the system must be built and maintained taking the local geographic and weather conditions into account.

### b. Treatment of Storm Data

The Commission has required utilities to report the causes of interruptions, including the extreme storms. EGS, however, excludes outage duration and frequency data from its SAIDI and SAIFI reports if the data are attributable to a "major storm."[86] As defined currently by the Commission, major storms include situations in which there is a loss of power to 10 percent or more of customers in a region over a 24-hour period and full restoration is not achieved within 24 hours.[87] EGS' definition of a major storm counts any event in which 10 percent or more of a region's customers are interrupted for 24 hours or more, and is similar to the Commission's definition.[88]

HLFCCG argued that interruptions associated with major storms should be included in the computation of reliability indices. HLFCCG maintains that the design and maintenance of lines, and therefore their condition under the stress of severe weather, is within the control of the utility.[89] Exclusion of major-storm interruptions from reliability indices could encourage reduced preventive maintenance, including vegetation management, and reductions in force needed for restoration efforts.[90]

---

[85] Tr. at 214, 377.

[86] Tr. at 54.

[87] EGS Ex. 10, Ervin Rebuttal Testimony at 30.

[88] *Id.*

[89] HLFCCG Ex. 1, Patton Direct Testimony at 14.

[90] *Id.* at 15.

The Commission is reluctant to allow the Company to exclude major-storm data from its overall reports because such reports may be incorrectly perceived as an indication that overall service quality is better than it actually is. Also, leaving major-storm data out may obscure the fact that poor management and maintenance, and not just the severity of the weather, contribute to or cause a weather event to become serious enough to be classified as a "major storm." Despite a great deal of controverting testimony by customer groups, the Company continues to assert that the acknowledged problems during the 1997 ice storm were a "storm-of-the-century" aberration.[91] Allowing the Company to carve out major storms from its outage-reporting data would mask the seriousness of service quality problems that occur on its system under all conditions.

The Commission understands that if a truly major storm affects the system, the Company cannot be expected to restore power and respond to increased customer calls as fast as it would in a more "normal" or day-to-day situations. Therefore, the Commission will allow the segregation of major from non-major storm data in outage frequency and duration reports. The major storms, defined by the severity of the weather conditions, rather than by the outage duration, will be reported and evaluated separately, as discussed in the "Remedies" section below.

## 4. Personnel Levels and Management Practices; Spending Levels

### a. Personnel Levels

All parties agreed that post-merger personnel cuts were executed, ostensibly, in order to save costs. The Company asserted that cuts were possible because of increased efficiencies and that the permanent employees were simply replaced with contract workers.[92] The other parties maintained that cuts were not only too extensive, but

---

[91] Tr. at 225; EGS Ex. 10, Ervin Rebuttal Testimony at 32-35.

[92] Tr. at 160, 236; EGS Ex. 8, Ervin Supplemental Direct at 19; EGS Ex. 10, Ervin Rebuttal Testimony at 51.

resulted in a loss of many years of worker experience that could not be compensated for by contract workers who may lack knowledge of the system or loyalty to the Company. For example, General Counsel witness Ethridge cited the forced departure of 66 employees with an average of 18 years of experience each.[93]   A precise number of lost employees was not conclusively proven: the Company maintained that total net loss was only 23,[94] but HLFCCG, for instance, asserted that in the space of three years, the jobs of 67 linemen were eliminated.[95]

A related issue concerned the Company's ability to evaluate contract workers' performance: while the Company felt confident about increased efficiency of its hiring practices, it did admit to not having performance measures for contract workers.[96] General Counsel presented Company documents showing that controls over contract worker management were not effective.[97]   An internal risk assessment audit, conducted by the Company, also concluded that no formal and consistent process existed to monitor contractor performance, that management employees did not generate necessary reports to allow proper monitoring, and that distribution contracts were not competitively bid.[98] An additional concern presented by Cities dealt with the decrease in the number of operational staff while regulatory staff increased; this led Cities to conclude that the Company had insufficient focus on system maintenance matters.[99]

---

[93] General Counsel Ex. 1, Ethridge Direct Testimony at 37.

[94] Tr. at 236; EGS Ex. 10, Ervin Rebuttal Testimony at 52.

[95] HLFCCG IB at 6 (referring to General Counsel Ex. 16 at 2, and Ex. 17 at 2).

[96] Tr. at 249-50.

[97] General Counsel IB at 14 (referring to HLFCCG Ex. 13, Entergy Internal Audit and Risk Assessment).

[98] HLFCCG Ex. 1, Patton Direct Testimony, Risk Assessment Attachment at 3-4, 6.

[99] Cities Ex. 1, Lawton Direct Testimony at 12; Tr. at 164.

The Commission concludes that, post-merger, EGS cut many experienced employees, some of whom were consequently replaced by contract workers. The Commission, however, will not prescribe what personnel levels the Company should maintain. It is up to EGS to make sure it has enough workers to carry out proper maintenance and necessary emergency responses, along with having well-defined performance measures for both regular and contract employees.

### b. Management Practices

Because the various operational entities under the holding company are split both along functional and geographic lines, tracing management structure poses some difficulties. According to Company witness Johnny Ervin, a network manager is located in Beaumont, along with a reliability supervisor.[100] There are two levels of customer service managers located in Beaumont; the vice president of customer service is located in Jackson, Mississippi. During the hearing, however, the Company presented its director of performance measurement, located in Little Rock, Arkansas, to speak on customer service issues. The network manager and reliability supervisor report to a franchise director (in Beaumont) and reliability director (in New Orleans, Louisiana), respectively. Both of these directors report to a senior vice president of distribution operations, who is located in New Orleans and is actually employed by Entergy Services, Inc. The senior vice president answers to a utility group president, who has above him the chief operating officer and, finally, the chief executive officer of Entergy. According to Mr. Ervin, this reflects a new and "flatter" organizational structure, designed to promote better communication.[101] None of the managers in Beaumont reports to the EGS president, who has offices in Beaumont and Austin, Texas.

---

[100] Tr. at 789-794; the entire description of the management structure is taken from these pages of the transcript.

[101] *Id.*

The Commission has concerns regarding the Company's management structure. It is not clear from the evidence that managers actually have the authority and matching resources to supervise their specific areas.[102] Those responsible for system reliability have little control over the vegetation management area, even though vegetation management has a major impact on how well the T&D system functions. The Company's internal audit concluded that there was no overall strategic plan in place to set performance strategies, and that hindered management in accomplishing business objectives and goals.[103] While EGS' representatives explained that recent changes in management structure were aimed at increasing communication, they also revealed that there was no structured way for the management to track and resolve problems reported by the employees.[104] In addition, managers' bonuses are tied in part to cost-cutting which may conflict with efforts to improve system performance.[105]

The Commission concludes that those who are responsible for the reliable performance of the Company's distribution system in Texas must also have the necessary authority and resources at their full disposal to maintain the system. The managers in the Texas territory must have clearly delineated powers and should be accountable to a unified higher management. The current, bifurcated management structure, under which local Texas supervisors report to multiple supervisors, is an obstacle to effective and reliable operation of EGS' Texas system.

### c. Spending Levels

An issue addressed at length in this docket involved the Company's record of investment in the T&D system, particularly in maintenance. While there is hardly a

---

[102] Tr. at 791-92.

[103] HLFCCG Ex. 1, Patton Direct Testimony, Internal Audit and Risk Assessment at 4.

[104] Tr. at 204-05.

[105] Tr. at 475, 847. General Counsel Ex. 20. Also, EGS internal risk assessment studies for vegetation management and distribution maintenance list cost-cutting as a major business goal.

substitute for sufficient O&M expenditures, the Commission will not prescribe a specific level of spending that may guarantee adequate service quality, and, at present, is not keenly interested in past expenditure levels. The Commission is primarily interested in results. As noted in the March 7, 1997 Supplemental Preliminary Order in Docket No. 16705, the Commission recognizes "that there may be a point of diminishing returns above which the dollars or resources allocated to service quality become unreasonable and fail to be cost effective."[106] That crossover point is not set in this docket, and it is not intended to be set. EGS is responsible for determining sufficient spending levels and for the appropriate allocation of resources to O&M, distribution capital additions, and other categories in order to meet its obligation to provide adequate service quality.

In the hearing, EGS witnesses maintained that the Company had increased T&D spending since the 1993 merger; that inspection and measurement standards had improved; and that its spending on service quality programs equaled or even exceeded that of other utilities.[107] It is not certain, however, that EGS actually increased spending because expenses were not categorized clearly. Increased spending, if any, shows just that--increased spending; it does not measure how the quality of service has improved, or whether the service is adequate in accordance with PURA. Nonetheless, EGS is required to provide *continuous and adequate* service in accordance with traditional reasonable and necessary cost standards.[108]

In a memo dated October 31, 1995, a Company official discusses vegetation maintenance spending in the Southern Region and points to a recently implemented 20 percent reduction in allocations which, he expresses, cannot be sustained by any region

---

[106] Supplemental Preliminary Order at 2, Docket No. 16705 (Mar. 7, 1997).

[107] Tr. at 760; EGS IB at 7-10.

[108] The Commission would expect some increases in spending since the 1993 merger because GSU, facing bankruptcy, would have presumably reduced even the necessary expenses.

without an adverse effect on customer service.[109]  The parties generally agreed that spending on O&M decreased, while distribution capital additions slightly increased.[110] The Internal Audit department of the Company in its distribution risk assessment study identified the budget process which allocated dollars to the regions based on past history rather than system needs as one of the problems that needed to be resolved.[111]

After evaluating the record evidence, the Commission concludes that expenditure levels for O&M are confusing and unclear, and pose a problem regarding tracking and accountability.  While the Commission declines to state specific amounts to be spent, proper tracking and accounting of expenditures, both by type and jurisdiction, are essential.  For example, the Company was unable to explain a 50 percent increase in the miscellaneous Federal Energy Regulatory Commission (FERC) Account 588.[112]  It is virtually impossible to ascertain how much of the O&M budget is actually spent in the Texas jurisdiction or for distribution capital additions as compared to system maintenance.

The Commission concludes that expenditures for O&M must be readily available and verifiable.  The same applies to the oft-mentioned, but never specified or quantified, "increased efficiencies" used to justify cutting costs.[113]  For such claims to have any weight, the Company must have a ready and reasonable explanation together with supporting documentation.

---

[109] General Counsel Ex. 28 at 2.

[110] Tr. at 134, 248; 353-54; General Counsel Ex. 1, Ethridge Direct Testimony at 20, 27; Cities Ex. 1, Lawton Direct Testimony at 8.

[111] General Counsel Ex. 30 at 7.

[112] *Id.* at 9; Tr. at 153-54.

[113] EGS Ex. 8, Ervin Supplemental Direct at 16, 19-20.

## 5. Pockets of Unreliability; Customer Service

### a. Pockets of Unreliability

One of the issues identified in the Supplemental Preliminary Order in Docket No. 16705 involves pockets of particularly unreliable service,[114] such as the feeder Tamina, which had 41.3 hours of outage time in one year.[115] Rural customers are more likely to experience outages and wait longer for restoration. The Company admits to areas of lower reliability[116] and agrees that "outliers" must be improved.[117] The Company's practice--seemingly logical--of first restoring and clearing areas with most customers has led to the same customers experiencing repeated lower-quality service. In addition, the Company maintains a list of "politically sensitive" accounts, which suggests that some customers may receive preferential treatment.[118]

The Commission concludes that there should be a high standard of service for all customers, including a set minimum standard below which no customer would fall, and that the Company needs to bring all of its worst performing poles and feeders into compliance with that minimum standard.

### b. Customer Service

The Company has maintained, from the outset of this case, that its service is not deficient, but that it simply faces a "customer perception" problem. The Company knows that it has a large number of customers who are not satisfied with their electric service.[119]

---

[114] Supplemental Preliminary Order at 3, Docket No. 16705 (March 7, 1997); *see also*, General Counsel Ex. 7 at 36.

[115] General Counsel Ex. 3, Eckhoff Direct Testimony, Appendix H.

[116] Tr. at 122, 223, 652.

[117] Tr. at 223-24.

[118] Tr. at 396-97.

[119] Tr. at 219. The Company's internal customer survey showed declining satisfaction levels from 1995 to 1996, Tr. at 198-200.

Based on the record, the Commission concludes that EGS customers' perceptions are justified. The same concerns were reflected in the testimony of city officials charged with protecting the health and safety of their citizens. Of particular note was the evidence that a municipality was compelled to call upon its volunteer firefighters to disconnect live electric wires because the Company's personnel were not available to perform this highly dangerous task.[120]

The Company's inadequate service quality is not necessarily an outgrowth of a lack of "money" or "expenditures." The Company has available funds that should be sufficient to provide higher-quality service, as may be gathered from the fact that the entire O&M budget was not spent.[121] It should be noted that the internal risk assessment study on distribution line construction and service restoration lists as the first priority improvement in customer perception of energy delivery and improvement in reliability only as a second priority.[122]

EGS' customers and the Commission believe that the Company has an obligation to provide continuous and adequate service, and that significant improvements in EGS' performance are needed. Section D, below, outlines the outcomes EGS must attain for the Commission to be satisfied that those improvements have been made. An improvement in EGS performance will eventually lead to more favorable perceptions and evaluations by the Company's customers.

---

[120] Tr. at 376.

[121] Tr. at 468-70.

[122] General Counsel Ex. 30 at 1.

*D. Remedies*

Based on the foregoing analysis, the Commission concludes that the Company's service quality must be improved. The following incentive plan lays out remedies to help EGS achieve such improvements. The five essential components of the plan are as follows:

1. A reduction in the return on equity divided into two parts: an adjustment component that recognizes EGS' current service quality is not adequate, with amounts to be refunded to customers, and an incentive-pool component to encourage future improvements in service quality;

2. Adoption of minimum and target levels for SAIDI and SAIFI as recommended in General Counsel's testimony, including improvement in the worst- feeder performance; establishment of standards for major-storm data; and reporting requirements;

3. Partial adoption of customer service performance benchmarks as recommended in General Counsel's testimony;

4. Establishment of a quality assurance requirement to ensure improved performance through the hiring of an independent consultant consistent with the amended, non-unanimous stipulation; and, to guarantee the accuracy of all data, hiring by the Company of an independent auditor to review all reports.[123]

5. A customer information and notification requirement.

## 1. Reduction in the Return on Equity and Incentive Pool

Drawing from the recommendation in the testimony of Cities' witness Lawton, the Company will be assessed a 60-basis point reduction in its ROE adopted in Phase II of Docket No. 16705. This reduction shall be implemented in recognition of the historically inadequate performance of EGS' distribution system. The Company will be required to refund current overcollections, including all appropriate taxes, for the period

---

[123] EGS had filed an amended, non-unanimous stipulation regarding the hiring of an independent consultant to assess Company's distribution system, including a review of the service quality processes. The Commission approved the stipulation with modifications on January 15, 1998.

starting with June 1, 1996, the effective date of any rate reductions ordered in Docket No. 16705, up to the effective date of this order.[124]

Going forward, the Company will collect the amount equal to one-half of the 60-basis point reduction, plus appropriate taxes, and deposit that amount in an interest-bearing escrow account to create an incentive pool. The Company may earn this escrowed amount back by achieving specific performance targets. The other one-half of the 60-basis point reduction, plus appropriate taxes, will be retained by the ratepayers. The performance evaluation year will be a 12-month period, commencing on November 1, and ending on October 31. For SAIDI and SAIFI minimum level compliance, SAIDI and SAIFI target level compliance, and compliance with the billing-error rate and call center performance targets, the initial evaluation period shall commence on November 1, 1997, and end on October 31, 1998. For service installation, line extension, and light replacement customer service performance measures, the initial evaluation period shall commence on May 1, 1998, and end on October 31, 1998. Thus, EGS' performance during the initial measurement year for these three performance measures shall be based on only six months of customer service performance. During subsequent years, EGS' performance shall be based on twelve months of customer service performance. At the end of each performance evaluation period, if the Company fails to achieve stated performance benchmarks in any of the three areas (SAIDI and SAIFI minimum levels, SAIDI and SAIFI target levels, and customer service), a corresponding portion of the incentive pool will be refunded to distribution-level customers, divided on a pro-rata basis within each customer class, except as noted below. If the Company successfully reaches all of the benchmarks, the full amount of the incentive pool will revert back to EGS.

---

[124] The effective date of this Order for the purposes of the requirements set forth herein is the date on which this Order is no longer subject to rehearing.

The performance evaluation year is intended to coincide with the filing requirements of the Commission's Electric System Service Quality Report (ESSQR) forms. If the Commission were to change the ESSQR form time periods to a calendar-year basis, the performance evaluation periods discussed above for EGS shall change to be consistent with the Report form periods.

Performance will be evaluated, and the incentive pool will be divided, according to three measures: (1) improvement in the minimum performance levels for SAIDI and SAIFI for worst feeders; (2) improvement in the target performance levels for SAIDI and SAIFI for average feeders; and (3) improvement in customer service performance, which has five components: (a) billing-error rate, (b) connection rate at the call center, (c) timeliness in completing service and meter installations, (d) timeliness in completing line extensions, and (e) timeliness in replacing and/or repairing service and street lights.

For the purposes of determining what amount, if any, the Company will earn back, the portions of the incentive pool will be represented by the following benchmarks: SAIDI and SAIFI minimum value improvements for the "worst" feeders (described below) will count as one-third of the pool; SAIDI and SAIFI target value improvements will count as one-third of the pool; and customer service improvements will count as one-third. Failure to achieve a measure will result in refunds to the affected customers based on the requirements for that specific measure. SAIDI and SAIFI will be calculated on a feeder-specific basis.

The Company has stated it does not have the ability to measure customer-specific feeder performance, and thus cannot calculate customer-specific refunds. For the first measure, however, refunds shall be provided to all customers taking service from a feeder that fails to meet the SAIDI and SAIFI minimum acceptable levels as recorded over a one-year period. These refunds are more customer-specific than currently contemplated by the Company, but because only a small number of feeders is expected to fall into this

category, the refund calculations should not pose an insurmountable problem.[125]  For the second measure, if the Company fails to achieve the specified SAIDI and SAIFI target level improvements, refunds shall be made to all Texas, distribution-level customers.  For the third measure, failure to meet the standard for any of the customer service components will result in pro-rata refunds to each of the distribution-level customers.  Distribution-level customers are meant to be those Texas, retail residential and small commercial ratepayers whose contract demands are less than or equal to 100 kW.

Feeder-specific refunds shall be distributed in a single billing period in proportion to and limited by each customer's total annual electric usage (i.e., no customer shall receive a refund greater than the total amount paid by that customer for the service in that year).  If any money remains in the pool, the amount shall be refunded to all distribution-level customers on a pro-rata basis.  All refunds shall be labeled "Service Quality Refund" on the customer's bill and shall be directed to the current customer receiving service at a given premise.

## 2. Minimum and Target Performance Levels

### a. Frequency and Duration of Interruptions

The performance benchmarks are drawn from General Counsel's testimony with some adjustments.  General Counsel proposed that the Company measure the duration of interruptions using the Average System Availability Index (ASAI).  The ASAI index and the SAIDI index are closely related.  Since the Company is required to report SAIDI under the Commission's service quality rules, that index will be used as the duration measure. General Counsel, HLFCCG, and Cities agree that performance should be measured feeder-by-feeder rather than through a system average.  EGS has accepted a feeder-by-feeder approach for outage frequency.[126]  General Counsel's proposal for

---

[125] The Company states that it does not have the ability to tie specific feeders to specific customers; it is expected, however, that the number of feeders involved is such that manual calculations will be possible or the Company can use its TACTICS program.  Tr. at 445-46.

[126] Tr. at 228.

feeder-by-feeder SAIFI and SAIDI targets is presented in Table 1, where the SAIDI targets are converted from the ASAI values recommended by General Counsel.[127] The Commission adopts the following performance targets for use by EGS as its reliability performance standards.

Table 1: General Counsel's Proposal for Interruption Performance Measures

| Index Value | Minimum Acceptable Value (annual) | Target Value (annual) |
|---|---|---|
| SAIFI | 3.8 interruptions | 2.6 interruptions |
| SAIDI | 315 minutes (5.25 hours) | 158 minutes (2.63 hours) |

Source: Eckhoff Direct Testimony at 7.

General Counsel's testimony indicates that distribution feeders serving approximately 90 percent of EGS' Texas customer meters met the minimum acceptable values for SAIDI and SAIFI in 1996.[128] Distribution feeders serving approximately 75 percent of EGS' Texas customer meters met the target values in 1996.[129]

### b. Minimum Performance Benchmark

General Counsel presented testimony to show that a certain percentage of EGS' feeders fall below the minimum acceptable values for SAIDI and SAIFI. As part of the remedial plan, the Company must achieve 95 percent compliance with the minimum acceptable values in 1998, so that no more than 5 percent of distribution feeders serving EGS' Texas customer fail to meet the minimum acceptable values for SAIDI and SAIFI.

---

[127] General Counsel Ex. 3, Eckhoff Direct Testimony at 7. HLFCCG recommends an annual feeder-by-feeder standard for SAIFI of 3 interruptions and for SAIDI of 200 minutes. HLFCCG Ex. 1, Patton Direct Testimony at 29.

[128] General Counsel reported that feeders serving 89.97 percent of EGS' Texas customer meters met the SAIFI minimum value, and 90.84 percent met the ASAI minimum value. General Counsel Ex. 3, Eckhoff Direct Testimony at 33-34.

[129] General Counsel reported that feeders serving 75.6 percent of EGS' Texas customers met the SAIFI target value, and 76.86 percent met the ASAI target value. Id.

For the following year, the compliance level will be raised to 98.5 percent. In addition, in year 2 and thereafter, EGS must also meet the following conditions: (1) two or more feeders served by the same substation may not fail to attain any minimum acceptable value; (2) no feeder may fail to attain the minimum acceptable value for two or more consecutive years; and (3) 98.5 percent of all meters must receive service at a level meeting or exceeding both minimum acceptable values. Feeders with 5 or fewer meters shall not be considered in determining whether EGS has met these compliance standards. The Company will maintain or exceed the 98.5 percent compliance with these standards in the subsequent years.

To document and track this improvement, the Company shall identify the worst-performing feeders as discussed herein. EGS shall file SAIDI and SAIFI performance data for all feeders in the following way: (1) exclusive of storm effects and using the SAIDI and SAIFI definitions of major events as contained in the Commission's Electric System Service Quality Report filing (PUC Project No. 15013), and (2) inclusive of all such storm effects and defining major weather events as an ice accumulation of at least one inch of ice within the period of 24 hours, or winds greater than 80 miles-per-hour. Further, EGS shall rank all of its 431 Texas distribution feeders from best to worst according to SAIFI numbers calculated as described above. A list of the worst 10 percent shall be submitted as a part of the June 15, 1998 ESSQR filing. Because the report asks for data on the worst 5 percent of the feeders, the Company shall supplement its filing for the purposes of this docket. If the Company fails to meet the minimum acceptable value benchmark or the major-storm restoration measure for that year, as described below, one-third of the incentive pool amount, plus appropriate taxes, will be refunded to customers served by all non-complying feeders.

### c. Target Performance Benchmark

In 1998, for all feeders, the Company must achieve 85 percent compliance with General Counsel's recommended target levels for SAIDI and SAIFI to retain the corresponding portion of the incentive pool (i.e., the Company must improve up to the

target levels an additional 10 percent of its feeders, from 75 to 85 percent). In the following year, SAIDI and SAIFI compliance with the target levels will be raised to 90 percent of feeders, and this level will be maintained or exceeded in the future. If the Company fails to meet the target performance benchmark, one-third of the incentive pool, plus appropriate taxes, will be refunded to all Texas distribution-level customers.

### d. Treatment of Major-Storm Data

The record shows that extreme weather events can cause major outages. For the purposes of record-keeping and performance evaluation, it is necessary to define extreme events according to actual weather conditions rather than the effect weather has on the T&D system. For the purposes of its supplemental filing, EGS shall define extreme weather as an ice accumulation of at least one inch of ice within the period of 24 hours, or winds greater than 80 miles-per-hour. The Company shall keep its records in a way that includes all weather events, and a separate set that includes only the major-weather events. The determination of the Company's performance regarding SAIDI and SAIFI benchmarks shall be calculated based on the all-inclusive data. In addition, the Commission adopts as the performance measure for major-weather events the complete restoration of all customers' electric service no later than 120 hours after the initiation of such an event (i.e., when an accumulation of one inch of ice or 80 mph wind have been recorded). Failure to achieve this measure will preclude the Company's recovery of the one-third of the incentive pool, plus appropriate taxes, associated with the SAIDI and SAIFI minimum acceptable level compliance for that year.

If an extreme-weather event occurs on the system, and the Company believes it has a detrimental effect on the overall performance for that year, the Company may submit a good cause exception filing for the Commission's consideration on whether to include such an event in the annual evaluation of compliance with set benchmarks.

### e. Reporting Requirements

As discussed above, the Company shall file collected data regarding performance measures on a semi-annual basis, which filings shall coincide with the filing dates of the Commission's ESSQR form. In addition to that filing, on March 1 of each year beginning in 1999, the Company shall file a proposed reconciliation statement showing the level of achievement with the established benchmarks to qualify for any part of the incentive pool. The filing shall be audited by an independent auditor prior to filing, and the auditor's report shall be filed with the proposed reconciliation statement. If and when the Commission approves the filing, the Company shall retain the appropriate portion of the pool or refund the corresponding portion, plus appropriate taxes, to its Texas distribution-level customers, as directed by the Commission. SAIDI and SAIFI performance data shall be reported according to the following schedule: May through October data due on December 15; November through April data due on June 15 of each year.

## 3. Customer Service Performance Benchmarks

The performance measures listed below in Table 2 are drawn from General Counsel's recommendations, with the exception of security and street light replacement, which is based on a recommendation made by the Company.[130] In its reply brief, EGS adopted many of the components of General Counsel's recommended performance measures for customer service.[131] For the purposes of this remedial plan, each customer service measure will be computed for the time interval noted in Table 2, and reported to the Commission every six months, consistent with the filing dates for the service quality reports, as a separate Customer Service Report. If all five targets are achieved by EGS in one given year, the customer service portion of the incentive pool will be retained by the

---

[130] General Counsel Ex. 7, Goodman Direct Testimony; General Counsel Ex. 5, Burrows Direct Testimony, Attachment JBG-8.

[131] EGS Reply Brief at 17-21.

Company for that year; otherwise, that portion of the incentive pool, plus appropriate taxes, will be refunded to distribution-level customers on a pro-rata basis.

Table 2:  Performance Targets for Customer Service Measures

| Customer Service Measure | Performance Target |
|---|---|
| Billing-error rate | The Texas system average monthly rate of actual customer over-billing errors per 1000 customers shall not exceed five. |
| Call center performance | Seven days a week, 24 hours per day, on a monthly basis, in every EGS call center, 85 percent of the time, calls shall be answered within 30 seconds. |
| Service installation | In any distribution substation service area, 90 percent of applications for new electric service and meters not involving line extensions or new facilities shall be filled within five working days, excluding those orders in which a later date is specifically requested by the customer.  Service installation compliance will be measured on a quarterly basis. |
| Line extensions | In any distribution substation service area, 85 percent of requests for line extensions or new facilities shall be completed within 60 working days, excluding those orders in which a later date is specifically requested by the customer.  This standard includes orders for new service and other services, installations, moves, or changes, but not complex services.  Line installation compliance will be measured on a quarterly basis. |
| Light replacements | In any distribution substation service area, 90 percent of all customer reports of security and streetlight outages shall be corrected within 48 hours.  Light replacement compliance will be measured on a quarterly basis. |

Note: Definitions of specific terms are adopted from J.B. Goodman Direct Testimony, Attachment JBG-8.

After EGS files its first annual customer service report on December 15, 1998, the Commission Staff will work cooperatively with any party who requests it to review performance data collected by EGS relevant to the performance targets, established in Table 2 for new service installations, line extensions, and street lights, in order to determine whether the targets should be adjusted and, if so, in what manner.  No earlier than April 1, 1999, any party may petition the Commission to revise these three customer service measures and targets.  In its December filing each year, EGS shall, for the purposes of this docket, provide an annual, audited summary of customer service performance data.

## 4. Quality Assurance Proposal; Independent Consultant; and Independent Auditor

According to the terms of the amended, non-unanimous stipulation, the Company shall hire an independent consultant to assess the distribution system, develop strategies for improvement, revise data collection practices, and set up evaluation criteria procedures spelled out in the order approving that stipulation as modified.[132]  Testimony in this docket exposed inconsistencies in EGS' collection, recording, and reporting of service quality indices, including SAIDI and SAIFI.  The Company shall develop a quality assurance program that guarantees accurate and consistent reporting of all collected data.  The Company shall file its quality assurance proposal no later than August 16, 1998.[133]  The deadline shall be extended one day for every day the consultant's report addressing the EGS distribution system is filed beyond July 16, 1998.  This proposal shall be developed with the input and in conjunction with the work done by the independent consultant hired under the terms of the amended, non-unanimous stipulation.  To guarantee that all data and reports collected by EGS and filed with the Commission are accurate and consistent, the Company shall hire annually an independent auditor to review such data and reports.

## 5. Customer Information/Notification

The final component of the incentive plan is the information and notification requirement.  Following its annual reconciliation statement filed with the Commission, the Company shall include an insert in bills to its customers that explains the service quality requirements, the Company's performance during the preceding annual period, and the amount of the refund to distribution-level customers.  The insert shall contain

---

[132]  On December 17, 1997, EGS, OPUC, HLFCCG, Cities, and General Counsel, jointly filed a supplementary motion for entry of an order consistent with proposed amendments to a previously filed non-unanimous stipulation.

[133]  The quality assurance requirement appears consistent with the amended non-unanimous stipulation related to hiring a service quality consultant filed by EGS and other signing parties, on December 17, 1997.

instructions to customers on who to contact to report broken or malfunctioning street lights. The proposal for the scope and content of the bill inserts shall be included in the Company's annual reconciliation filing.

## IV.    Findings of Fact and Conclusions of Law

The preceding discussion explains the Commission's factual and legal conclusions with regard to the issues presented in this docket. In accordance with TEX. GOV'T CODE ANN. § 2001.141, the Commission separately states the following findings of fact and conclusions of law.

### A. Findings of Fact

Procedural History

1.     On November 27, 1996, EGS filed with the Commission its transition/rate case in Docket No. 16705.

2.     The Commission referred the case to SOAH on December 5, 1996. The preliminary order issued by the Commission on January 24, 1997, in Docket No. 16705 directed that the docket "address specific service quality standards that will apply after the transition [proposed by EGS]."

3.     On March 7, 1997, the Commission issued a supplemental preliminary order in Docket No. 16705 that focused specifically on service quality issues. That order delineated three questions which must be addressed: (1) Whether EGS has an effective and prudent management policy in place that devotes sufficient resources to ensure adequate and reliable service to its ratepayers; (2) Whether there appear patterns of variable service quality in EGS' service territory, and if so, what is the cause and potential resolution of these variations; (3) Whether the Commission should implement procedures, and if so, what procedures can it implement, to monitor service quality on EGS' system, and to respond to situations in which EGS' service quality falls below the benchmark levels.

4.     SOAH segmented the hearings in Docket No. 16705 (SOAH Docket No. 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) into four phases to address numerous transition and rate issues separately. The service quality issues were scheduled for hearing in early November 1997, in the "Competitive Issues" phase of the case.

5.      At the November 4, 1997 Open Meeting, Chairman Pat Wood, III, and Commissioner Judy Walsh voted to sever the service quality issues from Docket No. 16705 and determined that the Commission itself would hear and resolve these issues.

6.      An order issued on November 4, 1997, established Docket No. 18249 to address the service quality issues.   The order also established procedures by which the Commission would hear and rule on the service quality issues directly.

7.      Chairman Wood and Commissioner Walsh convened and presided over a public hearing on the merits on November 20 and 21, 1997, to address EGS' service quality issues.   EGS, Cities, HLFCCG, and General Counsel submitted their testimony and exhibits into evidence and conducted cross-examination.    The Chairman and Commissioner Walsh also directed questions to the witnesses.

8.      EGS, Cities, HLFCCG, and General Counsel filed post-hearing briefs in this docket on December 2, 1997.  Reply briefs were filed by these same parties on December 9, 1997.  The Office of Public Utility Counsel and the Attorney General's Office filed statements on December 2 and 9, 1997, respectively, supporting the briefs of the Cities and HLFCCG.

9.      The Commission issued its Final Order in this docket on February 13, 1998.

10.     On March 5, 1998, General Counsel and EGS filed motions for rehearing.

11.     At the March 19, 1998 open meeting, the Commission granted extensions to rule on the motions for rehearing until May 14, 1998, and to file replies until March 25, 1998.

12.     On March 25, 1998, a joint reply to motions for rehearing and motion for entry of order consistent with the parties' stipulation and agreement (the Stipulation) was filed and signed by General Counsel, EGS, HLFCCG, and OPUC.

13.     The Commission granted rehearing at the April 1, 1998 open meeting and also approved the Stipulation.

Notice

14.     Hearings held on November 20 and 21, 1997, were properly noticed in accordance with TEX. GOV'T CODE ANN. §§ 551.041, 551.043, 2001.051, and 2001.052.

15.     This matter was scheduled for discussion in open meetings convened on December 17, 1997, January 14, 1998, and April 1, 1998, for which notice was given pursuant to TEX. GOV'T CODE ANN. §§ 551.041 and 551.043.

EGS

16.     EGS is a public utility subject to the jurisdiction of this Commission in accordance with PURA §§ 14.001, 31.001, 32.001, 33.122, and 36.001 through 36.156.

17.     EGS is a wholly-owned subsidiary of Entergy, a holding company incorporated in Delaware and registered with the federal Securities and Exchange Commission in accordance with the Public Utility Holding Company Act.

18.     Entergy acquired Gulf States Utilities, Inc., to create EGS, effective as of December 31, 1993.

19.     EGS operates in Louisiana and Texas, and through its parent holding company is affiliated with investor-owned electric utilities located in Louisiana, Mississippi, and Arkansas. Entergy's headquarters is located in New Orleans, Louisiana.

20.     EGS' Texas service territory covers the southeastern part of the state. EGS' principal office in Texas is located in Beaumont.

Management Structure

21.     In Beaumont, EGS employs, among others, a network manager and a reliability supervisor. These managers report to a franchise director, also located in Beaumont.

22.     The network manager's and reliability supervisor's responsibilities include managing and dealing with system reliability, outages, restoration, and vegetation management.

23.     The network managers report to the franchise director located in Beaumont, who reports to the senior vice president of distribution operations, employed by Entergy Services, Inc., and located in New Orleans.

24.     In New Orleans, the vice president of distribution operations answers to a utility group president, who reports to a chief operating officer, and ultimately the chief operating officer of Entergy.

25.     The network manager, reliability supervisor, and franchise director do not report to the EGS president, who has offices both in Austin and Beaumont.

26.     The Company management structure is ill-suited to assure best supervision of the T&D system in the Texas territory. The supervisors in Texas answer to multiple directors in Louisiana, do not have all the necessary resources at their disposal, and their bonus incentives are tied in part to successful cost-cutting.

Transmission System

27.   The construction of EGS' transmission system started in 1924.  Half of the transmission lines currently in service were added in the 1950's and 1960's.  Since 1977, 12 percent of the lines have been newly built or rehabilitated.

28.   The Commission finds that the physical state of EGS' transmission system is adequate; few transmission-related outages or circuit breaker operations occurred.

29.   Transmission line ROW appear to be clear.

30.   The EGS transmission system appears to provide adequate, continuous, and reliable service.

Physical Condition of Distribution System and Pole Inspection Program

31.   EGS serves approximately 318,279 customers in Texas.  The distribution system in the state is comprised of 11,472 miles of electric lines; 394,865 poles; and approximately 431 feeders.

32.   EGS contracted with Osmose Wood Preserving Company to perform inspections of EGS poles and crossarms in Texas for the years 1995 and 1996.

33.   In 1995 and 1996, Osmose field inspectors inspected a total of 37,233 wood poles in eight different areas.  The poles reviewed account for 9.4 percent of the total number of poles in EGS' Texas system.

34.   Although the Osmose inspections focused on particularly troubled spots of the distribution system in Texas, certain areas revealed a number of deficient poles that was excessive by any measure.

35.   Osmose survey results show wide fluctuations in percentages of poles with decay, from 8 to 37 percent, with the average percentage being 17.9 percent.

36.   EGS proposes to implement a new pole inspection program, through which approximately 35,000 poles will be inspected annually, so that all poles in the Texas jurisdiction will be inspected by the end of the 10th year.

37.   General Counsel selected Drash Consulting Engineering Inc. to survey 33 uniformly distributed substations from the Texas portion of the EGS distribution system.

38.   General Counsel recommended that Drash inspect a representative sample of 591 poles on feeders originating from these 33 substations, of which Drash visually surveyed 582, or 98.42 percent, of poles.

39.    The Drash report picked for inspection approximately every 5th, 10th, or 15th pole from the substation. The age of the poles was determined by visual inspection.

40.    Drash filed its report on August 11, 1997, in which it identified 59 of 582 poles with structural deficiencies, such as rot, decay, or leaning, and 72 poles with encroachments by tree limbs and vegetation build-up.

41.    The Drash survey did not use specific criteria by which to evaluate the condition of the poles, but relied on the inspectors' experience.

42.    Beginning on May 12, 1997, the Commission Staff performed limited, random inspections of EGS' poles in the Vidor, Orange, Bridge City, Port Arthur, and Port Neches areas. The Staff inspections also encompassed the northern portion of the system to the western limits of EGS' service area.

43.    By August 1997, the Commission Staff surveyed 60 poles, and found that 6.7 percent had equipment deficiencies and 63 percent had ROW problems.

44.    In general, the distribution system is in adequate condition; however, there are numerous poles with decay, in need of repair or replacement, and many lines and poles that need vegetation clearing.

45.    The inspection program carried out by the Company has not been sufficiently extensive or adequate to fulfill its purpose of securing reliable service.

46.    The Company's distribution system maintenance practices have failed to assure continuous and adequate service to EGS' customers.

Reliability Indices and Performance Standards

47.    EGS uses the following standards and systems to collect and record performance measures:    System Average Interruption Frequency Index (SAIFI); System Average Interruption Duration Index (SAIDI); Distribution Interruption System (DIS); TACTICS; and a System Control and Data Acquisition devise (SCADA). General Counsel also used the Average System Availability Index (ASAI) as an outage measure.

48.    EGS begins to record a specific outage only after a customer calls in to the Company to complain. Timing of the outage duration starts after the customer alerts the Company.

49.    System-wide, the average customer in EGS' Texas territory experienced outages totaling 133 minutes (as recorded in SAIDI) in 1996. The system-wide SAIFI in Texas for 1996 was 2.648 interruptions.

50.    Fifty of 431 feeders (11.6 percent) in the EGS' Texas system were below the minimum ASAI standard recommended by General Counsel (99.94 percent or 157 minutes), while 37 (8.58 percent) feeders missed the minimum SAIFI standard of 3.8 interruptions per year.

51.    Eighty-three feeders or primary circuits experienced outage times in excess of 200 minutes during 1996.

52.    Eighteen feeders, serving 9,457 meters, are "historically deficient"[134] for SAIFI, and seventeen feeders, serving 10,835 meters, are "historically deficient" for ASAI.

53.    Nine percent of the meters did not meet minimum ASAI standards. Similarly, 10 percent of the meters fell below minimum SAIFI benchmarks.

54.    Customers on several feeders suffered significantly more interruptions than the average customer, and with lengthier outages: feeders Tamina and China recorded SAIDI scores of 2,477 minutes and 934 minutes, respectively, while feeder Dobbin reached a SAIDI value of 699 minutes. Feeder Pleasure scored 10.2 interruptions, feeder Crystal had a SAIFI of 8 interruptions, and Cordrey scored 7.56 interruptions.

55.    Sixty-five feeders with approximately 58,000 customers have a SAIFI rating less than the 10-year Company average.

56.    EGS testified that it restores first those feeders with the highest numbers of customers. Likewise, it clears vegetation first on the feeders with the most customers.

57.    EGS excluded certain data in calculating its reliability indices. In 1994, the Company ceased counting outages in areas with less than 500 customers. For the first six months of 1996, the Company reported 35 to 40 percent fewer outages than were reported on average during the first six months of the 1991-94 time-frame.

58.    The average outage duration during the first three years after the merger went up to 2.4105 hours, from the average of 1.8220 hours during the seven years preceding the merger.

59.    By September 1996, the number of outages reported increased by 80 percent from 1995, due to a greater number of small outages recorded.

60.    EGS prepared a Reliability Report for the Southwest Region, issued in May 1994, that summarized reliability performance for the year, compared actual performance with Company goals, identified problem areas, and reported corrective actions.

---

[134] Historically deficient feeders are those with consistently poor performance over a period of several years.

61.    Equipment failures were excluded from the May 1994 Reliability Index, as were outages attributed to public damage, non-preventable trees, load curtailment, transmission line outages, instantaneous outages, and planned outages. EGS began reporting these types of outages again in September 1995.

62.    EGS excluded from its performance measures and reliability indices data collected during episodes of extreme weather conditions in February 1994 and January 1997.

63.    The measure of outage duration does not take into account either the number of customers who fail to alert the Company to an outage, or the length of time a customer has suffered an outage prior to notifying the Company.

64.    Linemen working for or on behalf of EGS make subjective determinations as to the cause, duration, or effect of an outage, which may hinder true and accurate reporting of the outage causes.

65.    EGS records and reports its reliability and performance data based on system-wide measures. This method of reporting overlooks recurring individual feeder problems and pockets of disproportionately low service quality.

66.    EGS is not technically equipped at the present time to measure SAIDI and SAIFI performances at the individual customer level. The Company, however is able to calculate performance indices on a feeder-by-feeder basis.

67.    The Company's data and compiled indices are unreliable because of changing data collection standards, failure to report all relevant information, and manipulation of the data.

Vegetation Management

68.    The purpose of vegetation management is to ensure to the extent possible that vegetation in or near ROW does not come into contact with the conductors and either break the wires or cause ground faults.

69.    Many of the outages in EGS' service territory result from trees or tree limbs falling into EGS' ROWs or distribution lines.

70.    EGS stated that it has a six-year, rural tree-trimming cycle; it calls for a 20-foot clearance. Trees in urban areas, according to the Company, are trimmed on a three-year cycle. The Company did not offer persuasive evidence that these cycles were actually followed.

71.    The Company stated that 80 percent of EGS' vegetation management expenditures are allocated to cyclical tree trimming.

72.     Texas vegetation management expenses in the post-merger period were $4.99 million in 1994, $5.09 million in 1995, and $4.735 million in 1996. The decrease in spending between 1995 and 1996 is attributed by the Company to unexplained efficiency gains.

73.     The total line-miles actively maintained by the Company dropped approximately 30 percent in 1996 from the 1994-1995 levels; EGS witnesses did not explain this decrease.

74.     Vegetation management spending increased by 34 percent in 1997, a significant part of which went towards the January 1997 ice storm cleanup costs.

75.     Vegetation-related SAIDI and SAIFI values have worsened since the merger. System-wide SAIDI values for Texas have increased from 21.17 in 1994 to 40.36 in 1997. SAIFI values have also increased from 0.31 in 1994 to 0.63 in 1997. As of September 1997, the SAIDI level for 1997 exceeded the SAIDI value for the entire year in 1996.

76.     Network managers in EGS' Texas territory have the responsibility to ensure adequate service reliability. Network managers, however, do not directly supervise or fully control the vegetation management program.

77.     A 1994 study by Environmental Consultants, Inc., (ECI) proposed specific recommendations for EGS' vegetation management to include herbicide and tree trimming based on plant species, equipment scheduling in the planning process, aggressive pursuit of tree removals, and performance measures for contractors. EGS has not implemented the recommendations proposed by ECI.

78.     Entergy's Internal Audit department conducted a comprehensive risk assessment study of the vegetation management program in 1996, and concluded that sufficient strategic planning had not occurred to ensure that Entergy met its objectives. The study also found that the Alliance Agreement between Entergy and vegetation management contractors was not being consistently applied in the various regions, and did not meet business objectives.

79.     Power lines cannot be shielded 100 percent from all contact with vegetation; however, the Company's inability to develop and carry out prudent vegetation management policies has resulted in major service disruptions.

80.     EGS' management structure does not provide those responsible for ensuring service reliability with direct authority to address or prevent vegetation-related outages.

81.     The Company does not have a strategic plan to guide vegetation management efforts.

82.     Neglect and backlog of vegetation management projects has posed unacceptable risks of increasing and recurrent service outages, especially during major storms.

83.     The Commission finds that the Company's vegetation management efforts have not been adequate, have led to a backlog in vegetation clearing, and have resulted in an unacceptably high risk to the system.

Emergency Preparedness, Response, and Outage Restoration

84.     In June 1996, EGS conducted a drill simulating an emergency situation in order to test its emergency response and restoration plans.

85.     EGS' emergency plan and procedures are on file with the Commission, and were reviewed by the Commission Staff after the ice storm in January 1997.

86.     In Docket No. 16301, *Ice Storm '97 Field Investigations Project*, the Commission Staff concluded that EGS had a good emergency plan in place before the ice storm of January 1997.

87.     The Commission defines "major storm" as a weather-related event in which there is a loss of power to 10 percent or more of the customers in a region over a 24 hour period and with all customers not restored within 24 hours.

88.     EGS defines major storm as any event in which 10 percent or more of a region's customers are interrupted for 24 hours or more.

89.     Many parts of Texas experienced an ice storm of significant magnitude that began early on January 12, 1997, and lasted through the afternoon of January 13, 1997.

90.     Most utilities in Texas experienced disruptions in service during the January 1997 ice storm.

91.     EGS should have been better prepared to deal with the January 1997 ice storm, given that it had experienced major weather events in 1994 and 1995, and that it had successfully conducted emergency drills in 1996.

92.     During the ice storm in January 1997, up to 120,000 of EGS' Texas customers were without power.   Restoration took seven days to complete, with temporary emergency crews mobilized from Louisiana, Mississippi, and Arkansas.

93.     By January 16, 1997, EGS had more than 2,700 personnel deployed to restore service on various parts of its Texas system.

94.     At the public hearing on November 20, 1997, city officials from the towns of Port Neches, Orange, and Nederland described numerous episodes in which the numbers of

EGS workers, equipment, and materials were insufficient to deal adequately with emergency situations. Other officials from Cleveland, Dayton, and Port Arthur gave favorable reports of EGS' performance during the January 1997 ice storm.

95.    Mr. Dick Nugent, representing the city of Nederland, testified that after several attempts to reach EGS personnel, city officials had to retrieve an EGS supervisor from his house in Nederland to help them with power restoration efforts.

96.    Mr. A.R. Kimler, from the city of Port Neches, testified that local firefighters were deployed to cut down live power lines because EGS stated there were not enough employees to respond at the time.

97.    The impact of the January 1997 ice storm was greatly exacerbated by the Company's failure to maintain its ROW clear of excessive vegetation.

98.    While the Company has emergency plans in place, not all personnel are familiar with the plans, a fact that may have accounted for the Company's uneven and delayed restoration efforts during the January 1997 ice storm.

99.    It may be uneconomic for EGS to build, operate, or maintain a 100 percent storm-proof system. The January 1997 ice storm, however, revealed that EGS must implement a better preventive maintenance program and faster customer response initiatives.

100.   Segregation of major-storm data from non-major storm data in outage duration and frequency reports provides a more accurate method to evaluate EGS' performance on a day-to-day basis, as well as during crisis events.

101.   The standard for classifying major storms is to be defined in terms of the severity of the weather-related event, rather than in terms of the impact on the T&D system. Feeders subject to major storms can be defined as those experiencing an accumulation of one inch of ice or more within a 24-hour period, or those exposed to winds of at least 80 mph.

102.   EGS' outage restoration efforts during the January 1997 ice storm would have been more effective if: (1) EGS had been more diligent in its preventive vegetation management practices; and (2) it had a better communication and management program in place to deal with emergency situations.

103.   The effect and incidence of lightning strikes did not materially affect the quality of service offered by the Company.

Spending Levels

104.   System-wide transmission spending followed a generally increasing trend since 1992. No data was presented for transmission O&M expenditures on the Texas portion

of the system.

105.   Between 1994 and 1996, distribution maintenance spending decreased by $4 million each year.  Half of these cuts ($2 million each year) came from the overhead line maintenance spending.

106.   Miscellaneous distribution expenses recorded in Federal Energy Regulatory Commission (FERC) Account 588 increased from just under $3 million in 1991-1993, to $10.3 million in 1995, and $12.4 million in 1996, an increase EGS could not explain.

107.   FERC has designated Account 588 for mapping, records, communications, and other miscellaneous expenses such as clerical, stenographic, and janitorial work at buildings.

108.   EGS decreased its level of spending for pole and appurtenance replacements by 50 percent during the years 1995 and 1996.

109.   EGS' O&M spending has been uneven, lacks clear accounting, and proportionately more is spent on distribution capital additions than on distribution system maintenance.

110.   In 1995, most of the spending for distribution capital additions was in the Louisiana area.

111.   Efficiency savings have not been identified nor proven in areas where spending levels had been reduced.

112.   The Company witness could not explain whether any of the savings from the unspent T&D budget were credited according to the Entergy/GSU merger agreement (PUC Docket No. 11292).

Personnel Levels

113.   The Company has carried out substantial cuts in the number of employees assigned to T&D operations:  95 distribution employees in 1995-1996 and 26 in 1997. EGS has increased its use of contract workers during the same periods for a total net decrease of 42 permanent linemen and servicemen since the merger.

114.   Since the merger, most the terminated T&D employees were replaced with contract workers.  Sixty-six of the terminated T&D employees had on average of 18 years experience with the Company.

115.   The Company has no performance measures to evaluate contract-worker efficiency.

116.   The ratio of contract employees to permanent linemen and servicemen is now 2:1. The Commission does not oppose the use of contract employees. The present ratio of contract employees to permanent staff, however, is high, particularly in light of the extensive experience lost when many of the permanent employees were laid-off.

117.   EGS is expected to structure its line maintenance and vegetation management programs in such a way that adequate numbers of properly trained and supervised employees are promptly available.

118.   EGS hired 30 additional contract crews in October 1997, specifically to remedy a backlog of vegetation management projects.

119.   The Company lacks a clearly stated strategic plan for vegetation management, and priorities are driven primarily by budget considerations.

Customer Service

120.   An EGS customer survey reveals that satisfaction results decreased among all classes of ratepayers and for all components of service from 1995 to 1996, as more customers classified EGS service as "fair" or "bad" than "very good" or "helpful."

121.   EGS did not track customer complaints prior to 1995, nor did it track customer service performance standards. EGS began a complaint management system in January 1997 to document every complaint called in to the Company.

122.   The Company's automated voice response unit, substituted for live employees, has not led to increased customer satisfaction.

123.   EGS has failed to implement sufficient customer service procedures and has a high number of dissatisfied customers.

124.   The Company also has, by its own admission, pockets of particularly inadequate service.

125.   In a letter dated September 19, 1997, State Representative Mark Stiles wrote to the Commission expressing concern over an increase in the number of EGS customers who contacted him to complain of poor service by EGS.

126.   EGS acknowledges that it has a large number of customers who remain unsatisfied with their customer service.

127.   EGS' customer service quality is clearly deficient based on the numerous complaints to the Commission and Texas Legislature, and as indicated in the Company's own survey data.

Stipulation

128.    In the Stipulation, filed by parties on March 25, 1998, and approved by the Commission at the April 1, 1998 open meeting, the parties, among other provisions, agreed to: (1) lower the compliance level for SAIDI and SAIFI minimum acceptable level to 98.5 percent; (2) make the reporting and evaluation periods consistent with the Electric System Service Quality Report form; (3) provide for a possible review of customer service targets; (4) change the selection process of the auditor; and (5) change the due date of the quality assurance proposal to August 16, 1998.

129.    The Stipulation addressed only some of the issues raised by the parties in the motions for rehearing.    However, at the April 1, 1998 open meeting, the EGS representative indicated that if the Commission adopted the Stipulation as drafted, the parties would not appeal the Order.

## B. Conclusions of Law

1.    Entergy Gulf States, Inc., (EGS) is a public utility as defined in PURA § 31.002(1).

2.    The Commission has jurisdiction over issues addressed in this Order in accordance with PURA §§ 14.001, 31.001, 32.001, 33.122, 36.001-36.151, and 38.071.

3.    The Commission has jurisdiction over all matters relating to the conduct of a hearing in this case, in accordance with PURA § 14.051.

4.    This Order is issued in accordance with TEX. GOV'T CODE ANN. § 2001.141.

5.    PURA § 37.151(2) requires that EGS provide continuous and adequate service in its certificated service territory.

6.    EGS is obligated, pursuant to PURA § 38.001, to furnish service, instrumentalities, and facilities that are safe, adequate, efficient, and reasonable.

7.    EGS has failed to provide continuous and adequate service to many of its customers, as required by PURA §§ 37.151(2) and 38.001.

8.    In establishing a reasonable return on invested capital, the Commission is required, among other things, to consider the quality of the utility's service. PURA § 36.052(3).

9.    The Commission, after notice and hearing, may order an electric utility to provide specified improvements in its service and in a specified area if (a) service in the area is

inadequate or substantially inferior to service in a comparable area; and (b) requiring the company to provide the improved service is reasonable. PURA § 38.071.

10.    The remedies proposed in the Stipulation are tailored to achieve the desired result as contemplated in the Final Order; implementation of such remedies is in the public interest.


## V.    Ordering Paragraphs

1. Upon issuance of a final order in EGS' pending rate case in Docket No. 16705, the Company shall calculate the revenues equal to 60-basis points, and appropriate taxes, of the ROE established in Docket No. 16705.

2. Within 30 days after issuance of the final order in Docket No. 16705, the Company shall submit to the Commission its calculation of the revenues equal to 60-basis points, and appropriate taxes, for Commission review and approval.

3. If a rate reduction is ordered in Docket No. 16705, the Company shall refund to its customers an amount equal to 60-basis points of its ROE authorized in Docket No. 16705, plus appropriate taxes, for the period from June 1, 1996, through the effective date of this Order.[135]

4. As of the effective date of this Order, the Company shall reduce collections from customers by an amount equal to 30-basis points, and appropriate taxes, of the ROE authorized in Docket No. 16705.

5. As of the effective date of this Order, the Company shall establish an interest-bearing escrow account into which it shall deposit, on an on-going basis, the amount equal to 30-basis points, and appropriate taxes, of its ROE authorized in Docket No. 16705.

6. The Company shall hire an independent consultant, according to the conditions set out in the amended, non-unanimous stipulation regarding the hiring of consultants, as approved with modifications by the Commission in this docket. The consultant shall assess the distribution system, develop strategies for improvement, revise data-collection practices, establish evaluation criteria, and perform any additional work as set out in the amended, non-unanimous stipulation.

---

[135] If the final order in Docket No. 16705 does not mandate any refunds to customers, there will not be a refund of 60-basis points to customers based on this Order for the period from June 1, 1996, up to the effective date of this Order.

7. The Company shall file a quality assurance proposal governing the collection, recording, and reporting of SAIDI and SAIFI, and any other relevant service quality measures by August 16, 1998. This filing deadline shall be extended one day for every day the consultant's report addressing the EGS distribution system is filed beyond July 16, 1998.

8. Twice annually, and starting on June 15, 1998, the Company shall file the Electric System Service Quality Report, including its supplemental filing, to document SAIDI and SAIFI feeder-by-feeder data for each six-month period, calculated in the manner discussed in this Order. The Company shall also submit a listing of the worst performing 10 percent of the Company's feeders, twice annually along with their performance data. Beginning on December 15, 1998, and twice annually thereafter, at the same time as the Electric System Service Quality Reports, the Company shall file its Customer Service Reports, relating to service installations, line extensions, and light replacements. Initial Customer Service Reports related to the remaining customer service measures (billing-error rate and call center performance) shall be due on June 15, 1998. In its December filing each year, the Company shall provide an annual, audited summary of customer performance data.

9. Beginning in 1999, and no later than March 1 of that and each subsequent year, the Company shall file with the Commission its reconciliation proposal for the funds held in escrow according to this Order for the prior calendar year. The Company's annual filing shall be audited by an independent auditor, and the audit shall be filed with the reconciliation proposal.

10. If the Commission determines that the Company has achieved the performance standards set out in this Order for a minimum acceptable level of improvement for SAIDI and SAIFI for the 10 percent of worst feeders and, if applicable, major-storm restoration process, the Company may retain one-third of the amount in escrow for that year; otherwise, the Company shall refund that amount, plus appropriate taxes, to its Texas distribution-level customers taking service from the non-complying feeders, as explained in section D(1) and D(2)(b) of this Order. If the Commission determines that the Company has achieved the performance standards set out in this Order for the target level improvement for SAIDI and SAIFI, the Company may retain one-third of the amount in escrow for that year, otherwise, the Company shall refund that amount, plus appropriate taxes, to all its Texas distribution-level customers, divided on a pro-rata basis within each customer class. If the Commission determines that the Company has achieved the performance standards set out in this Order for customer service, the Company may retain one-third of the amount in escrow for that year; otherwise, the Company shall refund that amount, plus appropriate

taxes, to its Texas distribution-level customers divided on a pro-rata basis within each customer class.

11. In conjunction with its annual reconciliation filing, the Company shall submit a proposal for customer notification.  At a minimum, the proposal shall include the content and format for a billing insert that explains the service quality requirements, the Company's performance for the preceding year, street light reporting instructions and telephone number, and the amount of the escrow pool retained by the Company and/or refunded to customers.

12. The Company shall develop and implement, within the six months of the effective date of this Order, a media campaign to inform and educate customers in its Texas service territory about the importance and proper procedure for reporting to the Company malfunctioning or broken street lights.

13. The provisions of the Stipulation are approved as reflected in this Order.

14. The entry of an order consistent with the Stipulation of the parties does not indicate the Commission's endorsement of approval of any principle or methodology that may underlie the Stipulation of the parties.  Neither should entry of an Order consistent with the full settlement of the parties be regarded as a binding holding or precedent as to the appropriateness of any principle or methodology underlying the Stipulation of the parties.

15. All other motions, requests for entry of specific findings of fact and conclusions of law, and any other requests for general or specific relief, if not expressly granted herein, are hereby denied for want of merit.

This Order reflects the opinion of Chairman Wood and Commissioner Walsh. Commissioner Curran was not present at the adjudicatory hearing conducted in this docket, and did not participate in the final order and order on rehearing deliberations.

SIGNED AT AUSTIN, TEXAS, the _21st_ day of April 1998.

PUBLIC UTILITY COMMISSION OF TEXAS

_____

PAT WOOD, III, CHAIRMAN

_____

JUDY WALSH, COMMISSIONER

q/share/final/18249rhr.doc

# Appendix 5


# Excerpts from PUC Docket No. 16705, Second Order on Rehearing

PUC DOCKET NO. 16705
SOAH DOCKET NO. 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

RECEIVED

98 OCT 14 AM 9:02

PUBLIC UTILITY COMMISSION
FILING CLERK

| | |
|---|---|
| APPLICATION OF ENTERGY TEXAS | § |
| FOR APPROVAL OF ITS TRANSITION | § |
| TO COMPETITION PLAN AND THE | § |
| TARIFFS IMPLEMENTING THE PLAN, | § |
| AND FOR THE AUTHORITY TO | § |
| RECONCILE FUEL COSTS, TO SET | § |
| REVISED FUEL FACTORS, AND TO | § |
| RECOVER A SURCHARGE FOR | § |
| UNDER-RECOVERED FUEL COSTS | § |

PUBLIC UTILITY COMMISSION

OF TEXAS

## SECOND ORDER ON REHEARING

This Second Order on Rehearing (Order) addresses the application filed by Entergy Gulf States, Inc. (EGS or the Company) on November 27, 1996, in accordance with Paragraph 9b of the Stipulation and Agreement approved by the Commission in Docket No. 11292.[1] Through this Order, the Commission adopts in part and modifies in part the Proposal for Decision (PFD) as corrected and the Supplemental Proposal for Decision (SPFD) issued by the State Office of Administrative Hearings (SOAH) Administrative Law Judges (ALJs) in late March 1998.[2]

### I.     Introduction

The SOAH ALJs conducted separate evidentiary hearings on the four component parts of this docket: fuel, revenue requirement, cost allocation/rate design, and competitive issues. After completion of the hearings and review of the record evidence, the ALJs recommended that the Commission order EGS to reduce its current Texas retail base rates by $137 million, which

---

[1] *Application of Entergy Corporation and Gulf States Utilities Company for Sale, Transfer or Merger*, Docket No. 11292, 19 P.U.C. BULL. 2040, 2041 (Ordering Paragraph 5) (Dec. 29, 1993).

[2] The ALJs issued the PFD on March 25, 1998, as revised by clarifications, revised text, and revised schedules filed on June 4, 12, and 16, 1998. The ALJs issued the SPFD, which addresses supplemental fuel-related issues, on March 27, 1998. The Commission considered the matters addressed in this Order at its open meetings convened on June 30, July 8 through 10, July 13, July 16, and July 22, 1998. The Commission issued its "final" order in this docket on July 22, 1998. The Commission considered motions for rehearing at its open meetings convened on August 26, and October 8, 1998. A more detailed procedural history of this case is contained in Attachment A to the PFD and the Findings of Fact (FoF) and Conclusions of Law (CoL), as modified, contained in this Order.

5006

represents a 29% reduction from current base rates. The rationale for this recommended reduction is set forth in detail in the PFD and SPFD which, together, total over 800 pages.

In this Order, the Commission directs EGS to reduce its Texas retail base rates in conformance with the attached schedules (approximately $111 million, or $26 million less than the reduction recommended by the ALJs). This base rate reduction, and the Commission's rationale for modifying portions of the PFD and SPFD, are explained in detail in the Discussion section of this Order. In this Introduction, the Commission focuses primarily on the three most contentious issues in this docket: (1) treatment of EGS' claimed affiliate expenses; (2) the treatment of EGS' "excess costs over market" (referred to either as "ECOM" or "potentially stranded investment"); and (3) interruptible service.

## A. Affiliate Expenses

The ALJs concluded in the PFD that EGS failed to meet its statutory burden of proof to justify recovery of approximately $86 million in Texas retail affiliate expenses. The ALJs therefore recommended that the Commission disallow all of these claimed costs.[3] This $86 million in recommended disallowed expenses is comprised of $49 million billed to EGS by its corporate service affiliate, Entergy Services, Inc. (ESI), or allocated to EGS by its nuclear service affiliate, Entergy Operations, Inc. (EOI), plus an additional $37 million direct-billed to EGS by EOI.[4] In the alternative to a full disallowance, the ALJs recommended that the Commission could potentially justify allowing EGS to recover the direct-billed EOI affiliate expenses ($37 million), but that the record clearly required disallowance of the $49 million in ESI and EOI allocated expenses. (To avoid confusion, this Order refers to the ESI billed and EOI *allocated* expenses as the $49 million in disallowed "ESI" expenses; the $37 million in EOI *direct billed* expenses are referred to as the "EOI" expenses.) In this Order, the Commission adopts the ALJs'

---

[3] For convenience, this Introduction refers only to the Texas retail affiliate expenses claimed by EGS. The Company's application and the PFD actually refer primarily to "system-wide" affiliate expenses in the range of $200 million. The system-wide expenses include affiliate expenses allocable to EGS' services in Louisiana, services in the Texas wholesale market, and services in the Texas retail market.

[4] The complexity of the affiliate transactions affecting EGS (previously Gulf States Utilities, Inc. (GSU)) significantly increased when Entergy Corporation purchased GSU in 1993, thereby creating EGS.

are now declining. By allowing the Company to surcharge the AOD expense over a three-year period, the Commission moves closer to intergenerational equity than would occur if future customers are required to pay the AOD over the remaining life of River Bend. Thus, the Commission's treatment both mitigates EGS' ECOM and better matches the recovery period for the AOD to the time period in which the AOD would normally have been expensed.

## C.    Interruptible Service

The Commission concludes that the current demand charge credits provided to the interruptible service (IS) customers will not be subject to partial imputation as recommended by the ALJs. The current IS demand and energy charges also will not be reduced in tandem with the base rate reductions applicable to firm customers. Instead, the demand and energy charges to IS customers, under the IS rider, will be frozen at current levels. This treatment results in the IS customers continuing to receive interruptible service at rates below firm service, but narrows the demand charge credit as base rates for firm customers are reduced. Also, by freezing the energy charges billed to IS customers under the IS rider, the Commission is ensuring that IS customers are allocated their fair share of transmission costs and, where applicable, distribution costs.

## D.    Overall Effect of this Order

The Commission affirms the majority of the PFD, but concludes that the record evidence requires modification to a number of findings and conclusions reached by the ALJs. In addition to the modification summarized above, the Commission modifies the ALJs' recommendations to conclude that (1) EGS' wheeling expenses and revenues should be subject to base rate treatment, rather than fuel reconciliation and fuel surcharges; (2) in recognition of the remedies established in EGS service quality case,[25] the Company's rate of return on equity (ROE) will be set at 11.1% for the period June 1, 1996 through May 12, 1998, and at 11.4% from May 13, 1998 through the remainder of the effective period of the rates in this docket;[26] and (3) the Company is also

---

[25] *Entergy Gulf States, Inc. Service Quality Issues (Severed From Docket No. 16705)*, Docket No. 18249, Order on Rehearing (April 22, 1998) (*EGS Service Quality*).

[26] The remedies established in *EGS Service Quality* will remain in place for some period beyond the rate period subject to this docket. Thus, the ROE reduction remedy will also apply in at least some portion of EGS' next effective rate period.

entitled to recover approximately $10 million more in fuel expense than recommended by the ALJs.

The following discussion addresses each of the Commission's modifications to the PFD and SPFD. The discussion does not track the sequence of the SOAH recommendations, but begins with the larger transition items arising in the competitive issues and revenue requirement phases. Discussion of the cost allocation/rate design and fuel issues follows in that sequence. This Order also includes a separate section addressing how refunds will be treated in this docket, including refunds resulting from a companion order on rehearing issued on September 2, 1998 in *Gulf States Utilities Company Remand of Actual Taxes Paid Issues,* Docket No. 18290.

Also attached to this Order are schedules detailing (1) the Company-wide Revenue Requirement and Invested Capital (Commission Schedules I through VI); (2) the Revenue Requirement and Revenue Deficiency (Commission Schedule KS-J1); (3) the Texas Retail Class Revenue Requirement Assignment, the Texas Retail Class Revenue Requirement Allocation, and the Texas Retail Class Rate Base Allocation (Commission Schedules KS-TX/1 through KS-TX/3, respectively); and (4) the Calculation of the Fixed Fuel Factor and the Allocation of Fuel Over/Under Recovery by Rate Class (Commission Schedules KP-Fuel/1 and KP-Fuel/2, respectively).

To the extent *not* addressed below, the Commission affirms the ALJs' discussions and proposed findings of fact (FoFs) and conclusions of law (CoLs) without substantive modification.

the ALJs in effect are recommending an improper double disallowance because, in the SPFD, the ALJs recommend disallowance of certain natural gas expenses related to fuel burns in February of 1996. As stated by General Counsel, "[t]he Commission therefore should not disallow imprudent fuel costs related to EGS's failure to burn fuel oil, on the one hand, and refuse to include the fuel oil in inventory, on the other."[60]

The Commission agrees with General Counsel and EGS; if the February 1996 natural gas expenses are to be disallowed as imprudent (which they are, as discussed below), the Company should be permitted to recover the costs of the No. 6 fuel oil that it should have burned in lieu of the disallowed high cost natural gas. Accordingly, to reflect the preponderance of evidence in the record, FoF 117 is modified and FoF 117A is added to find that the fuel oil working capital in rate base is $5,110,085, rather than $2,085,630.

5.    Return on Equity

The Commission affirms the ALJs' recommendation to set the Company's ROE at 11.7% in this docket with the following modifications. First, the Commission acknowledges that an appropriate range for EGS' ROE is 9.65% to 13.94%. This range is based on both the constant growth and the multi-stage non-constant growth discounted cash flow (DCF) analyses. As the ALJs recognized, using both of these models more closely resembles the balance employed by the Commission in Docket No. 14965. Accordingly, FoFs 128 and 129 are modified, New FoF 128A is added, and FoFs 130-132 are deleted. Additionally, the Commission modifies FoF 134 to reflect that, although adjustments to EGS' ROE were not modified in this case for poor demand-side management and affiliate transactions, the Commission retains full discretion to make such adjustments in a future case.

Second, a new FoF 128B is added to reduce the 11.7% ROE by 60 basis points to 11.1% for the period June 1, 1996 through May 12, 1998, and by 30 basis points to 11.4% from May 13, 1998 through the remainder of the period in which the rates subject to this docket are in effect. This bifurcated ROE reduction is required by the Commission's determinations in the related

---

[60] *See* General Counsel's Brief on Exceptions at 18.

*EGS Service Quality* proceeding (Docket No. 18249), which concluded that the ROE ultimately authorized in this docket (Docket No. 16705) would be reduced permanently by 60 basis points from the date refunds become effective in this docket "through the effective date of [the final order in Docket No. 18249]."[61] After the effective date of the final order in Docket No. 18249 (that is, May 12, 1998), the authorized ROE in Docket No. 16705 is increased by 30 basis points to 11.4%, but the Company must escrow that 30 basis points of ROE. As provided in *EGS Service Quality*, the Company will be permitted to retain up to the full amount of the escrowed 30 basis points if it meets certain service quality benchmarks established in that proceeding.[62] If it does not meet those benchmarks, some portion or all of the escrowed amount will be refunded to customers, thus effectively resulting in a minimum ROE of 11.1%. These ROE reductions are not predicated on a finding that the ALJs erred in recommending the 11.7% ROE. Rather, they are based on the Commission's rulings in *EGS Service Quality*. Accordingly, new FoF 128B is not a modification to the ALJs' ROE recommendation subject to APA § 2003.049(g), but rather is made to conform the ROE in this docket to the rulings in Docket No. 18249.

Third, the reduction to the Company's authorized ROE also results in a reduction to the ALJs' recommended return on invested capital.[63] This authorized overall return dollar amount is therefore reduced as reflected on the attached Commission Schedules I and IV. In addition, FoFs 134 and 135 are modified respectively to clarify that only the direct-billed EOI expenses are approved in this docket, and to reflect the adjustment to the overall cost of capital as a result of the Commission's decisions in *EGS Service Quality*.

## 6. Amortization Expense

The amortization expense reflected on Schedule I must be decreased to reflect the removal of $9 million in annual amortization expenses related to the AOD discussed in the

---

[61] *EGS Service Quality* Order on Rehearing at 51 (Ordering Paragraph 3).

[62] *Id.* at Ordering Paragraph 5.

[63] This figure is the corrected amount reflected in Schedules I and IV of the ALJs' June 12, 1998 clarification. The original PFD recommends a slightly higher figure. PFD at 317.

before the next fuel reconciliation. Therefore, EGS is not required to file a fuel reconciliation with the November 1998 rate case, and a good cause exception to the rate case filing requirement is granted accordingly. The SOAH ALJs assigned to the next case will address the procedural issues raised by EGS. Otherwise, EGS should be prepared to address any other revenue requirement and major rate design issues in the November 1998 rate case. Accordingly, FoFs 96R through 96U are added to clarify this issue.

Finally, EGS has not proposed to recover its rate case expenses or the Cities' rate case expenses in this docket. The question remained whether the Company might attempt to recover these expenses in a future docket. At the Commission's open meeting on July 10, 1998, representatives of EGS committed orally on the record that the Company will not seek to recover Cities' or its own rate case expenses in this proceeding or any future proceeding. Accordingly, a FoF 164 is modified and a new FoF 164A is added to reflect this commitment.

## IV.     Findings of Fact and Conclusions of Law

The section consolidates the FoFs and CoLs contained in both the PFD and SPFD, as modified in accordance with the foregoing discussion. The numbering sequence contained in the PFD is retained; the SPFD FoFs and CoLs are integrated into this sequence by placing them in the proper location and changing the SPFD number to a corresponding numbered *and* lettered designation. The designation "SFoF" refers to the findings in the Supplemental PFD. The references to "Revised PFD" refer to the corrected pages to the PFD filed by the ALJs on June 4, 1998.

### A. Findings of Fact

1.     Entergy Gulf States, Inc. (EGS) is an electric utility serving southeast Texas and south central Louisiana and is one of five wholly-owned operating companies of the Entergy Corporation, an investor-owned public utility holding company headquartered in New Orleans, Louisiana.

**Property Insurance Reserve Balance**

120. The reasonable and necessary reserve balance in rate base for property insurance should be ($15,572,000).

**Other Adjustments to Invested Capital**

121. Based on an amortization period ending January 31, 2000, the test year amortization expense for deferred financing costs would increase by $5,903,700, and amortization expense for property cancellation loss for River Bend 2 would decrease by $1,365,396, for a net increase in test year amortization of $4,538,304.

122. No expenditures necessary to produce cost savings related to the merger between EGS and Entergy Corporation should be reflected in rate base consistent with the decision to disallow all such costs.

123. From April 1994 through the end of the test year, June 30, 1996, EGS collected $36,205,679 on a total Company basis for post-retirement expenses other than pensions (OPEBs). This amount should not be reduced by EGS' OPEB trust funds, as EGS has not had access to the funds with which to fund rate base.

124. The following are appropriate adjustments to EGS' requested level of invested capital:

| Account | 13 Mo. Avg. | Adjustment | Total Level |
|---|---|---|---|
| Injuries and Damages | ($5,543,000) | $643,000 | ($4,899,000) |
| Coal Car Maint. Reserve | ($4,071,000) | ($91,000) | ($4,162,000) |
| Customer Deposits | ($21,510,000) | ($860,000) | ($22,370,000) |
| Contractor Retainage | ($455,000) | 11,000 | ($444,000) |

**Cost of Capital**

125. EGS' cost of capital should be based on a capital structure consisting of 48.06% long-term debt, 2.16% QUIPS, 6.52% preferred stock, and 43.26% common equity.

**Employee Pensions and Benefits**

142.  Total electric pension expense should reflect a 3.5% assumed salary escalation factor, an eight percent discount rate, and an adjustment to reflect the declining employee levels through January 1997.

143.  EGS' reasonable and necessary pension expense through January 1997 is ($3,161,011). (*See* Revised PFD.)

144.  Post-retirement benefits other than pension should be $8,800,267 for total electric. This includes a medical cost trend rate of 7.9%, an eight percent discount rate, and employee levels through January 1997. It is not reasonable to permit a utility to recover estimated costs that exceed by any large degree the actual costs experienced in the test year. The $8.8 million level of expense reasonably approximates EGS' test year OPEB expense.

**Production Operation and Maintenance Expense**

145.  EGS included $136,327,381 in production O&M expense, of which $51,491,665 relates to fossil plants. Production O&M expense for its Big Cajun II Unit 3 plant should be $6,428,935, which amounts to a $5,921,024 reduction from EGS' requested O&M expense for this plant. Using EGS' revised figures based on the FERC Form 1 methodology achieves a reasonable total fossil plant O&M expense of $45,570,641.

**Insurance Expense**

146.  EGS' reasonable insurance expense is $1,651,321 per year for current losses. With regard to current losses, EGS should accrue only enough each year to cover typical storm damage. (*See* Revised PFD.)

147.    Any reduction to the reserve fund occurring after the test year should not be considered in this case because EGS did not prove a reasonable post-test-year level for its existing reserve fund or that the amount expended in 1997 to reduce the fund was prudent or appropriate. Reserve fund levels following the test year in this case can be addressed in EGS' November 1998 rate filing when all parties will have the opportunity to evaluate the reasonableness of changes to the insurance reserve fund.

**Affiliate Expenses**

148.    Under PURA § 11.003(2), a utility's affiliates include any entity owning five percent or more of a utility and any entity in which the holding company has a five percent ownership interest. Accordingly, Entergy Service, Inc. (ESI) and Entergy Operations, Inc. (EOI), subsidiaries of Entergy Corporation, are EGS' affiliates. Entergy Services, Inc. provides numerous services ranging from administrative functions to providing fuel supplies to Entergy's various affiliates. Entergy Operations, Inc. is responsible for the management, operation, and support of the five nuclear generating units owned by the Entergy operating companies.

149.    EGS provided evidence of ESI expenses based on the total of all expenses charged. Neither proof by an aggregate finding as to total expenses nor total expenses for that affiliate is viable in this docket--because so many services are provided by ESI, the quantity and diversity of these costs is enormous and involve thousands of items billed during the test-year period. For this reason, EGS must provide evidence of the reasonableness and necessity of its affiliate expense in strict compliance with Section 36.058 of PURA. That is, it must provide evidence supporting the reasonableness and necessity of these expenses by class of costs. It failed to do this.

Appendix 6


PUC Docket No. 39896,
Hearing on the Merits Transcript:
Excerpts of Direct and Cross-Examination
of ETI Witness Shawn Corkran

SOAH DOCKET NO. 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

PUC DOCKET NO. 39896

| APPLICATION OF ENTERGY | ) | STATE OFFICE OF |
| TEXAS, INC., FOR AUTHORITY) | | |
| TO CHANGE RATES | ) | |
| AND RECONCILE FUEL COSTS, | ) | |
| AND OBTAIN DEFERRED | ) | |
| ACCOUNTING TREATMENT | ) | ADMINISTRATIVE HEARINGS |

HEARING ON THE MERITS

Thursday, April 26, 2012

BE IT REMEMBERED THAT at 9:00 a.m., on Thursday, the 26th day of April 2012, the above-entitled matter came on for hearing at the State Office of Administrative Hearings, William P. Clements, Jr. Building, 300 West 15th Street, Room 404, Austin, Texas, before THOMAS H. WALSTON, STEVEN D. ARNOLD AND HUNTER BURKHALTER, Administrative Law Judges, and the following proceedings were reported by Lou Ray, Kim Pence and Aloma Kennedy, Certified Shorthand Reporters.

Volume 3                                          Pages 472 - 718

AFTERNOON SESSION

THURSDAY, APRIL 26, 2012

(1:00 p.m.)

JUDGE BURKHALTER: Okay. We're back on the record after our lunch break.

Mr. Neinast, Mr. Olson?

MR. OLSON: Yes, sir. The Company calls --

JUDGE BURKHALTER: Call your next witness.

MR. OLSON: -- Shawn Corkran.

JUDGE BURKHALTER: Hello, Mr. Corkran. How are you?

MR. CORKRAN: Good.

JUDGE BURKHALTER: Would you raise your right hand, please?

(Witness Corkran sworn)

PRESENTATION ON BEHALF OF ENTERGY TEXAS, INC.

(CONTINUED)

SHAWN B. CORKRAN,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. OLSON:

Q    Mr. Corkran, please state your name and title.

A    My name is Shawn Burr Corkran, and my title is director of transmission and distribution operations for

ETI.

Q    Okay.  Do you have in front of you a stack of paper entitled ETI Exhibit No. 25?

A    I do.

Q    And can you identify that for the record?

A    Yes, this is the direct testimony and exhibits as filed.

Q    Okay.  And do you also have in front of you ETI Exhibit 48?

A    Yes, I do.

Q    And can you identify that for the record, please?

A    Yes, this is rebuttal testimony and exhibits that I filed.

Q    Okay.  Was the direct and rebuttal testimony and exhibits prepared by you or under your supervision?

A    Yes, sir.

Q    Do you have any corrections to the testimony or exhibits at this time?

A    I do not.

Q    If I were to ask you the same questions today, would your answers be the same?

A    Yes, sir.

MR. OLSON:  Your Honor, at this time, I move to admit ETI 25 and 48.

JUDGE BURKHALTER: Any objection?

(No response)

JUDGE BURKHALTER: They're admitted.

(Exhibit ETI Nos. 25 and 48 admitted)

MR. OLSON: I pass the witness.

JUDGE BURKHALTER: Mr. Mack?

MR. MACK: Yes, Your Honor. Thank you.

CROSS-EXAMINATION

BY MR. MACK:

Q   Good afternoon, Mr. Corkran. My name is Stephen Mack. I have a few questions for you about the 1997 ice storm that Entergy is requesting recovery from customers. Okay?

A   Okay.

Q   But before we get to that, I want to talk a little bit about an order you reference in your rebuttal testimony, and that's the order in Docket 18249. Do you recall referencing that order?

A   Yes, I do.

Q   And Docket 18249 was a case established by the Commission to address the service quality issues of Entergy Gulf States. Isn't that right?

A   That's my understanding.

Q   And in that case, the Commission ultimately determined that the quality of Entergy's electric

service to its customers was poor. Isn't that right?

A Yes; I understand they identified deficiencies.

Q Okay. So in order to remedy the Company's service quality issues, the Commission ordered an incentive program to encourage the Company to fix its problems. Isn't that right?

A By "incentive program," are you referring to the 60 bases point reduction and then the ability to limit some of that?

Q There was -- yeah, we'll get to that, but there was an incentive plan, wasn't there, ordered as part of that case? And if it helps you, I can bring you a copy of the order and point you to the page, if you'd like.

A Okay. Yes, sir, I'd like to see that just to remind me and refresh me.

JUDGE BURKHALTER: And, Mr. Corkran, I'm having a hard time hearing you.

WITNESS CORKRAN: Okay.

JUDGE BURKHALTER: Thank you.

MR. MACK: May I approach the witness?

JUDGE BURKHALTER: Yes.

Q (BY MR. MACK) And I'm directing you to Page 28 of the Final Order on Rehearing in Docket No. 18249. Okay?

A Okay.

Q    And could you just -- and basically what it says is, "The Commission concludes that the Company's service quality must be improved.  The following incentive plan lays out the remedies to help EGS achieve such improvements."  Isn't that correct?

A    Yes, that's correct.

Q    And that's the incentive plan I'm referring to.

A    Okay.  And I'm familiar with that, yes, sir.

Q    Okay.  And I think you just mentioned as part of that incentive plan the Commission ordered a reduction to Entergy's ROE.  Is that right?

A    That's my understanding.

Q    And if Entergy met some of its -- some of the goals in this order, it could earn some of that back.  Isn't that right?

A    Yes, sir.  That's what I understand.

Q    All right.  But you understand that this incentive program was only meant to fix the problem of Entergy's service quality.  Is that right?

A    Yes.  As I understand, it was focused on a number of areas of service quality that touched into the reliability areas, call center performance.  There were several areas in that service quality area.

Q    And nothing in this order determined who should be responsible for paying for the damage and outages

caused by the service quality issues. Isn't that right?

A   I'm not aware, no.

Q   Are you aware whether the order addressed the 1997 ice storm?

A   I'm aware that it was referenced in some of the findings, but I don't know specifically when you say "addressed" what you mean by "addressed." I mean, I understand it was referenced in the order and in the project.

Q   And you said you read the order and you're familiar with it?

A   I have read it, yes.

Q   Well, one issue that the ALJs and the Commission will have to address in this case is who should be responsible for paying for the damage caused by the 1997 ice storm. Isn't that right?

A   Yes, I believe so.

Q   And in this order that you reference in your rebuttal testimony, I believe the Commission found that the damage caused was greatly exacerbated by the Company's service quality issues. Isn't that right?

A   That's -- I understand that finding, yes.

Q   And the expense we're talking about for this 1997 ice storm in this case is 13 million?

A   That's correct.

Q    And that's what the Company is requesting recovery for from its customers?

A    Yes.

Q    And I believe it's your position in the rebuttal that even though the Company's service quality issues was a major factor in the number and duration of outages, it's the customers that should have to pay 100 percent of these costs.  Is that right?

A    That's my position, yes.

Q    Now, since this case, has Entergy improved its quality of service?

A    Yes, sir, we have.

Q    So would it be true that the expenses incurred in the 1997 ice storm, if that same storm were to happen today, would not be as great?

A    I'm not certain.  I mean, you know, the finding of fact that was in the docket indicated that probably would be the case.

Q    Okay.  And if we can rely on that finding of fact of the Commission to be accurate, if the same storm were to occur now or in the future, the expense level wouldn't be as great.  Is that right?

A    I mean, it's difficult to say.  You know, there was a lot of information given with respect to vegetation in particular exacerbating the issue, but I'm

also aware that we had icing in the range of one to three inches, which was very significant and exceeded our design criteria and also exceeded the design criteria of the NESC, the National Electric Safety Code.

So, yes, while there were things that did exacerbate the damage, it's difficult for me to say that, you know, it would be -- you know, I can't tell you how much worse. I understand it exacerbated it and made it somewhat worse, but it's difficult to say.

Q But it's your testimony that Entergy has greatly improved its quality of service issues since that case?

A We have.

Q All right. Are you aware of a Company witness named Gregory Wilson?

A Yes, I'm aware of the name.

Q And in this case, I'll submit to you he performs a study to estimate an annual level of expense for projected storms. Are you aware of that?

A Yes.

Q Okay. And to the extent he were to include the full amount of the 1997 ice storm in his analysis, that would not be correct, would it, since the Company has improved its service quality issues -- quality of service issues? I'm sorry.

A    I'm not sure I understand your question.  Help me understand the question.

Q    All right.

A    Are you saying that his analysis is based on the performance from the early --

Q    Do you know whether he has included in his analysis for estimating future storms the full amount of the 1997 ice storm?

A    I really do not know.  I'm aware that he testified in this case, but I'm not familiar with his testimony.  I mean, you know, particularly I was focused on the costs associated with the recovery and, you know, how they -- how they really tied to what we saw in the field.  I'm not real familiar with Mr. Wilson's testimony --

Q    All right.  I think I put in --

A    -- in what he proposed.

Q    I think I put in front of you an excerpt of his testimony.

A    Okay.

Q    Do you have that?

A    I do.

MR. MACK:  And this has not been admitted into evidence yet, but I expect it will be tomorrow by Entergy.

JUDGE BURKHALTER: So you're just offering this as a demonstrative?

MR. MACK: Yes.

Q (BY MR. MACK) And on Page 7 of his testimony, Lines 15 and 16, he recommends an amount for annual expected losses of 4.89 million. Is that right?

A Yes. On Lines 15 and 16?

Q Yes.

A Yes, that's the number I see.

Q Okay. And on Lines 19 through 21, he says he calculates that number "using a Monte Carlo simulation run on the loss history," which he references as being on Exhibit GSW-3. Do you see that?

A Yes, I see the statement.

Q Okay. And can you turn the page to Exhibit GSW-3? And can you verify for us that the 1997 ice storm was included in his analysis?

A I can't verify it. I see a large number there of similar magnitude to the 13 million.

Q And that large number has been trended to increase quite a bit, hasn't it?

A Yes, it has.

MR. MACK: I pass the witness.

JUDGE BURKHALTER: Mr. Nortey?

MR. NORTEY: No questions, Your Honor.

JUDGE BURKHALTER: Ms. Ferris?

MS. FERRIS: Yes, Your Honor. Thank you. Can I have a moment? Because Mr. Mack covered my questions.

CROSS-EXAMINATION

BY MS. FERRIS:

Q Good afternoon, Mr. Corkran.

A Good afternoon.

Q I'm going to try not to duplicate Mr. Mack's efforts.

Does a successful restoration effort for a given storm mean that all costs related to the storm restoration effort were necessarily prudent?

A Let's see. You're asking if a successful restoration means that the costs were prudent, necessary?

Q Does a successful restoration effort for a given storm mean that all the -- all the costs related to that storm were prudent necessarily?

A I mean, I'm not sure. I can't speak to the definition of "prudency," where it would fall.

Q Fair enough.

I wanted to ask you a little bit about that order from the Docket 18249 that Mr. Mack asked you about.

MS. FERRIS: May I approach, Your Honor?

JUDGE BURKHALTER: Yes.

MS. FERRIS: I have an excerpt from the hearing, and I will not be offering this as evidence because it will speak for itself. It's merely a demonstrative.

A    Okay. Thank you.

Q    (BY MS. FERRIS) Could you turn to Page 18 of the order on rehearing for Docket 18249?

A    Okay.

Q    There is a sentence that begins at the very end of the third line from the bottom, and it continues to the top of the next page. Could you read that sentence for us, please? It begins with the word "While."

A    The sentence reads, "While Company's initial efforts to mobilize and deploy additional nonEGS personnel were slow and caused concern, vegetation management failures greatly aggravated the situation."

Q    Thank you. And just above, I guess this would be three lines down in the middle of the line. There's another sentence that begins with the word "A major," could you read that sentence?

A    Yes. The sentence reads, "A major cause of the outages during the storm were broken or bowed ice-laden tree limbs overhanging the wires."

Q Further down the order states that "The Company's failure to clear the limbs before the storm was a major factor in the number and duration of the outages experienced by customers." Is that right?

A Yes, that's correct. That's what it says.

Q Thank you. Did the cost to restore the system after the 1997 ice storm, was it increased as a result of EGI's imprudence?

A Imprudence?

Q Or was it -- let me rephrase. Were the costs of the 1997 ice storm, to recovery it, were those costs increased due to the state of the vegetation management?

A My understanding is that was a finding, was that it did exacerbate the storm damage.

Q Did the Company -- or excuse me -- has the Company made any attempt to quantify the extent to which restoration costs were increased as a result of the state of their vegetation management?

A Not that I'm aware of.

Q Okay. I want to shift gears a little bit for you. Let's turn to Page 12 and 13 of your rebuttal testimony, please. Are you there?

A Let's see. Okay. Yes, I'm there.

Q Okay. On this section of your testimony, you address Dr. Szerszen's recommendations with regard to

Q Further down the order states that "The Company's failure to clear the limbs before the storm was a major factor in the number and duration of the outages experienced by customers." Is that right?

A Yes, that's correct. That's what it says.

Q Thank you. Did the cost to restore the system after the 1997 ice storm, was it increased as a result of EGI's imprudence?

A Imprudence?

Q Or was it -- let me rephrase. Were the costs of the 1997 ice storm, to recovery it, were those costs increased due to the state of the vegetation management?

A My understanding is that was a finding, was that it did exacerbate the storm damage.

Q Did the Company -- or excuse me -- has the Company made any attempt to quantify the extent to which restoration costs were increased as a result of the state of their vegetation management?

A Not that I'm aware of.

Q Okay. I want to shift gears a little bit for you. Let's turn to Page 12 and 13 of your rebuttal testimony, please. Are you there?

A Let's see. Okay. Yes, I'm there.

Q Okay. On this section of your testimony, you address Dr. Szerszen's recommendations with regard to

# Appendix 7

PUC Docket No. 39896
Hearing on the Merits Transcript:
Excerpts re. Optional Completeness

Q    Okay. And you've seen this before. Correct?

A    Yes, I have. Well, I've not seen this exhibit, but I've seen the full 10-K.

Q    You've seen the full 10-K. And the full 10-K was filed in roughly, what was it, March or April of this year?

A    Yeah; in the first quarter.

Q    Right. And the 10-K is a report that the parent corporation makes each year on its financials. Is that correct?

A    That is correct.

Q    And included in these 10-K financials are a report or a summary of each operating company, including Entergy Texas, Inc. Correct?

A    Yes.

Q    And do you participate in putting this together, sir?

A    I have reviewed what's in here. It's usually put together based upon facts known about the Company and then sent to my review to see if it is accurate.

Q    Okay. Fair enough.

MR. LAWTON: And at this time, Your Honor, I'd offer Cities Exhibit 8.

JUDGE WALSTON: Any objection?

MR. LAWTON: 7; 7. Excuse me.

MR. WREN: No objection, Your Honor. We'd reserve optional completeness.

JUDGE WALSTON: Cities Exhibit 7 is admitted.

(Exhibit Cities No. 7 admitted)

Q (BY MR. LAWTON) Okay. Now, is Entergy Corp -- and keep that exhibit with you. Keep it handy. Okay, sir?

A I will.

Q Is Entergy Corp -- as seen from the president, Entergy Texas, Inc., is Entergy Texas, Inc. a growing company?

A It has been slowly growing.

Q It has been slowly growing?

A Slowly growing.

Q So your load is growing each year?

A The load has -- well, there has been some years when load did not increase very much, but overall on the average since I became president, it has grown.

Q Okay. And so there's a difference when I say load and sales, I guess. Do you understand that?

A Let's talk -- good point. There's energy, which is the sales, the megawatt-hours that we sell, and there's also the need for additional resources for reliability, which would be the capacity that we would

that time. Is that accurate?

A    That's correct.

Q    All right. And ETI's corporate credit ratings remain the same, even though that settlement resulted in a lower than requested revenue requirement and an ROE and none of the alternative ratemaking mechanisms that ETI-had proposed in that case. Correct?

A    Yes.

MS. GRIFFITHS: I need to move for the admission of TIEC -- let's see -- Exhibits 9 and TIEC Exhibit 8.. And I think I've already asked for 6 and 7 -- or I did not ask for 6 but just for 7.

JUDGE ARNOLD: Six has already been admitted.

MS. GRIFFITHS: Okay. I would ask for the admission of both of them, Your Honor.

MR. OLSON: With respect to 8 and 9, just reserve optional completeness.

JUDGE ARNOLD: Okay. Seven, 8 and 9 will be admitted. I think 9 is subject to optional completeness.

(Exhibit TIEC Nos. 7, 8 and 9 admitted)

Q    (BY MS. GRIFFITHS) Could you turn to Page 35 of your testimony. Okay. Now, on Page 35 of your testimony, you testify regarding the fact of ETI's

MS. CYR: Your Honor, no objection to exhibit -- I'm trying to find Exhibit 9.

JUDGE BURKHALTER: Nine is the --

MS. CYR: No objection -- well, Your Honor, generally we don't have court opinions as an admitted exhibit, but -- I mean, we don't have an objection if Your Honors want to have them, but counsel normally cites --

JUDGE BURKHALTER: I understand. We can take notice of it and --

MS. FERRIS: Your Honor, actually, I also, just for you notice as well, the last page is the Supreme Court status sheet. So it's one page in addition to the case law. I meant to point that out earlier.

JUDGE BURKHALTER: Well, I tell you what, if there's no objection to it, I'll go ahead and admit it as an exhibit. I agree we can take notice of it, but -- so 9 is admitted.

(Exhibit OPC No. 9 admitted)

MS. CYR: Your Honors, as to 10, the highly sensitive, we will want Your Honors -- what counsel has provided is the actual response, but there is the question to be asked, and we would like for optional completeness to provide the question that was

actually asked and then the response thereto.

MS. FERRIS: Your Honor, I actually have the question and I could offer that as 10A if Entergy would prefer.

MS. CYR: If I can just confirm that is our response.

MS. FERRIS: This is the question itself.

MS. CYR: With the --

MS. FERRIS: With the Addendum 1.

MS. CYR: Okay. Together with the highly sensitive --

MS. FERRIS: Yes.

JUDGE BURKHALTER: Why don't we just combine it and make it into -- make it all 10? Well, no, let's don't do that, because we've got the stuff in the envelope. I think it would probably be cleaner to make it 10A.

MS. CYR: So with that, Your Honor, we would have no objection to --

JUDGE BURKHALTER: All right. So I'm hearing no objection to 10 and 10A. So they are both admitted.

(Exhibit OPC Nos. 10 and 10A admitted.

MS. CYR: No objection to OPC 11.

JUDGE BURKHALTER: It's admitted.

MS. FERRIS: Okay.

JUDGE ARNOLD: I've looked at 18 where there are dark blackouts. They're shaded. I don't know if something is supposed to go in there or not. And I sure as heck can't tell from 18 whether there is anything there.

MS. FERRIS: Well, can I ask you this question, Your Honor: This is an RFI response provided by the company, sponsored by this witness. The company has provided it to us in response to the question that asks for their forms. And to the extent that we don't understand whether something is missing or not, it would be up to the company to provide optional completeness go that. This is an admission by a party-opponent.

JUDGE ARNOLD: If I can see the originally-supplied -- I don't know what the company gave you in discovery. I do know that sometimes when you run something through a copy machine, it comes out black when it's highlighted.

MS. FERRIS: Your Honor, I'll be glad to pull it up on the interchange right now go my iPad. I have the complete FERC Form 1 and FERC Form 60 pulled up right now, if you would like to review that document. You go onto Page 201 to see that there are shades there on the blank form and that should resolve any

authentication questions that are involved.

Your Honor, would you like to see?

JUDGE ARNOLD: I apologize. I'm just trying to find something go my computer, and I've lost it.

Just found it. Are you saying this is go the interchange?

MS. FERRIS: The responses -- and I actually have go the FERC website, their Form 60 document, the pdf form. And I could give you the link or I could let you use my iPad.

JUDGE ARNOLD: Give me the link.

MS. FERRIS: www.FERC.gov/docs-filing\ forms --

JUDGE ARNOLD: Back slash?

MS. FERRIS: -- or slash forms -- /form-60.pdf.

JUDGE ARNOLD: That's the same thing as 18B?

MS. FERRIS: Yes. And what I was saying, he was saying -- if we look go Page 201, which is the one with the shading, the first one with shading, we can see that the form has shading the same place that we have shading, the 18 has shading.

JUDGE ARNOLD: No. I understand that. I

don't know if something is supposed to go in there or not.

MS. FERRIS: Your Honor, if the form had shading, it indicates you're not supposed to fill it in go your 10 -- I mean, you don't fill in go shading. I can show you an example. On Page 102 of the form go Line 68 there is a title in black, "Current and Accrued Liabilities." It's shaded in. And then things that fall below it are not shaded in, because that's where you fill in.

JUDGE ARNOLD: Given the fact that this has been supplied in response to a discovery request, I'm going to go ahead and let it in. If the company believes there is something hidden in the blacked-out areas, they can supply it.

MR. NEINAST: And also, Your Honor, if I may ask optional completeness?

JUDGE ARNOLD: Yes.

MR. NEINAST: Thank you.

JUDGE ARNOLD: It's admitted.

(Exhibit OPC No. 18 admitted)

MS. FERRIS: Thank you, Your Honor.

Q (BY MS. FERRIS) Now I want to go back to your direct testimony, Ms. Tumminello. You have your Exhibit SBT-8?

A   That's correct.

MR. MACK:   Your Honors, Cities move for the admission of Cities Exhibit No. 41.

JUDGE WALSTON:   Just for clarification, Mr. Mack, is this the entire response?   It's not an excerpt?

MR. MACK:   That is an excerpt.  Also attached, or attached with the original was a highly sensitive cost/benefit analysis.

MR. McGRATH:   And that is not included in your Exhibit 41?

MR. MACK:   Not included in the exhibit, yes, that's right, what we're offering.

MR. McGRATH:   No objection, subject to optional completeness.

JUDGE WALSTON:   Okay.  Cities Exhibit 41 is admitted, subject to optional completeness.

(Exhibit Cities No. 41 admitted)

Q   (BY MR. MACK)  All right.  In this question, the City of Rose City asked the company to provide any studies or analysis to support the statement that call options provide the necessary degree of reliability for fuel supply at a lower cost than alternative means.  Do you see that?

A   Yes.

the expenses are volatile, they're not in the company -- subject to the company's control -- for example, they're not affiliated charges, they're not charges that the company itself has authority over. And a third factor is when the amount of the expenses can be substantial enough that they can actually impair the company's integrity or its financial wholeness.

Q So rate case expenses, those impair the company's financial integrity if they're not included in a rider?

A Well, I think that they could. I mean, they could hurt it.

Q What's that based on?

A Well, the fact that rate case expenses these days are in the many multimillions of dollars. And, in fact, in this case, I guess you're asking for 12 million.

MR. WILLIAMS: Linda tells me I neglected to offer ETI Exhibit 83. I offer that exhibit at this point.

JUDGE WALSTON: Any objection?

MR. MACK: Your Honors, Mr. Williams kind of made the insinuation that Schedule A from the last case, Docket 37744, was not -- were not retail numbers.

I think we would like to object as far as

optional completeness so that we can provide documents to show that these are retail numbers.

JUDGE WALSTON: Any other objections? All right. Then, Exhibit ETI-83 is admitted subject to showing of optional completeness.

(Exhibit ETI No. 83 admitted)

MR. WILLIAMS: Thank you.

Q    (BY MR. WILLIAMS)  Let me go back to the rider. Are you aware of any Commission ruling indicating that financial integrity is a necessary showing to get a rate case expense rider?

A    No, I'm not.

Q    So putting that to one side, the main basis you have for approving of riders is that costs are volatile, costs are beyond the Company's control.  Correct?

A    Those are the main ones.  I think the courts have looked at and I think commissions have approved or based their decisions on.

Q    Also, when you say "beyond the control," it's not -- the Company is not going to be able to reduce its costs or make those costs smaller by the way of managing them.  It's just sort of stuck with them.  Correct?

A    I don't understand your question.

Q    Well, if there's a cost that you can manage your business in a way to reduce it, in your view that

admission of Cities Exhibits 43A and 43B.

JUDGE BURKHALTER: Any objection?

MR. NEINAST: No objections.

JUDGE BURKHALTER: They're admitted.

(Exhibit Cities Nos. 43A and 43B admitted)

JUDGE BURKHALTER: And, Mr. Boehm, you never moved for admission of Kroger 3, 4 and 5. Did you wish to have them admitted?

MR. BOEHM: Thank you, Your Honor. Kroger would move for the admission of KRO 3, KRO 4 and KRO 5.

JUDGE BURKHALTER: Any objection?

MR. NEINAST: No objections.

JUDGE BURKHALTER: They're admitted.

(Exhibit KRO Nos. 3 through 5 admitted)

MR. NEINAST: I do have to go back, Your Honor, I just realized, in optional completeness for 43A.

JUDGE BURKHALTER: Okay. You have the right to supplement under the rule of optional completeness for 43A.

MR. NEINAST: And can I also ask for 43B.

Mr. Mack, is there every other page missing in the -- looks like the original sheet 1 and the next one is original sheet 3, 5, as well as 6.

MR. MACK: I wasn't intending to refer to

them, but I have the --

MR. NEINAST: Optional completeness on both is fine.

JUDGE BURKHALTER: All right.

Q (By Mr. Mack) Now, Ms. Talkington, would you agree that this Brazos contract, which has been attached -- has been partially attached -- to Cities Exhibit 43B is a contract that allocates costs on a 12CP basis?

A This is the first time I've ever seen this contract, so I could not tell you that without reading the entire thing.

Q Okay. Could I direct your attention to what's been Bates stamped page No. TIEC 4-2 BB414?

Are you there?

A BB414?

Q Yes, ma'am.

A Okay.

Q And the second paragraph from the bottom, the second sentence of that paragraph, could you read that and tell me whether the costs of -- I'm sorry, Entergy's costs are allocated to Brazos based on the 12CP allocation method?

A The sentence that starts, "The ETI production"?

Q Yes.

A    Yes.

Q    And we've done that in this case?

A    Yes.

Q    Now, let me show you Schedule 041 from the rate filing package. This is in evidence. Let me ask if you can identify the amount of the weather normalization in this case in terms of dollars.

A    Yes. According to this schedule, base revenues were reduced by 22.4 million. This is the weather adjustment.

Q    Okay. And other things equal, the utility's earnings would be $22 million higher than they otherwise would be during normal weather on account of the weather. Correct?

A    Pretax, yes.

Q    Okay. Now, let me show you the 10-K for the Company for 2011. This is in evidence already. Let me just point to you the net income for ETI for 2011 and see if you can read that and identify that.

A    So for Calendar Year 2011 the report shows net income of 80,845,000.

Q    Okay. And what --

MR. VanMIDDLESWORTH: May I ask -- because I don't have the 10-K with me.

MR. WREN: Oh, I'm sorry.

MR. VanMIDDLESWORTH: I was wondering if I could either see it or know what exhibit it was.

MR. WREN: We reserved for optional completeness.

MR. VanMIDDLESWORTH: Until we know that it's in the record we would object on asking this witness to recite from a company document that hadn't been introduced yet.

JUDGE WALSTON: I believe the Cities had offered portions of it, and I think the Company had reserved the right for optional completeness.

MR. WREN: Correct, Your Honor. I didn't think this would be controversial. The Cities clearly offered the 10-K and I clearly reserved optional completeness.

MR. VanMIDDLESWORTH: So are you offering -- so if he wants to offer the full 10-K in, then I think that would be appropriate.

MR. WREN: I'll be glad to do that. I think that's unnecessary. It burdens the record, but if that's the wish I can do that.

JUDGE WALSTON: Okay.

MR. VanMIDDLESWORTH: I may be persuaded otherwise, but if you're crossing him on a page that hasn't yet been introduced, then I think we would need

to see whether it's something that is appropriate for optional completeness and --

MR. WREN: I'll let you reserve on optional completeness.

JUDGE WALSTON: I think it would be best, since we have had bits and parts and pieces referred to, I would recommend you go ahead and just offer the whole thing in unless you have some problem with that.

MR. WREN: So, Your Honor, then I think this would be ETI Exhibit 98, because I've reserved 96 and 97.

JUDGE WALSTON: Okay. Then ETI Exhibit 98 will be admitted, and you can get additional copies -- bring the additional copies later, obviously.

(Exhibit ETI No. 98 marked and admitted)

MR. WREN: Thank you, Your Honor. The reference in question is to Cities Exhibit 8 and 7 that include excerpts from the 10-K.

JUDGE WALSTON: Just for our convenience, can you refer us to the page number you were questioning the witness about?

MR. WREN: Yes, Your Honor. May I approach the witness?

JUDGE WALSTON: Yes.

Q    (BY MR. WREN)  Can you tell me the page number

there.

MR. SMYTH: No.

JUDGE ARNOLD: Mr. Neinast?

MR. NEINAST: I don't -- no.

JUDGE ARNOLD: Doctor, thank you so much. You're excused.

WITNESS SZERSZEN: You're welcome. Thank you.

JUDGE ARNOLD: And we've reached the time for our afternoon break. Let's come back at 3:35.

(Recess: 3:17 p.m. to 3:36 p.m.)

JUDGE ARNOLD: We're back on the record following a break. Mr. Mack, I understand you have some matters you want to discuss.

MR. MACK: Yes, Your Honor. Thank you. A couple days ago during the testimony of Mr. Brazell, Entergy introduced ETI's Exhibit 83, which showed Schedule A of the Company's rate filing from the last case, and I think he was being asked whether that was a total Company number or a wholesale number, and we reserved the right of optional completeness on that exhibit.

And we'd like to introduce Cities Exhibit 49, which is Schedule A-1, stating that there was not a wholesale class in the filing. The second

page to it is Schedule Q from the same filing showing what Mr. Brazell noted as his bottom-line number there on a retail basis. So we offer Cities Exhibit No. 49 for optional completeness.

JUDGE ARNOLD: Any objections?

MR. NEINAST: No objections.

JUDGE ARNOLD: Admitted.

(Exhibit Cities No. 49 admitted)

JUDGE ARNOLD: Ms. Ferris --

MS. FERRIS: Thank you, Your Honor.

JUDGE ARNOLD: -- you're up.

MS. FERRIS: Office of Public Utility Counsel calls Nathan Benedict.

JUDGE ARNOLD: Pardon me. If I learn how to talk.

Mr. Benedict, if you'd raise your right hand, please?

(Witness Benedict sworn)

JUDGE ARNOLD: Ms. Ferris, you may proceed.

MS. FERRIS: Thank you.

Q    Okay.   I would like to -- do you have in front of you what's been marked as Cities Exhibit 48?

A    48?   Yes, I do.

Q    And can you identify that as Attachment 4 to the intra-system bill for the test year?

A    It goes through -- and what's attached here are the coincident peak calculations for the RA version of the intra-system bill from July of '10 through June of '11.

Q    And that's Attachment 4.   Correct?

A    It is Attachment 4.   That's correct.

Q    And that's where the responsibility ratios are calculated?

A    There are two sets of responsibility ratios calculated on that page.   Correct.

MR. MACK:   Your Honor, Cities move for the admission of Cities Exhibit 48.

JUDGE ARNOLD:   Any objections?

MR. WESTERBURG:   We would like to reserve optional completeness, Your Honor.

JUDGE ARNOLD:   Admitted subject to optional completeness.

(Exhibit Cities No. 48 admitted)

Q    (BY MR. MACK)   Now, could you turn to September of the rate year -- I'm sorry -- of the test year in the

A    If we're talking about the one underneath -- in WET308 --

Q    Yes.

A    -- then I believe that's a 10-year contract.

Q    The company is asking for the Commission's approval of the Calvin-Carville contract in this docket. Is that right?

A    I believe that's the case.

Q    And once the Texas Commission gives ETI or any other company approval of a purchased power contract, does the Commission ever revoke this approval?

A    I don't know.  I'm not the purchased power expert in this case.

Q    Okay.  I want to turn to another project that's discussed in your rebuttal testimony.  On Page -- let me see if I can get the page right this time.  I have it. Here we go.  Yes, Page 10 of 18, I believe you're discussing Project Code F3PCWE0140.  Is that right?

A    E0140.  Okay.

Q    Do you have that before you marked as OPC Exhibit 35?

A    Yes, I do.

         MS. FERRIS:  Your Honor, at this time we offer OPC Exhibit 35.

         JUDGE ARNOLD:  Any objections?

MR. WESTERBURG: No, Your Honor, with reserving optional completeness.

MS. FERRIS: Oh, I'm sorry. I would just seek clarification on what you're reserving on, if this is their entire document. This is a one-page document.

MR. WESTERBURG: I was just going to confirm that.

MS. FERRIS: Okay.

MR. WESTERBURG: It looks like it is.

MS. FERRIS: Okay. So no reservation needed?

MR. WESTERBURG: Well, I haven't been able to look at -- it stops. And so when we look at our book, we'll see if it --

JUDGE ARNOLD: Okay; okay.

MR. WESTERBURG: I just want to confirm it's an update.

JUDGE ARNOLD: He can reserve optional completeness --

MR. WESTERBURG: Right.

JUDGE ARNOLD: -- if there is anything left of this document.

MS. FERRIS: Thank you, Your Honor.

JUDGE ARNOLD: It's admitted.

(Exhibit OPC No. 35 admitted)

# Appendix 8

*Tex. Health Facilities Comm'n v. Charter Medical-Dallas,*
665 S.W.2d 446 (Tex. 1984)


665 S.W.2d 446
(Cite as: 665 S.W.2d 446)

▷

Supreme Court of Texas.
TEXAS HEALTH FACILITIES COMMISSION et al., Petitioner,
v.
CHARTER MEDICAL–DALLAS, INC., Respondent.

No. C–2478.
Feb. 15, 1984.

Appeal was taken from orders of the Health Facilities Commission granting certificates of need to two hospitals and denying certificate of need for another hospital. The 250th Judicial District Court, Travis County, Charles D. Mathews, J., sustained the Commission's order. On appeal, the Austin Court of Appeals, Third Supreme Judicial District, Powers, J., 656 S.W.2d 928, reversed and remanded with instructions, and appeal was taken. The Supreme Court, Barrow, J., held that Commission's decision was supported by substantial evidence and was not arbitrary or capricious.

Court of Appeals reversed and trial court affirmed.

West Headnotes

[1] Administrative Law and Procedure 15A
⬤➞486

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(D) Hearings and Adjudications
            15Ak484 Findings
                15Ak486 k. Sufficiency. Most Cited

Cases

Statute requiring administrative agencies to accompany findings of fact set forth in statutory language by supporting statement of underlying facts requires accompanying statement of underlying facts only when ultimate fact-finding embodies mandatory fact-finding set forth in relevant enabling act; agency may not avoid this statutory requirement by simply rewording its criteria. Vernon's Ann.Texas Civ.St. art. 6252–13a, § 16(b).

[2] Administrative Law and Procedure 15A
⬤➞486

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(D) Hearings and Adjudications
            15Ak484 Findings
                15Ak486 k. Sufficiency. Most Cited
Cases

Valid findings of fact by administrative agency must be clear and specific. Vernon's Ann.Texas Civ.St. art. 6252–13a, § 16(b).

[3] Administrative Law and Procedure 15A
⬤➞485

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(D) Hearings and Adjudications
            15Ak484 Findings
                15Ak485 k. Necessity and Purpose.
Most Cited Cases

Underlying facts which must accompany finding

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

665 S.W.2d 446
**(Cite as: 665 S.W.2d 446)**

of fact set forth in statutory language may not be presumed from findings of conclusional nature. Vernon's Ann.Texas Civ.St. art. 6252–13a, § 16(b).

**[4] Administrative Law and Procedure 15A ☜486**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(D) Hearings and Adjudications
            15Ak484 Findings
                15Ak486 k. Sufficiency. Most Cited Cases

In general, findings of fact underlying finding of fact set forth in statutory language must be such that reviewing court can fairly and reasonably say that underlying findings support statutorily required criteria. Vernon's Ann.Texas Civ.St. art. 6252–13a, § 16(b).

**[5] Administrative Law and Procedure 15A ☜486**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(D) Hearings and Adjudications
            15Ak484 Findings
                15Ak486 k. Sufficiency. Most Cited Cases

Mere recitals of testimony or references to or summations of evidence are improper and do not satisfy requirement to support fact-findings set forth in statutory language by statement of underlying facts. Vernon's Ann.Texas Civ.St. art. 6252–13a, § 16(b).

**[6] Administrative Law and Procedure 15A ☜486**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(D) Hearings and Adjudications
            15Ak484 Findings
                15Ak486 k. Sufficiency. Most Cited Cases

Statement of facts underlying findings set forth in statutory language should relate to material basic facts and should relate to ultimate statutory finding that they accompany. Vernon's Ann.Texas Civ.St. art. 6252–13a, § 16(b).

**[7] Health 198H ☜242**

198H Health
    198HI Regulation in General
        198HI(C) Institutions and Facilities
            198Hk236 Licenses, Permits, and Certificates
                198Hk242 k. Proceedings on Application. Most Cited Cases
    (Formerly 204k1 Hospitals)

Underlying findings of fact made by Health Facilities Commission to support its decision to grant certificates of need to two hospitals and deny certificate of need to another hospital satisfied statutory requirement that findings set forth in statutory language be accompanied by supporting statement of underlying fact where, even though some findings were nothing more than mere recitals of evidence, other findings were sufficient from which basic facts could fairly and reasonably be determined. Vernon's Ann.Texas Civ.St. art. 6252–13a, § 16(b).

**[8] Administrative Law and Procedure 15A ☜791**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Deci-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

665 S.W.2d 446
(Cite as: 665 S.W.2d 446)

sions

   15AV(E) Particular Questions, Review of
    15Ak784 Fact Questions
     15Ak791 k. Substantial Evidence. Most
Cited Cases

In applying substantial evidence test to agency's decisions, reviewing court is prohibited from substituting its judgment for that of the agency as to weight of evidence on questions committed to agency discretion. Vernon's Ann.Texas Civ.St. art. 6252–13a, § 19(e), (e)(5).

[9] **Administrative Law and Procedure 15A**
**☞764.1**

15A Administrative Law and Procedure
  15AV Judicial Review of Administrative Decisions
   15AV(D) Scope of Review in General
    15Ak764 Harmless or Prejudicial Error
     15Ak764.1 k. In General. Most Cited
Cases
 (Formerly 15Ak764)

Reviewing court may reverse agency decision because of absence of substantial evidence only if such absence has prejudiced substantial rights of litigant. Vernon's Ann.Texas Civ.St. art. 6252–13a, § 19(e), (e)(5).

[10] **Administrative Law and Procedure 15A**
**☞791**

15A Administrative Law and Procedure
  15AV Judicial Review of Administrative Decisions
   15AV(E) Particular Questions, Review of
    15Ak784 Fact Questions
     15Ak791 k. Substantial Evidence. Most
Cited Cases

Although substantial evidence is more than a mere scintilla, evidence in the record actually may preponderate against decision of agency and nonetheless amount to substantial evidence; true test is not whether agency reached correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency.

[11] **Administrative Law and Procedure 15A**
**☞753**

15A Administrative Law and Procedure
  15AV Judicial Review of Administrative Decisions
   15AV(D) Scope of Review in General
    15Ak753 k. Theory and Grounds of Administrative Decision. Most Cited Cases

Reviewing court is not bound by reasons given by agency in its order, provided there is valid basis for action taken by agency.

[12] **Administrative Law and Procedure 15A**
**☞788**

15A Administrative Law and Procedure
  15AV Judicial Review of Administrative Decisions
   15AV(E) Particular Questions, Review of
    15Ak784 Fact Questions
     15Ak788 k. Determination Supported
by Evidence in General. Most Cited Cases

Agency's action will be sustained if evidence is such that reasonable minds could have reached conclusion that agency must have reached in order to justify its action.

[13] **Administrative Law and Procedure 15A**
**☞749**

665 S.W.2d 446
**(Cite as: 665 S.W.2d 446)**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak749 k. Presumptions. Most Cited Cases

**Administrative Law and Procedure 15A &#9822;750**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak750 k. Burden of Showing Error. Most Cited Cases

**Administrative Law and Procedure 15A &#9822;788**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
        15Ak784 Fact Questions
            15Ak788 k. Determination Supported by Evidence in General. Most Cited Cases

Findings, inferences, conclusions, and decisions of administrative agency are presumed to be supported by substantial evidence and burden is on contestant to prove otherwise; hence, if there is evidence to support either affirmative or negative findings on specific matter, decision of agency must be upheld.

**[14] Health 198H &#9822;243**

198H Health
    198HI Regulation in General
        198HI(C) Institutions and Facilities
            198Hk236 Licenses, Permits, and Certificates
                198Hk243 k. Evidence. Most Cited Cases

(Formerly 204k1 Hospitals)

Substantial evidence supported decision of Health Facilities Commission to grant certificate of need to two hospitals and to deny certificate of need for another hospital. Vernon's Ann.Texas Civ.St. art. 4418h, § 3.10(b)(1).

**[15] Health 198H &#9822;242**

198H Health
    198HI Regulation in General
        198HI(C) Institutions and Facilities
            198Hk236 Licenses, Permits, and Certificates
                198Hk242 k. Proceedings on Application. Most Cited Cases
    (Formerly 204k1 Hospitals)

Decision of Health Facilities Commission to grant certificate of need for two hospitals and to deny certificate of need for another was not arbitrary or capricious. Vernon's Ann.Texas Civ.St. art. 6252–13a, § 16(e)(6).

**\*448** Jim Mattox, Atty. Gen., Steven L. Martin, Asst. Atty. Gen., Austin, Law Offices of Earl Luna, Mary Mildord, Dallas, Heath, Davis & McCalla, Dudley D. McCalla, Austin, for petitioner.

Wood, Lucksinger & Epstein, Bruce Bigelow, Austin, Trotter, Bondurant, Miller and Hishon, Glen A. Reed, Atlanta, Ga., for respondent.

BARROW, Justice.
    This is an appeal from three consolidated orders of petitioner Texas Health Facilities Commission. The orders of the Commission granted certificates of need to petitioners Healthcare International and Memorial Hospital of Garland and denied a similar request made by respondent Charter Medical-Dallas, Inc. The action of the Commission was upheld by the trial court. The

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

665 S.W.2d 446
(Cite as: 665 S.W.2d 446)

court of appeals, with one justice dissenting, reversed the judgment of the trial court and remanded the cause to the Commission for further proceedings. *Charter Medical-Dallas, Ins. v. Texas Health Facilities Com'n,* 656 S.W.2d 928. We reverse the judgment of the court of appeals and affirm the judgment of the trial court.

The Texas Health Facilities Commission is the Texas administrative agency charged with governing the availability of health care facilities in this state. *See* Health Planning and Development Act, Tex.Rev.Civ.Stat.Ann. art. 4418h, §§ 1.01–6.04 (HPDA). The Commission's primary function is to prevent the development of new health care facilities with services that are not needed or that cannot feasibly be developed, staffed, or operated. This function is performed primarily by the Commission's administration of a state certificate of need program. *Id.,* § 2.06. Under this program, a person proposing to establish or modify a health care facility must obtain a certificate of need from the Commission. *Id.,* § 3.01.

*449 In December of 1979 and January of 1980, the parties to this appeal filed applications seeking certificates of need for proposed projects. Memorial sought permission to convert a portion of its general hospital into psychiatric use; Healthcare proposed to construct a new facility, "Green Oaks;" and Charter Medical applied for permission to construct "Dallas Psychiatric Hospital." All three projects were planned for the area encompassing north Dallas County and Collin County. These three applications were consolidated by the Commission, and a hearing was held to determine whether one or more of the applications should be granted. The Commission rendered its orders in October of 1980 granting certificates of need to Healthcare and Memorial and denying the application of Charter Medical.

The trial court rendered judgment sustaining the orders of the Commission as to all three applications. This judgment was reversed by the court of appeals and the cause remanded to the Commission. The stated reason for the court of appeals' decision is that the Commission's orders contain insufficient underlying (basic) facts to support the ultimate findings or conclusions of the Commission on the three applications. The court of appeals held that the absence of underlying facts rendered the Commission's ultimate findings arbitrary and capricious. The court of appeals remanded all three applications to the Commission since the Commission's denial of Charter Medical's request may have been based upon the granting of the other two applications.

In reaching its decision, the court of appeals set forth a lengthy recitation of the facts and Commission rules applicable to this appeal; we refer the reader to that opinion for a more complete statement on these matters. We limit our discussion to the specific points properly before this Court and upon which we base our decision.

This administrative appeal arises under the authority of the HPDA in conjunction with the Texas Administrative Procedure and Texas Register Act. Tex.Rev.Civ.Stat.Ann. art. 6252–13a (APTRA). Under the legislative scheme of the APTRA, the manner of review of agency actions is governed by the enabling statute in the area under adjudication. APTRA, § 19(e); *Southwestern Bell Telephone Co. v. Public Utility Commission,* 571 S.W.2d 503, 508 (Tex.1978). Section 1.04 of the HPDA incorporates the APTRA "except to the extent inconsistent with" the HPDA. Therefore, the scope of judicial review in this case must be discerned from both the HPDA and the APTRA.

In determining the role of the reviewing court, we must first ascertain the legislative standards to which the Commission must adhere in making its decisions, i.e., what findings and conclusions the Commission must make before it properly may grant a certificate of need. Subsection 3.10(a) of the HPDA requires the Commission to promulgate rules establishing criteria to determine whether an applicant is to be issued a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

665 S.W.2d 446
(Cite as: 665 S.W.2d 446)

certificate of need for a proposed project. Subsection 3.10(b) sets forth five specific factors that must be included among the Commission's criteria:

Criteria established by the commission must include at least the following:

(1) whether a proposed project is necessary to meet the healthcare needs of the community or population to be served;

(2) whether a proposed project can be adequately staffed and operated when completed;

(3) whether the cost of a proposed project is economically feasible;

(4) if applicable, whether a proposed project meets the special needs and circumstances for rural or sparsely populated areas; and

(5) if applicable, whether the proposed project meets special needs for special services or special facilities.

Thereafter, subsection 3.10(c) contains six factors that the Commission "shall consider" in developing its criteria.

The Commission has promulgated "General Criteria for Use in Certificate of Need Reviews"**450** that incorporate both the factors required by subsection 3.10(b) and the factors that the legislature has directed the Commission to "consider."[FN1] These criteria include thirteen broad categories addressing such matters as "Community Health Care Requirements," "Service Area Population," and "Relationship to Existing Services and Existing Facilities."

FN1. The matters required by section 3.10(b) to be included within the Commission's cri-

teria may be found primarily in subsections 513.5, 513.11, 513.13, and 513.17 of Title 25 of the Texas Administrative Code. The non-mandatory factors are scattered throughout the other subsections of section 513. *See* Tex. Health Fac. Comm'n, 25 Tex.Admin.Code §§ 513.1–513.21 (May 1, 1982) (compiling Tex. Health Fac. Comm'n Rules 315.19.01.010 to .130, 3 Tex.Reg. 1361–64 (1978), as amended 4 Tex.Reg. 2949–50 (1979)).

Under these broad, general categories are approximately fifty-four subcategories or factors that the Commission considers relevant to its decision on the ultimate factors. These subcategories are referred to by the court of appeals as "intermediate facts." The findings of the Commission on the totality of these criteria form the basis of the Commission's decision to grant or deny a certificate of need. "An applicant or party who is aggrieved by an order of the commission ... is entitled to judicial review under the substantial evidence rule." HPDA, § 3.15.

Having determined the prerequisites to agency action under the HPDA, we look to the APTRA to determine its guidelines for judicial review. Section 16(b) of the APTRA states: "A final decision must include findings of fact and conclusions of law, separately stated. Findings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings." The exact manner of judicial review is stated in section 19(e):

The scope of judicial review of agency decisions is as provided by the law under which review is sought.... Where the law authorizes review under the substantial evidence rule, ... the court may not substitute its judgment for that of the agency as to the weight of the evidence on questions committed to agency discretion but may affirm the decision of the agency in whole or in part and shall reverse or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

665 S.W.2d 446
(Cite as: 665 S.W.2d 446)

remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) in violation of constitutional or statutory provisions;

(2) in excess of the statutory authority of the agency;

(3) made upon unlawful procedure;

(4) affected by other error of law;

(5) not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

(6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

The above-quoted portions of the APTRA are the primary guidelines to be used by a court in reviewing the actions of administrative agencies.

In this case, there are allegations challenging the adequacy of the Commission's findings of fact, contending that the Commission's action is not supported by substantial evidence, and asserting that the Commission's orders are arbitrary and capricious. The court of appeals purported to base its decision solely on the conclusion that the Commission's findings of fact are arbitrary and capricious. In its opinion, however, the intermediate court touched upon each of the above three contentions. Hence, we shall address each of these matters.

*Findings of Fact*
[1] The logical first step in evaluating the Com-

mission's order is to examine the agency's fact findings to determine whether they meet the statutory requirements. *See Auto Convoy Co. v. Railroad Commission,* 507 S.W.2d 718, 719 (Tex.1974). Section 16(b) of the APTRA requires that all findings of fact, "if set forth in statutory*451 language," must be accompanied by a supporting statement of underlying facts. We must determine the meaning of these words in the present context.

In *Lewis v. Gonzales County Savings and Loan Association,* 474 S.W.2d 453 (Tex.1971), we were asked to construe an analogous fact-finding requirement in the Savings and Loan Act. Tex.Rev.Civ.Stat.Ann. art. 852a, § 11.11(4). Therein, we held:

We are of the view this requirement applies only to findings of fact in the commissioner's orders which are "set forth in statutory language." [footnote omitted]. When findings are made in the language of the Rules and Regulations that do not embody statutory language, they need not be accompanied by a concise and explicit statement of the underlying facts.

*Gonzales County,* 474 S.W.2d at 457. We went on to explain that, generally, statutory findings are broadly stated and require discretion or judgment on the part of the agency based on a multitude of factors. Conversely, non-statutory findings usually are more factual in nature and carry with them the supporting underlying facts. Thus, the latter need no accompanying facts to support them.

Judicial review would be enhanced if all general conclusions of an agency were accompanied by a statement of underlying facts. The plain language of the statute, however, precludes such a construction of section 16(b). By limiting the fact-finding requirement to findings "set forth in statutory language," the legislature has expressed its intention in this matter. We

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

665 S.W.2d 446
(Cite as: 665 S.W.2d 446)

may not impose an additional fact-finding requirement under the guise of statutory construction. *Cf. Goldman v. Torres,* 161 Tex. 437, 341 S.W.2d 154, 158 (1960).

*Gonzales County* holds that an accompanying statement of underlying facts is required when an ultimate finding of fact embodies statutory language. This construction has been followed in post-APTRA cases. *See, e.g., Gage v. Railroad Commission,* 582 S.W.2d 410, 414 (Tex.1979); *Imperial American Resources Fund, Inc. v. Railroad Commission,* 557 S.W.2d 280, 286 (Tex.1977). Therefore, we hold that section 16(b) of the APTRA requires an accompanying statement of underlying facts only when the ultimate fact finding embodies a mandatory fact finding set forth in the relevant enabling act.[FN2] An agency may not avoid this statutory requirement by simply rewording its criteria; section 16(b) extends to all statutory fact findings that represent the criteria that the legislature has directed the agency to consider in performing its function.

> FN2. The HPDA does not *require* that the Commission make findings on certain factors before it may act; rather, the statute directs the Commission to include certain matters within its criteria for review and directs the Commission to act upon applications within established time limits. HPDA, §§ 3.10, 3.11. Nonetheless, the factors that the Commission *must* include among its criteria are the type of factors that fall within the scope of section 16(b) so that these findings of fact must be accompanied by a statement of underlying facts. *Cf. Miller v. Railroad Commission,* 363 S.W.2d 244, 245 (Tex.1962).

[2][3][4] The characteristics of proper findings of fact, as well as their purposes, are well established. Valid findings of fact must be clear and specific. *Gage,* 582 S.W.2d at 414. A mere conclusion or a recital of evidence is inadequate. *Thompson v. Railroad Commission,* 150 Tex. 307, 240 S.W.2d 759,

761–62 (1951). The required underlying facts may not be presumed from findings of a conclusional nature. *Morgan Drive Away, Inc. v. Railroad Commission,* 498 S.W.2d 147, 152 (Tex.1973). In general, underlying findings of fact must be such that the reviewing court can fairly and reasonably say that the underlying findings support the statutorily required criteria. *Railroad Commission v. Entex, Inc.,* 599 S.W.2d 292, 298 (Tex.1980); *Railroad Commission v. Graford Oil Corp.,* 557 S.W.2d 946, 950 (Tex.1977).

The underlying findings of fact required by the APTRA have a substantial statutory purpose and are more than a technical prerequisite.*452 *Morgan Drive Away, Inc.,* 498 S.W.2d at 150. This Court set forth the purposes of such findings of fact in *Miller v. Railroad Commission,* 363 S.W.2d 244, 245–46 (Tex.1962) as follows:

> One purpose no doubt is to restrain any disposition on the part of the [agency] to grant a certificate without a full consideration of the evidence and a serious appraisal of the facts. Another is to inform protestants of the facts found so that they may intelligently prepare and present an appeal to the courts. Still another is to assist the courts in properly exercising their function of reviewing the order.

[5][6] This Court has neither the right nor the authority to lay out a precise form of findings to be made by the Commission. *Id.* at 246. On the other hand, we may make suggestions as to the form of the agency record in the interest of proper judicial review. *See Graford Oil Corp.,* 557 S.W.2d at 952 n. 6. Proper underlying (basic) findings of fact should follow the guidelines we previously have noted: they should be clear, specific, non-conclusory, and supportive of the ultimate statutory finding. Mere recitals of testimony or references to or summations of the evidence are improper. Such findings should be stated as the agency's findings. The findings should relate to material basic facts and should relate to the ultimate statutory finding that they accompany. In general, the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

665 S.W.2d 446
(Cite as: 665 S.W.2d 446)

findings of fact required by APTRA § 16(b) should be sufficient to serve the overall purposes evident in the legislative requirement that they be made.

[7] The record of this case discloses that the Commission made almost five hundred findings of fact covering approximately forty-eight pages. The orders of the Commission includes ultimate findings on each of the criteria required by HPDA section 3.10(b). In addition, the Commission's findings contain numerous underlying facts in support of these statutory findings. Many of these findings do not satisfy the requirements previously stated since they are nothing more than recitals of evidence. Nevertheless, there are sufficient findings such that we can fairly and reasonably say that the underlying or basic facts support the Commission's conclusions on the ultimate or statutory criteria. We hold, therefore, that the underlying findings of fact made by the Commission satisfy the requirements of section 16(b) of the APTRA.

### The Substantial Evidence Rule

[8][9] The APTRA codifies the principle of judicial review under the substantial evidence rule. Section 19(e)(5) authorizes a reviewing court to test an agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole. *See Railroad Commission v. Shell Oil Co.,* 139 Tex. 66, 161 S.W.2d 1022, 1029–30 (1942). In applying the test, the court is prohibited from substituting its judgment for that of the agency as to the weight of the evidence on questions committed to agency discretion. *See Gerst v. Guardian Savings and Loan Association,* 434 S.W.2d 113, 115 (Tex.1968). The reviewing court may reverse an agency decision because of the absence of substantial evidence only if such absence has prejudiced substantial rights of the litigant. APTRA, § 19(e).

[10][11][12] Although substantial evidence is more than a mere scintilla, *Alamo Express, Inc. v. Union City Transfer,* 158 Tex. 234, 309 S.W.2d 815, 823 (1958), the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence. *Lewis v. Metropolitan Savings and Loan Association,* 550 S.W.2d 11, 13 (Tex.1977). The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency. *Gerst v. Nixon,* 411 S.W.2d 350, 354 (Tex.1966). A reviewing court is not bound by the reasons given by an agency in its order, provided there is a valid basis for the action taken by the agency. *453Railroad Commission v. City of Austin,* 524 S.W.2d 262, 279 (Tex.1975). Thus, the agency's action will be sustained if the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action. *Suburban Utility Corp. v. Public Utility Commission,* 652 S.W.2d 358, 364 (Tex.1983).

[13] The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise. *Imperial American Resources Fund, Inc. v. Railroad Commission,* 557 S.W.2d 280, 286 (Tex.1977). Hence, if there is evidence to support either affirmative or negative findings on a specific matter, the decision of the agency must be upheld. *Gerst v. Goldsbury,* 434 S.W.2d 665, 667 (Tex.1968); *see also Lewis v. Jacksonville Building and Loan Association,* 540 S.W.2d 307, 311 (Tex.1976).

[14] The record before this Court is extensive and contains substantial information relevant to the Commission's inquiry. This controversy was hotly contested, and the record contains evidence favoring all three applicants. We will address one statutory criterion that supports the Commission's decision in this case. Under HPDA section 3.10(b)(1), the Commission considers "whether a proposed project is necessary to meet the healthcare needs of the com-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

665 S.W.2d 446
(Cite as: 665 S.W.2d 446)

munity or population to be served...." The Commission found that Memorial and Green Oaks were necessary, but that Charter Medical was not.

On judicial review, we look first to the underlying findings of fact made in support of the ultimate finding of fact contrary to Charter Medical's position. Factors unfavorable to Charter Medical include the following: Charter Medical would not be near or connected with a general hospital and ambulance service would be required to transfer a patient to a general hospital for medical treatment; Charter Medical was not accessible by public transportation; Charter Medical failed to establish physician interest in its facility similar to the interest expressed in the other two facilities by testifying physicians; and Charter Medical failed to support its projected occupancy rates with competent evidence. Findings on these matters were relatively more favorable regarding both Memorial and Green Oaks. Other material findings concerned the probable absence of certain recreational facilities at Charter Medical, the unnecessary duplication of specified services and equipment by Charter Medical, and the negative report on Charter Medical by the Texas Area 5 Health Systems Agency.

Because the Commission correctly found that Charter Medical failed to establish that its facility was necessary to meet the healthcare needs of the community, as required by the statute, the Commission's order must be upheld. *Cf. Gerst v. Goldsbury,* 434 S.W.2d at 667. We note that many of the Commission's 213 findings on this criterion are improper and irrelevant and were not considered by this Court. Moreover, we doubt the sufficiency of other ultimate findings made by the Commission, although we reach no conclusion thereon. We do admonish the Commission to adhere to the guidelines we have set forth previously regarding findings of fact.

Our second inquiry concerns whether the findings, inferences, and conclusions that relate to health care needs are supported by substantial evidence. We

hold that they are. Our conclusion is based upon the principles of judicial review that we have reiterated herein. As required by APTRA section 19(e), we have tested each material finding, inference, and conclusion for evidentiary support. There is in the record substantial evidence to support the underlying facts discussed above and the ultimate fact to which they relate.

*Arbitrary and Capricious Standard of Review*
[15] The court of appeals held that the validity of an agency's inferences of ultimate facts or its reasoning process is judged by whether such inferences are arbitrary*454 and capricious. The court also concluded that the sole purpose of the substantial evidence rule is to measure the validity of the process by which the agency has inferred stated basic facts from the evidence and matters officially noticed. Our discussion of the substantial evidence rule discloses the erroneous nature of these conclusions. Because the court of appeals has, in effect, engaged in a substantial evidence review of the Commission's order, we also have addressed that point. We now turn to a discussion of the arbitrary and capricious standard of review.

Throughout the long history of the substantial evidence rule the existence of substantial evidence has been equated with fair and reasonable conduct on the part of the agency. Conversely, agency decisions that are unsupported by substantial evidence have been deemed arbitrary and capricious. Thus, the two terms have many times been considered two sides of the same coin. *See, e.g., Benson v. San Antonio Savings Association,* 374 S.W.2d 423, 427 (Tex.1963); *City Savings Association v. Security Savings and Loan Association of Dickinson,* 560 S.W.2d 930, 932 (Tex.1978). On the other hand, cases have arisen in which a line of demarcation was drawn between these two concepts.

In *Lewis v. Metropolitan Savings and Loan Association,* 550 S.W.2d 11 (Tex.1977), this Court was faced with an allegation that the agency action in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

665 S.W.2d 446
(Cite as: 665 S.W.2d 446)

question, in admitting and excluding evidence, had resulted in a denial of due process of law. The agency contended that the only issue on appeal was whether the decision was supported by substantial evidence; a denial of due process would not provide a basis for reversal so long as the agency's decision was upheld under substantial evidence scrutiny. We held that instances may arise in which the agency's action is supported by substantial evidence, but is arbitrary and capricious nonetheless. One such instance is when a denial of due process has resulted in the prejudice of substantial rights of a litigant.

Another example of arbitrary action by an agency is *Railroad Commission v. Alamo Express,* 158 Tex. 68, 308 S.W.2d 843 (1958). Therein, this Court found that the agency had acted in an arbitrary manner when it failed totally to make findings of fact and instead based its decision on findings in another case. Arbitrary and capricious agency action also may be found when an agency improperly bases its decision on non-statutory criteria. *Public Utility Commission v. South Plains Electric Cooperative, Inc.,* 635 S.W.2d 954, 957 (Tex.App.—Austin 1982, writ ref'd n.r.e.).

In enacting the APTRA, it is clear that the legislature intended to distinguish between agency action that is not supported by substantial evidence and agency action that is arbitrary and capricious. We construe section 19(e)(6) of the APTRA to be a safeguard against agency conduct that is arbitrary or constitutes an abuse of discretion although that conduct does not amount to a violation of any other provision of the APTRA or the agency's enabling act. The arbitrary and capricious standard of review historically has been construed narrowly, and we do not think that the legislature intended it to be interpreted as a broad, all-encompassing standard for reviewing the rationale of agency actions. Under the foregoing definition of the arbitrary and capricious standard of review, we hold that the Commission's orders in this case are not arbitrary nor do they constitute an abuse of discretion.

We conclude that the findings of fact made by the Commission comply with section 16(b) of the APTRA. The Commission's findings, inferences, conclusions, and decisions are supported by substantial evidence and do not constitute an abuse of discretion.

The judgment of the court of appeals is reversed, and the judgment of the trial court is affirmed.

Tex.,1984.
Texas Health Facilities Com'n v. Charter Medical-Dallas, Inc.
665 S.W.2d 446

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Appendix 9

*City of El Paso v. Public Util. Comm'n,*
839 S.W.2d 895 (Tex. App.—Austin 1992)
*aff'd in part, rev'd in part on other grounds,*
883 S.W.2d 179 (Tex. 1994).


839 S.W.2d 895, 135 P.U.R.4th 584
(Cite as: 839 S.W.2d 895)

Court of Appeals of Texas,
Austin.

CITY OF EL PASO, the State of Texas and Office
of Public Utility Counsel, Appellants,
v.
PUBLIC UTILITY COMMISSION OF TEXAS, et
al., Appellees.

No. 3–90–007–CV.
Aug. 26, 1992.
Rehearing Overruled Oct. 14, 1992.

Proceeding was brought for review of order of Public Utility Commission setting rates to be charged by electric utility. The 250th Judicial District Court, Travis County, Paul R. Davis, Jr., J., entered order upholding Commission's decision, and city, state, and Office of Public Utility Counsel appealed. Withdrawing prior opinion, the Court of Appeals, Jones, J., held that: (1) post-in-service carrying costs associated with construction of power plant should not have been included in electric utility's rate base; (2) inclusion in utility's rate base of deferred post-in-service operating and maintenance costs was not inconsistent with Texas statutory law; and (3) Commission did not engage in retroactive rate making by making onetime adjustment to electric utility's cost of service, following passage of federal statute requiring utility to convert from flow-through accounting system to normalization system.

Affirmed in part, reversed in part and remanded.

West Headnotes

[1] Administrative Law and Procedure 15A ⚷ 749

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak749 k. Presumptions. Most Cited Cases

Administrative Law and Procedure 15A ⚷ 750

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak750 k. Burden of showing error. Most Cited Cases
    Court of Appeals presumes the validity of administrative orders which it reviews, and challenger bears burden of showing error in order.

[2] Administrative Law and Procedure 15A ⚷ 763

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak763 k. Arbitrary, unreasonable or capricious action; illegality. Most Cited Cases

Administrative Law and Procedure 15A ⚷ 791

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
            15Ak784 Fact Questions
                15Ak791 k. Substantial evidence. Most Cited Cases

Administrative Law and Procedure 15A ⚷ 793

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
            15Ak784 Fact Questions
                15Ak793 k. Weight of evidence. Most

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

839 S.W.2d 895, 135 P.U.R.4th 584
**(Cite as: 839 S.W.2d 895)**

Cited Cases

Court of Appeals may not substitute its discretion or judgment for that of administrative agency, and may reverse agency's decision only if it is unsupported by substantial evidence, is arbitrary, or results from abuse of discretion.

**[3] Administrative Law and Procedure 15A ☞ 754.1**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak754 Discretion of Administrative Agency
            15Ak754.1 k. In general. Most Cited Cases
    (Formerly 15Ak754)

**Administrative Law and Procedure 15A ☞ 763**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak763 k. Arbitrary, unreasonable or capricious action; illegality. Most Cited Cases

Administrative agency's decision is arbitrary or results from abuse of discretion if agency fails to consider a factor that legislature directed it to consider, considers irrelevant factor, or weighs only relevant factors but still reaches completely unreasonable result.

**[4] Electricity 145 ☞ 11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings before commissions. Most Cited Cases

Public Utility Commission could adopt nonunanimous stipulation in setting electric utility's rates, where Commission afforded nonstipulating parties an opportunity to be heard on merits of stipulation and made independent finding, supported by sub-

stantial evidence in record, that stipulation resolved matters in dispute in way that was fair, just and reasonable and in public interest.

**[5] Electricity 145 ☞ 11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings before commissions. Most Cited Cases

In setting rates for electric utility, Public Utility Commission was not required to accept or reject examiners' report in its entirety, but had authority to repudiate portion of report and modify it by deletion.

**[6] Administrative Law and Procedure 15A ☞ 791**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
          15Ak784 Fact Questions
            15Ak791 k. Substantial evidence. Most Cited Cases

**Administrative Law and Procedure 15A ☞ 793**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
           15Ak784 Fact Questions
            15Ak793 k. Weight of evidence. Most Cited Cases

In conducting substantial evidence review of administrative agency's decision, Court of Appeals must determine whether evidence as whole is such that reasonable minds could have reached the conclusion that agency must have reached in order to take disputed action; Court may not substitute its judgment for that of agency and may consider only the record on which agency based its decision.

**[7] Administrative Law and Procedure 15A ☞ 750**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak750 k. Burden of showing error.
Most Cited Cases

Appellant bears burden of showing lack of substantial evidence to support administrative agency's decision, a burden which it cannot meet merely by showing that evidence preponderates against agency decision.

**[8] Public Utilities 317A ☞165**

317A Public Utilities
    317AIII Public Service Commissions or Boards
        317AIII(B) Proceedings Before Commissions
            317Ak165 k. Evidence. Most Cited Cases

Public Utility Commission has power, in rate-making proceeding, to judge witnesses' credibility and to accept or reject witness' testimony in whole or in part.

**[9] Electricity 145 ☞11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings before commissions. Most Cited Cases

Decision to disallow $32 million of the nuclear power plant construction costs that electric utility sought to include in its rate base, on ground that utility's decision to participate in nuclear power project was imprudent, was sufficiently supported by evidence presented in rate-making proceeding, including utility's stipulation that, if its decision was improvident, resulting cost that should be disallowed totaled $32 million.

**[10] Administrative Law and Procedure 15A ☞462**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(D) Hearings and Adjudications

           15Ak458 Evidence
               15Ak462 k. Weight and sufficiency.
Most Cited Cases

Declaration contrary to party's position on disputed issue in administrative proceeding is akin to quasi-admission; while not binding on declarant, as judicial admission would be, such a concession is entitled to some evidentiary weight.

**[11] Administrative Law and Procedure 15A ☞486**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(D) Hearings and Adjudications
            15Ak484 Findings
               15Ak486 k. Sufficiency. Most Cited Cases

Administrative agency's findings of fact need additional support of findings of underlying facts only when ultimate findings are in terms taken directly from enabling legislation, or when they represent criteria that legislature has directed agency to consider in performing its function.

**[12] Electricity 145 ☞11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings before commissions. Most Cited Cases

Findings of underlying fact made by Public Utility Commission in support of its finding that electric utility's decision to participate in nuclear power plant construction project was not entirely prudent were sufficient to satisfy statutory fact-finding requirements; Commission's findings of underlying fact did not have to identify processes and acts found to be imprudent, nexus between those acts and disallowance amount, and evidentiary support for disallowance figure. Vernon's Ann.Texas Civ.St. art. 6252–13a, § 16(b, e).

**[13] Statutes 361 ☞1076**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

361 Statutes
  361III Construction
    361III(A) In General
      361k1074 Purpose
        361k1076 k. Purpose and intent. Most
Cited Cases
  (Formerly 361k184)

**Statutes 361 ⬤➙1151**

361 Statutes
  361III Construction
    361III(E) Statute as a Whole; Relation of
Parts to Whole and to One Another
      361k1151 k. In general. Most Cited Cases
  (Formerly 361k205)

In construing statute, court's role is to seek out legislative intent from general view of enactment as whole and, once intent has been ascertained, to construe statute so as to give effect to purpose of legislature.

**[14] Administrative Law and Procedure 15A ⬤➙305**

15A Administrative Law and Procedure
  15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
    15AIV(A) In General
      15Ak303 Powers in General
        15Ak305 k. Statutory basis and limitation. Most Cited Cases

Administrative agency is creation of legislature and, as such, has only those powers expressly conferred and those necessary to accomplish its duties.

**[15] Administrative Law and Procedure 15A ⬤➙796**

15A Administrative Law and Procedure
  15AV Judicial Review of Administrative Decisions
    15AV(E) Particular Questions, Review of
      15Ak796 k. Law questions in general. Most Cited Cases
  (Formerly 15Ak800)

Reviewing court may determine, as matter of law, the scope of agency's statutory authority.

**[16] Administrative Law and Procedure 15A ⬤➙305**

15A Administrative Law and Procedure
  15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
    15AIV(A) In General
      15Ak303 Powers in General
        15Ak305 k. Statutory basis and limitation. Most Cited Cases

Power of agency to take such actions as may be necessary to perform express duty is not without limits; agency may not, on theory of necessary implication from specific power, function or duty expressly delegated, exercise what amounts to new and additional power or one that is inconsistent with statutory provision or ascertainable legislative intent.

**[17] Public Utilities 317A ⬤➙124**

317A Public Utilities
  317AII Regulation
    317Ak119 Regulation of Charges
      317Ak124 k. Value of property; rate base. Most Cited Cases

As general rule, only assets that may be included in utility's rate base are those found to be used and useful in providing service to utility's customers.

**[18] Electricity 145 ⬤➙11.3(2)**

145 Electricity
  145k11.3 Regulation of Charges
    145k11.3(2) k. Determination of rate base. Most Cited Cases

Post-in-service carrying costs associated with construction of new power plant could not be included in electric utility's rate base, without violating statute requiring that construction costs be calculated as of time that physical asset being constructed is placed in public service. Vernon's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Ann.Texas Civ.St. art. 1446c, § 41(a).

[19] Public Utilities 317A ☞124

317A Public Utilities
   317AII Regulation
      317Ak119 Regulation of Charges
         317Ak124 k. Value of property; rate base.
Most Cited Cases
    Power plant was "dedicated to public use," within meaning of statute limiting those construction costs which may be included in utility's rate base, at time it began operating commercially. Vernon's Ann.Texas Civ.St. art. 1446c, § 41(a).

[20] Electricity 145 ☞11.3(2)

145 Electricity
   145k11.3 Regulation of Charges
      145k11.3(2) k. Determination of rate base.
Most Cited Cases
    Public Utility Commission had discretionary authority to allow deferral and capitalization of post-in-service operating and maintenance costs associated with newly constructed electric power plant, and to permit electric utility to include such costs in its rate base, to the extent that this was not inconsistent with other state law. Vernon's Ann.Texas Civ.St. art. 1446c, §§ 2, 16, 27, 39.

[21] Public Utilities 317A ☞119.1

317A Public Utilities
   317AII Regulation
      317Ak119 Regulation of Charges
         317Ak119.1 k. In general. Most Cited Cases
   (Formerly 317Ak119)
    Term "thereafter," as used in statute providing that new rates set by Public Utility Commission are "thereafter to be observed until changed," was not blanket prohibition against any consideration by Public Utility Commission of utility's past gains or losses in fixing future rates. Vernon's Ann.Texas Civ.St. art. 1446c, § 43(f).

[22] Electricity 145 ☞11.3(2)

145 Electricity
   145k11.3 Regulation of Charges
      145k11.3(2) k. Determination of rate base.
Most Cited Cases
    Deferral, capitalization and inclusion in electric utility's rate base of post-in-service operating and maintenance costs associated with newly constructed power plant did not violate constitutional prohibition against retroactive rate making, even assuming that inclusion in rate base of such post-in-service costs had retrospective effect, as new rates neither impaired vested rights nor changed substantial rights or obligations of implied contract. Vernon's Ann.Texas Const. Art. 1, § 16.

[23] Public Utilities 317A ☞169.1

317A Public Utilities
   317AIII Public Service Commissions or Boards
      317AIII(B) Proceedings Before Commissions
         317Ak169 Orders
            317Ak169.1 k. In general. Most Cited Cases
   (Formerly 317Ak169)
    Retrospective effect alone will not invalidate rate order, if order does not substantially impair or destroy vested rights and does not change substantial rights and obligations of implied contract between utility and its ratepayers. Vernon's Ann.Texas Const. Art. 1, § 16.

[24] Public Utilities 317A ☞101

317A Public Utilities
   317AI In General
      317Ak101 k. In general. Most Cited Cases
   (Formerly 317Ak103)
    Implied contract exists between utility and its ratepayers, creating both utility's duty to provide defined service and ratepayers' duty to pay defined rate.

[25] Public Utilities 317A ☞101

317A Public Utilities
   317AI In General

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

317Ak101 k. In general. Most Cited Cases
(Formerly 317Ak103)

Under their implied contract with utility, ratepayers have right to pay constant rate for utility service until, by legislatively approved procedures, old rate is formally challenged.

**[26] Public Utilities 317A ⟵119.1**

317A Public Utilities
    317AII Regulation
        317Ak119 Regulation of Charges
            317Ak119.1 k. In general. Most Cited Cases
(Formerly 317Ak119)

Only rights and obligations existing between rate settings are constitutionally protected against alteration by retroactive rate making. Vernon's Ann.Texas Const. Art. 1, § 16.

**[27] Statutes 361 ⟵1559**

361 Statutes
    361IX Retroactivity
        361k1559 k. Effect on vested rights. Most Cited Cases
(Formerly 361k278.9, 361k265)

Whether legislation substantially impairs or destroys vested rights necessitates consideration of whether retrospective effect advances or retards public interest, effectuates or defeats bona fide intentions or reasonable expectations of affected persons, and surprises persons who have long relied on contrary state of law.

**[28] Motions 267 ⟵39**

267 Motions
    267k39 k. Reargument or rehearing. Most Cited Cases

While motions for rehearing must point out the specific finding challenged and the legal basis for challenge, they need not contain citations of authority.

**[29] Electricity 145 ⟵11.3(2)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(2) k. Determination of rate base. Most Cited Cases

In disallowing certain construction costs that electric utility sought to include in its rate base, based on imprudent delays in construction that increased financing costs for project, Public Utility Commission could properly offset against such increased financing costs the unexpected benefit that ratepayers realized because of delay, i.e., the continued use of money that ratepayers would otherwise have had to pay in higher rates if construction had been completed; Commission did not thereby engage in retroactive rate making.

**[30] Electricity 145 ⟵11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings before commissions. Most Cited Cases

Findings of underlying fact that Public Utility Commission made, in order to support its ultimate finding of construction imprudence sufficient to require disallowance of portion of costs that electric utility sought to include in its rate base, did not have to explain why Commission found particular witness' testimony credible or determined particular figure to have resulted from imprudent construction management. Vernon's Ann.Texas Civ.St. art. 6252–13a, § 16(b).

**[31] Administrative Law and Procedure 15A ⟵486**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(D) Hearings and Adjudications
            15Ak484 Findings
                15Ak486 k. Sufficiency. Most Cited Cases

Administrative agency's articulation of underlying facts in support of its ultimate findings must be more than mere recitals of testimony, should be

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

839 S.W.2d 895, 135 P.U.R.4th 584
**(Cite as: 839 S.W.2d 895)**

stated as agency's findings, and should relate to ultimate statutory findings. Vernon's Ann.Texas Civ.St. art. 6252–13a, § 16(b).

**[32] Administrative Law and Procedure 15A ☞669.1**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(A) In General
            15Ak669 Preservation of Questions Before Administrative Agency
                15Ak669.1 k. In general. Most Cited Cases
    (Formerly 15Ak669)
    Administrative litigant may preserve complaint only by giving agency an opportunity to review legal ground on which complaint is based.

**[33] Administrative Law and Procedure 15A ☞669.1**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(A) In General
            15Ak669 Preservation of Questions Before Administrative Agency
                15Ak669.1 k. In general. Most Cited Cases
    (Formerly 15Ak669)

**Electricity 145 ☞11.3(7)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(7) k. Judicial review and enforcement. Most Cited Cases
    City failed to preserve objection to exclusion of witness' testimony in proceeding to establish reasonable rates for electric utility by failing to provide administrative agency with any basis for finding that testimony was admissible.

**[34] Electricity 145 ☞11.3(2)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(2) k. Determination of rate base. Most Cited Cases
    Public Utility Commission properly employed "largest single hazard plus 5%" method in determining electric utility's reserve requirements, for purpose of deciding whether utility had any excess capacity and whether it should be allowed to include certain power plant construction costs in it rate base.

**[35] Electricity 145 ☞11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings before commissions. Most Cited Cases
    Finding that electric utility had no appreciable excess capacity was sufficiently supported by evidence presented in rate-making proceeding, in which utility sought leave to include nuclear power plan construction costs in its rate base, notwithstanding Public Utility Commission's omission of three gas-fired units from utility's generation capability because of utility's plans to retire then early, and notwithstanding Commission's adoption of maintenance schedule that required removal of some units from line during summer peak period; two experts offered their opinions that Commission acted reasonably in approving maintenance schedule.

**[36] Public Utilities 317A ☞146**

317A Public Utilities
    317AIII Public Service Commissions or Boards
        317AIII(A) In General
            317Ak145 Powers and Functions
                317Ak146 k. Legislative and judicial powers and functions. Most Cited Cases
    Public Utility Commission has discretion to consolidate proceedings with common issue when consolidation would serve judicial or administrative economy.

**[37] Electricity 145 ☞11.3(6)**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

145 Electricity
   145k11.3 Regulation of Charges
      145k11.3(6) k. Proceedings before commissions. Most Cited Cases

Public Utility Commission had power, having consolidated rate-making matter with decision as to whether sale-and-lease-back arrangement entered into by utility was in public interest, to reserve decision on sale-and-lease-back matter and effectively sever proceedings which it had earlier consolidated.

**[38] Electricity 145 ☞11.3(4)**

145 Electricity
   145k11.3 Regulation of Charges
      145k11.3(4) k. Operating expenses. Most Cited Cases

Public Utility Commission could include in electric utility's cost of service the lease payments that utility made pursuant to sale-and-lease-back arrangement, at least to extent that payments did not exceed capital cost that Commission would have included in rate base had utility never entered into sale-and-lease-back arrangement; to that extend, payments could be considered in setting reasonable rates, without regard to whether sale-and-lease-back arrangement was consistent with public interest.

**[39] Electricity 145 ☞11.3(4)**

145 Electricity
   145k11.3 Regulation of Charges
      145k11.3(4) k. Operating expenses. Most Cited Cases

Refusal to recalculate electric utility's estimated fuel and purchased power expenses based on expenses actually incurred, when prolonged rate-making hearings delayed new rates' anticipated effective date, was not arbitrary or capricious or abuse of discretion, as recalculation time alone could conceivably delay rendition of new order long enough to once again alter new rates' effective date.

**[40] Electricity 145 ☞11.3(4)**

145 Electricity
   145k11.3 Regulation of Charges
      145k11.3(4) k. Operating expenses. Most Cited Cases

Public Utility Commission was not estopped, by its refusal to include Tax Reduction Act Stock Option Plan (TRASOP) expenses in utility's cost of service in two prior dockets, from including expense in electric utility's cost of service in later docket.

**[41] Electricity 145 ☞11.3(4)**

145 Electricity
   145k11.3 Regulation of Charges
      145k11.3(4) k. Operating expenses. Most Cited Cases

Public Utility Commission did not engage in retroactive rate making by making onetime adjustment to electric utility's cost of service, following passage of federal statute requiring utility to convert from flow-through accounting system to normalization system, to put utility in same position that it would have occupied had it used normalization system all along. 26 U.S.C.A. § 168(i)(9); 26 U.S.C.(1988 Ed.) § 167($l$)(3)(G).

**[42] Electricity 145 ☞11.3(6)**

145 Electricity
   145k11.3 Regulation of Charges
      145k11.3(6) k. Proceedings before commissions. Most Cited Cases

State of Texas had right to intervene on behalf of various state agencies in proceeding to set rates to be charged by electric utility.

**[43] Electricity 145 ☞11.3(7)**

145 Electricity
   145k11.3 Regulation of Charges
      145k11.3(7) k. Judicial review and enforcement. Most Cited Cases

Wrongful exclusion of State of Texas from rate-making proceeding did not necessitate reversal of order establishing rates for electric utility, where

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

state complained only of its inability to cross-examine witnesses who testified during its absence, and examiner specifically stated in his oral ruling that he would permit state to recall and cross-examine such witnesses; state was unable to demonstrate any prejudice to its substantial rights. Vernon's Ann.Texas Civ.St. art. 6252–13a, § 19(e).

**[44] Public Utilities 317A ⟶123**

317A Public Utilities
   317AII Regulation
      317Ak119 Regulation of Charges
         317Ak123 k. Reasonableness of charges in general. Most Cited Cases
     Public Utility Commission has broad discretion to determine whether particular rate design will result in just, reasonable, and nondiscriminatory rates.

**[45] Public Utilities 317A ⟶123**

317A Public Utilities
   317AII Regulation
      317Ak119 Regulation of Charges
         317Ak123 k. Reasonableness of charges in general. Most Cited Cases
     In deciding whether particular rate design will result in just, reasonable, and nondiscriminatory rates, Public Utility Commission may consider factors in addition to cost of producing service, keeping in mind that overriding considerations of consistency and utility's burden of proving that its proposed rates are just and reasonable. Vernon's Ann.Texas Civ.St. art. 1446c, § 40.

**[46] Public Utilities 317A ⟶194**

317A Public Utilities
   317AIII Public Service Commissions or Boards
      317AIII(C) Judicial Review or Intervention
         317Ak188 Appeal from Orders of Commission
            317Ak194 k. Review and determination in general. Most Cited Cases
     Absent unreasonably discriminatory rates, Court of Appeals will not overturn Public Utility

Commission's approval of rate design.

**[47] Public Utilities 317A ⟶120**

317A Public Utilities
   317AII Regulation
      317Ak119 Regulation of Charges
         317Ak120 k. Nature and extent in general. Most Cited Cases

**Public Utilities 317A ⟶167**

317A Public Utilities
   317AIII Public Service Commissions or Boards
      317AIII(B) Proceedings Before Commissions
         317Ak167 k. Hearing and rehearing. Most Cited Cases
     Utility customer seeking reassignment to different class of ratepayers must show that its conditions of service are similar to those of members of class to which it seeks reassignment; issue is one of fact, to be resolved by reference to particular circumstances of each case.

**[48] Public Utilities 317A ⟶165**

317A Public Utilities
   317AIII Public Service Commissions or Boards
      317AIII(B) Proceedings Before Commissions
         317Ak165 k. Evidence. Most Cited Cases
     Existing ratepayer classification schemes previously approved by Public Utility Commission are, prima facie, not unreasonably discriminatory, and complaining party has burden of proving that classification produces unreasonably discriminatory rates.

**[49] Electricity 145 ⟶11.3(1)**

145 Electricity
   145k11.3 Regulation of Charges
      145k11.3(1) k. In general. Most Cited Cases
     Decision not to reassign State of Texas from general services class to city-county consumer class was not abuse of discretion accorded to Public Utility Commission in approving rate design for electric utility's customers, where state failed to offer

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

any proof that its load characteristics were similar to those of city and county governmental customers, where current classification scheme had apparently existed unchallenged for some 50 years, and where Commission expressed its intention to investigate state's assignment to general services class in next rate case.

**[50] Electricity 145 ⬅️11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings before commissions. Most Cited Cases

Burden was on state, even assuming that it had right to be charged a cost-based rate based on constitutional provisions preventing it from depleting its treasury, to show that rate that it and its agencies would have to pay to electric utility were not equal to utility's actual costs of providing it and its agencies with service. Vernon's Ann.Texas Const. Art. 3, §§ 44, 51, 53; Art. 16, § 6.

**\*900** Norman J. Gordon, Diamond, Rash, Leslie, Smith & Samaniego, El Paso, Nanette G. Williams, Asst. City Atty., City of El Paso, El Paso, for City of El Paso.

Jim Mattox, Atty. Gen., W. Scott McCullough, Asst. Atty. Gen., Austin, for State of Tex.

C. Kingsbery Ottmers, Public Counsel, John Laakso, Asst. Public Counsel, Austin, for OPUC.

Jim Mattox, Atty. Gen., Norma K. Scogin, Asst. Atty. Gen., Austin, for PUC.

Michael D. McQueen, Kemp, Smith, Duncan & Hammond, El Paso, Barry Bishop, John F. Williams, Clark, Thomas, Winters & Newton, Austin, for El Paso Elec. Co.

C. Michael Ginnings, Ginnings, Birkelbach, Keith & Delgado, El Paso, for Border Steel.

**\*901** Before CARROLL, C.J., and ABOUSSIE and JONES, JJ.

ON MOTION FOR REHEARING
JONES, Justice.

The opinion and judgment issued by this Court on August 14, 1991, are withdrawn, and this opinion is filed in place of the earlier one.

The district court affirmed an order of the Public Utility Commission ("Commission") setting rates to be charged by El Paso Electric Company ("EPEC"). The Commission issued the order, after hearing, pursuant to the Public Utility Regulatory Act (PURA), Tex.Rev.Civ.Stat.Ann. art. 1446c (Supp.1992). The City of El Paso ("City"), the State of Texas (on behalf of various state agencies located in western Texas) ("TSA"), and the Office of Public Utility Counsel ("OPC"), appellants, seek reversal of the trial court's judgment. We will affirm in part and reverse in part.

Disapproving of EPEC's decision to invest in the Arizona Nuclear Power Project, appellants complain of the Commission's order permitting EPEC to charge rates that allow it to recover most of the project's costs. The Commission ordered the rate increase after conducting a lengthy evidentiary hearing, providing many opportunities for all parties to plead and present their cases; the Commission considered two sets of motions for rehearing. The Travis County district court, to which the complaining parties brought their appeal, affirmed the Commission's order.

On appeal, appellants challenge twelve different aspects of the Commission's decision: (1) adoption of a non-unanimous stipulation; (2) failure to disallow more for "decisional" imprudence; (3) approval of deferred accounting for regulatory-lag expenses; (4) failure to disallow more for constructional imprudence; (5) exclusion of witness Hubbard's testimony; (6) refusal to find excess capacity in EPEC's system; (7) inclusion of common facilities in rate base; (8) inclusion of income tax expense in cost of service; (9) inclusion of a portion of Unit

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

2 lease payments in cost of service; (10) calculation and inclusion of other cost-of-service allowances; (11) temporary exclusion of TSA from the proceedings; (12) determination of rates and rate class for TSA. We will reverse the trial court's judgment to the extent it affirmed the Commission's approval and use of "deferred accounting" for the carrying costs EPEC incurred between the date the Palo Verde plant became commercially operational and the date the new rates were effective; we will affirm the remainder of the trial court's judgment.

### SETTING

At the heart of this dispute is EPEC's decision to expand its power generation system by obtaining an ownership interest in the Arizona Nuclear Power Project, also known as the Palo Verde Nuclear Generating Station. EPEC and four other utility companies agreed to partially fund and otherwise assist in building one or more nuclear steam electric generating units, with attendant common facilities. In return, EPEC was entitled to 15.8% of the resulting net energy generation and the same percentage of available generating capability. Construction is complete on the common facilities and two of the five units originally planned. At the time this proceeding was heard by the Commission, a third unit was still under construction.

Factors arising after construction began have induced EPEC to alter its ownership interest in the units. Originally, EPEC owned an undivided interest in each of the units as a tenant in common with the other four project participants. Although EPEC retains its undivided interest in Unit 1, the company has sold its interest in Unit 2 and made arrangements to lease the unit back for the duration of EPEC's involvement in the project.

Because of the complexity of appellants' points of error, we will supply additional facts from the record throughout this opinion as necessary to clarify the discussion.

### PROCEDURAL BACKGROUND

On October 31, 1986, EPEC filed an application requesting the Commission to determine *902 whether EPEC's arrangement to sell and lease back its ownership interest in Unit 2 was in the public interest. On April 6, 1987, EPEC filed applications with various affected cities and the Commission to raise its rates based on the inclusion of the new nuclear plant in its generation system. The City of El Paso, one of the affected cities, approved rates within the El Paso city limits that would not have allowed EPEC to recover any of its nuclear plant investment; EPEC appealed the City's decision to the Commission. The Commission consolidated EPEC's appeal with its appeals from the decisions of other municipalities and with the environs case (affecting areas outside the cities) that was already before it.[FN1]

> FN1. All of the affected cities set rates within their respective city limits prohibiting EPEC from recovering its nuclear plant investment. Only El Paso sought review of the Commission's order.

Because of the voluminous evidence to be presented, the Commission initially divided the proceedings in the rate case into three phases. The Commission added a fourth phase after several parties tendered a non-unanimous "stipulation" to the Commission and requested that the Commission base its decision on the stipulation. In addition, pursuant to an agreed motion, the Commission consolidated the rate case with the proceeding to approve the sale/leaseback arrangement. An examiner convened hearings on each of the four phases during August, September, October, and November of 1987. On February 1, 1988, the hearings examiner filed a report with the Commission recommending against adoption of the stipulation.

On March 31, 1988, the Commission signed an order adopting and incorporating the terms of an amended and restated stipulation and increasing rates to permit EPEC to earn a return on part of its investment. The order withheld approval of the sale/leaseback arrangement until a later proceeding, effectively undoing the earlier consolidation. On

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

May 10, 1988, the Commission made minor changes to its order in response to motions for rehearing filed by the City, OPC, TSA, and others. The City, OPC, and TSA filed second motions for rehearing which the Commission overruled on June 16, 1988.

The City, OPC, and TSA each appealed the Commission's order to a Travis County district court, and the Commission obtained a consolidation of those appeals. All the appellants participated in the ensuing district-court review, which resulted in an affirmance of the Commission's order. The City, OPC, and TSA each raise several challenges to the trial court's judgment and, through it, to the Commission's order.

### THE NON–UNANIMOUS STIPULATION

The threshold complaint of the City and OPC is that the Commission erred in basing its final order, in part, on a non-unanimous stipulation. Both appellants argue that there is no substantial evidence to support the stipulated matters and that the Commission violated its own procedural rules by considering the stipulation. In addition, OPC asserts that some necessary findings or statements of underlying facts are lacking and that, by considering and basing its final order on the stipulation, the Commission "improperly attempt[ed] to negate statutorily created rights belonging solely to OPC."

[1] An unarticulated assumption underlies the majority of appellants' challenges to the Commission's decision in these and other points of error; although they do not say so explicitly, appellants impliedly urge us to *presume* that, by basing its final order partially on stipulated matters, the Commission completely abdicated its responsibility to determine disputed issues. We may not so presume; indeed, the law compels a contrary presumption. In reviewing a challenged administrative order, we must presume its validity. The challenger bears the burden of showing error. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 453 (Tex.1984); *Continental Cars, Inc. v. Texas Motor Vehicle Comm'n,* 697 S.W.2d

438, 441 (Tex.App.1985, writ ref'd n.r.e.).

[2][3] *903 We may not substitute our discretion or our judgment for that of the agency; we may reverse an agency's decision only if it is unsupported by substantial evidence, is arbitrary, or results from an abuse of discretion. *Railroad Comm'n v. Continental Bus System, Inc.,* 616 S.W.2d 179, 181 (Tex.1981). An agency's decision is arbitrary or results from an abuse of discretion if the agency: (1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result. *Gerst v. Nixon,* 411 S.W.2d 350, 360 n. 8 (Tex.1966); *Statewide Convoy Trans., Inc. v. Railroad Comm'n,* 753 S.W.2d 800, 804 (Tex.App.1988, no writ).

[4] Appellants analogize the present case to a civil cause in which the court has rendered an agreed judgment without the consent of all parties. The analogy is not apt. In the present case, the decision-maker did not impose the terms of a settlement on non-settling parties. Although the parties signing the stipulation believed its terms fairly resolved disputed issues, [FN2] tender of the stipulation to the examiner did not bind the Commission to "adopt" it. Furthermore, the Commission did not, as appellants suggest we presume, adopt the stipulation as its final order without scrutiny.

> FN2. EPEC, the Commission staff, and four corporate intervenors which purchased significant amounts of electricity from EPEC all signed the stipulation.

The non-signing parties had ample opportunity to argue their positions both before and after the Commission rendered its decision. A fourth phase was added to the hearings to provide a forum in which parties could object to the Commission's use of the stipulation as a partial basis for its final order. In addition to presenting evidence, the parties submitted briefs concerning use of the stipulation, filed exceptions to the proposed final order incor-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

porating stipulated matters, and moved for rehearing after the Commission rendered its decision. Having urged their objections to the Commission's use of the stipulation at each of these stages, appellants yet failed to show that basing a final order on a non-unanimous stipulation would be improper.

In a similar case, coincidentally involving the Palo Verde Nuclear Generating Station, the New Mexico Supreme Court approved the state Public Service Commission's adoption of a non-unanimous stipulation:

[The Commission] can adopt a contested stipulation by, first, affording any non-stipulating party an opportunity to be heard on the merits of the stipulation (i.e., whether it is a fair and reasonable resolution of the controversy before the Commission) and second, making an independent finding, supported by substantial evidence in the record, that the stipulation does indeed resolve the matters in dispute in a way that is fair, just and reasonable and in the public interest.

*Attorney General of New Mexico v. New Mexico Public Service Comm'n,* 111 N.M. 636, 640, 808 P.2d 606, 610 (1991). The New Mexico court relied on *Mobil Oil Corp. v. Federal Power Commission,* 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974), where the United States Supreme Court noted the distinction between considering a proposal "as a settlement" and considering it "on its merits": "[E]ven if there is a lack of unanimity [in the stipulation], it may be adopted as a resolution *on the merits....*" 417 U.S. at 414, 94 S.Ct. at 2282 (quoting *Placid Oil Co. v. FPC,* 483 F.2d 880, 893 (5th Cir.1973)) (emphasis in original).

In the present case, the requirements mentioned in the foregoing cases for the adoption of a non-unanimous stipulation were satisfied. First, the non-stipulating parties were given an opportunity to be heard on the merits of the stipulation. Indeed, as stated above, the Commission added a fourth phase to the proceedings devoted exclusively to receiving evidence and argument on the propriety of using

the stipulation as a basis for resolving the contested issues. Second, the Commission made the requisite independent findings. The initial part of the Commission's Order recited:

**\*904** 4. Even where some parties to a proceeding do not agree to a stipulated result, it is reasonable to adopt such a stipulation if:

(a) The parties opposing the stipulation have notice that the stipulation may be considered by the Commission and an opportunity to be heard on their reasons for opposing the stipulation;

(b) The matters contained in the stipulation are supported by a preponderance of the credible evidence in the case;

(c) The stipulation is in accordance with applicable law;

(d) The stipulation results in just and reasonable rates;

(e) The results of the stipulation are in the public interest, including the interest of those customers represented by parties opposing the stipulation.

5. Pursuant to the Findings of Fact and Conclusions of Law set forth below, the Commission finds the Amended and Restated Stipulation, as modified, is a reasonable basis for resolution of the issues in this case and that adoption of the Amended and Restated Stipulation, as modified, as the basis of the Commission's Order in this proceeding is in the public interest.

In addition, Finding of Fact No. 237 stated: "The provisions of the Amended and Restated Stipulation are reasonable and supported by a preponderance of the credible evidence in this record and should be adopted." Conclusion of Law No. 28 stated: "The Amended and Restated Stipulation, as modified per Finding of Fact No. 6, represents a reasonable resolution of the contested issues in this docket, is supported in the record, is in the public

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

interest, and should therefore be adopted, as the basis for the Commission's Order in this case."

Appellants have not shown that use of the stipulation as a partial basis for the final order is arbitrary, unreasonable, an abuse of discretion, or involves consideration of factors other than those the legislature has directed the Commission to consider. Under such circumstances, we conclude that the Commission may generally set just and reasonable rates in an order based, in part, on a non-unanimous stipulation.

On a procedural level, OPC asserts that the Commission's rules, specifically Public Utility Commission Rules of Practice & Procedure § 21.151, 16 Tex.Admin.Code § 21.151 (1990), prohibit it from basing its order on a non-unanimous stipulation. Section 21.151 provides:

> After the expiration of the time for filing exceptions and replies thereto, the examiner's report and proposal for decision will be considered by the commission and either adopted, modified and adopted, or remanded to the examiner....

OPC admits the Commission has the power to reject an examiner's recommendation; however, it claims the Commission may not modify and then adopt a stipulation. OPC argues that the Commission violated section 21.151 by basing its final order on a modified stipulation over the examiner's contrary recommendation. The argument is meritless.

[5] Paragraph six of the Commission's final order expressly adopts findings of fact and conclusions of law proposed by the parties who signed the stipulation. The Commission accepted the proposed findings and conclusions rather than those recommended by the examiner only when there was a conflict between the two. The Commission expressly adopted the "examiner's report" to the degree it was consistent with the proposed findings and conclusions; it expressly repudiated the section of the examiner's report concerning EPEC's

prudence in investing and remaining involved in the project. We hold that the Commission was not required to accept or reject the examiner's report in its entirety. The Commission's authority undoubtedly extends to repudiating a part of the examiner's report and modifying it by deletion.

Within its challenge to the Commission's use of the stipulation, OPC claims that paragraph 4(e) of the Commission's final order "supplants" OPC's authority to represent the interest of residential and small business consumers in ratemaking cases of this type. Paragraph 4(e) provides: "The results of the stipulation are in the public *905 interest, including the interest of those customers represented by parties opposing the stipulation." OPC's interpretation of the order and of its own enabling legislation is incorrect.

The legislature created OPC to "advocate" the interests of residential and small commercial consumers. PURA § 15A(a). However, the *Commission* must set just and reasonable rates in ratemaking cases. PURA § 38. In addition, only the Commission has the authority to determine whether a sale of utility assets is in the public interest. *See* PURA § 63. Authority to advocate a position on behalf of small businesses and residential consumers is not equivalent to authority to decide what is in the public's best interest. The only authority OPC possesses is the former. OPC's contention is overruled.

One challenge to the Commission's use of the non-unanimous stipulation remains. Appellants argue that some findings of fact phrased in statutory language lack the required accompanying concise statements or findings of underlying facts. This argument, addressed to all the findings accompanying the final order, is too general to preserve error. To the extent that appellants assert generally that necessary findings of underlying fact are missing, they have waived their complaint by failing to demonstrate any error prejudicing their substantial rights. *See* Administrative Procedure and Texas Register Act (hereinafter "APTRA"), Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19(e)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Supp.1992).

The order addresses numerous issues, and appellants have made several specific substantial-evidence and finding-of-fact challenges. We will discuss appellants' specific (and consequently preserved) challenges while disposing of their remaining points of error.

"DECISIONAL" IMPRUDENCE

The Commission concluded that due to imprudent decisions, $32 million of EPEC's costs should not be included in rate base. The City's third point of error and OPC's second point contend that the disallowance is unsupported by substantial record evidence, arguing that the amount disallowed should have been greater.[FN3] OPC also charges that the Commission acted arbitrarily and abused its discretion in selecting the $32 million figure and that it made insufficient findings of underlying facts.

> FN3. All parties appear to agree that, to some degree, EPEC made imprudent decisions. On its face, PURA § 41(a) contemplates an imprudence disallowance only within the framework of a request that "construction work in progress" be included in rate base. The parties, however, have not briefed or argued whether a "prudence" standard governs the inclusion of new nuclear plant-in-service in rate base. We will therefore discuss appellants' points in the terms they have chosen. We do not express an opinion on the possible existence of a distinction between the reasonableness standard guiding the PUC in setting rates and the prudence standard it uses pursuant to PURA § 41(a) in deciding whether to include the value of construction work in progress in rate base.

Based on its anticipated load demand, EPEC first decided to participate in the nuclear power project at a 15.8% level. Confident that its decision was a prudent one, EPEC has continued to particip-

ate at the same level. When appellants challenged the prudence of EPEC's decisions, the City, EPEC, and the Commission staff each offered expert testimony on whether EPEC had acted prudently in deciding to participate in the project and in continuing to participate at the 15.8% level. The Commission concluded EPEC had not been entirely prudent in making decisions about its level of participation in the project.

The issues we must resolve are: (1) whether substantial evidence supports the findings underlying the Commission's disallowance of the precise $32 million figure, and (2) whether the Commission made the necessary findings of fact to allow this Court to conduct a meaningful review of imprudently incurred costs.

A. Substantial Evidence and Abuse of Discretion.

[6][7] In conducting a substantial-evidence review, we must determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion*906 the agency must have reached in order to take the disputed action. *Texas State Bd. of Dental Examiners v. Sizemore,* 759 S.W.2d 114, 116 (Tex.1988), *cert. denied,* 490 U.S. 1080, 109 S.Ct. 2100, 104 L.Ed.2d 662 (1989); *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 453 (Tex.1984). We may not substitute our judgment for that of the agency and may consider only the record on which the agency based its decision. *Sizemore,* 759 S.W.2d at 116. The appealing party bears the burden of showing a lack of substantial evidence. *Charter Medical,* 665 S.W.2d at 453. It cannot meet this burden merely by showing that the evidence preponderates against the agency decision. *Id.* at 452. If substantial evidence would support either affirmative or negative findings, we must uphold the agency's order, resolving any conflict in favor of the agency's decision. *Auto Convoy Co. v. Railroad Comm'n,* 507 S.W.2d 718, 722 (Tex.1974); *Warner v. City of Lufkin,* 582 S.W.2d 165, 167 (Tex.Civ.App.1979, writ ref'd n.r.e.).

Appellants' position is that only the City's wit-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ness, Ben Johnson, provided a method by which the Commission could quantify the amount of imprudently incurred costs. Johnson offered the opinion that EPEC had made several imprudent decisions and that, as a result, the Commission should disallow 50% of its costs. The City contends that because no other witness suggested a quantification method, the Commission, upon a finding of some decisional imprudence, should have adopted Johnson's quantification method and, necessarily, his result. We do not agree.

[8] The Commission is empowered to hold hearings, receive evidence, make decisions, issue orders, and find facts. PURA § 16. In addition, the Commission impliedly possesses those powers necessary and convenient to making findings and decisions. PURA § 16(a). PURA does not expressly confer on the Commission power to judge witnesses' credibility; however, the requirement that the Commission make decisions, findings of fact, and conclusions of law implies the necessary corollary power to judge credibility and to accept or reject a witness's testimony in whole or in part. *Gerst v. Guardian Sav. & Loan Ass'n*, 434 S.W.2d 113, 116 (Tex.1968); *Texas State Bd. of Dental Examiners v. Silagi*, 766 S.W.2d 280, 283 (Tex.App.1989, writ denied).

EPEC maintains that, based on information available at the time it made its decisions, its continued participation in the project would enable it to supply ratepayers with needed electricity at the lowest possible cost. Consequently, EPEC contends that *all* its costs should be included in rate base. The City, on the other hand, argues that available data would have informed a prudent utility manager that involvement in a nuclear project would be unduly burdensome to ratepayers. Consequently, Johnson recommended that the Commission disallow half of EPEC's costs. However, the evidence encompassed more than Johnson's recommendations.

All the witnesses who offered their opinions about EPEC's decisional prudence recognized the

complexity of a decision to construct or purchase new generating capacity. A utility must weigh many competing concerns before undertaking an expansion project. EPEC, as a part of its decision to participate in the Arizona Nuclear Power Project, considered the following factors, among others: (1) the feasibility of obtaining financing; (2) the effect of longterm financing on EPEC's financial integrity; (3) the potential impact on ratepayers of increasing system capacity by a significant percentage; (4) predicted expenses, revenues, and load demands for the relevant time periods; (5) EPEC's degree of financial flexibility; and (6) the availability of alternative sources for the additional capacity that forecasts had shown would be necessary. The effects these factors have on total project costs are not susceptible of ready quantification.

[9] Requiring the Commission to adopt or reject witnesses' testimony in toto, especially when the testimony concerns a multi-faceted issue such as this one, would hobble the Commission's ability to assess each witness and render its decision based solely *907 on the testimony it found credible. Having deduced that the Commission may properly accept less than all of a witness's testimony, we conclude the Commission committed no error in disallowing a lesser percentage of costs than Johnson recommended. The Commission could properly identify the factors which credible evidence showed EPEC should have considered when making its decisions. Likewise, the Commission could also decide that prudence would not have required EPEC to consider other factors because the evidence to the contrary was not credible.

The record contains substantial evidence to support a disallowance figure of zero for decisional imprudence; the Commission would, therefore, have been acting within its discretion had it agreed that EPEC was entirely prudent in its management and planning. The substantial evidence would also have supported a Commission finding that 50% of EPEC's costs should have been disallowed.[FN4] Appellants assert that the stipulation is the only pos-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

sible evidence of the exact $32 million disallowance. Because the appellants do not admit that the stipulation has any evidentiary weight, they contend there is no evidence to support the $32 million figure. We disagree.

> FN4. We express no opinion on the proposition that, because the Commission's prudence decision and resulting disallowance rested on a number of factors, the Commission could reasonably have concluded that the substantial evidence would support a figure *anywhere* within the range from zero to 50% of the total project costs.

[10] Because it is a statement contrary to EPEC's pecuniary interest, the concession has some evidentiary weight. A declaration contrary to a party's position on a disputed issue is akin to a quasi-admission. While not binding on the declarant, as a judicial admission would be, such a concession constitutes *some* evidence. *Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc.,* 606 S.W.2d 692, 694 (Tex.1980); *Texas Distillers, Inc. v. Howell,* 409 S.W.2d 888, 890 (Tex.Civ.App.1966, writ ref'd n.r.e.). It is for the trier of fact to determine the weight to be assigned to a quasi-admission. *Mendoza,* 606 S.W.2d at 694.

EPEC's position has always been that it acted prudently in deciding to participate in the project at the 15.8% level. Nevertheless, EPEC conceded through the stipulation that, if its decision had been imprudent, the resulting costs that should be disallowed totaled $32 million. Such a statement is clearly contrary to EPEC's position. Therefore, the Commission could properly consider and weigh the stipulation in quantifying the imprudently incurred costs.

The range of figures supported by the testimony of expert witnesses, the complexity of the issues the Commission had to review to determine whether EPEC made prudent decisions, the difficulty of assigning a value to the effects of any component on project costs, and EPEC's admission

against interest all combine to compel our conclusion that substantial record evidence supports the $32 million disallowance. We overrule the substantial-evidence challenge to the disallowance for decisional imprudence.

In addition, because OPC's contention that the Commission abused its discretion rests on the premise that the stipulation has no evidentiary weight, and because we have concluded to the contrary, we overrule this contention as well.

B. Findings of Fact.

As its final challenge within this point, OPC asserts that "[t]he Commission's findings are insufficient to comply with APTRA." However, instead of arguing that specific findings of underlying fact are insufficient, OPC complains that the Commission failed to provide "explicit statements of underlying facts to support its findings as required by Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 16(e) (APTRA)." [FN5]

> FN5. We construe OPC's allegation to refer to the requirements of section 16(*b* ), which deals with findings of fact. APTRA § 16(e) addresses agency motions for rehearing.

[11] Section 16(b) of APTRA provides, in part, that "[f]indings of fact, *if set forth in statutory language,* must be accompanied*908 by a concise and explicit statement of the underlying facts supporting the findings." (Emphasis added.) The Texas Supreme Court has concluded that an agency's findings of fact need the additional support of findings of underlying facts only when the ultimate findings are in terms taken directly from the enabling legislation or when they "represent the criteria that the legislature has directed the agency to consider in performing its function." *Charter Medical,* 665 S.W.2d at 451.

The "statutory language" to which APTRA § 16(b) refers is the language in the statute that confers authority on the agency to take the complained-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

of action. *Id.* In PURA, the legislature authorized the Commission to make orders setting rates. PURA § 37. A number of PURA's sections also detail the criteria the Commission is to consider in setting rates. *See* PURA §§ 38, 39, 41, and 43. Therefore, only when the Commission's findings are stated in PURA's express terms, or when they represent criteria the legislature has directed the Commission to consider, must the Commission also make findings of underlying fact.

[12] OPC does not direct us to a particular finding that requires, but is not accompanied by, findings of underlying fact. However, we conclude from its argument that Findings 101 through 103 are the subjects of its complaint, because those findings address the prudence and disallowance issues. Although PURA does not expressly require the Commission to make a finding of prudence before including costs in rate base, once the Commission finds a major project to have been imprudently planned or managed, it should generally disallow project costs to the extent of the imprudence. *See* PURA § 41(a); *supra* note 3.

Finding of Fact 101 is phrased in statutory terms; the Commission therein decided that EPEC was "not entirely prudent in its planning and management" of the project. The phrasing of that finding in statutory terms required the Commission to make findings of underlying fact showing the basis for the Commission's determination of imprudence and supplying the amount of the disallowance. Findings 102 and 103 accomplish these goals.

Neither Finding 102 or 103 is phrased in statutory terms. Finding 103 states that "[q]uantification of the effects of imprudence requires the exercise of judgment based upon the evidence. In light of the evidence relating to prudence and the difficulties in quantification, the quantification of decisional imprudence at $32 million for Units 1 and 2 is reasonable and appropriate." Finding 102 indicates the Commission concluded that imprudence existed only with respect to "the Company's *continuing evaluation* of the level

of its participation in the Palo Verde Project." (Emphasis added.) Taken together, these findings adequately supply the required concise statement of underlying facts supporting Finding 101.

OPC contends that, in order to be sufficient, the Commission's findings of underlying fact must identify "the processes and acts found to be imprudent, the nexus between those acts and the disallowance amount, [and] the evidentiary support for the disallowance figure." OPC fails to point either to statutory provisions or case law mandating that the Commission make such findings. Not having discovered any such authority ourselves, we conclude that such findings are not required.

We overrule the City's third point of error and OPC's second point of error.

### DEFERRALS

EPEC requested that its rate base be increased by the amount of carrying costs and operating and maintenance costs it incurred during "regulatory lag." [FN6] The utility had "deferred" these types of costs for Units 1 and 2, aggregating each type of cost for each unit into a separate capital *909 account. [FN7] EPEC obtained the Commission's prior permission to defer Unit 1 costs. The Commission reserved the right, however, to refuse subsequently to include the deferred costs in rate base to the extent they were unreasonable, related to plant not used and useful, or were spent or incurred imprudently. Although EPEC did not obtain prior permission to defer its post-in-service costs for Unit 2, it nevertheless deferred them, apparently assuming that obtaining prior approval a second time was unnecessary. After the rate-increase proceeding was completed, the Commission included the deferred costs for both units in rate base.

> FN6. "Regulatory lag" is the period between the date a new plant begins commercial operation (the "in-service" date) and the effective date of the new rates that result from including the new plant's costs in rate base.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN7. "Deferral" is an accounting procedure a utility can use to record all costs of a certain type in two accounts, one an expense account and the other a capital asset account. As the expense account balance increases, so does the capital asset account balance, so that the two balances remain identical. Recording costs this way preserves evidence the utility may later use to seek inclusion of the capital account balance in rate base and a corresponding increase in rates.

In this appeal, the City and OPC contend the Commission erred, first, in entering an order permitting EPEC to defer Unit 1 costs and, second, in subsequently including the "deferred-costs assets" for both units in rate base. [FN8] OPC and the City lodge several arguments against the deferred accounting procedure used here, including that the practice constitutes impermissible retroactive ratemaking and that it violates the "original-cost" standard contained in PURA § 41(a). [FN9] Thus, they assert that the Commission exceeded its authority by including the deferred post-in-service costs in rate base.

FN8. TSA also purports to complain of the deferral procedure. However, TSA failed to address the alleged error in its motions for rehearing to the agency. Therefore, it has waived any error. APTRA § 16(e); *Burke v. Central Educ. Agency,* 725 S.W.2d 393, 396 (Tex.App.1987, writ ref'd n.r.e.).

FN9. The City did not preserve a section-41(a) argument in its motion for rehearing to the Commission. The City also argues in its brief to this Court that the Commission failed to make necessary findings of underlying fact to support its conclusion that Unit 2 costs should be included in rate base, but the City likewise did not assign such failure as error in its motion for rehearing. Both complaints

have been waived. APTRA § 16(e); *Burke v. Central Educ. Agency,* 725 S.W.2d 393, 396 (Tex.App.1987, writ ref'd n.r.e.).

[13] A reviewing court's role in construing a statute is to "seek out the legislative intent from a general view of the enactment as a whole, and, once the intent has been ascertained, to construe the statute so as to give effect to the purpose of the Legislature." *Hightower v. State Comm'r of Educ.,* 778 S.W.2d 595, 597 (Tex.App.1989, no writ); *see also Medeiros v. Insurance Co. of N. Am.,* 781 S.W.2d 404, 406 (Tex.App.1989, no writ); *Sexton v. Mount Olivet Cemetery Ass'n,* 720 S.W.2d 129, 137 (Tex.App.1986, writ ref'd n.r.e.).

[14][15] As a general rule, an administrative agency is a creation of the legislature and, as such, has only those powers expressly conferred and those necessary to the accomplishment of its duties. *State v. Jackson,* 376 S.W.2d 341, 344 (Tex.1964); *Sexton,* 720 S.W.2d at 137; *Railroad Comm'n v. Atchison, T. & S.F. R.R.,* 609 S.W.2d 641, 643 (Tex.Civ.App.1980, writ ref'd n.r.e.). The present case is governed by PURA, which expressly grants to the Commission "the general power to regulate and supervise the business of every public utility within its jurisdiction and to do all things, whether specifically designated in this Act or implied herein, necessary and convenient to the exercise of this power and jurisdiction." PURA § 16(a). A reviewing court may determine, as a matter of law, the scope of an agency's statutory authority. *See Gage v. Railroad Comm'n,* 582 S.W.2d 410, 412 (Tex.1979).

[16] The power of an agency to take such actions as may be "necessary" to perform an express duty is not without limits. This Court has previously held that

[t]he agency may not, however, on a theory of necessary implication from a specific power, function, or duty expressly delegated, erect and exercise what really amounts to a new and additional power *or one that contradicts the statute,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

no matter that the new power is *910 viewed as being expedient for administrative purposes.

*Sexton,* 720 S.W.2d at 137–38 (emphasis added). Thus, if there is no specific express authority for a challenged action, and if the action is inconsistent with a statutory provision or ascertainable legislative intent, we must conclude that, by performing the act, the agency has exceeded its grant of statutory authority.

PURA requires the Commission to set rates at a level that will permit each utility "a reasonable opportunity to earn a reasonable return on its invested capital used and useful in rendering service to the public over and above its reasonable operating expenses." PURA § 39(a). This provision imposes many complex tasks on the Commission: What are the utility's reasonable operating expenses? What portion of the utility's expenditures constitute capital investment? What portion of the utility's invested capital is used and useful in rendering service? How should the value of the utility's used-and-useful invested capital be calculated? What is a reasonable return on the utility's used-and-useful invested capital?

Historically, one of the most vexing questions for regulatory authorities has been how to calculate the value of a utility's invested capital. *See* Charles F. Phillips, *The Regulation of Public Utilities* 305–29 (2nd ed. 1988) (hereinafter cited as "Phillips"). In the landmark case of *Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898), the United States Supreme Court established the legal basis of the so-called "fair value" doctrine:

[T]he basis of all calculations as to the reasonableness of rates to be charged by a corporation ... must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the prob-

able earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience.

*Id.* at 546–47, 18 S.Ct. at 434.

*Smyth v. Ames* commanded that both the *original* cost of construction, on the one hand, and the current *reproduction* or *replacement* cost, on the other hand, must be "considered" in setting rates. As debate raged as to which of the two cost measures should receive the greater weight or emphasis, the *Smyth* fair-return doctrine received increasing criticism over the years. Finally, *Smyth* was abandoned by the Supreme Court in *Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). The Court in *Hope* held that regulatory commissions are not bound by any particular formula in determining rates, as long as the rates established "enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed." 320 U.S. at 605, 64 S.Ct. at 289.

The Texas experience roughly paralleled that of the federal system. In *Railroad Commission v. Houston Natural Gas Corporation,* 289 S.W.2d 559 (Tex.1956), after a thorough historical review, the Texas Supreme Court held that pre-PURA statutes mandated a fair-value method of valuation, which the court defined as "a reasonable balance between original cost less depreciation and replacement cost new less an adjustment for present age and condition." *Id.* at 572. As originally adopted in 1975, PURA incorporated this fair-value definition.[FN10] In 1983, however, the legislature amended PURA to make Texas a pure "original-cost" state. Section 41(a) of PURA now provides:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN10. The relevant sections of PURA originally provided:

Sec. 39. In fixing the rates of a public utility the regulatory authority shall fix its overall revenues at a level which will permit such utility to recover its operating expenses together with a reasonable return on its invested capital.

Sec. 40. (a) The regulatory authority shall not prescribe any rate which will yield more than a fair return upon the adjusted value of the invested capital used and useful in rendering service to the public.

\* \* \* \* \* \*

Sec. 41. The components of adjusted value of invested capital and net income shall be determined according to the following rules:

(a) Adjusted Value of Invested Capital. Utility rates shall be based upon the adjusted value of property used by and useful to the public utility in providing service including where necessary to the financial integrity of the utility construction work in progress at cost as recorded on the books of the utility. The adjusted value of such property shall be a reasonable balance between original cost less depreciation and current cost less an adjustment for both present age and condition. The regulatory authority shall have the discretion to determine a reasonable balance that reflects not less than 60% nor more than 75% original cost, that is, the actual money cost, or the actual money value of any consideration paid other than money, of the property at the time it shall have been dedicated to public use, whether by the utility which is the present owner or by a predecessor, less depreciation, and not less than 25%

nor more than 40% current cost less an adjustment for both present age and condition. The regulatory authority may consider inflation, deflation, quality of service being provided, the growth rate of the service area, and the need for the public utility to attract new capital in determining a reasonable balance.

1975 Tex.Gen.Laws, ch. 721, §§ 39–41, at 2341–42 (PURA §§ 39–41, since amended); *see also Southwestern Bell Tel. Co. v. PUC,* 571 S.W.2d 503, 512–16 (Tex.1978).

*911 Sec. 41. The components of invested capital ... shall be determined according to the following rules:

(a) Invested Capital. *Utility rates shall be based upon the original cost of property used by and useful to the public utility in providing service* including construction work in progress at cost as recorded on the books of the utility. The inclusion of construction work in progress is an exceptional form of rate relief to be granted only upon the demonstration by the utility that such inclusion is necessary to the financial integrity of the utility. Construction work in progress shall not be included in the rate base for major projects under construction to the extent that such projects have been inefficiently or imprudently planned or managed. *Original cost shall be the actual money cost, or the actual money value of any consideration paid other than money, of the property at the time it shall have been dedicated to public use, whether by the utility which is the present owner or by a predecessor, less depreciation.*

PURA § 41(a) (emphasis added).

In addressing the arguments made by the City and OPC in the present case, we deem it convenient to discuss separately the two different types of costs for which the Commission allowed deferred-accounting treatment: (1) carrying costs, and (2) oper-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ating and maintenance costs.

A. Carrying Costs.[FN11]

> FN11. There are actually two types of such "costs" associated with capital construction projects: (1) interest paid on debt capital (i.e., borrowed funds); and (2) inability to earn a fair return on equity capital. While the difference between the two is relevant for some purposes, it does not appear to be so for purposes of our decision in the present case. Accordingly, we refer to both collectively as "carrying costs."

[17][18] As a general rule, the only assets that may be included in a utility's rate base (so that the utility earns a return on the value of such assets) are those found to be "used and useful" in providing service to the utility's customers. As quoted above, for example, section 41(a) of PURA specifically states that rates must be based on "the original cost of property used by and useful to the public utility in providing service." When a new plant is built, the utility must invest large amounts of capital during construction. Until the plant is completed, however, it is usually not considered a used and useful asset. Accordingly, a rigid application of the used-and-useful rule could prohibit the utility from earning a return on this invested capital until the new plant is completed and its cost is included in rate base by the regulatory authority. Thus, under such a rigid application, equity capital that had been or *912 could have been earning a return for the utility would, when devoted to construction of the new plant, be unable to earn a return until the new plant was completed and its cost included in rate base; further, any interest actually paid on borrowed funds would not earn a return, even though the payment of such interest might have required the investment of additional capital.

It has been widely if not universally conceded that utilities should, in fairness and occasionally out of economic necessity, be compensated for these carrying costs, especially for major capital construction projects. Two methods have been developed to compensate utilities for such costs. The first method capitalizes the carrying charges incurred during the construction period as allowance for funds used during construction (AFUDC). AFUDC is recorded part as current income, part as an offset to interest expenses, but no cash payments are made by ratepayers during construction. The payments from ratepayers to recover the carrying charges begin when the completed plant goes on stream. The entire cost of the plant (including AFUDC) is added to rate base, and it earns a rate of return on investment and is depreciated over the life of that plant.

James Bonbright, et al., *Principles of Public Utility Rates* 246 (2nd ed. 1988) (hereinafter cited as "Bonbright"). The second method, as the Bonbright treatise explains it,

> is to include construction work in progress (CWIP) in the rate base. (CWIP includes accrued AFUDC on investment not in rate base.) The regulatee recovers its carrying charges currently from ratepayers through the return component of its rates, rather than adding them to the cost of construction for recovery when the plant is in service. The return on CWIP is recorded as income on a current basis (like AFUDC), and actual cash payments are made by the ratepayers currently (unlike AFUDC).

*Id.* Section 41(a) of PURA expressly permits the inclusion of CWIP in rate base where the utility demonstrates that "such inclusion is necessary to the financial integrity of the utility," and CWIP may be included only to the extent that the project has not been "inefficiently or imprudently planned or managed." PURA § 41(a).

In the present case, CWIP was not requested; rather, EPEC accrued AFUDC in a capital account while the plant was under construction. When the new plant began commercial operation, FERC accounting rules required EPEC to cease accruing

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

AFUDC in a capital account; any such costs that continue after commercial operation begins must thereafter be recorded as expenses. Except for deductions for imprudence, the "original cost" of the plant, including AFUDC, was included by the Commission in EPEC's rate base. In addition, however, the Commission allowed EPEC to defer, and later included in rate base, the carrying costs that EPEC incurred between the date of commercial operation and the effective date of the new rates that included in rate base the "original cost" of the Palo Verde plant. These carrying costs appear to be simply a continuation of AFUDC under a different name. OPC contends that the Commission's action violated the provision in section 41(a) permitting only the cost of the new plant "at the time it shall have been dedicated to public use" to be included in rate base. We agree.

The legislature has made it clear in section 41(a) that the value of new plant is, for rate-base purposes, to be measured by its original cost at the time the plant is dedicated to public use. As stated above, it has been generally recognized that carrying costs associated with the construction of a new plant are essentially part of the "original cost" of constructing the plant, and the utility should be compensated for them by including at least part of those costs in rate base. Nonetheless, the legislature apparently chose to simplify the calculation of a plant's original cost by placing a "cut-off date" on construction and acquisition costs: such costs must be calculated as of the *913 time the physical asset being constructed or acquired is placed in public service.[FN12]

> FN12. "Since no program of rate regulation is self-executing, one of the most important virtues of an *original cost* valuation method is that of relative ease of administration." H. Louis Nichols & Randall Hagan Fields, *Rate Base Under PURA: How Firm is the Foundation?*, 28 Baylor L.Rev. 861, 866 (1976).

As stated earlier, the post-in-service carrying costs that were allowed to be "deferred" and which were included in rate base in the present case are indistinguishable from the AFUDC that was properly accrued and capitalized before commercial operation began. Accordingly, any procedure that permits such costs to be included in rate base would effectively allow the inclusion in rate base of a construction cost of the plant that was incurred *after* the plant's dedication to public use, thereby violating the mandate of section 41(a) that the original cost of new plant be calculated as of the date the plant is placed in public service. In effect, such a procedure would, by an accounting device, permit the Commission to let in through the back door what the legislature has expressly prohibited coming in the front door.

Even without the unique wording of section 41(a), the Washington Utilities and Transportation Commission reached the same conclusion when faced with a request to extend the period of capitalization of AFUDC from the in-service date of a new plant to the date when new rates went into effect:

> [A]ccrual of AFUDC after the in-service date of a utility plant would result in a utility plant with a value exceeding its "original" cost. The original cost concept requires that the value of utility plant be determined at the time it is first placed in service to the public. To grant this petition would establish a dangerous and unwarranted precedent leading to further requests to disregard the original cost concept.

*In re Puget Sound Power & Light Co.,* 62 PUR4th 436, 440 (Wash. Util. & Transp. Comm'n 1984). Whether or not one agrees that the original-cost method of valuation requires, *as a general proposition,* that the value of a utility plant must be determined at the time it is first placed in service to the public, the language of section 41(a) clearly mandates that approach. Accordingly, the Commission contravened section 41(a) when it allowed post-in-service carrying costs to be included in EPEC's rate base.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

839 S.W.2d 895, 135 P.U.R.4th 584
(Cite as: 839 S.W.2d 895)

EPEC and the Commission present several arguments against such a construction of section 41(a). First, they argue that the phrase "at the time it shall have been dedicated to public use" does not mean the time the plant itself is placed in service. They assert, instead, that the phrase refers to the *money* spent to construct the plant, and that such money is dedicated to public use at the time it is spent. We cannot agree with this interpretation of section 41(a). For example, section 41(a) states that "original cost" is "the actual money *cost ... of the property* at the time it shall have been dedicated to public use." Thus, the reference to "property" in section 41(a) is obviously to property being *acquired* or *constructed* in exchange for the payment of money, not to the funds themselves used to pay for its acquisition or construction. Just as clearly, the term "it" in the phrase "at the time *it* shall have been dedicated to public use" refers back to the "property" being acquired or constructed. Thus, in the case of new plant, section 41(a) requires that the plant's original cost be determined as of the time *the new plant* is placed in service.

[19] EPEC and the Commission next argue that "dedicated to public use" does not refer to the time a plant begins commercial operation. We disagree. Having determined that the "cut-off date" contained in section 41(a) refers to the property being acquired or constructed, and not to the money used to pay for its acquisition or construction, the question becomes: When is a new plant dedicated to public use? We conclude that new plant is dedicated to public use when it is first placed in public service. First, the plain meaning of the statutory provision supports the proposition that a plant has not been "dedicated to *914 public use" until it has been placed in public service, and a plant is placed in public service when it begins operating commercially. Second, under FERC rules and Commission practice, a utility must cease accruing AFUDC when a new plant begins commercial operation. Simple logic dictates that the most appropriate time to determine the original cost of a capital asset is when existing accounting rules require that a signi-

ficant, ongoing cost of that asset cease being capitalized and start being expensed.

In this connection, EPEC and the Commission also argue that section 41(a) does not contain *any* temporal limitation (i.e., "cut-off date") on the determination of the original cost of capital assets. They stress that section 41(a) provides that original cost is the actual money cost of property "at the time it shall have been dedicated to public use, *whether by the utility which is the present owner or by a predecessor.*" They contend that the emphasized clause above shows that the purpose of section 41(a) is simply to prevent utilities from selling or transferring a plant to another utility and having the purchasing utility use its purchase price as the original cost of the plant. Thus, they argue, the last sentence of section 41(a) merely requires that original cost be the cost to whichever utility first placed the plant in public service, not that original cost must necessarily be determined *at the specific time* that the plant was placed in service. We disagree. The language of section 41(a) could hardly be clearer in this regard: "Original cost shall be the actual money cost ... of the property at the time it shall have been dedicated to public use...." The clause that follows, "whether by the utility which is the present owner or by a predecessor," is simply one of clarification, emphasizing that the time of dedication to public use is the critical date, irrespective of whether that dedication was made by the current owner or a predecessor.

Ignoring the statute's plain language, EPEC cites *Office of Consumers' Counsel v. Public Utilities Commission,* 18 Ohio St.3d 264, 480 N.E.2d 1105 (1985), in which the Ohio Supreme Court construed the relevant Ohio statute to mean that original cost would be the cost "to the person that first dedicated the property to the public use"; the court went on to hold that the statute "establishes which entities' costs are to be utilized in establishing a rate base. [It] does not affect the timing of property valuation." *Id.* 480 N.E.2d at 1107. A comparison of the Ohio statute with the Texas statute, however,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

shows why the Texas statute cannot rationally be given the same construction. The Ohio statute provided: "Such original cost of property ... shall be the cost, as determined to be reasonable by the commission, *to the person that first dedicated the property to the public use....*" Ohio Rev.Code Ann. § 4909.05(E) (emphasis added). The Texas statute provides: "Original cost shall be the actual money cost ... of the property *at the time it shall have been dedicated to public use,* whether by the utility which is the present owner or by a predecessor, less depreciation." PURA § 41(a). The two statutes could not be more different in their focus and meaning. The Ohio statute focuses on "who"; the Texas statute focuses on "when." Accordingly, the *Office of Consumers' Counsel* case is inapposite.

EPEC and the Commission next argue that our construction of section 41(a) will prevent the inclusion in rate base of recognized elements of invested capital, such as working capital, "accumulated deferred federal income tax," and rate case expenses, none of which have a "commercial operation" date or an "in-service" date. We disagree that our holding will have such an effect. As stated above, the purpose of section 41(a) was to establish a method of valuing tangible property acquired or constructed by the utility. Although the term "property" can, in an appropriate context, certainly have a meaning broader than just tangibles, the history of the original-cost/replacement-cost debate as to the proper method of valuing a utility's invested capital indicates that the crux of the dispute has related primarily, if not exclusively, to plant-in-service. Indeed, the supreme court in the *Alvin Case* held that "the Texas statutes require a *physical *915 property valuation rate base. "* Houston Natural Gas,* 289 S.W.2d at 564 (emphasis added).

We recognize that a utility's invested capital—and therefore its rate base—can include more than plant-in-service. For example, one noted commentator identifies the following four elements of a utility's rate base: (1) "tangibles, which includes 'used and useful' land, buildings, and equipment (plant)"; (2) "other elements of value, [which] includes working capital, property held for future use, and intangibles"; (3) "customer contributions and tax deferrals, [which are] frequently deducted from the rate base, since those components do not represent investor-supplied capital"; and (4) "construction work in progress." Phillips, *supra* at 302. The Bonbright treatise also identifies four elements of rate base, although it arranges the categories somewhat differently: "(1) net plant in service; (2) property held for future use; (3) working capital; and (4) construction work in progress (CWIP)—no AFUDC." Bonbright, *supra* at 237.

Although "invested capital" can include more than tangible assets, it is simply not feasible to apply the original-cost formula contained in section 41(a) to certain types of assets, e.g., intangibles and working capital. Such assets have no money "cost" by which they are acquired or constructed; indeed, in some instances they more closely resemble the payment of money than a tangible asset for which money is paid. Nonetheless, we do not believe the legislature intended for section 41(a) to *limit* a utility's rate base to the original cost of tangible assets, and we do not so hold. We hold only that the original-cost formula ("the actual money cost ... of the property at the time it shall have been dedicated to public use") states a mandatory method for the valuation of tangible assets, i.e., plant-in-service. This holding neither addresses nor affects the issue of whether—and to what extent—other types of assets may be included in rate base.

EPEC and the Commission next argue that sections 2, 16, 27, and 39 of PURA grant broad enough powers to the Commission to allow it to use "deferred accounting" procedures. Without discussing those statutory provisions in detail, we note our general agreement that they grant broad power and discretion to the Commission. However, they do not *expressly* authorize inclusion of post-in-service carrying costs in rate base, and we cannot construe them to *impliedly* permit an action that is contrary to or inconsistent with another section of PURA.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Sexton,* 720 S.W.2d at 137–38. And as we have held, allowing post-in-service carrying costs to be included in rate base is inconsistent with section 41(a).[FN13]

> FN13. Our holding does not prevent post-in-service carrying costs from being amortized and recovered by a utility; it merely prevents them from being included in rate base. Moreover, even if the practical effect of this holding were to prevent recovery of such costs incurred during regulatory lag, "[a]ny change in protection for the utility against undue regulatory lag should come from the legislature." *Railroad Comm'n v. Lone Star Gas Co.,* 656 S.W.2d 421, 427 (Tex.1983).

We conclude, therefore, that the Commission exceeded its authority when it included in EPEC's rate base the carrying costs incurred by EPEC after the Palo Verde plant began commercial operation.

B. Operating and Maintenance Costs.

*1. PURA § 41(a)*

The foregoing discussion makes it clear that we consider the purpose of PURA § 41(a) to be the establishment of a method of determining the value of tangible capital assets that a utility has acquired or constructed. Section 41(a) prohibits post-in-service *carrying costs* from being included in rate base because carrying costs constitute part of the actual money cost of acquiring or constructing new plant. Operating and maintenance (O & M) costs, on the other hand, are not part of the cost of acquiring or constructing new plant; rather, they are expenses associated with maintaining the plant after it is already in service. To illustrate the distinction, if the Palo Verde plant had been completely shut down and abandoned the day after it became operational, EPEC's carrying costs *916 would have continued unabated until all funds borrowed for its construction were repaid; the O & M costs, however, would have ceased. Because post-in-service O & M costs are not part of the "actual money cost" of acquiring or constructing the plant, the original-cost formula contained in section 41(a) simply has no application to such expenditures. Accordingly, whatever other objections may be made to the inclusion in rate base of post-in-service O & M costs, such inclusion is not inconsistent with PURA § 41(a).

*2. Retroactive Ratemaking*

Initially, we note that EPEC applied for and received from the Commission permission to defer post-in-service O & M costs on Palo Verde Unit 1 *before* that unit became commercially operational. Accordingly, we question whether the inclusion of Unit 1 O & M costs has any retrospective effect at all. Indeed, the City does not even lodge a retroactive-ratemaking complaint about the inclusion in rate base of O & M costs as to Unit 1. However, because we must address whether the inclusion in rate base of O & M costs for Unit 2 constitutes improper retroactive ratemaking, we will assume without deciding that the Commission's inclusion of Unit 1 O & M costs in rate base did have a retrospective effect.

[20] As stated previously, sections 2, 16, 27, and 39 of PURA expressly grant broad powers to the Commission. We believe those provisions give the Commission discretionary authority to allow deferral and capitalization of post-in-service O & M costs, and to permit the Commission to include such costs in rate base, unless such a procedure is inconsistent with other state law. Thus, to determine the validity of the Commission's action in the present case, we must determine whether the deferral, capitalization, and inclusion in rate base of such costs is inconsistent with a statutory or constitutional prohibition of retroactive ratemaking. *See Texas Ass'n of Long Distance Tel. Cos. (TEXALTEL) v. PUC,* 798 S.W.2d 875, 881–82 (Tex.App.1990, writ denied); *Southwestern Bell Tel. Co. v. PUC,* 615 S.W.2d 947, 953 (Tex.Civ.App.), *writ ref'd n.r.e.,* 622 S.W.2d 82 (Tex.1981).

a. Statutory prohibitions.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

In order to satisfy the first prong of the retro-activity test, the action allegedly having retrospective effect must not contravene any statutory prohibition. As stated above, we have concluded that the deferral, capitalization, and later inclusion in rate base of post-in-service O & M costs is not contrary to PURA § 41(a).

Appellants also contend, however, that inclusion of such O & M costs is inconsistent with PURA § 43(f). Section 43(f) provides that if, after hearing, the Commission finds the existing rates to be unreasonable or in violation of law, it shall fix new rates "by order," which rates are "thereafter to be observed until changed." Although many jurisdictions have construed the term "thereafter" to give the regulatory authority power to prescribe rates prospectively only, the Texas Supreme Court stated in one case that the term in section 43(f) gives Texas agencies "discretion" in setting the effective date of new rates. *See Railroad Comm'n v. Lone Star Gas Co.,* 656 S.W.2d 421, 425–26 (Tex.1983).[FN14] Nonetheless, this *917 Court has held that PURA § 43(f) prohibits the Commission from making new rates effective at a date earlier than the date of the order fixing those rates. *See PUC v. GTE–SW,* 833 S.W.2d 153 (Tex.App.—Austin, 1992, writ denied); *PUC v. General Tel. Co.,* 777 S.W.2d 827 (Tex.App.1989, writ dism'd); *cf. TEXALTEL,* 798 S.W.2d at 882–84 (rates may be made effective after order fixing the level of revenues but before final approval of tariffs).

> FN14. One commentator has recently argued against giving undue importance to the "thereafter" language contained in many state utility regulatory acts:
>
> > It is difficult to understand why legislatures would have delegated such broad powers to commissions, but would have simultaneously limited that authority with off-hand wording in a provision merely describing the process for the entry of a rate order. The most probable

reason, then, for the inclusion of the "thereafter" language in the enabling statutes is the simple fact that after the commission enters a rate order, a utility cannot mechanically collect rates in the past.

. . . . .

> ... If commissions in their rate orders are allowed to consider only losses or gains forecasted to occur "thereafter," then it is difficult to discern how commissions have the authority to correct mistakes in past rate orders, to allow recoveries for past extraordinary gains or losses, to change accounting treatment for past gains or losses, or to grant refunds or surcharges after reversal of a rate order.
>
> Stefan Krieger, *The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in Public Utility Proceedings,* 1991 U.Ill.L.Rev. 983, 1034–35 (1991).

[21] In the present case, the effective date of the new rates was not prior to the date of the order fixing the rates. Therefore, the Commission's action here was not inconsistent with our holdings in *GTE–SW* and *General Telephone.* Appellants argue, however, that the inclusion in rate base of deferred O & M costs *had the effect* of implementing the new rates as of the date the Palo Verde plant became commercially operational, i.e., retroactively. We decline to construe the term "thereafter" in section 43(f) to have such sweeping effect. We are not willing to say that the term "thereafter" in PURA § 43(f) constitutes a blanket prohibition of any consideration by the Commission of a utility's past gains or losses in fixing future rates. Thus, even if the "thereafter" language in section 43(f) precludes the Commission from making new rates effective at a date earlier than the date of the order fixing those rates, the Commission's action in the present case—permitting deferral, capitalization, and inclusion in rate base of EPEC's post-in-service O & M

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

costs—is not inconsistent with such a prohibition.

We conclude, therefore, that the Commission's inclusion in rate base of EPEC's deferred post-in-service O & M costs is not inconsistent with Texas statutory law.

### b. Constitutional prohibition.

[22] To withstand the second prong of appellants' retroactive-ratemaking challenge, the Commission's order must not violate Article I, § 16 of the Texas Constitution, which provides: "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts shall be made." Courts often recite the rule that ratemaking is a legislative activity, even when delegated to an administrative body. *See, e.g., Houston Natural Gas Corp.,* 289 S.W.2d at 563. For that reason, it has often been stated that rates set after an agency hearing generally must have a prospective effect, just as would laws enacted by the legislature.[FN15] *Id.; see also* Tex. Const. Ann. art. I, § 16 (1984).

> FN15. A mechanical recitation of this rule to support application of the retroactive-ratemaking prohibition may not be justified. *See* Krieger, *supra* at 1035–37. Professor Krieger points out that many states, including Texas, expressly require the use of adjudicative rather than rulemaking procedures for rate hearings. *Id.* at 1037; *see* APTRA § 3(2).

Appellants complain that allowing EPEC to recover post-in-service O & M costs through deferred accounting would permit EPEC to charge ratepayers an additional amount for services that they have already received and paid for. In this regard, the following general observations about retroactive laws are instructive:

> [One,] a law is retroactive if it assumes to give effect to a past event, in order to create a present right or duty. [Two,] ... a law is retroactive when it assumes to give to a past event the effect of creating rights and duties ab initio, or as of some

time prior to the retroactive law....

> ... Under limitations [one and two], it is true, a law gives to an event which has already transpired a juristic significance it did not have at the time it occurred; but it does this only in order that it may thereby regulate future conduct.

Bryant Smith, *Retroactive Laws and Vested Rights,* 5 Tex.L.Rev. 231–33 (1927). In addition, the supreme court has recognized that statutes permitting agencies to consider prior conduct have retrospective effect. *Texas Water Rights Commission v. Wright,* 464 S.W.2d 642, 648–49 (Tex. 1971).

In the present case, the past event given significance by inclusion in rate base of the deferred post-in-service O & M costs is the *918 start-up of commercial operation of Units 1 and 2. Appellants assert that allowing EPEC to earn a return on such deferred-cost assets gives the start-up of those units the effect, ab initio, of creating a new duty for ratepayers: they are thereafter required, without Commission approval, to pay higher rates for services received. Thus, recovery of such O & M costs would, in appellants' view, effect a change in charges after ratepayers have consumed the service. *See, e.g., Lone Star Gas,* 656 S.W.2d 421. For purposes of the ensuing discussion, we will assume without deciding that inclusion in rate base of the post-in-service O & M costs has a retrospective effect.

[23] A retrospective effect alone, however, will not invalidate an agency action. *Wright,* 464 S.W.2d at 648. Notwithstanding a retrospective effect, a rate order may avoid constitutional infirmity if it does not substantially impair or destroy vested rights, *McCain v. Yost,* 155 Tex. 174, 284 S.W.2d 898, 900 (1955); *TEXALTEL,* 798 S.W.2d at 882, and if it does not change the substantial rights and obligations of the implied contract between a utility and its ratepayers, *Southwestern Bell,* 615 S.W.2d at 956; *Amarillo Gas Co. v. City of Amarillo,* 208 S.W. 239, 240 (Tex.Civ.App.1919, no writ). Although courts have often failed to explicate or ap-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ply the latter consideration, we conclude that it is significant in the present case.

[24][25][26] Several courts have concluded that an implied contract exists between a utility and its ratepayers, creating both the utility's duty to provide a defined service and the ratepayers' duty to pay a defined rate. *See, e.g., Amarillo Gas Co.,* 208 S.W. at 240; *Southwestern Bell,* 615 S.W.2d at 956. Under this implied contract, ratepayers have a right to pay a constant rate for service until, by legislatively approved procedures, the old rate is formally challenged. *See TEXALTEL,* 798 S.W.2d at 882. The setting of new rates permissibly adjusts the respective rights and obligations of the ratepayers and the utility. Only the rights and obligations existing between rate settings are constitutionally protected against alteration by retroactive ratemaking. 208 S.W. at 240. Therefore, only if new rates alter the ratepayers' right to pay a set rate for a specified service will they violate the prohibition of article I, § 16.

The *Amarillo Gas* case, involving city ordinances which set consumer gas rates, typifies true retroactive ratemaking. Among other things, the first ordinance included a provision which allowed consumers a 10% discount if they paid their bills within ten days. The subsequent ordinance eliminated the discount and imposed a 10% surcharge on payments made after ten days. A dispute arose when the gas company attempted to collect surcharges on bills for gas the company had supplied before the effective date of the second ordinance. The question on appeal was whether imposing the surcharge on bills for gas supplied before the effective date "change[d] the substantial rights and obligations of this contract as to transactions already had under it." 208 S.W. at 240. The court concluded that

the practical and necessary result of the amendment was to require the consumer to pay considerably more for his gas than he would have been required to pay under the old rates.... The rates established by the new ordinance did inevitably

make a substantial change in the rights and obligations of the consumer, and we conclude [that they] cannot be applied to the gas consumed prior to the time the ordinance took effect.

*Id.*

Unlike *Amarillo Gas,* the present case involves no attempt to charge ratepayers an additional sum for service already purchased. Before the effective date of the new rates, EPEC's ratepayers paid Commission-authorized rates for the service they were obtaining. EPEC invested in the Palo Verde plant to equip itself to provide additional service to its ratepayers. When the new plant became commercially operational, the ratepayers began receiving the benefit of the new service before being charged for it. Therefore, because the Commission had not defined the substantial *919 rights and obligations of a new implied contract between EPEC and its ratepayers, the ratepayers had no substantial right to pay a certain rate for service being provided by the Palo Verde plant. Significantly, the ratepayers also had not paid rates which would allow EPEC a return on its investment in the plant. Therefore, including in new rates costs incident to the interim benefit provided by the operation of Palo Verde plant does not change a substantial right belonging to the ratepayers. *Cf. Business & Prof. People for the Pub. Interest v. Illinois Commerce Comm'n,* 205 Ill.App.3d 891, 150 Ill.Dec. 750, 563 N.E.2d 877 (1990) (deferral of regulatory-lag costs allowed because costs of new plant had not been taken into account in setting existing rates), *rev'd on other grounds,* 146 Ill.2d 175, 166 Ill.Dec. 10, 585 N.E.2d 1032 (1991).

[27] Just as allowing inclusion in rate base of the Palo Verde plant's post-in-service O & M costs does not change the ratepayers' substantial rights, likewise it does not impair or destroy vested rights. Whether legislation substantially impairs or destroys vested rights necessitates consideration of whether the retrospective effect: (1) advances or retards the public interest; (2) effectuates or defeats the bona fide intentions or reasonable expectations

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

839 S.W.2d 895, 135 P.U.R.4th 584
(Cite as: 839 S.W.2d 895)

of affected persons; and (3) surprises persons who have long relied on a contrary state of the law. *Southwestern Bell,* 615 S.W.2d at 956–57; *see also Wright,* 464 S.W.2d at 648.

The public has an interest in obtaining a reasonable quantity and quality of service. The utility should generate the service safely, under the guidance of efficient management, and make the service obtainable at reasonable rates. *See* Phillips, *supra,* at 164. In the present case, the Commission could reasonably have concluded that including post-in-service O & M costs in rate base would advance these interests. Further, a ratepayer could not reasonably expect a utility to spend millions of dollars building a nuclear facility, use the facility to generate electricity, and then not seek a return on its investment therein. In addition, the fact that the Commission had previously granted EPEC a certificate of convenience and necessity to participate in the project thereafter precluded any interested persons from reasonably claiming surprise at finding themselves obligated to pay the costs of building and operating the new plant.

All of these important considerations support the conclusion that the Commission has not substantially impaired or destroyed vested rights by including in rate base EPEC's post-in-service O & M costs. Therefore, because the new rates neither impair vested rights nor change substantial rights or obligations of implied contract, we conclude that deferral, capitalization, and inclusion in rate base of such costs does not violate the constitutional prohibition against retroactive ratemaking.

C. Disallowance for Imprudence.

OPC also argues in point of error five that the Commission erred by not reducing the deferred O & M costs in proportion to the imprudence disallowance before including the assets in rate base. OPC cites no authority that would require the Commission to reduce the "deferred-costs asset" because of imprudence. Instead, it points to the Commission's reservation of the right to exclude the capitalized costs from rate base contained in the order allowing deferral of Unit 1 costs. Apparently, OPC has construed this reservation as a representation that the costs would not be included; we do not find any such representation in the order.

D. Substantial Evidence.

As its final complaint within this point of error, OPC contends that the total figure assigned by the Commission to the deferred-costs asset is not supported by substantial evidence. We do not agree. Our review of the record shows that EPEC provided ample documentation of the costs it had incurred and deferred after the Palo Verde plant became commercially operational.

We sustain OPC's and the City's fifth points of error to the extent they complain *920 of the Commission's deferral, capitalization, and inclusion in rate base of EPEC's post-in-service carrying costs. We overrule OPC's and the City's fifth points of error to the extent they complain of the Commission's deferral, capitalization, and inclusion in rate base of EPEC's post-in-service O & M costs, and in all other respects.

CONSTRUCTIONAL IMPRUDENCE

By its third point of error, OPC raises three distinct complaints about the disallowance of $28 million in construction costs as a result of EPEC's imprudent planning or management of the project's construction. First, OPC asserts that substantial evidence does not support the Commission's method of quantifying the imprudently incurred costs. Second, OPC argues that the quantification method used by the Commission results in retroactive ratemaking. Finally, OPC complains that "[t]he Commission's finding regarding construction cost impacts is conclusory and does not indicate the underlying facts relied upon by the PUC." We construe this contention to be a challenge to the sufficiency of Finding of Fact 100 and an assertion that the Commission should have made additional findings of underlying facts to support Finding 100.

[28] EPEC maintains that OPC has waived all of its contentions except that concerning retroactive

ratemaking because it failed to present legal bases for its complaints in its second motion for rehearing. We do not agree. Although OPC's second motion for rehearing contained no citations to legal authority for its complaints, the motion did contain statements of OPC's legal bases for its argument. While motions for rehearing must point out the specific finding challenged and the legal basis for the challenge, they need not contain citations of authority. *Burke v. Central Educ. Agency,* 725 S.W.2d 393, 397 (Tex.App.1987, writ ref'd n.r.e.).

A. Retroactive Ratemaking.

[29] OPC asserts that by disallowing a smaller portion of construction costs than OPC recommended, "the Commission has retroactively increased the value of the Company's revenue requirement fixed in prior rate proceedings, and shifted these additional hypothetical costs to future ratepayers." Essentially, OPC argues that the Commission may not legally adopt a method recognizing any savings that ratepayers may have realized because of delays in completing construction.

The Commission staff's expert, Morris Jacobs, and the City's expert, Richard B. Hubbard, agreed that financing costs had increased because of delays. Jacobs also testified, however, that ratepayers had received an unexpected benefit because of the delay: they had had the present use of money they would otherwise have had to pay in rates if the construction had been completed and the costs included in rate base as scheduled. Consequently, according to Jacobs, the true amount of imprudently incurred costs can be determined only by reducing the increased financing costs by the amount of the benefit to ratepayers. OPC objects to offsetting the ratepayers' benefit against the increased financing costs, apparently because the former accrued before the Commission could set rates including the plant in rate base. Accordingly, OPC argues that the savings cannot be taken into account without having a retrospective effect on rates.

We fail to see how recognizing an actual benefit ratepayers derive from delays would impermiss-

ibly increase revenue requirements "fixed in prior rate proceedings." We conclude that by offsetting such a benefit against increased financing costs in determining the constructional-imprudence disallowance, the Commission did not change the substantial rights of the ratepayers or impair or destroy any of their vested rights. *See McCain v. Yost,* 155 Tex. 174, 284 S.W.2d 898, 900 (1955); *Amarillo Gas Co. v. City of Amarillo,* 208 S.W. 239, 240 (Tex.Civ.App.1919, no writ). Therefore, we reject OPC's retroactive-ratemaking argument.

B. Substantial Evidence.

Finding of Fact 100 provides: "Staff witness Jacobs presented a credible quantification*921 of construction management imprudence related to costs of delay in the amount of $28 million." The gist of OPC's purported substantial-evidence argument is that the Commission erred in adopting Jacobs's method of quantifying imprudently incurred costs. This is not, however, a substantial evidence challenge. OPC has not attempted to show that application of Jacobs's method results in a figure unsupported by substantial evidence; nor does OPC argue that substantial evidence supports another, but different, figure. We must, therefore, make two distinct determinations: (1) whether the finding underlying the Commission's $28 million disallowance of imprudently incurred construction costs is supported by substantial evidence, and (2) whether Jacobs's method considered all imprudently incurred costs.

Turning to the latter first, we recognize that we must not disturb an agency's exercise of discretion unless it is arbitrary or unreasonable, *Murphy v. Rowland,* 609 S.W.2d 292, 297 (Tex.Civ.App.1980) and that we must allow the agency some leeway to select the method by which it carries out its own legislative mandate, *Railroad Comm'n v. Humble Oil & Refining Co.,* 193 S.W.2d 824, 833 (Tex.Civ.App.1946, writ ref'd n.r.e.), *aff'd,* 331 U.S. 791, 67 S.Ct. 1523, 91 L.Ed. 1820 (1947). Therefore, we will not reverse the Commission's decision to use Jacobs's method unless OPC can

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

show that the Commission made its decision arbitrarily and unreasonably.

Jacobs did not relate any particular imprudent construction management actions to any specific delays. Jacobs's testimony supports the amount of the Commission's disallowance. In addition, other witnesses testified that some construction delays were unavoidable and not the result of management imprudence. Although the City's witness, Hubbard, supplied testimony linking specific construction decisions with resulting delays, we conclude that substantial evidence supports Jacobs's quantification method.

C. Finding of Fact 100.

[30] OPC challenges the sufficiency of Finding of Fact 100 and alleges that it lacks necessary findings of underlying facts. Finding 100 is not a finding "set forth in statutory language" such that it must have a "concise and explicit statement of the underlying facts." *See* APTRA § 16(b). Instead, it is itself a finding of underlying fact which supports Finding 99. Finding 99 is phrased in statutory language and states that EPEC was imprudent to some degree. Finding 100 concisely sets out the underlying facts that (1) based on Jacobs's credible quantification, (2) $28 million in construction costs would be disallowed.

OPC contends the Commission was obligated to explain its adoption of Jacobs's method rather than Hubbard's. In addition, OPC claims the Commission had a duty to identify individual instances of construction imprudence. Appellants have not cited any authority that would require the Commission to explain why it found a particular witness's testimony credible or determined a particular figure to have resulted from imprudent construction management. We consider these arguments to be challenges to the sufficiency of the finding.

APTRA § 16(b) does not delineate a standard for *sufficient* findings of underlying fact. The supreme court articulated the established principles in *Charter Medical:*

The characteristics of proper findings of fact, as well as their purposes, are well established. Valid findings of fact must be clear and specific. A mere conclusion or a recital of evidence is inadequate. The required underlying facts may not be presumed from findings of a conclusional nature. In general, underlying findings of fact must be such that the reviewing court can fairly and reasonably say that the underlying findings support the statutorily required criteria.

\* \* \* \* \* \*

Proper underlying (basic) findings of fact should follow the guidelines we previously have noted: they should be clear, specific, non-conclusory, and supportive of the ultimate statutory finding. Mere recitals of testimony or references to or summations of the evidence are improper.*922 Such findings should be stated as the agency's findings. The findings should relate to material basic facts and should relate to the ultimate statutory finding that they accompany.

*Charter Medical,* 665 S.W.2d at 451–52 (citations omitted); *see also State Banking Bd. v. Allied Bank Marble Falls,* 748 S.W.2d 447 (Tex.1988).

[31] The supreme court has recently reconsidered the question of sufficiency of underlying fact findings. *See Goeke v. Houston Lighting & Power Co.,* 797 S.W.2d 12 (Tex.1990). The court expressed the opinion that, although there is no precise form for an agency's articulation of underlying facts, certain "guidelines" exist to prevent the types of abuses courts have found.[FN16] Those specific guidelines are that the findings: (1) must be more than mere recitals of testimony; (2) should be stated as the agency's findings; and (3) should relate to the ultimate statutory findings. *Id.* at 15. We will review appellants' sufficiency complaints under the *Goeke* guidelines.

FN16. Within the context of this opinion, we need not decide whether the language

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the supreme court used in *Goeke* reduces the requirements set forth in *Charter Medical* and *Allied Bank* in order for underlying findings of fact to be considered sufficient to comply with APTRA § 16(b).

Finding 100 is not conclusory; it indicates not only the evidence on which the Commission relied in making Finding 99, but also the Commission's conclusion that the figure found using the method was credible. The finding obviously supports Finding 99, an ultimate statutory finding. Therefore, Finding 100 is a sufficient finding of underlying fact.

For all of the foregoing reasons, we overrule OPC's third point of error in its entirety.

### THE EXCLUSION OF HUBBARD'S TESTIMONY

In support of its request that plant construction costs be included in rate base, EPEC offered evidence of prudent construction management. In response, the City called Hubbard, who testified that EPEC had managed the construction imprudently and that, as a result, construction costs had been unreasonably high. EPEC moved to strike sections of Hubbard's testimony, arguing that his conclusions were inadmissible because they were speculative and not based on concrete information. The hearing examiner excluded the challenged testimony. The City complains of the exclusion. EPEC answers that the City waived its complaint by failing to state a legal basis to support it in the City's second motion for rehearing.

[32][33] An administrative litigant may preserve a complaint only by giving the agency an opportunity to review the legal ground on which the complaint is based. *Sears v. State Bd. of Dental Examiners,* 759 S.W.2d 748, 750 (Tex.App.1988, no writ); *Burke,* 725 S.W.2d at 397. Our review of the City's motions for rehearing convinces us that EPEC is correct. The City failed to provide the Commission any basis for finding the testimony admissible. For this reason, we overrule the City's

second point of error.

If we had resolved the complaint on its merits, however, we would have found no reversible error. Hubbard testified at length about the duration of design-problem delays and the necessity of reworking the designs. We must assume the Commission considered this testimony and gave it due weight. The examiner excised only minute sections from the thick attachments to Hubbard's direct testimony. Ample evidence existed from which the Commission could have found that EPEC had managed the construction imprudently. The City has not shown that the exclusion prejudiced its substantial rights, and has therefore failed to carry its burden of showing harmful error.

### EXCESS CAPACITY

The City and OPC, each in its fourth point of error, complain that the Commission erred in finding that EPEC had no system excess capacity. Both appellants contend that Finding of Fact 107, in which *923 the Commission concludes that no present excess capacity exists, is unsupported by substantial evidence in the record. In its argument, the City specifically challenges the action of the Commission in: (1) including in the load determination the amount of power EPEC has contracted to sell to the Texas–New Mexico Power Company (TNP); (2) allowing EPEC to reduce estimated system capacity by retiring three gas-fired units earlier than it had originally planned; (3) rescheduling maintenance because of the alteration in system components; and (4) calculating the reserve requirement.

OPC joins in the last of these four specific complaints. In addition, OPC complains that Findings of Fact 111 through 113 do not explicitly state the facts the Commission relied on and the reasoning it used in disregarding the Examiner's recommendations. OPC also asserts the Commission erred by not making a conclusion of law clarifying the relation, if any, between the "used and useful" standard of PURA § 39(a) and the excess capacity concept. Finally, OPC complains that the Commis-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

sion "abrogated OPC's right to represent the interests of residential and small commercial customers on excess capacity issues in future rate cases of El Paso Electric Company."

EPEC's application to increase rates sought only the inclusion in rate base of costs related to Units 1 and 2. At the time the Commission heard evidence on the application, Unit 3 was not complete and had not begun commercial operation. It would have been improper for the Commission to have determined, at that time, whether excess capacity would exist on EPEC's system once Unit 3 became operational. The Unit 3 issues, including excess capacity, are not yet ripe for determination. Consequently, to the extent the City seeks resolution of Unit 3's used-and-useful status, we overrule its point of error for lack of ripeness.

A. Substantial Evidence.

[34] Appellants complain that the Commission erred in disregarding the examiner's recommendations for treatment of four disputed issues. The most heated debate arose when the Commission selected the "largest single hazard plus 5%" method for determining reserve requirements. The examiner recommended that the Commission use the "20% of peak load" method. Use of the examiner's recommended method would have resulted in excess capacity of approximately 50% of the units EPEC was requesting be included in rate base. Appellants claim the Commission's use of an improper method was the principal cause of the "no excess capacity" finding.

Two of EPEC's expert witnesses explained EPEC's method of determining reserve requirements. The company uses one of the methods outlined by the Western Systems Coordinating Council, an organization responsible for promoting reliable operations among the interconnected bulk power system to which EPEC belongs. The Council recommends three different methods of determining reserve requirements, of which the "largest single hazard plus 5%" is one. There was expert testimony that EPEC selected this method because, of the oth-

er two possibilities, one would set an unnecessarily high reserve and the other would produce an insufficient reserve to protect against a blackout in the event of a significant loss in system generation capacity. Considering these expert opinions, we cannot say that reasonable minds could not have reached the conclusion the Commission must have reached in order to make the finding it did. We conclude that substantial evidence supports the Commission's adoption of the "largest single hazard plus 5%" method of determining reserve requirements.

[35] The City also complains that the Commission determined the overall demand on the system to be much higher than it should have been, thereby inflating the system capacity found necessary. The City contends the Commission erred by: (1) including in its calculation the power EPEC has contracted to supply TNP; (2) omitting three gas-fired units from generation capability because of plans to retire them early; and (3) adopting a maintenance schedule that requires removal of some units from *924 the line during the summer peak period. Two experts offered their opinions that the Commission acted reasonably in approving the maintenance schedule and including the TNP obligation in peak load. In addition, one witness recognized that EPEC's objective in planning generation capacity was to "meet forecasted load demands with adequate system reliability *while minimizing total system cost.*" The Commissioners could reasonably have found that adding two nuclear power units to the system and retiring three gas-fired units would achieve this objective. We conclude that substantial evidence in the record supports the Commission's finding that there is no appreciable excess capacity in the EPEC system.

B. Other Contentions.

OPC complains that the Commission has abrogated OPC's right to represent its clients—residential and small commercial users—in future rate cases. OPC bases this contention on Finding 107. The relevant portion of that finding states that the excess capacity findings in the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

present case will not be considered "precedents in any manner in cases involving the addition of future generating capacity to the system, including Palo Verde Unit 3, or in any reconsideration proceeding conducted pursuant to paragraph 11 of the Amended and Restated Stipulation." The finding merely recites the Commission's refusal to address issues not yet ripe for determination. OPC has had a full and fair opportunity to litigate the excess capacity issue with respect to Units 1 and 2. Even without Finding 107, general principles of issue preclusion would bar OPC from relitigating the excess capacity issue with respect to those units. Finding 107 does no more than that.

OPC next complains of Findings of Fact 111–113; it asserts that each finding requires additional findings of underlying fact. The challenged findings are as follows:

111. The largest single hazard plus five percent ("LSH + 5") criterion for determining a reasonable reserve margin is used by EPEC and recommended by the Western Systems Coordinating Council, of which EPEC is a member.

112. Based on the evidence presented, use of the LSH + 5 criterion is reasonable for application to the EPEC system in this case.

113. Using the LSH + 5 criterion, EPEC should carry 258 MW of reserve capacity in 1988.

These findings are not ultimate findings; therefore, the Commission had no duty to make additional findings of underlying fact.

OPC also argues that the Commission was bound to explain its reasons for rejecting the examiner's recommendation and adopting a different method of determining reserve requirements. Again, OPC has not shown any authority requiring the Commission to do so. Therefore, we also find this argument to be meritless.

In its motions for rehearing to the Commission and at the trial court level, OPC objected to the Commission's failure to explicate the relationship between the concept of excess capacity and PURA's "used and useful" standard. We need not resolve this issue in order to dispose of the present case; therefore, we express no opinion on the matter.

We overrule the City's and OPC's fourth points of error.

## COMMON FACILITIES

As a part of its application to increase rates, EPEC requested that costs incurred in constructing the facilities to be used in common by all of the generating units, including those not yet completed, be included in rate base. The Commission found it reasonable to include such costs and made two findings of fact about which OPC now complains.

In its sixth point of error, OPC asserts generally that the Commission erred by deciding to consider the common facilities as "plant-in-service." OPC argues that the Commission, by refusing to apportion the costs of the common facilities to each unit, has changed its position on apportionment questions and that such a shift in position *925 is improper. OPC also asserts that the findings of fact relating to treatment of common facilities costs are insufficient and that additional findings of underlying fact are necessary to show the evidence on which the Commission relied in determining whether to include the common facilities costs in rate base.

OPC has failed to brief adequately its complaint on this issue. Each of its legal contentions comprises but a single sentence, and only in conjunction with its change-of-position complaint has OPC provided any supporting authority at all. OPC also fails to point out evidence in the record demonstrating either that the Commission has erred or that any error has substantially prejudiced OPC's rights. Finally, OPC cites no authority for the propositions that the Commission was obligated to make more findings of fact than it did, that the Commission had to allocate costs rather than following generally accepted accounting principles, or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

that OPC was unable to present its appeal adequately because of the Commission's alleged failure to explain why it declined to apportion the common facilities' capital costs. Such a complete failure to develop and support a complaint waives the complaint. *Helle v. Hightower,* 735 S.W.2d 650, 654 (Tex.App.1987, writ denied). We conclude OPC has waived its sixth point of error, and we overrule it.

### INCOME TAXES

In its final point of error, OPC generally challenges the cost-of-service determination on grounds that the amount found includes a "hypothetical" federal income tax expense. In the most cursory of fashions, OPC alleges the Commission erred in including the federal income tax expense in EPEC's cost of service because: (1) no evidence supports the inclusion; (2) the Commission made no findings of fact or conclusions of law regarding federal income tax expense; and (3) the Commission failed to inquire whether EPEC had actually incurred all of the tax expense. As a matter of interest, we note that OPC has overlooked Finding of Fact 186, which expressly addresses federal income tax expense. Consequently, OPC's complaint that the Commission made no findings with respect to federal income taxes is meritless.

OPC's briefing of this point of error is wholly inadequate. The only authority to which OPC has drawn this Court's attention is the opinion in *PUC v. Houston Lighting & Power Company,* 748 S.W.2d 439 (Tex.1987). Even more than in its sixth point of error, this multifarious seventh point contains conclusory statements unsupported by authority.

In its motion for rehearing, OPC complains that this Court "misunderstood" OPC's position on this issue; there follows a lengthy exposition of the position OPC intended to argue in its initial brief. The detailed discussion in OPC's motion for rehearing further underscores the inadequacy of the argument on this point in its original brief.

OPC has waived its seventh point by failing adequately to support or to argue the offending issue in its original brief.

### LEASE PAYMENTS ON UNIT 2

As required by PURA § 63, EPEC notified the Commission of the sale/leaseback arrangement for Unit 2. The sole issue to be determined as to that transaction was whether the sale/leaseback was consistent with the public interest. In January 1987 the hearings examiner stayed proceedings in the sale/leaseback matter so that the Commission could consider the public interest issue along with EPEC's rate case. In response to a motion filed by EPEC, the Commission consolidated the two matters under the docket number for the rate case.

When the Commission rendered a final order, however, it did not decide whether the sale/leaseback transaction was consistent with the public interest; instead, it specifically reserved that issue for later determination. Nonetheless, the Commission made fact findings that allowed Unit 2 lease payments to be included in EPEC's cost of service to the extent they did not exceed the amount the Commission would have included in rate base for Unit 2 capital costs if EPEC had retained an ownership *926 interest. The partial inclusion of lease payments in cost of service prompts the City's substantial evidence challenge in its final point of error.

PURA § 63 requires a utility to report a contemplated or consummated transaction within a reasonable time if the total transaction consideration exceeds $100,000. Further, the section provides that

[o]n the filing of a report with the commission, the commission shall investigate the same *with or without* public hearing, to determine whether the action is consistent with the public interest. In reaching its determination, the commission shall take into consideration the reasonable value of the property, facilities, or securities to be acquired, disposed of, merged or consolidated. If

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the commission finds that such transactions are not in the public interest, the commission shall take the effect of the transaction into consideration in the rate-making proceedings and disallow the effect of such transaction *if it will unreasonably affect rates or service.* The provisions of this section shall not be construed as being applicable to the purchase of units of property for replacement or to the addition to the facilities of the public utility by construction.

PURA § 63 (emphasis added). Pursuant to PURA, the Commission must, at some point, decide whether the sale/leaseback transaction is consistent with the public interest. The statute designates no time within which the Commission must make that determination after the utility files its report. The section expressly allows the Commission to decide the issue without holding a public hearing; consequently, we do not construe PURA to require the Commission to resolve that question in the context of a formal ratemaking proceeding.

[36][37][38] The Commission has discretion to consolidate proceedings with common issues when consolidation would serve judicial or administrative economy. *See Alamo Express, Inc. v. Union City Transfer,* 309 S.W.2d 815, 821 (Tex.1958). The City does not deny this, but asserts that once the Commission had consolidated the proceedings, it was powerless to sever them. The City contends that at that point the Commission became bound to settle the public interest question in its order setting rates. This contention fails to recognize the Commission's discretion to regulate its docket so that only issues which can reasonably and fairly be tried within the framework of a single proceeding are tried together. We conclude the Commission has the power to sever. Any other result would defeat the legislative intent in delegating duties to the Commission for more efficient administration. Therefore, in the interest of accomplishing the legislative purpose underlying the Commission's creation, we deem it essential that the Commission's power to consolidate be balanced by a corresponding power to sever. During the hearing, the Commission apparently concluded that "the effect" of the sale/leaseback transaction did not include the entire amount of lease payments made. EPEC would have incurred certain costs even if it had retained its ownership interest in the unit instead of arranging the sale/leaseback. Therefore, even if the Commission were ultimately to find the transaction inconsistent with the public interest, the cost that EPEC would have incurred had it retained ownership would be includable in rates because it was not an "effect" contemplated by the disallowance provision of PURA § 63. Consequently, the Commission did not err in including this amount in cost of service.

By post-submission brief, the City argues that deferral of the public-interest determination implies a finding that EPEC failed to carry its burden of proof on that issue. In support of this argument, the City directs our attention to the supreme court's recent decision in *Coalition of Cities for Affordable Utility Rates v. PUC,* 798 S.W.2d 560 (Tex.1990). The City did not make this argument below; therefore, it is not properly before this Court. *See City of San Antonio v. Texas Water Comm'n,* 407 S.W.2d 752 (Tex.1966).

Even if we were to agree that the Commission impliedly found EPEC had failed to carry its burden of showing that the transaction was consistent with the public interest,*927 we would find no reversible error in the inclusion of part of the payments in cost of service. Finding of Fact 122 provides: "EPEC's proposed 'book break-even' calculation of the portion of the lease payment may be included in cost of service in this instance, as it is not in excess of the amount that would result if calculated using the traditional ratemaking plant in service/rate base methodology." The City fails to recognize that the Commission is responsible not only for determining whether the transaction in question is consistent with the public interest, but also for disallowing the effect of the transaction "if it will unreasonably affect rates or service." PURA

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

§ 63. Only if inclusion of the effect will unreasonably affect rates will it be disallowed. Therefore, Finding 122 implies, consistent with the *Coalition* analysis, that the Commission found that EPEC carried its burden of showing that inclusion of the relevant portion of the lease payment would not unreasonably affect rates. The City has not challenged this implied finding; therefore, even if the City's untimely argument were correct, it would not show reversible harm. We overrule the City's seventh point of error.

COST–OF–SERVICE ALLOWANCES

The City makes several general complaints about the Commission's revenue-requirements determination and, in addition, specifically challenges five separate components of the cost-of-service allowance. The general complaints are that: (1) substantial evidence does not support the Commission's revenue requirements finding; (2) the Commission applied no statutory standard in determining revenue requirements; and (3) the Commission failed to make all required findings of underlying facts.

We conclude that, except for the specific challenges to five component amounts, the City has waived its complaints by failing to show that particular cost-of-service component amounts are unsupported by substantial evidence. Nor has the City identified a statutory standard requiring the Commission to supply findings of underlying facts in addition to those already made. Although the City contends that the Commission decided the matter without referring to PUC Substantive Rule § 23.21(b), the findings obviously refer to that rule. Therefore, we overrule the City's general complaints and proceed to address the challenges to specific component amounts.

A. Fuel and Purchased Power Expense.

[39] The City contends that the Commission overstated expenses for fuel and "purchased power" because it included in that amount the price of 25 megawatts of electricity not actually purchased by EPEC.

Staff witness Stan Kaplan calculated EPEC's reasonably predictable fuel costs based on the assumption that the new rates would become effective January 1, 1988. In estimating the amount of purchased power costs, Kaplan anticipated that EPEC would purchase 75 megawatts in January 1988 and 50 megawatts per month for the balance of the calendar year. However, the prolonged hearings delayed the new rates' effective date to a point approximately three months beyond the January 1, 1988, date Kaplan had assumed. Nonetheless, the Commission's final order was based on Kaplan's prediction, which included an anticipated first-month purchase of 75 megawatts. The City argues that the cost of 25 megawatts, which EPEC did not purchase after the new rates became effective, should be excluded from cost of service.

A utility's allowable expenses are calculated by adjusting its historical test year expenses for known and measurable changes. 16 Tex.Admin.Code § 23.21(b) (1991). Based on the evidence filed before and the testimony adduced during the hearing, the Commission determines the amount of the utility's reasonably predictable purchased power costs for the "rate year," i.e., the first twelve months after the rates will become effective. 16 Tex.Admin.Code § 23.23(b)(2)(B) (1991). This determination inherently involves estimation and the making of a number of assumptions. One necessary assumption is that rates will become effective on some specific *928 date. In the present case, that assumption turned out to be incorrect by three months. On that basis, the City argues that the Commission's determination of EPEC's reasonable and necessary operating expenses was invalid. We do not agree.

If we were to hold the relevant determination in this case invalid, we would be imposing an onerous burden on the Commission; it would have to recalculate each element of every component of revenue requirements whenever a witness's assumption that new rates would become effective on a certain date later proved to be incorrect. The recalculation time alone could conceivably delay rendition of a new

order long enough once again to alter the effective date. Such a process might never end. We conclude that, under the circumstances of this case, the Commission did not abuse its discretion and did not act arbitrarily or capriciously by refusing to recalculate purchased-power cost once it became apparent that the actual effective date would not coincide with the assumed effective date. We overrule the City's contention regarding this component.

B. Operating and Maintenance Expenses.

The City next asserts that the Commission found an improper amount of "operating and main-tenance expenses" because it: (1) listed the expense as a single-line item; (2) provided no findings of underlying fact to explain its reasoning in adopting the figure; (3) found a figure unsupported by any evidence; and (4) included rate-case expenses in operating and maintenance expense after having severed them out of the docket.

The City points to no duty compelling the Commission to find, as underlying facts, the amounts comprising a sum which is itself a com-ponent of a statutorily mandated criterion. PURA directs the Commission to find the amount of "reasonable and necessary *operating expenses,*" not *operating and maintenance expense;* likewise, PURA does not expressly mandate consideration of operating and maintenance expense when the Com-mission determines net income. *See* PURA § 41(c). In the present case, the Commission found specific amounts for "operating expenses" and for that cat-egory's components, one of which was labelled "operating and maintenance expenses." Because the Commission had no duty to itemize the subcompon-ents of "operating and maintenance expenses," its failure to find them as underlying facts cannot be considered error. *See, e.g., Frost v. PUC,* 672 S.W.2d 883, 885 (Tex.App.1984, writ ref'd n.r.e.). We conclude the Commission did not act arbitrarily and capriciously in declining to further subdivide the components of operating expense.

During the proceeding, EPEC offered evidence of the amount of operating and maintenance ex-

pense, to which the City did not object. Although this figure was undisputed, the Commission re-duced it before including the amount in revenue re-quirements as cost of service. We will not reverse the Commission's order absent a showing that the City's substantial rights were prejudiced by the in-clusion of the reduced expense figures in cost of service. Since the City has not shown harm, we overrule its challenge.

Finally, the City contends the Commission im-properly included the rate-case cost in operating and maintenance expense. The City bases its claim of error on the alleged prior severance of the rate-case expense issue from the proceeding. In para-graph 16 of its final order, the Commission held that "[t]he issue as to the reasonableness of the Company's and the Cities' rate case expense in-curred in the prosecution of this case is severed from this docket." The City argues that, because of paragraph 16, no regulatory commission expense should be included in the revenue requirements. We do not agree. The Commission's staff provided testimony supporting the findings of that portion of the regulatory commission expense that was undis-puted, and the Commission included only these un-disputed amounts in cost of service.

We conclude that the City's contentions regard-ing operating and maintenance expense are merit-less.

*929 C. Employee Benefits.

The City next challenges the Commission's findings on employee benefits. It asserts that the Commission erred by concluding that the evidence supported staff witness Young's adjustments to the 401–k plan expenses and the Tax Reduction Act Stock Option Plan (TRASOP) expenses.

The City argues that the Commission abused its discretion by finding a 401–k plan expense in ex-cess of the amount requested by EPEC was reason-able and necessary when the evidence does not sup-port the finding. According to the City, by doing so, the Commission has violated its own rules. The

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

City has not indicated which of its substantive rules the Commission violated, and it identifies no evidence that would tend to show that the Commission acted without reference to any guiding legal principles. In addition, the staff offered evidence that the greater sum was necessary to provide the benefit to all existing employees and reasonably anticipated additional employees. We conclude that substantial evidence supports the Commission's findings that the amount recommended by the staff was reasonable and necessary.

[40] The City next contends that the Commission erred in including any TRASOP costs in employee benefits expense. The basis for this argument appears to be that the Commission had rejected inclusion of these expenses in two prior dockets; in the City's view, apparently, the Commission's prior holdings estop it from including the expense in later dockets. The City cites no authority for this proposition.

The legislature has given the Commission discretion to determine which of a utility's expenses are reasonable and necessary and, hence, may be recovered. PURA § 41(c). Because the reasonableness determination is one committed to agency discretion, it may be overturned only by a showing that the agency either based its decision on legally irrelevant factors, failed to consider legally relevant factors, or reached a completely unreasonable result after weighing only legally relevant factors. *Gerst,* 411 S.W.2d at 360; *Statewide Convoy,* 753 S.W.2d at 804. The City has not shown that the Commission erred in any of these respects. Consequently, we conclude that the City's attacks on the Commission's findings regarding employee benefits are without merit.

D. Taxes Other Than Federal Income Taxes.

The City contends that no evidence supports the Commission's finding of a specific amount for expenses incurred for taxes other than federal income taxes. This item of expense increased by $992,773 after the stipulation phase of the hearing, and the City claims that neither EPEC nor the staff can identify evidence supporting the upward adjustment.

Contrary to the City's assertion, EPEC offered testimony supporting the tax expense alterations. EPEC's witness Mayhew testified that taxes are uniquely tied to other elements of revenue requirements. Therefore, when other components of the revenue requirement were adjusted, the tax expense necessarily was changed to accurately reflect the expense EPEC would incur. Mayhew explained that one way of isolating the tax effect of alterations in revenue requirements would be to compare the two reconciliation statements, line by line, identifying changes and recalculating taxes based on them. The City has not attempted to show that the recalculation was done incorrectly, and we conclude that its contention on this issue is meritless.

E. Depreciation Add–Back.

In its final challenge to the Commission's cost-of-service findings, the City attacks Finding of Fact 187. By that finding, the Commission included in cost of service an element referred to as "depreciation add-back," the purpose of which was to account for EPEC's transition from a "flow-through" system of tax accounting to a "normalization" system. The City challenges this finding on the grounds that: (1) inclusion of "depreciation add-back" amounts to retroactive ratemaking, (2) the inclusion is not supported by substantial *930 evidence, and (3) certain necessary findings of underlying fact have been omitted.

The City complains that it "cannot know how the Commission reached its determination because there are no underlying findings of fact." Without providing legal authority for its position, the City argues that the Commission failed in its duty to make additional findings of underlying fact that would show "a logical nexus between the conclusion of the underlying fact[s] and the evidence." For the same reasons that we held such findings of "nexus" unnecessary in connection with the Commission's "decisional-imprudence" findings, we conclude they are also unnecessary here.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

839 S.W.2d 895, 135 P.U.R.4th 584
(Cite as: 839 S.W.2d 895)

[41] The City next argues that inclusion of depreciation add-back constitutes retroactive ratemaking because

[t]he evidence does not identify any shortfall in depreciation reserves to cover test year tax timing reversals. The evidence does show that some of the alleged deficiency may be attributed to years before the Company's first rate proceeding, which would mean that the burden imposed on ratepayers by the Commission as a result of Finding of Fact No. 187, inured to the benefit of the Company and its shareholders in the past.

The City misconstrues the nature of the transition from a flow-through accounting system to a normalization system.

As is common for utilities, EPEC depreciated its assets at an accelerated rate for tax purposes while depreciating them using the straight-line method on its ratemaking books. Under a flow-through system, any tax benefit that resulted from the practice of keeping one set of books for tax purposes and another for ratemaking purposes was passed on to the ratepayers as it accrued. As time passed, the utility would incur, first, a very low, then a medium, and, finally, a relatively high level of income tax liability. The portion of rates attributable to income taxes that ratepayers paid over the asset's life would also rise, corresponding to the utility's actual tax liability.

Under normalization, on the other hand, while actual tax liability follows the same increasing path, rates reflect that the ratepayers' contribution to the payment of the utility's income taxes remains constant throughout the asset's useful life. To the extent that this creates an "overpayment" of taxes during the early years of an asset's useful life, the utility accumulates the excess in a deferred-income-tax account. The accumulated funds are later used during the stage of the asset's useful life when ratepayer payments are not enough to satisfy the utility's actual tax liability. At the end of the asset's useful life, the total overpayments and underpayments will

match, such that ratepayers will have paid an amount equal to the actual tax liability incurred by the utility. *See generally GTE–SW,* 833 S.W.2d at 164–65.

Federal law now requires that all public utilities which accelerate depreciation for federal income tax purposes use the normalization system. 26 U.S.C. § 168(f)(2), (i)(9) (Supp.1992). In most cases, a utility that had been using the flow-through system had to switch to normalization in the middle years of the useful lives of its assets, rather than at the beginning or end of those lives. As a result, the utility had not built up a deferred-tax account with which to pay its taxes during the later years in which its actual tax liability will exceed the tax payments ratepayers will be making under normalization. The utility therefore faces an increasing tax liability without a means of recovering the increased expense; yet, in spite of the deficiency in funds available to satisfy the tax liability, the utility must pay its taxes as they become due. Consequently, in this case, the Commission has included in cost of service a one-time adjustment to put EPEC in the position it would have occupied had it used normalization all along.

The City complains bitterly about the allegedly retroactive effect of the new rates because the adjustment the Commission made is called "depreciation add-back." This label does indeed make it sound as if the Commission has obliged present and prospective ratepayers to pay the utility a second time for assets already *931 depreciated. However, we do not decide the propriety of Commission action based on the name the Commission has elected to apply to it. The true effect of the "depreciation add-back" adjustment is to allow the utility to obtain from present and prospective ratepayers its actual current and future tax expenses. Consequently, this adjustment to the deferred-tax account does not, in any way, constitute retroactive ratemaking.

As a final matter, we note that the City's assertion of inadequate evidence to reveal a shortfall in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the reserves needed to pay taxes in the test year or ensuing years is incorrect. Moises Rodriguez, the supervisor of the EPEC's tax accounting section, testified that, while EPEC had adjusted reserves to compensate for the shift to normalization as it affected the timing differences related to depreciation, EPEC had not done so for differences related to the tax "bases" of all its assets. In Mr. Rodriguez's words, "[t]he net result is that the current accumulated deferred Federal income tax balance does not fully reflect the timing difference that occurred prior to 1979." Rodriguez concluded that an adjustment was necessary to bring EPEC into compliance with federal law. We therefore conclude that substantial evidence supports the Commission's adjustment to the deferred-tax element of EPEC's cost of service.

Having concluded that all of the City's challenges to the Commission's cost-of-service allowances are without merit, we overrule the City's sixth point of error.

EXCLUSION OF TSA DURING PROCEEDINGS

[42][43] On October 22, 1987, the examiner orally granted EPEC's motion to strike TSA as a party, excluding TSA from the proceedings. TSA appealed the decision to the Commission, but the Commission extended its time for making a decision such that it rendered the order setting new rates before ruling on TSA's appeal. In the meantime, on November 6, 1987, EPEC withdrew its motion to remove TSA from the proceedings, and the examiner readmitted TSA and reinstated its party status.

During the fifteen days that TSA did not participate in the hearing, more than thirty witnesses offered testimony on various issues. TSA contends that the October 22 order violated its due process rights by preventing it from cross-examining these witnesses. In addition, TSA alleges that the Commission intentionally postponed considering its appeal solely to prevent TSA from obtaining a stay of the proceedings from the Texas Supreme Court until such time as that court could determine TSA's

entitlement to party status. Finally, TSA asserts that the Commission erred in refusing to make findings of fact and conclusions of law concerning the due process claim.

The supreme court's holding in *State v. Thomas,* 766 S.W.2d 217 (Tex.1989), is dispositive of TSA's complaint. TSA had the right, under the Texas Constitution, to intervene in the proceedings. *Id.* at 219. However, the wrongful exclusion of TSA will necessitate reversal of the Commission's order only if the error prejudiced substantial rights of TSA. APTRA § 19(e).

After TSA appealed the October 22 order to the Commission, that body granted itself five extensions of time to consider the complaint. These extensions allowed the Commission to avoid deciding the issue; the final extension postponed consideration of the appeal until after the Commission had signed a final order in the docket. Nevertheless, TSA participated as a party in all proceedings after its reinstatement on November 6. TSA suffered no harm, therefore, from the Commission's failure to rule on its appeal. The harm, if any, stems from TSA's inability to cross-examine the thirty-plus witnesses who testified while it was absent from the proceedings.

TSA does not complain of its inability to cross-examine approximately two dozen of the witnesses who testified during its absence. TSA claims to have suffered harm only by losing the opportunity to cross-examine: (1) three prudence and deferral witnesses who had testified during the first two days TSA was excluded; and (2) four *932 rate-design witnesses. As to the latter, TSA has not preserved any error; the examiner specifically stated in his oral ruling that he would permit TSA to recall and cross-examine *any* rate-design witnesses. As to the former, the examiner made it clear he would entertain a motion from TSA to recall them.

TSA recalled only EPEC witness Mayhew, a rate-design expert. It made no motion to recall and cross-examine the three prudence and deferral wit-

nesses. Further, while TSA was still present during the original rate-base phase of the hearing—the only phase to which deferral and prudence issues would have been pertinent—it did not seek to cross-examine witnesses or present evidence of its own. Under these circumstances, and because TSA failed to request available relief that would have made it whole, we cannot say that the error in excluding TSA for fifteen days prejudiced substantial rights of TSA. We therefore overrule TSA's first point of error.

In addition, because *Thomas* dictates the conclusion that TSA should not have been excluded, we need not rule on TSA's complaint regarding the Commission's failure to make the requested findings of fact and conclusions of law on that issue.

### TSA'S RATE CLASSIFICATION

The third phase of the proceedings, the rate-design segment, afforded the parties an opportunity to offer evidence in support of or in opposition to the proposed method of apportioning the anticipated rate increase among the various rate classes. In addition, because TSA sought to be reassigned to the city/county governmental-consumer class (rate class 41) from the general services class (rate class 24), the parties also offered evidence on the classification issue. The examiners recommended that TSA not be reassigned and that the proposed apportionment method be approved. The Commission adopted both recommendations and the examiners' underlying reasoning. In its second and third points of error, TSA argues that the Commission erred by approving a rate for TSA that is not cost-based and by refusing to move TSA to the city/county rate class.

A. Rate Class 41

TSA urges us to conclude that the Commission erred in refusing to include TSA in the city/county rate class, which arguably pays lower rates than the general services class. TSA asserts that there is no reasonable basis for differentiating TSA from the city and county governmental consumers; that EPEC offered no proof of a factor justifying different treatment for TSA than for the city and county

consumers; and consequently, that PURA § 38 required the Commission to reassign TSA to the city/county class to prevent EPEC from charging unreasonably discriminatory rates.

[44][45][46] The Commission has broad discretion to determine whether a particular rate design would result in just, reasonable, and non-discriminatory rates. In making the determination, the Commission may consider factors in addition to the cost of providing service, keeping in mind the overriding considerations of consistency and the utility's burden of proving that its proposed rates are just and reasonable. *See* PURA § 40; *Texas Alarm & Signal Assoc. v. PUC*, 603 S.W.2d 766, 773 (Tex.1980). Absent unreasonably discriminatory rates, we will not overturn the Commission's approval of a rate design. *PUC v. AT & T Communications of the Southwest*, 777 S.W.2d 363 (Tex.1989).

[47][48] A customer seeking reassignment to a different class must show that its conditions of service are similar to those of the members of the class to which it seeks reassignment. The issue is one of fact, to be resolved by reference to the particular circumstances of each case. *Ford v. Rio Grande Valley Gas Co.*, 174 S.W.2d 479, 480 (Tex.1943); *Amtel Communications v. PUC*, 687 S.W.2d 95, 102 (Tex.App.1985, no writ). Existing classification schemes previously approved by the Commission are, prima facie, not unreasonably discriminatory, and the complaining party has the burden of proving that the classification produces unreasonably discriminatory*933 rates. *Ashley v. City of Gilmer*, 271 S.W.2d 100, 102 (Tex.Civ.App.1954, writ ref'd); *see also Ford*, 174 S.W.2d at 480; *Amtel Communications*, 687 S.W.2d at 102.

[49] Resolution of the burden-of-proof issue disposes of the dispute here. TSA failed to offer proof that its load characteristics were similar to those of the city and county governmental customers. In addition, TSA offered no proof that its constituent agencies are similar to the city/county consumers in other respects which the Commission

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

considers when classifying a customer. Having offered no proof of these similarities, TSA has failed to carry its burden of showing that its rate is unreasonably discriminatory.

Another consideration which persuades us that the Commission did not abuse its discretion in refusing to reassign TSA is that the Commission's final order, following a suggestion in the Examiners' Report, directed EPEC

> to perform the appropriate studies, so that during [EPEC's] next general rate case, the load and usage characteristics at the state agencies, as a group, including any state universities and colleges, can be compared to the load and usage characteristics of both Rate Classes 24 and 41.

Considering that the current classification scheme has apparently existed unchallenged for some fifty years, that the Commission has expressed its intention to investigate TSA's assignment to the general services class in the next rate case, and that requiring EPEC to produce the needed information in this proceeding could have resulted in a significant delay, we conclude that the Commission acted reasonably by refusing to reassign TSA to the city/county rate class. We overrule TSA's third point of error.

## B. Cost–Based Rates

TSA next contends that it is entitled to rates based on the utility's actual cost of serving only the agencies constituting TSA. To support this argument, TSA cites four Texas constitutional provisions it claims require EPEC to charge TSA a rate based on the cost of serving only TSA. *See* Tex. Const. art. III, §§ 44, 51, and 53 (1984), and art. XVI, § 6 (Supp.1992).

[50] The cited constitutional provisions prevent the State from depleting its treasury by disbursing State funds without obtaining a corresponding benefit for the public. *See, e.g., University of Texas System v. Robert E. McKee, Inc.,* 521 S.W.2d 944, 948 (Tex.Civ.App.1975, writ ref'd n.r.e.); *State v.*

*City of Austin,* 160 Tex. 348, 331 S.W.2d 737, 742 (1960); *Olshan Demolishing Co. v. Angleton Indep. School Dist.,* 684 S.W.2d 179, 185 (Tex.App.1984, writ ref'd n.r.e.); and *State v. City of Dallas,* 319 S.W.2d 767, 775–76 (Tex.Civ.App.1959), *aff'd,* 160 Tex. 348, 331 S.W.2d 737, 742 (1960). We need not decide, however, whether rates that are not cost-based violate these provisions. TSA's challenge to the proposed rate, like its challenge to its classification, is resolved by examining the burden of proof on the issue. Even assuming for the purposes of this discussion that TSA correctly identified a constitutional entitlement to cost-based rates, we conclude that it had the burden of proving that its new rates were *not* cost-based. Because it did not carry this burden, we will overrule its second point.

TSA insists that EPEC had the burden of proving that the rate it proposed for TSA was based on its cost of serving TSA. This argument is premised on: (1) the overall burden of proof a utility bears in ratemaking proceedings imposed by PURA § 40; and (2) EPEC's exclusive control of cost-of-service information. We conclude that these considerations are insufficient to impose on EPEC the burden of proving that its proposed rates are based on its costs to serve this select group of customers.

All individual state agencies were originally assigned to the general services rate class fifty years ago; until now, they have not complained of that assignment. The agencies comprising TSA intervened in this ratemaking proceeding as a newly formed group seeking to be reassigned to the city/county class. The crux of the group's *934 cost-based-rates argument is that EPEC was obligated to prove that the rate EPEC anticipated charging the group was based on the utility's cost of serving only the members of the group. We conclude that the Commission acted reasonably both in refusing to impose such a burden on EPEC and in ordering EPEC to produce information necessary to evaluate the issue in the next ratemaking case.

The Texas Supreme Court has held that a util-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ity is not required to compare profits and rates of return between services. *Texas Alarm & Signal,* 603 S.W.2d at 772. The considerations supporting the decision not to require such a comparison also support the decision not to require a utility to determine and offer proof of the costs of serving individual customers or subclasses of customers who share one or more characteristics. *Cf. City of Corpus Christi v. PUC,* 572 S.W.2d 290, 294–96 (Tex.1978). Comparing rates of return between *services* requires the utility to determine the expenses it incurred and the adjusted value of property it used in producing each service. Determining cost-based rates for subclasses of consumers would require the utility to determine the expenses it incurred and the adjusted value of property it used in producing service *for each individual customer.* This would be even more onerous a burden than that rejected by the supreme court in *Texas Alarm & Signal.* In addition, requiring EPEC to determine costs of service for individual customers would generate more costs, which would then be passed on to consumers. The increase in rates that could result from added costs of the ratemaking proceeding is a factor the Commission can and should consider. *Id.* at 772 n. 7.

Allocation of the burden of proof to a complaining party is reasonable in circumstances in which individual customers have combined to form a subclass, which then asserts an entitlement to rates based not on the costs of serving all customers, but of serving only the members of the subclass. If the complaining subclass were not assigned the burden of proof in such circumstances, the utility would arguably be obligated, in every rate-making proceeding, to present evidence of the cost of serving every subclass that customers could define based on shared characteristics. Even assuming that it would be possible for the utility to satisfy such an obligation, it is questionable whether the vastly increased costs which such a presentation would entail would be in the public's interest.

Further supporting our conclusion that the

Commission did not abuse its discretion in approving the new rates is the fact that TSA did not request the information before the hearings, even though the Commission could have compelled EPEC to produce the information necessary to prove TSA's claim of being overcharged. Instead, TSA asserted, during the rate-design phase, that it needed the information but had no access to it. Because TSA made little attempt to acquire the information it needed to carry its burden of proof, its policy argument is unsympathetic. Therefore, even assuming for the sake of argument that TSA's constitutional theory is correct, the record it has brought this Court is insufficient to show harm. We find no reversible error on this record. TSA's second point of error is overruled.

## CONCLUSION

In the context of a myriad of complex issues and often-contentious parties, the Commission must be allowed to weigh all competing interests in setting rates that will be fair to all consumers. With the exception of the use of deferred accounting as to EPEC's carrying costs incurred during the regulatory-lag period, we conclude that the Commission acted within its discretion in setting new rates for EPEC.

We reverse that portion of the trial court's judgment which affirmed the Commission's approval and use of deferred accounting as to the carrying costs incurred by EPEC between the date Palo Verde Units 1 and 2 became commercially operational and the effective date of the new rates. We affirm the remainder of the trial court's judgment. We remand the cause to the Commission for such further *935 proceedings as may be necessary or appropriate to implement this Court's judgment.

Tex.App.–Austin,1992.
City of El Paso v. Public Utility Com'n of Texas
839 S.W.2d 895, 135 P.U.R.4th 584

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Appendix 10

*City of El Paso v. Public Util. Comm'n,*
883 S.W.2d 179 (Tex. 1994)



883 S.W.2d 179, Util. L. Rep. P 26,411
(Cite as: 883 S.W.2d 179)

▷

Supreme Court of Texas.
CITY OF EL PASO, The State of Texas, and Office of
Public Utility Counsel, Petitioners,
v.
PUBLIC UTILITY COMMISSION OF TEXAS and
El Paso Electric Company, Respondents.

No. D–3053.
Argued Sept. 13, 1993.
Decided June 22, 1994.
Rehearing Overruled Oct. 6, 1994.

Electric utility applied for rate increase. The Texas Public Utility Commission set rate, and judicial review was sought. The 250th District Court, Travis County, Paul R. Davis, Jr., J., upheld Commission's decision, and appeal was taken. Withdrawing prior opinion, the Austin Court of Appeals, J. Woodfin Jones, J., 839 S.W.2d 895, affirmed in part, reversed in part, and writ of error was sought. The Supreme Court, Enoch, J., held that: (1) Commission acted within its discretion by basing its final order, in part, on nonunanimous stipulation agreement, and (2) inclusion of deferred costs in electric utility's rate base did not violate test year requirement.

Affirmed in part and reversed in part.

Spector, J., dissented and filed opinion in which Gonzalez, Doggett and Gammage, JJ., joined.

West Headnotes

[1] Electricity 145 ⊂⟹11.3(6)

145 Electricity
    145k11.3 Regulation of Charges

        145k11.3(6) k. Proceedings before commissions. Most Cited Cases

**Public Utilities 317A ⊂⟹161**

317A Public Utilities
    317AIII Public Service Commissions or Boards
        317AIII(B) Proceedings Before Commissions
            317Ak161 k. In general. Most Cited Cases

Public Utility Commission could properly base rate order, in part, on nonunanimous stipulation; Commission made independent findings that stipulation was supported by preponderance of record evidence and resulted in just and reasonable rates, after providing all parties, including nonsignatories, opportunity to be heard on merits of stipulation. V.T.C.A., Government Code § 2001.141.

[2] **Administrative Law and Procedure 15A ⊂⟹754.1**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak754 Discretion of Administrative Agency
                15Ak754.1 k. In general. Most Cited Cases

**Administrative Law and Procedure 15A ⊂⟹763**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak763 k. Arbitrary, unreasonable or capricious action; illegality. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

883 S.W.2d 179, Util. L. Rep. P 26,411
(Cite as: 883 S.W.2d 179)

Agency's decision is arbitrary or results from abuse of discretion if agency: (1) fails to consider factor legislature directs it to consider; (2) considers irrelevant factor; or (3) weighs only relevant factors that legislature directs it to consider but still reaches completely unreasonable result.

[3] Public Utilities 317A ⬥161

317A Public Utilities
    317AIII Public Service Commissions or Boards
        317AIII(B) Proceedings Before Commissions
            317Ak161 k. In general. Most Cited Cases

Public Utility Commission is free to accept or reject, in whole or in part, hearing examiner's recommendations; Commission may repudiate part of examiner's report and modify it by deletion.

[4] Administrative Law and Procedure 15A ⬥791

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
            15Ak784 Fact Questions
                15Ak791 k. Substantial evidence. Most Cited Cases

At its core, "substantial evidence test" for reviewing agency decisions is reasonableness test or rational basis test; true test is not whether agency reached correct conclusion, but whether some reasonable basis exists in record for action taken by agency.

[5] Administrative Law and Procedure 15A ⬥749

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak749 k. Presumptions. Most Cited Cases

Administrative Law and Procedure 15A ⬥750

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak750 k. Burden of showing error. Most Cited Cases

Findings, inferences, conclusions, and decisions of administrative agency are presumed to be supported by substantial evidence, and burden is on contestant to prove otherwise.

[6] Electricity 145 ⬥11.3(6)

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings before commissions. Most Cited Cases

Substantial evidence supported Public Utility Commission's disallowance of certain amount of costs in electric utility's rate base due to imprudent decisions made in connection with construction of new generating capacity; Commission reasonably exercised its discretion in selecting amount within range of figures provided by experts.

[7] Public Utilities 317A ⬥128

317A Public Utilities
    317AII Regulation
        317Ak119 Regulation of Charges

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

883 S.W.2d 179, Util. L. Rep. P 26,411
(Cite as: 883 S.W.2d 179)

317Ak128 k. Operating expenses. Most Cited Cases

**Public Utilities 317A ⚷129**

317A Public Utilities
317AII Regulation
317Ak119 Regulation of Charges
317Ak129 k. Rate of return. Most Cited Cases

Statutory standard that controls revenue requirement determinations is that rates be fixed to permit utility reasonable opportunity to earn reasonable return on its invested capital plus "reasonable and necessary" operating expense to provide service. Vernon's Ann.Texas Civ.St. art. 1446c, § 39(a).

**[8] Electricity 145 ⚷11.3(2)**

145 Electricity
145k11.3 Regulation of Charges
145k11.3(2) k. Determination of rate base. Most Cited Cases

**Public Utilities 317A ⚷124**

317A Public Utilities
317AII Regulation
317Ak119 Regulation of Charges
317Ak124 k. Value of property; rate base. Most Cited Cases

Inclusion of deferred costs in electric utility's rate base does not violate test year requirement; Public Utility Commission may, in its discretion, go outside test year when necessary to achieve just and reasonable rates. Vernon's Ann.Texas Civ.St. art. 1446c, § 3(t).

**[9] Public Utilities 317A ⚷124**

317A Public Utilities
317AII Regulation
317Ak119 Regulation of Charges
317Ak124 k. Value of property; rate base. Most Cited Cases

In determining whether to allow particular utility to defer post-in-service costs, Public Utility Commission has discretion to proceed on ad hoc or "case-by-case" basis.

**\*181** Norman J. Gordon, El Paso, James G. Boyle, Austin, Nanette G. Williams, David C. Caylor, El Paso, Luis A. Wilmot, San Antonio, Stephen Fogel, William L. Magness, W. Scott McCollough, Dan Morales, Joe K. Crews and Richard A. Muscat, Austin, for petitioners.

James W. Checkley, Alan Holman, Austin, Thomas S. Leatherbury, Ferd C. Meyer, Jr., Kenneth C. Raney, Jr., Dallas, R. Eden Martin, Chicago, IL, Barry Bishop, John F. Williams, Austin, Harry M. Reasoner, Houston, Walter Demond, Austin, Alton J. Hall, Jr., Houston, Norma K. Scogin, Dan Morales, Joe N. Pratt, and Davison W. Grant, Austin, for respondents.

Justice ENOCH delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justices HIGHTOWER, HECHT, and CORNYN join.

This is an administrative appeal from an order of the Public Utility Commission (Commission) setting rates to be charged by El Paso Electric Company (EPEC).[FN1] The order was consistent with a non-unanimous stipulation between EPEC and several parties, including the Commission General Counsel. In its final order, the Commission authorized EPEC to capitalize and include in rate base deferrals associated with certain post-in-service carrying costs and operating costs related to its investment in the Palo Verde Nuclear Generating Station (Palo Verde). The questions presented by this appeal are first, whether the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

883 S.W.2d 179, Util. L. Rep. P 26,411
(Cite as: 883 S.W.2d 179)

Commission acted within its discretion by basing its final order, in part, on the nonunanimous stipulation agreement, and second, whether the Commission has the authority under the Public Utility Regulatory Act (PURA) [FN2] to allow a public utility to include in a utility's rate base certain costs incurred during the "regulatory lag" period.[FN3] We answer both issues yes, and consequently affirm the judgment of the court of appeals in part and reverse in part.

> FN1. Tex. Public Utils. Comm'n, *Application of El Paso Electric Company for Authority to Change Rates,* Docket No. 7460, 14 TEX.P.U.C.BULL. 932, 1202 (June 16, 1988) (Docket No. 7460).

> FN2. TEX.REV.CIV.STAT.ANN. art. 1446c (Vernon Supp.1994).

> FN3. Generally, regulatory lag is the delay between the time when a utility's profits are above or below standard and the time when an offsetting rate decrease or rate increase may be put into effect by commission order or otherwise. This delay is due to the inherent inability in the regulatory process to allow for immediate rate decreases or increases. For purposes of this opinion, "regulatory lag" is the period between the date a new plant begins commercial operation (the "in-service" date) and the effective date of the new rates that result from including the new plant's costs in the rate base. *See* JAMES C. BONBRIGHT ET AL., PRINCIPLES OF PUBLIC UTILITY RATES 96 (2d ed. 1988).

In April 1987, EPEC filed an application for a rate increase with the Commission seeking to recover costs associated with its investment in the Palo Verde Project. EPEC sought rate treatment related to its investment in the two units which had started commercial operation, Palo Verde Units 1 and 2. [FN4] On Oc-

tober 22, 1987, during the course of the hearing on EPEC's application, certain industrial intervenors and the Commission General Counsel announced and filed a stipulation agreement intended to resolve the case. [FN5] The Examiners scheduled an additional phase of the hearing to consider the stipulation, and eventually recommended to the Commission that the stipulation be rejected. The Commissioners modified the proposed stipulation and, as modified, adopted its terms in its final order.

> FN4. EPEC and four other utility companies agreed to partially fund and otherwise assist in building one or more nuclear steam electric generating units, with attendant common facilities. Construction is complete on the common facilities and two of the five units originally planned (Palo Verde Units 1 and 2). After construction began, EPEC modified its ownership interest in the units. Originally, EPEC owned an undivided interest in each of the units as a tenant in common with the other four project participants. Although EPEC retains its undivided interest in Unit 1, the company has sold its interest in Unit 2 and made arrangements to lease the unit back for the duration of EPEC's involvement in the project.

> FN5. EPEC, the Commission staff, and four corporate intervenors which purchased significant amounts of electricity from EPEC all signed the stipulation.

As part of its request for a rate increase, EPEC requested that its rate base be increased*182 by the amount of carrying costs and operating and maintenance costs it incurred during the "regulatory lag" period. The utility had deferred these types of costs for Units 1 and 2, aggregating each type of cost for each unit into a separate capital account. EPEC obtained the Commission's prior permission to defer Unit 1 costs.[FN6] The Commission reserved the right, howev-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

883 S.W.2d 179, Util. L. Rep. P 26,411
(Cite as: 883 S.W.2d 179)

er, to refuse subsequently to include the deferred costs in the rate base to the extent they were unreasonable, related to plant not used and useful, or were spent or incurred imprudently. Although EPEC did not obtain prior permission to defer its post-in-service costs for Unit 2, it nevertheless deferred them. After the hearing, the Commission granted EPEC's request to include the deferred costs for both units in the rate base.

> FN6. The Commission authorized deferred accounting treatment for Unit 1 in Tex. Public Utils. Comm'n, *Application of El Paso Electric Company for Authority to Change Rates,* Docket No. 6350, 13 TEX.P.U.C.BULL. 1091, 1239–41 (1986).

The City of El Paso (City), the State of Texas (on behalf of various state agencies located in western Texas) (State), and the Office of Public Utility Counsel (OPUC) sought judicial review of the Commission's order, contending that the Commission erred by basing its order, in part, on the non-unanimous stipulation. The City, State, and OPUC also argued that the Commission lacked the authority to permit EPEC to defer post-in-service costs, and subsequently to include the deferrals in the utility's rate base.

The trial court upheld the Commission's order. The court of appeals affirmed the portion of the trial court's judgment which affirmed the Commission's order allowing the inclusion of capitalized post-in-service operating costs in the utility's rate base. 839 S.W.2d 895, 934 (1991). The court of appeals reversed the portion of the trial court's judgment which affirmed the Commission's order allowing the deferral of post-in-service carrying costs. *Id.*[FN7] All parties filed applications for writ of error to this court. For the reasons stated below, we reverse the judgment of the court of appeals to the extent that it disallows the deferral of post-in-service carrying costs. In all other respects, the judgment of the court of appeals is affirmed.

> FN7. The court of appeals separated the costs into two categories: (1) operating and maintenance costs, and (2) carrying costs. Our holding makes no distinction between these costs.

## I.
### The Non–Unanimous Stipulation

The City and OPUC make several arguments supporting their position that the Commission erred by basing its order, in part, on a non-unanimous stipulation. They ask this Court to reverse the judgment of the court of appeals, contending that its holding affirms an action of the Commission that is not supported by substantial evidence, not consistent with Texas law, arbitrary and capricious and characterized by an abuse of discretion. We do not accept the City's or OPUC's arguments.

### A.
### Reliance on the Non–Unanimous Stipulation

The City and OPUC contend that where no evidence existed to support its decision, the Commissioners erroneously relied on the stipulation itself as a substitute for the evidence. The City argues that by relying on the stipulation as opposed to the evidence, the Commissioners violated the statutory requirement that every finding be based exclusively on the evidence. TEX.GOV'T CODE ANN. § 2001.141 (Vernon Pamphlet 1994). The City analogizes the present case to a civil cause in which the court renders an agreed judgment without consent of all the parties. It contends that in adopting the stipulation as a resolution of the case, the Commission improperly imposed the terms of the settlement on the non-signing parties.

We reject the City's analogy. In *Mobil Oil Corp. v. Federal Power Commission,* 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974), the Supreme Court upheld the Federal Power Commission's final order

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

883 S.W.2d 179, Util. L. Rep. P 26,411
**(Cite as: 883 S.W.2d 179)**

establishing a rate structure that was based, in part, on a non-unanimous stipulation. The Court emphasized*183 the importance of considering a non-unanimous proposal "on its merit:"

> If a proposal enjoys unanimous support from all of the immediate parties, it could certainly be adopted as a settlement agreement if approved in the general interest of the public. But even if there is a lack of unanimity, it may be adopted as a resolution *on the merits,* if FPC makes an independent finding supported by 'substantial evidence on the record as a whole' that the proposal will establish 'just and reasonable' rates for the area.

417 U.S. at 314, 94 S.Ct. at 2348–49 (quoting *Placid Oil Co. v. Federal Power Comm'n,* 483 F.2d 880, 893 (5th Cir.1973)) (emphasis in original).

In Docket No. 7460, the Commission's order provided, in part:

> 4. Even where some parties to a proceeding do not agree to a stipulated result, it is reasonable to adopt such a stipulation if:

> (a) The parties opposing the stipulation have notice that the stipulation may be considered by the Commission and an opportunity to be heard on their reasons for opposing the stipulation;

> *(b) The matters contained in the stipulation are supported by a preponderance of the credible evidence in the case;*

> (c) The stipulation is in accordance with applicable law;

> (d) The stipulation results in just and reasonable rates; and;

> (e) The results of the stipulation are in the public interest, including the interest of those customers represented by parties opposing the stipulation.

Docket No. 7460, *supra* note 1, at 1202–03 (emphasis added).[FN8] The Commission's order continued to conclude that:

> FN8. We note that the Commission has used these same standards to evaluate non-unanimous settlements in several other dockets. *See, e.g.,* Tex. Public Utils. Comm'n, *Application of El Paso Electric Company to Declare Palo Verde Unit 1 in Service,* Docket No. 6764, 12 TEX.P.U.C.BULL. 1533, 1534–35 (November 14, 1986).

5. Pursuant to the Findings of Fact and Conclusions of Law set forth below, the Commission finds the Amended and Restated Stipulation, as modified, is a reasonable basis for resolution of the issues in this case and that adoption of the Amended and Restated Stipulation, as modified, as the basis of the Commission's Order in this proceeding is in the public interest.

Finding of Fact No. 237 provided:

> 237. The provisions of the Amended and Restated Stipulation are reasonable and supported by a preponderance of the credible evidence in this record and should be adopted.[FN9]

> FN9. In addition to the recitations above, Conclusion of Law No. 28 stated: "The Amended and Restated Stipulation, as modified per Finding of Fact No. 6, represents a reasonable resolution of the contested issues in this docket, is supported in the record, is in the public interest, and should therefore be adopted, as the basis for the Commission's order in this case." Docket No. 7460, *supra*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

883 S.W.2d 179, Util. L. Rep. P 26,411
(Cite as: 883 S.W.2d 179)

note 1, at 1280.

[1] It is clear from the Commission's order that, consistent with *Mobil Oil,* the Commission's decision in Docket No. 7460 was based on the merits; it was not simply an adoption of a non-unanimous "settlement." The Commission made an independent finding that the non-unanimous stipulation was supported by a preponderance of the record evidence and resulted in just and reasonable rates.[FN10] Thus, contrary to the City's arguments, the Commission's final order was consistent with the requirement that every finding be based exclusively on the evidence.

> FN10. We note that the Commission's Final Order included 237 separate, specific Findings of Fact concerning the rate increase. The Commission specifically considered the amended and restated stipulation in the context of these findings as a whole. *See* Docket 7460, *supra* note 1, at 1233–74. Thus, contrary to the City's and OPUC's contentions, the Commission's findings supporting its reliance on the non-unanimous stipulation were not "wholly conclusory." Further, because the Commission explicitly provided that it was based on a review of the evidence in the record as a whole, we reject the City's contention that the Commission acted arbitrarily and abused its discretion as a fact finder and decision maker by adopting a contested settlement "without a review of the record or support in the evidentiary record."

In addition to considering the non-unanimous stipulation on its merits, the Commission provided all parties, including non-signatories,*184 the opportunity to be heard on the merits of the stipulation. As the court of appeals notes, the Commission added an additional phase to the proceedings devoted exclusively to receiving evidence and argument on the propriety of using the stipulation as a basis for resolving the contested issues. 839 S.W.2d at 903. Thus,

we reject the City's argument that the substantial rights of the City and other non-signatory parties were in some way prejudiced by the Commission's adoption of the non-unanimous stipulation.

The OPUC independently argues that the Commission's reliance on the non-unanimous stipulation agreement was arbitrary and capricious because the Commission failed to follow its own standards in relying on the stipulation. Specifically, the OPUC notes that the court of appeals concluded that the inclusion of deferred post-in-service carrying costs violates PURA section 41(a); and, because the stipulation included provisions concerning treatment of deferred carrying charges, the stipulation violates the Commission's own standard, *see supra* text above, that the stipulation be "in accordance with applicable law." As a result, the OPUC argues that the court of appeals should have reversed and remanded the Commission's final order *in toto.* Because we conclude that the inclusion of deferred post-in-service carrying costs does not violate PURA section 41(a), *see infra* IV., the OPUC's argument on this point is moot.

[2] An agency's decision is arbitrary or results from an abuse of discretion if the agency: (1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result. *Gerst v. Nixon,* 411 S.W.2d 350, 360 n. 8 (Tex.1966). We agree with the court of appeals that the City and OPUC have failed to establish that the use of the stipulation as a partial basis for the final order involves consideration of factors other than those the legislature has directed the Commission to consider. 839 S.W.2d 895, 903–04.

## B.
### Section 21.151
[3] Section 21.151 of the Public Utility Commission's Rules of Practice and Procedure provides:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

883 S.W.2d 179, Util. L. Rep. P 26,411
(Cite as: 883 S.W.2d 179)

After the expiration of the time for filing exceptions and replies thereto, the examiner's report and proposal for decision will be considered by the commission and either adopted, modified and adopted, or remanded to the examiner....

16 TEX.ADMIN.CODE § 21.151 (West 1990). The City and the OPUC argue that the Commission violated section 21.151 by basing its final order on a modified stipulation over the examiner's recommendation. This argument is without merit. First, section 21.151 does not speak to the Commission's ability to consider non-unanimous stipulations in reaching its orders. Second, the Commission is free to accept or reject the examiner's recommendations. *See Ross v. Texas Catastrophe Prop. Ins.,* 770 S.W.2d 641, 642 (Tex.App.—Austin 1989, no writ). Section 21.151 does not require the Commission to accept or reject the examiner's report in its entirety. Rather, the Commission may repudiate part of the examiner's report and modify it by deletion as it did in this case.

### C.
### Findings of Facts/Substantial Evidence

In a final challenge to the Commission's use of the non-stipulation agreement, the City argues that "[t]he non-unanimous 'stipulation' used by the Commission ... is not supported by substantial evidence and key findings of fact drafted to support the final order are inadequate to satisfy statutory requirements." We will discuss the City's specific substantial-evidence and finding-of-fact challenges. *See infra II–III.* However, to the extent the City makes a general complaint against the stipulation, we agree with the court of appeals that the City has waived any argument on this point as its point and argument are too general to preserve error. The City provides no substantive argument to support its legally conclusory statements.

### *185 II.
### Substantial Evidence—"Decisional" Imprudence

### Disallowance [FN11]

FN11. "Decisional" imprudence refers to EPEC's decisions to become involved in the Palo Verde Project, the extent of its involvement and its decisions to remain in the project at the 15.8% participation level.

The Commission concluded that due to imprudent decisions, $32 million of EPEC's costs should not be included in rate base. Both the City and OPUC argue that the disallowance is unsupported by substantial record evidence, claiming that the amount disallowed should have been greater.

[4][5] At its core, the substantial evidence rule is a reasonableness test or a rational basis test. *Railroad Comm'n of Texas v. Pend Oreille Oil & Gas Co.,* 817 S.W.2d 36, 41 (Tex.1991). The reviewing court, then, concerns itself with the reasonableness of the administrative order, not the correctness of the order. *Id.* In applying this test, we may not substitute our judgment as to the weight of the evidence for that of the agency. *Id.* (the substantial evidence rule "prevents the court from 'usurping the agency's adjudicative authority even though the court would have struck a different balance' ").

Although substantial evidence is more than a mere scintilla, the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 452 (Tex.1984). The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency. *Id.* The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise. *Id.* at 453; *Imperial American Resources Fund, Inc. v. Railroad Comm'n,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

883 S.W.2d 179, Util. L. Rep. P 26,411
**(Cite as: 883 S.W.2d 179)**

557 S.W.2d 280, 286 (Tex.1977); *City of San Antonio v. Texas Water Comm'n*, 407 S.W.2d 752, 758 (Tex.1966).

The City argues that although the City, EPEC, and the Commission staff each offered expert testimony on the decisional imprudence issue, the evidentiary record contains no specific reference to amount. Further, the City contends that the court of appeals erred by relying, in part, on matters included in the non-unanimous stipulation to conclude that the Commission's decision was supported by substantial evidence because the matters relied on were not independently supported by a preponderance of the evidence.

In the Findings of Fact, the Commission provided:

101. The Company was not entirely prudent in its planning and management of its participation in the Palo Verde project.

102. There is evidence in the record of imprudence in the Company's continuing evaluation of the level of its participation in the Palo Verde Project. The parties to the Amended and Restated Stipulation have quantified The [sic] cost of such imprudence as $22 million as applied to Units 1 and 2. The Company has conceded an additional $10 million disallowance to be applied to PVNGS Units 1 and 2.

103. Quantification of the effects of imprudence requires the exercise of judgment based upon the evidence. In light of the evidence relating to prudence and the difficulties in quantification, the quantification of decisional imprudence at $32 million for Units 1 and 2 is reasonable and appropriate.

Docket No. 7460, *supra* note 1, at 1250.

The record before this Court is extensive and contains substantial information relevant to the Commission's inquiry on this issue. The evidence includes expert testimony offered by the City, EPEC, and the Commission staff. The City's witness, Ben Johnson, stated that in his opinion the EPEC had made several imprudent decisions and that, as a result, the Commission should disallow 50% of its costs.[FN12] EPEC testified that there *186 should be a zero disallowance because there simply was no decisional imprudence. The Commission staff offered testimony that certain aspects of the Company's decision making process were imprudent. However, the Commission's witnesses did not conclude that the decision to participate in the project was itself imprudent. Rather, they focused on the perceived errors associated with EPEC's decision making process. The Commission's witnesses noted that they were unaware of any theory that would enable them to recommend any specific disallowance of project costs or capacity based on their conclusions.[FN13]

> FN12. Although not clear from Mr. Johnson's testimony, under his suggested approach, the imprudence disallowance would have exceeded $350 million.

> FN13. We note that the Examiner likewise recognized flaws in EPEC's decision making process. However, the Examiner noted that "it is too much to ask that one reconstruct the appropriate process fifteen years after the fact in order [to] find whether a decision made on an inappropriate basis might still have been made on an appropriate one." Docket No. 7460, *supra* note 1, at 981.

The evidence before the Commission therefore ranged from expert testimony that no imprudence disallowance should be imposed, to testimony that a 50% imprudence disallowance should be imposed, and finally to testimony that there is no known theory to quantify the flaws in EPEC's decision making process giving rise to its investment. In other words,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

883 S.W.2d 179, Util. L. Rep. P 26,411
(Cite as: 883 S.W.2d 179)

several experts had significant differences of opinion on the proper method to determine and the proper amount of EPEC's imprudence disallowance. These differences are understandable when considering the enormous complexity involved in a utility's decision to construct or purchase new generating capacity.

[6] In conducting a substantial-evidence review, we must determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action. *Texas State Bd. of Dental Examiners v. Sizemore,* 759 S.W.2d 114, 116 (Tex.1988), *cert. denied,* 490 U.S. 1080, 109 S.Ct. 2100, 104 L.Ed.2d 662 (1989). The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 452 (Tex.1984). We agree with the court of appeals that the record contains substantial evidence to support a disallowance figure of zero for decisional imprudence; and, the record contains substantial evidence to support a Commission finding that 50 percent of EPEC's costs should have been disallowed. *See* 839 S.W.2d at 907. Thus, because of the admitted complexity in valuing the decisional imprudence in this case, we hold that there is a reasonable basis for the Commission to, in its discretion, select an amount within the range of figures provided by expert testimony of the parties.[FN14] Moreover, the City and OPUC have failed to explain why any one amount within that range is more reasonable or better supported by the evidence than the $32 million figure eventually reached by the Commission. The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 452 (Tex.1984); *Imperial American Resources Fund, Inc. v. Railroad Comm'n,* 557 S.W.2d 280, 286 (Tex.1977); *City of San Antonio v. Texas Water*

*Comm'n,* 407 S.W.2d 752, 758 (Tex.1966). We do not accept that the City and OPUC have met their burdens to overcome the presumption in this case.

FN14. In affirming the Commission's order, the court of appeals relied in part on its determination that EPEC's agreement in the non-binding stipulation to a $32 million disallowance constituted a "quasi-admission." 839 S.W.2d at 907. The court of appeals concluded that "[b]ecause it is a statement contrary to EPEC's pecuniary interest, the concession has some evidentiary weight." *Id.* While we need not address whether the EPEC's agreement in the non-binding stipulation constituted a "quasi-admission," we note that it is debatable as to whether EPEC's acceptance of a $32 million figure was in fact a statement against its pecuniary interest, considering that the evidence could have supported a much higher disallowance. *See supra* note 12.

## *187 III.
## Final Revenue Requirement [FN15]

FN15. The final revenue requirement represents the total revenues needed by the utility in order to cover its reasonable and necessary operating expenses and receive a return on the rate base.

The City complains generally about the revenue requirement determination and then makes specific contentions concerning particular components of the revenue requirement. The City argues that the final revenue requirement of the Commission was based solely on the non-binding stipulation agreement and not on the record evidence. According to the city, the findings and conclusions adopted by the Commission do not allow this Court to analyze the decision because the agreement between the parties is not evidence and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

883 S.W.2d 179, Util. L. Rep. P 26,411
**(Cite as: 883 S.W.2d 179)**

not a statutory standard for review. We disagree.

Finding of Fact No. 152 provides:

The preponderance of the evidence establishes that the company has a total revenue requirement with components as set forth in Exhibit B of the Amended and Restated Stipulation.

Docket No. 7460, *supra* note 1, at 1260. This finding is supported by twenty-five underlying findings of fact addressing the components of the total revenue requirement, with each finding supported by record evidence. *Id.* at 1260–1265 (Findings of Fact 153–87). Except for the specific challenges to three of the components making up the total revenue requirement, the City does not complain specifically that any particular underlying finding supporting Finding of Fact No. 152 is not supported by substantial evidence. We presume that the Commission's decision is supported by substantial evidence. *Charter Medical,* 665 S.W.2d at 453.

[7] In addition, we reject the City's argument that the Commission applied no statutory standard in determining revenue requirements. As the City recognizes, the statutory standard that controls revenue requirement determinations is that rates be fixed to permit the utility a reasonable opportunity to earn a reasonable return on its invested capital plus "reasonable and necessary" operating expense to provide service. TEX.REV.CIV.STAT.ANN. art. 1446c, § 39(a). The Commission's determination of the revenue requirement is supported by findings which detail the Commission's resolution of contested issues regarding the Company's "reasonable and necessary" operating expenses. Thus, the statutory standard for determining the revenue requirement was met.

The City makes numerous challenges to three components of the final revenue requirement, including (1) Operating and Maintenance expenses; (2) Employee Benefits; and (3) Taxes other than Federal Income Taxes. After reviewing the opinion of the court of appeals, the briefs of the parties, and the record, we conclude that the City's arguments on these issues are without merit. The court of appeals correctly articulates the error in the City's claims. 839 S.W.2d at 927–31.

## IV.
### Deferrals

The City, OPUC, and State make several arguments contesting the Commission's authority to permit the deferral of post-in-service costs, and the inclusion of the deferred costs in the utility's rate base.[FN16] In *State of Texas v. Public Utility Commission,* 883 S.W.2d 190 (Tex.1994), we held that the Commission possesses the authority to allow a utility to defer post-in-service costs in order to protect the utility's financial integrity. We further held that the subsequent inclusion of the deferred costs in the utility's rate base did not violate PURA section 41(a), nor did it violate the rule against retroactive ratemaking. As a result we reject the arguments of the City, OPUC and State on these issues. We will address only those issues that were not addressed in *State of Texas v. Public Utility Commission.*[FN17]

> FN16. The Commission allowed EPEC to include $74,503,575 of deferrals in rate base. Docket No. 7460, *supra* note 1, at 1258 (Finding of Fact 144).

> FN17. In *State of Texas v. Public Utility Commission,* 883 S.W.2d 190, we held that the Commission must consider to what extent the inclusion of the deferred cost assets in rate base is actually necessary to preserve the utilities' financial integrity. 883 S.W.2d at 201. We noted that such a determination should be made at the rate hearing. *Id.* Because no party argued that the Commission should have made such a determination in this case, any argument on this point is

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

883 S.W.2d 179, Util. L. Rep. P 26,411
**(Cite as: 883 S.W.2d 179)**

waived.

***188 A.**
**Test Year Requirement**

[8] PURA requires utilities to file for a rate increase by presenting revenue and expense data from the same 12–month period using an historical test year. TEX.REV.CIV.STAT.ANN. art. 1446c, § 3(t); 16 TEX.ADMIN.CODE § 23.21(a); *Suburban Utility Corp. v. Public Utility Comm'n,* 652 S.W.2d 358, 366 (Tex.1983). In *State of Texas v. Public Utility Commission,* we held that an accounting order authorizing deferred accounting treatment does not violate the test year requirement because there is no requirement in PURA or the Commission's procedures that the Commission must follow a test year when determining accounting policy. However, in the context of a rate case, the test year requirement applies. Thus, we must address the argument that the actual inclusion of deferred costs in a utility's rate base violates the test year requirement.

The State argues that post-in-service costs were deferred for up to 25 months and thus, the inclusion of such rates in EPEC's rate base violated the test year requirement.[FN18] However, the Commission may, in its discretion, go outside the test year when necessary to achieve just and reasonable rates. In *Suburban Utility Corp. v. Public Utility Commission,* 652 S.W.2d 358, 366 (Tex.1983), we stated that "[c]hanges occurring after the test period, if known, may be taken into consideration by the regulatory agency to help mitigate the effects of inflation and in order to make the test year data as representative as possible of the cost situation that is apt to prevail in the future." Because it ordered the deferral of post-in-service costs, the Commission understood the impact of deferring post-in-service costs on the test year. It is within the discretion of the Commission to consider expenditures that occur outside the test year if such consideration will assist the Commission in making the test year as representative as possible to the cost situation expected in the future.

FN18. The deferral period for Palo Verde Unit 1 was twenty-five months and for Unit 2 was nineteen months.

**B.**
**Standards Applied**

The Commission granted EPEC's request to defer post-in-service costs for Unit 1 based upon a "financial integrity and viability" standard. Docket No. 6350, *supra* note 6, at 1239–41. However, the Commission granted EPEC's unit 2 request for deferred accounting based on a "measurable harm" standard. Docket No. 7460, *supra* note 1, at 1079. The City argues that the use of two different standards is arbitrary and capricious because the Commission has created new standards for each decision concerning deferred accounting.[FN19] We disagree.

FN19. We note that in *State of Texas v. Public Util. Comm'n,* 883 S.W.2d 190 (Tex.1994), we held that the Commission possesses the authority to authorize deferred accounting treatment of post-in-service costs. Further, we concluded that it was not an abuse of discretion for the Commission to apply a financial integrity standard to determine whether to authorize deferred accounting because that standard "ensured that the utilities will receive an opportunity to recover the minimum rates mandated by PURA." *Id.* at 197. However, in *Office of Public Utility Counsel v. Public Util. Comm'n,* 883 S.W.2d 190 (Tex.1994), we held that the measurable harm standard lacked "a foundation in the regulatory scheme provided by PURA" and, as a result, the Commission abused its discretion by applying the measurable harm standard to determine whether to allow deferred accounting. 883 S.W.2d at 196. We note that the City does not contest the Commission's decision as to Unit 2 on the grounds that it was based

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

on a standard that was too speculative. Thus, we do not address that issue in this case.

[9] In determining whether to allow a particular utility to defer post-in-service costs, the Commission has discretion to proceed on an *ad hoc* or "case-by-case" basis. *See, e.g., Securities and Exch. Comm'n v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *National Labor Relations Bd. v. Wyman–Gordon Co.,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); *189Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 745 S.W.2d 918, 926 (Tex.App.— Austin 1988, writ denied). In *SEC v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947), the Court stated that *ad hoc* adjudication may be preferable to a formal rulemaking proceeding where "the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule;" and where the problem is so "specialized and varying in nature as to be impossible of capture within the boundaries of a general rule." Both of the foregoing considerations apply in the Commission's early attempts to define the proper standard to apply to deferred accounting cases.[FN20]

FN20. In fact, the Commission ultimately concluded that the measurable harm standard was too speculative. *See, e.g.,* Tex.Public Utils. Comm'n, *Petition of Houston Lighting and Power Company for Approval of Deferred Accounting Treatment for Limestone Unit 2 and the South Texas Project Unit 1,* Docket No. 8230, 14 TEX.P.U.C.BULL. 2752, 2811 (April 19, 1989).

Early in the process, the Commission was faced with numerous complex problems presented by the recent arrival of nuclear generation plants. While remaining within the statutory framework of PURA, the Commission had to balance the interests of consumers with the complex financial consideration created by public utilities investing large amounts of capital in nuclear plants. Proceeding on an *ad hoc* or "case-by-case" basis is fully understandable in the context of a newly created competitive market that involves complex technical considerations and competing statutory objectives. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 745 S.W.2d 918, 926–27 (Tex.App.—Austin 1988, writ denied); *see also Securities and Exch. Comm'n v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947). As a result, we hold that the Commission was within its discretion in proceeding on a "case-by-case" or *ad hoc* basis and applying different standards in different proceedings.[FN21]

FN21. The Commission's discretion to proceed on a "case-by-case" basis is not absolute. When the underlying considerations that support *ad hoc* adjudication are no longer present, then the Commission will be bound to follow the formal rulemaking procedures set out in the TEX.GOV'T CODE ANN. § 2001.141. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 745 S.W.2d 918, 926–27 (Tex.App.—Austin 1988, writ denied).

### V.
### Conclusion

We hold that the Commission did not err by basing its final order, in part, on a non-unanimous stipulation. Further, based on our holding in *State of Texas v. Public Utility Commission,* 883 S.W.2d 190 (Tex.1994), we hold that the Commission has the authority under PURA to include deferred post-in-service costs in a utility's rate base. Further, the Commission did not abuse its discretion by applying different standards in determining whether to allow deferred accounting treatment for Palo Verde Units 1 and 2. We reverse the court of appeals to the extent that it disallows the deferral and inclusion in rate base of deferred post-in-service carrying costs. In all other respects, the judgment of the court of appeals is affirmed.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

883 S.W.2d 179, Util. L. Rep. P 26,411
**(Cite as: 883 S.W.2d 179)**

Justice SPECTOR, joined by Justice GONZALEZ, Justice DOGGETT, and Justice GAMMAGE, dissenting.

This case demonstrates the weakness of the safeguards relied upon today in *State of Texas v. Public Utility Commission*, 883 S.W.2d 190 (Tex.1994). In that case, the majority defends its approval of deferred accounting treatment on the ground that deferred cost assets will be included in rate base only to the extent that they are deemed "prudent, reasonable and necessary." *Id.* at 197–198 n. 12. In the present case, however, the majority approves the Public Utility Commission's application of a similar standard, despite a total lack of evidence supporting the Commission's findings. I dissent.

At the rate hearings below, the City of El Paso presented extensive evidence concerning the imprudence of El Paso Electric Company's decisions to become involved in the Palo Verde Project and to remain involved at the 15.8 percent participation level. *See* Tex. Pub. Utils. Comm'n, *Application of El Paso Electric Company for Authority to Change *190 Rates,* Docket No. 7460, 14 TEX.P.U.C.BULL. 932, 965–84 (June 16, 1988). The City's expert testimony concluded that 50 percent of the cost of all three Palo Verde units should be disallowed as imprudent. *Id.* at 983. Using this figure, some $350 million should have been disallowed for Unit 1 alone.

The Commission agreed that El Paso Electric was "not entirely prudent" in planning and managing its participation in the Palo Verde project. *Id.* at 1250. In determining the amount of the disallowance, however, the Commission chose not to rely on the evidence presented; instead, it seized upon a figure of $32 million that had been discussed in the course of settlement negotiations. *Id.* at 1250–51. El Paso Electric's own expert testified, in regard to the settlement amount, "I don't think it really relates to anything." The $32 million figure has no basis in reality; it resulted solely from the parties' efforts to buy peace.

The majority cites no evidence in support of the $32 million disallowance, because none exists. Nonetheless, the majority upholds the Commission's findings as supported by substantial evidence. *Supra* at 186.

With the standard of review applied today, it is difficult to imagine any Commission decision relating to prudence that would be set aside by the Court. This lack of review will be especially pernicious in the context of deferred cost assets. Valuing the prudence of such assets will involve the same degree of complexity as valuing the imprudence in this case. Thus, in approving deferred amounts for inclusion in rate base, the Commission may arbitrarily select a figure within a wide range, and its decision will effectively be immune from judicial review. Judging by the example of this case, the figure selected will typically be much closer to the utility's recommended figure than it is to the ratepayers'.

I would hold that the disallowance for decisional imprudence must be based on the evidentiary record. Additionally, for the reasons stated in my dissenting opinion in *State of Texas v. Public Utility Commission*, 883 S.W.2d at 205–209, I would hold that no expenses incurred after the beginning of commercial operation may be capitalized and included in rate base. Accordingly, I would remand this cause to the Commission for a determination of rates in keeping with traditional standards.

Tex.,1994.
City of El Paso v. Public Utility Com'n of Texas
883 S.W.2d 179, Util. L. Rep. P 26,411

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Appendix 11

*Helena Chemical Co. v. Wilkins,*
47 S.W.3d 486 (Tex. 2001)



47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

▷

Supreme Court of Texas.
HELENA CHEMICAL COMPANY and Hyperformer Seed Company, Petitioners,
v.
Kenneth WILKINS and Tom Wilkins individually, and d/b/a Chapotal Farms and Porciones 99 Properties, Geen Wilkins and Mark Wilkins, individually and d/b/a Tabasco, and Wilkins Family Limited Partnership, Respondents.

No. 00–0418.
Argued Feb. 7, 2001.
Decided April 26, 2001.

Farmers filed action against seed seller, alleging violation of Deceptive Trade Practices Act (DTPA), breach of warranties, and fraud. The 229th Judicial District Court, Starr County, John A. Pope, III, J., entered judgment on jury verdict awarding damages to farmers. Both sides appealed. The Court of Appeals, 18 S.W.3d 744, affirmed. Seller filed petition for review. The Supreme Court, Baker, J., held that: (1) as matter of first impression, farmers' delay in submitting claims against seed seller to arbitration, as was required by Seed Arbitration Act, did not deprive trial court of jurisdiction to hear farmers' lawsuit; (2) farmers' witness was sufficiently qualified to testify as expert as to suitability of grain sorghum seed for dry land farming and its susceptibility to charcoal rot disease; (3) expert's testimony on suitability of seed for dry land farming was sufficiently reliable to be admissible; (4) evidence supported conclusion that seller's misrepresentations about seed's characteristics, quality, and grade amounted to more than mere puffing; and (5) evidence was sufficient for jury to calculate, with reasonable certainty, award of lost profit damages.

Affirmed.

Abbott, J., filed a dissenting opinion, in which Hecht and Owen, JJ., joined.

West Headnotes

**[1] Statutes 361 ☞1080**

361 Statutes
    361III Construction
        361III(A) In General
            361k1078 Language
                361k1080 k. Language and intent, will, purpose, or policy. Most Cited Cases
    (Formerly 361k188)

**Statutes 361 ☞1081**

361 Statutes
    361III Construction
        361III(A) In General
            361k1078 Language
                361k1081 k. Construction as written. Most Cited Cases
    (Formerly 361k176)

Court must construe statutes as written and, if possible, ascertain legislative intent from the statute's language.

**[2] Statutes 361 ☞1082**

361 Statutes
    361III Construction
        361III(A) In General
            361k1082 k. Construction based on multiple

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

factors. Most Cited Cases
(Formerly 361k174)

Even when a statute is not ambiguous on its face, a court can consider other factors to determine the Legislature's intent, including the object sought to be obtained, the circumstances of the statute's enactment, the legislative history, the common law or former statutory provisions, including laws on the same or similar subjects, the consequences of a particular construction, administrative construction of the statute, and the title, preamble, and emergency provision. V.T.C.A., Government Code § 311.023.

**[3] Statutes 361 ☞1151**

361 Statutes
    361III Construction
        361III(E) Statute as a Whole; Relation of Parts to Whole and to One Another
            361k1151 k. In general. Most Cited Cases
    (Formerly 361k205)

Court must always consider the statute as a whole rather than its isolated provisions.

**[4] Statutes 361 ☞1155**

361 Statutes
    361III Construction
        361III(E) Statute as a Whole; Relation of Parts to Whole and to One Another
            361k1155 k. Construing together; harmony. Most Cited Cases
    (Formerly 361k207)

Court should not give one provision of a statute a meaning out of harmony or inconsistent with other provisions, although it might be susceptible to such a construction standing alone.

**[5] Statutes 361 ☞1407**

361 Statutes
    361IV Operation and Effect
        361k1407 k. Mandatory or directory statutes.
Most Cited Cases
    (Formerly 361k227)

Word "must" in a statute is given a mandatory meaning when followed by a noncompliance penalty. V.T.C.A., Government Code § 311.016(2, 3).

**[6] Statutes 361 ☞1407**

361 Statutes
    361IV Operation and Effect
        361k1407 k. Mandatory or directory statutes.
Most Cited Cases
    (Formerly 361k227)

To determine whether the Legislature intended a provision to be mandatory or directory, a court considers the plain meaning of the words used, as well as the entire act, its nature and object, and the consequences that would follow from each construction.

**[7] Statutes 361 ☞1407**

361 Statutes
    361IV Operation and Effect
        361k1407 k. Mandatory or directory statutes.
Most Cited Cases
    (Formerly 361k227)

Even if a statutory requirement is mandatory, this does not mean that compliance is necessarily jurisdictional.

**[8] Statutes 361 ☞1407**

361 Statutes

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

361IV Operation and Effect
361k1407 k. Mandatory or directory statutes. Most Cited Cases
(Formerly 361k1075, 361k184)

When a statute is silent about the consequences of noncompliance, the court looks to the statute's purpose to determine the proper consequences.

**[9] Alternative Dispute Resolution 25T ☞181**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(D) Performance, Breach, Enforcement, and Contest
25Tk177 Right to Enforcement and Defenses in General
25Tk181 k. Applicant's default, delay, or laches. Most Cited Cases
(Formerly 33k23.2 Arbitration)

Farmers' delay in submitting claims against seed seller to arbitration, as was required by Seed Arbitration Act, until trial court granted seller's motion to compel arbitration, did not deprive trial court of jurisdiction to hear farmers' lawsuit, even though delay prompted arbitration board to refuse to arbitrate matter due to inability to investigate crops in field conditions, in light of Act's specific authorization for trial court to take such delay into account, court's ability to fashion remedy, and lack of provision dictating dismissal for noncompliance with timing requirement. V.T.C.A., Agriculture Code § 64.004.

**[10] Alternative Dispute Resolution 25T ☞152**

25T Alternative Dispute Resolution
25TII Arbitration
25TII(B) Agreements to Arbitrate
25Tk150 Operation and Effect
25Tk152 k. As ousting jurisdiction of or precluding resort to courts. Most Cited Cases

(Formerly 33k8 Arbitration)

Arbitration scheme established under the Seed Arbitration Act was created to provide an alternate forum for farmers to initially submit claims, not as a mechanism to preclude farmers' suits altogether. V.T.C.A., Agriculture Code § 64.001 et seq.

**[11] Statutes 361 ☞1407**

361 Statutes
361IV Operation and Effect
361k1407 k. Mandatory or directory statutes. Most Cited Cases
(Formerly 361k227)

To determine whether a statute's timing provision is mandatory, a court first looks to whether the statute contains a noncompliance penalty; if a provision requires that an act be performed within a certain time without any words restraining the act's performance after that time, the timing provision is usually directory.

**[12] Statutes 361 ☞1221**

361 Statutes
361III Construction
361III(G) Other Law, Construction with Reference to
361k1220 Other Jurisdictions
361k1221 k. In general. Most Cited Cases
(Formerly 361k226)

When a state statute is modeled after another jurisdiction's, that jurisdiction's interpretation before the Legislature enacts the state statute may be given weight.

**[13] Statutes 361 ☞1221**

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

361 Statutes
    361III Construction
        361III(G) Other Law, Construction with Reference to
            361k1220 Other Jurisdictions
                361k1221 k. In general. Most Cited Cases
    (Formerly 361k226)

When the Legislature looks to another jurisdiction's statute, but modifies rather than adopts some of its provisions, it does so purposefully.

**[14] Alternative Dispute Resolution 25T ☞114**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk114 k. Constitutional and statutory provisions and rules of court. Most Cited Cases
    (Formerly 33k2 Arbitration)

Seed arbitration laws are established to protect the farmer. V.T.C.A., Agriculture Code § 64.001 et seq.

**[15] Alternative Dispute Resolution 25T ☞181**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement, and Contest
            25Tk177 Right to Enforcement and Defenses in General
                25Tk181 k. Applicant's default, delay, or laches. Most Cited Cases
    (Formerly 33k23.2 Arbitration)

While submission to arbitration under the Seed Arbitration Act is mandatory if not waived by the seed seller, the Act's timing requirement is not. V.T.C.A., Agriculture Code § 64.004.

**[16] Evidence 157 ☞508**

157 Evidence
    157XII Opinion Evidence
        157XII(B) Subjects of Expert Testimony
            157k508 k. Matters involving scientific or other special knowledge in general. Most Cited Cases

**Evidence 157 ☞535**

157 Evidence
    157XII Opinion Evidence
        157XII(C) Competency of Experts
            157k535 k. Necessity of qualification. Most Cited Cases

**Evidence 157 ☞555.2**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.2 k. Necessity and sufficiency. Most Cited Cases

Two-part test governs whether expert testimony is admissible: (1) the expert must be qualified, and (2) the testimony must be relevant and be based on a reliable foundation. Rules of Evid., Rule 702.

**[17] Evidence 157 ☞546**

157 Evidence
    157XII Opinion Evidence
        157XII(C) Competency of Experts
            157k546 k. Determination of question of competency. Most Cited Cases

Trial court makes the initial determination about whether an expert is qualified and the proffered tes-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

timony is relevant and based on a reliable foundation. Rules of Evid., Rule 702.

**[18] Appeal and Error 30 ☞971(2)**

30 Appeal and Error
    30XVI Review
        30XVI(H) Discretion of Lower Court
            30k971 Examination of Witnesses
                30k971(2) k. Competency of witness.
Most Cited Cases

**Evidence 157 ☞546**

157 Evidence
    157XII Opinion Evidence
        157XII(C) Competency of Experts
            157k546 k. Determination of question of competency. Most Cited Cases

Trial court has broad discretion to determine admissibility of expert testimony, and the Supreme Court will reverse only if there is an abuse of that discretion.

**[19] Evidence 157 ☞536**

157 Evidence
    157XII Opinion Evidence
        157XII(C) Competency of Experts
            157k536 k. Knowledge, experience, and skill in general. Most Cited Cases

In deciding if an expert is qualified, trial courts must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion. Rules of Evid., Rule 702.

**[20] Evidence 157 ☞555.2**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.2 k. Necessity and sufficiency.
Most Cited Cases

If an expert relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable. Rules of Evid., Rule 702.

**[21] Evidence 157 ☞555.2**

157 Evidence
    157XII Opinion Evidence
        157XII(D) Examination of Experts
            157k555 Basis of Opinion
                157k555.2 k. Necessity and sufficiency.
Most Cited Cases

Expert's testimony is unreliable even when the underlying data is sound if the expert's methodology is flawed. Rules of Evid., Rule 702.

**[22] Evidence 157 ☞542**

157 Evidence
    157XII Opinion Evidence
        157XII(C) Competency of Experts
            157k542 k. Physical facts. Most Cited Cases

Witness was sufficiently qualified to testify as expert as to suitability of grain sorghum seed for dry land farming and its susceptibility to charcoal rot disease, even though he was not plant pathologist, where witness, a plant scientist with a doctorate in plant physiology, used his experience in conducting crop-variety testing to formulate conclusion on basis of research, study of independent tests, and observations regarding seed's suitability for dry land farming. Rules of Evid., Rule 702.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

**[23] Evidence 157 ☞555.4(1)**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k555 Basis of Opinion
            157k555.4 Sources of Data
               157k555.4(1) k. In general. Most Cited Cases

**Evidence 157 ☞557**

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k557 k. Experiments and results thereof. Most Cited Cases

Expert's testimony on suitability of grain sorghum seed for dry land farming was sufficiently reliable to be admissible in farmers' action against seed seller, where expert had 20 years experience as a plant scientist and conducting and interpreting crop trials and his conclusion flowed from his observation of seed tests and other factors including weather and weed-control reports, disease publications, other testing, and comparisons with crops on adjacent farms.

**[24] Antitrust and Trade Regulation 29T ☞161**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(B) Particular Practices
         29Tk161 k. Representations, assertions, and descriptions in general. Most Cited Cases
   (Formerly 92Hk6 Consumer Protection)

Actionable representations under the Deceptive Trade Practices Act (DTPA) may be oral or written. V.T.C.A., Bus. & C. § 17.41 et seq.

**[25] Antitrust and Trade Regulation 29T ☞161**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(B) Particular Practices
         29Tk161 k. Representations, assertions, and descriptions in general. Most Cited Cases
   (Formerly 92Hk34 Consumer Protection)

Party need not prove intent to make a misrepresentation under the Deceptive Trade Practices Act (DTPA); making the false representation is itself actionable. V.T.C.A., Bus. & C. § 17.46(b)(5, 7).

**[26] Antitrust and Trade Regulation 29T ☞138**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk133 Nature and Elements
            29Tk138 k. Reliance; causation; injury, loss, or damage. Most Cited Cases
   (Formerly 92Hk4 Consumer Protection)

**Antitrust and Trade Regulation 29T ☞162**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(B) Particular Practices
         29Tk162 k. Omissions and other failures to act in general; disclosure. Most Cited Cases
   (Formerly 92Hk4 Consumer Protection)

To recover under the Deceptive Trade Practices Act (DTPA), the plaintiff must show that the defendant's actions were the "producing cause" of actual damages, which requires some evidence that the de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

fendant's act or omission was a cause in fact of the plaintiff's injury. V.T.C.A., Bus. & C. § 17.50(a).

**[27] Antitrust and Trade Regulation 29T ☞138**

29T Antitrust and Trade Regulation
 29TIII Statutory Unfair Trade Practices and Consumer Protection
  29TIII(A) In General
   29Tk133 Nature and Elements
    29Tk138 k. Reliance; causation; injury, loss, or damage. Most Cited Cases
 (Formerly 92Hk4 Consumer Protection)

In presenting some evidence that the defendant's act or omission was a cause in fact of the plaintiff's injury, under the Deceptive Trade Practices Act (DTPA), it is not necessary to show that the harm was foreseeable. V.T.C.A., Bus. & C. § 17.50(a).

**[28] Appeal and Error 30 ☞930(1)**

30 Appeal and Error
 30XVI Review
  30XVI(G) Presumptions
   30k930 Verdict
    30k930(1) k. In general. Most Cited Cases

In conducting a no-evidence review, the Supreme Court must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary.

**[29] Appeal and Error 30 ☞1001(1)**

30 Appeal and Error
 30XVI Review
  30XVI(I) Questions of Fact, Verdicts, and Findings
   30XVI(I)2 Verdicts
    30k1001 Sufficiency of Evidence in Support
     30k1001(1) k. In general. Most Cited Cases

If more than a scintilla of evidence exists, the evidence is legally sufficient to support the finding of the disputed fact.

**[30] Antitrust and Trade Regulation 29T ☞369**

29T Antitrust and Trade Regulation
 29TIII Statutory Unfair Trade Practices and Consumer Protection
  29TIII(E) Enforcement and Remedies
   29TIII(E)6 Evidence
    29Tk369 k. Weight and sufficiency. Most Cited Cases
 (Formerly 92Hk39 Consumer Protection)

Evidence of specific representations about grain sorghum seed's characteristics and specific representations about how farmers' crop in particular would perform supported conclusion that seller's misrepresentations about seed's characteristics, quality, and grade amounted to more than mere puffing, under the Deceptive Trade Practices Act (DTPA). V.T.C.A., Bus. & C. § 17.46(b)(5, 7).

**[31] Antitrust and Trade Regulation 29T ☞369**

29T Antitrust and Trade Regulation
 29TIII Statutory Unfair Trade Practices and Consumer Protection
  29TIII(E) Enforcement and Remedies
   29TIII(E)6 Evidence
    29Tk369 k. Weight and sufficiency. Most Cited Cases
 (Formerly 92Hk39 Consumer Protection)

**Sales 343 ☞441(3)**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

343 Sales
    343VIII Remedies of Buyer
        343VIII(D) Actions and Counterclaims for Breach of Warranty
            343k438 Evidence
                343k441 Weight and Sufficiency
                    343k441(3) k. Breach of warranty. Most Cited Cases

Evidence that farmers' neighbor had no adverse effect from rotating from cotton to grain and that seed seller recommended alleged over-planting by farmers, together with evidence about grain sorghum seed's unsuitability for dryland farming, was sufficient to rebut possibility of causes of farmers' low yields other than seller's seed, which thus supported farmers' Deceptive Trade Practices Act (DTPA) and breach of warranty claims against seed seller. V.T.C.A., Bus. & C. § 17.46(b)(5, 7).

**[32] Damages 115 ⚷190**

115 Damages
    115IX Evidence
        115k183 Weight and Sufficiency
            115k190 k. Loss of profits. Most Cited Cases

Recovery for lost profits does not require that the loss be susceptible to exact calculation; however, the injured party must do more than show that it suffered some lost profits.

**[33] Damages 115 ⚷190**

115 Damages
    115IX Evidence
        115k183 Weight and Sufficiency
            115k190 k. Loss of profits. Most Cited Cases

Amount of lost profits must be shown by competent evidence with reasonable certainty.

**[34] Damages 115 ⚷190**

115 Damages
    115IX Evidence
        115k183 Weight and Sufficiency
            115k190 k. Loss of profits. Most Cited Cases

Establishing amount of lost profits is a fact-intensive determination.

**[35] Damages 115 ⚷190**

115 Damages
    115IX Evidence
        115k183 Weight and Sufficiency
            115k190 k. Loss of profits. Most Cited Cases

At a minimum, opinions or lost-profit estimates must be based on objective facts, figures, or data from which the lost-profits amount may be ascertained.

**[36] Damages 115 ⚷112**

115 Damages
    115VI Measure of Damages
        115VI(B) Injuries to Property
            115k107 Injuries to Real Property
                115k112 k. Growing crops, grass, shrubbery, or trees. Most Cited Cases

General rule for assessing damages for crop loss is the market value of the lost part of the crop, as measured at maturity, less the cost of harvesting and marketing the lost part.

**[37] Damages 115 ⚷188(1)**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

115 Damages
    115IX Evidence
        115k183 Weight and Sufficiency
            115k188 Loss of or Damage to Property
                115k188(1) k. Extent of damage in general. Most Cited Cases

**Damages 115 👉188(2)**

115 Damages
    115IX Evidence
        115k183 Weight and Sufficiency
            115k188 Loss of or Damage to Property
                115k188(2) k. Value of property. Most Cited Cases

Law does not demand perfect proof of damages for crop loss but liberally permits estimates of crop value and probable yield, as well as cultivating and marketing expenses.

**[38] Antitrust and Trade Regulation 29T 👉391**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(E) Enforcement and Remedies
        29TIII(E)7 Relief
            29Tk387 Monetary Relief; Damages
                29Tk391 k. Profits. Most Cited Cases
(Formerly 92Hk40 Consumer Protection)

While "limitation of liability and remedies" clauses printed on seed seller's invoices, delivery tickets, and seed labels were effective to limit farmers' recovery for breach of warranty, clauses did not preclude farmer' lost-profit recovery for nonwarranty representations or unconscionability under the Deceptive Trade Practices Act (DTPA). V.T.C.A., Bus. & C. § 17.41 et seq.

**[39] Antitrust and Trade Regulation 29T 👉391**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(E) Enforcement and Remedies
        29TIII(E)7 Relief
            29Tk387 Monetary Relief; Damages
                29Tk391 k. Profits. Most Cited Cases
(Formerly 92Hk40 Consumer Protection)

Evidence was sufficient for jury to calculate, with reasonable certainty, award of damages to farmers for lost profits resulting from seed seller's deceptive act or unconscionable action, under Deceptive Trade Practices Act (DTPA), concerning suitability of seed sold to farmers; farmer's testimony allowed jury to consider yield attributable to other seed, recalculate lease payments, and regard elevator costs as either reflected in yield or refundable so as to be not part of net cost calculation. V.T.C.A., Bus. & C. § 17.41 et seq.

**[40] Damages 115 👉40(1)**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
        115III(A)1 In General
            115k35 Pecuniary Losses
                115k40 Loss of Profits
                    115k40(1) k. In general. Most Cited Cases

Lack of a profit history does not, by itself, preclude a new business from recovering lost future profits.

**[41] Damages 115 👉190**

115 Damages
    115IX Evidence

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
(Cite as: 47 S.W.3d 486)

115k183 Weight and Sufficiency

115k190 k. Loss of profits. Most Cited Cases

Showing lost profit damages with reasonable certainty can be accomplished with a profit history *or* some other objective data, such as future contracts.

**\*490** Charles C. Murray, Lisa Powell, Atlas & Hall, McAllen, for Petitioners.

John B. Skaggs, Skaggs & Garza, Michele Nicole Gonzales, McAllen, for Respondents.

Justice BAKER delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice ENOCH, Justice HANKINSON, Justice O'NEILL, and Justice JEFFERSON joined.

This is a case of first impression involving**\*491** the Texas Seed Arbitration Act.[FN1] The Act requires that certain defective-seed claims be submitted to arbitration as a prerequisite to maintaining a legal action against the labeler. We must decide whether the timeliness requirement for submitting claims to arbitration is jurisdictional under the Act. We conclude that it is not, and that the evidence was legally sufficient to support the jury's verdict on liability, causation, and damages. Accordingly, we affirm the court of appeals' judgment.

> FN1. Unless otherwise indicated, all references to "the Act" are to the Texas Seed Arbitration Act. *See* TEX. AGRIC. CODE § 64.001–.007.

## I. BACKGROUND

The Wilkinses began farming in 1989 and first planted grain in 1992. Most of their land is nonirrigated dryland. They purchased a Cherokee-variety grain sorghum seed from Helena Chemical Company in 1992, 1993, and 1994. The Wilkinses claim that when they purchased this seed, they relied on Helena's advertising that it had "excellent dryland yield potential." Helena also represented that the seed had a "good field tolerance" to charcoal rot, a condition that causes the grain's stem to weaken and "fall down," reducing yield.

The 1992 crop had a good yield, but the 1993 crop yield was much lower. The Wilkinses claim that Helena's agent blamed this low yield on the seeds being planted too close together and that the agent recommended planting Cherokee seed on the entire tract with increased spacing between seeds. The Wilkinses followed this advice in 1994 with no increase in yield. Helena claims that insufficient rainfall and soil moisture depletion brought about by the Wilkinses' planting cotton on part of the property in 1993 caused the reduced yield.

In February 1995, the Wilkinses sued Helena alleging Deceptive Trade Practices—Consumer Protection Act (DTPA) violations, breach of express and implied warranties, and fraud. In March, Helena filed a plea in abatement and motion to compel nonbinding arbitration under the Act. In April, the trial court granted Helena's motion and abated the proceedings. Fifteen months later, the Wilkinses submitted their claims to the Texas Plant and Seed Board for arbitration. The Board declined to arbitrate because the crops were no longer in "field condition" and thus the Board could not inspect the crops.

The trial court lifted the abatement and the case proceeded to trial. The jury found for the Wilkinses on all claims except fraud. It did not find that Helena had acted knowingly. It awarded the Wilkinses $360,000 in damages. The trial court also awarded prejudgment interest from the date the Board declined to arbitrate. Helena and the Wilkinses appealed.

The court of appeals held that Helena had effectively disclaimed any warranties. 18 S.W.3d at 758. But it affirmed the judgment on the DTPA claims,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
(Cite as: 47 S.W.3d 486)

holding that the Board's refusal to arbitrate the Wilkinses' claims did not jurisdictionally bar their suit. 18 S.W.3d at 751–52. It also held that the evidence was legally and factually sufficient to support the jury's verdict on causation, liability, and damages. 18 S.W.3d at 754–59. Finally, in response to the Wilkinses' cross-appeal, the court held that the trial court properly calculated prejudgment interest. 18 S.W.3d at 760. Only Helena petitioned this Court for review.

## II. TEXAS SEED ARBITRATION ACT

Helena argues that the trial court did not have jurisdiction over the Wilkinses' *492 claims because the Act requires that all defective-seed claims first be timely submitted to nonbinding arbitration so the Board may effectively inspect the plants under field conditions. Thus, Helena argues, the Wilkinses' delay in submitting their claims for arbitration—which caused the Board to refuse to arbitrate—jurisdictionally barred the claims.

In response, the Wilkinses argue that submitting their claims to arbitration is all the Act requires. They posit that Helena's interpretation would render other statutory provisions meaningless and note that the Act does not authorize dismissal as a remedy under its arbitration procedures. Thus, the Wilkinses argue, the court of appeals correctly held that once they submitted their claims to arbitration under the Act, the trial court had jurisdiction to hear the claims regardless of whether arbitration actually occurred.

### A. APPLICABLE LAW
### 1. Texas Seed Arbitration Act

The Legislature enacted the Act in 1989 to "provide[ ] for an unbiased third party investigation by the State Seed and Plant Board of the Texas Department of Agriculture of complaints concerning seed performance." HOUSE COMM. ON AGRICULTURE AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989). Pertinent to this appeal, the Act provides:

### § 64.002. Requirement of Arbitration

(a) When a purchaser of seed designed for planting claims to have been damaged by the failure of the seed to produce or perform as represented by warranty or by the label required to be attached to the seed under this subtitle or as a result of negligence, the purchaser *must submit* the claim to arbitration as provided by this chapter *as a prerequisite* to the exercise of the purchaser's right to maintain a legal action against the labeler....

TEX. AGRIC. CODE § 64.002(a) (emphasis added).

### § 64.004. Effect of Arbitration

In any litigation *involving a complaint that has been the subject of arbitration* under this chapter, any party may introduce the report of arbitration as evidence of the facts found in the report, and the court may give such weight to the arbitration board's findings of fact, conclusions of law, and recommendations as to damages and costs as the court determines advisable. The court *may also take into account any findings of the board of arbitration* with respect to the failure of any party to cooperate in the arbitration proceedings, *including any finding as to the effect of delay in filing the arbitration claim* or the arbitration board's ability to determine the facts of the case.

TEX. AGRIC. CODE § 64.004 (emphasis added).

### § 64.005. Arbitration Board

(b) As a board of arbitration, the State Seed and Plant Board *shall conduct arbitration* as provided by this chapter....

TEX. AGRIC. CODE § 64.005(b) (emphasis added).

### § 64.006. Arbitration Procedures

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
(Cite as: 47 S.W.3d 486)

(a) A purchaser *may begin arbitration* by filing with the commissioner a sworn complaint and a filing fee, as provided by department rule.... Except in the case of seed that has not been planted, *the complaint must be filed within the time necessary to permit effective inspection of the plants under field conditions.*

....

**\*493** (c) The commissioner shall refer the complaint and the answer to the arbitration board for investigation, findings, and recommendations.

(d) On referral of the complaint for investigation, the arbitration board shall make a prompt and full investigation of the matters complained of and report its findings and recommendations to the commissioner not later than the 60th day after the date of the referral, or before a later date determined by the parties.

(e) The report of the arbitration board shall include findings of fact, conclusions of law, and recommendations as to costs, if any....

....

(h) The arbitration board shall consider any field inspection or other data submitted by either party in its report and recommendation.

TEX. AGRIC. CODE § 64.006 (emphasis added).

### 2. Statutory Construction

[1][2] We must construe statutes as written and, if possible, ascertain legislative intent from the statute's language. *Morrison v. Chan,* 699 S.W.2d 205, 208 (Tex.1985). Even when a statute is not ambiguous on its face, we can consider other factors to determine the

Legislature's intent, including: the object sought to be obtained; the circumstances of the statute's enactment; the legislative history; the common law or former statutory provisions, including laws on the same or similar subjects; the consequences of a particular construction; administrative construction of the statute; and the title, preamble, and emergency provision. TEX. GOV'T CODE § 311.023; *Ken Petroleum Corp. v. Questor Drilling Corp.,* 24 S.W.3d 344, 350 (Tex.2000).

[3][4] Additionally, we must always consider the statute as a whole rather than its isolated provisions. *Morrison,* 699 S.W.2d at 208. We should not give one provision a meaning out of harmony or inconsistent with other provisions, although it might be susceptible to such a construction standing alone. *Barr v. Bernhard,* 562 S.W.2d 844, 849 (Tex.1978). We must presume that the Legislature intends an entire statute to be effective and that a just and reasonable result is intended. TEX. GOV'T CODE § 311.021(2), (3).

[5] When used in a statute, the term "must" creates or recognizes a condition precedent. TEX. GOV'T CODE § 311.016(3). While Texas courts have not interpreted "must" as often as "shall," both terms are generally recognized as mandatory, creating a duty or obligation. *See* TEX. GOV'T CODE § 311.016(2), (3); *Wright v. Ector County Indep. Sch. Dist.,* 867 S.W.2d 863, 868 (Tex.App.—El Paso 1993, no writ) ("The ordinary meaning of 'shall' or 'must' is of a mandatory effect."); *Inwood N. Homeowners' Ass'n, Inc. v. Meier,* 625 S.W.2d 742, 743 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ) (same); *Mitchell v. Hancock,* 196 S.W. 694, 700 (Tex.Civ.App.—Fort Worth 1917, no writ) (same). The word " 'must' is given a mandatory meaning when followed by a noncompliance penalty." *Harris County Appraisal Dist. v. Consolidated Capital Props. IV,* 795 S.W.2d 39, 41 (Tex.App.—Amarillo 1990, writ denied). However, we have held language that appears to impose a mandatory duty to be only directory when this interpretation is most consistent with the Legislature's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

intent. *E.g., Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 629 (Tex.1996); *Lewis v. Jacksonville Bldg. & Loan Ass'n,* 540 S.W.2d 307, 310 (Tex.1976); *\*494 Thomas v. Groebl,* 147 Tex. 70, 212 S.W.2d 625, 630–31 (1948).

[6][7][8] To determine whether the Legislature intended a provision to be mandatory or directory, we consider the plain meaning of the words used, as well as the entire act, its nature and object, and the consequences that would follow from each construction. *Albertson's, Inc. v. Sinclair,* 984 S.W.2d 958, 961 (Tex.1999); *Chisholm v. Bewley Mills,* 155 Tex. 400, 287 S.W.2d 943, 945 (1956). Even if a statutory requirement is mandatory, this does not mean that compliance is necessarily jurisdictional. *Sinclair,* 984 S.W.2d at 961; *Hines v. Hash,* 843 S.W.2d 464, 467 (Tex.1992); *Schepps v. Presbyterian Hosp. of Dallas,* 652 S.W.2d 934, 938 (Tex.1983). When a statute is silent about the consequences of noncompliance, we look to the statute's purpose to determine the proper consequences. *Sinclair,* 984 S.W.2d at 961; *Schepps,* 652 S.W.2d at 937–38; *Chisholm,* 287 S.W.2d at 945.

**B. ANALYSIS**

[9] The parties agree that if the Wilkinses had not submitted their claims to arbitration after the trial court abated the proceedings, any claims subject to the Act would be jurisdictionally barred. *See* TEX. AGRIC. CODE § 64.002(a) ( "[T]he purchaser must submit the claim to arbitration ... as a prerequisite to the exercise of the purchaser's right to maintain a legal action against the labeler."); *see also Hines,* 843 S.W.2d at 469 (holding failure to perform mandatory but nonjurisdictional act while suit is abated for that purpose results in dismissal). However, because the Wilkinses did submit their claims to the Board, the only issue is whether their delay in doing so, and the Board's subsequent refusal to arbitrate, deprived the trial court of jurisdiction.

Helena argues that section 64.006(a)'s requirement that a complaint be "filed within the time nec-

essary to permit effective inspection of the plants under field conditions" is mandatory and jurisdictional. The Wilkinses acknowledge this statutory timing requirement, but argue that submission is the mandatory act and that timeliness is merely a factor the trial court may consider. We agree with the Wilkinses' interpretation.

Section 64.006(a) states that a purchaser's complaint "must" be filed within the time necessary to permit effective inspection under field conditions. The word " '[m]ust' creates or recognizes a condition precedent." TEX. GOV'T CODE § 311.016(3). The Legislature has instructed us to apply this definition unless its context "necessarily requires a different construction." TEX. GOV'T CODE § 311.016.

The problem with Helena's position that delay in submitting a claim to arbitration creates a jurisdictional bar is that we cannot read section 64.006(a) in a vacuum. Read in context, Helena's interpretation renders other provisions meaningless. In fact, section 64.004 expressly contemplates that a claim may be arbitrated and continue on to trial even when a delay in submission to arbitration prevents the Board from thoroughly investigating the claim. It provides:

> In any litigation involving a *complaint that has been the subject of arbitration under this chapter* ... [t]he court may also take into account any findings of the board of arbitration with respect to the failure of any party to cooperate ... *including any finding as to the effect of delay in filing the arbitration claim or the arbitration board's ability to determine the facts of the case.*

TEX. AGRIC. CODE § 64.004 (emphasis added). Accepting Helena's argument that section 64.006(a)'s timing requirement is *\*495 jurisdictional renders section 64.004 meaningless because in any case "involving a complaint that has been the subject of arbitration under this chapter," there could not be a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

"finding as to the effect of delay in filing ... or the arbitration board's ability to determine the facts of the case."

[10] Actually, the Act's language and purpose demonstrate that the Legislature simply did not contemplate the situation presented here—a submission to arbitration where the Board then refuses to arbitrate. Rather, the Legislature created this arbitration scheme to provide an alternate forum for farmers to initially submit claims, not as a mechanism to preclude farmers' suits altogether. *See* HOUSE COMM. ON AGRICULTURE AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989) (explaining that one reason this Act was passed was that "farmers are often reluctant to litigate" seed disputes).

In addition to the overall statutory objective, we have historically looked to two factors to determine if the Legislature intended a provision to be jurisdictional: (1) the presence or absence of specific consequences for noncompliance, *Sinclair,* 984 S.W.2d at 961–62, and (2) the consequences that result from each possible interpretation. *Barshop,* 925 S.W.2d at 629. Applying these factors supports our interpretation that delay in submitting claims is not jurisdictional.

[11] To determine whether a timing provision is mandatory, we first look to whether the statute contains a noncompliance penalty. If a provision requires that an act be performed within a certain time without any words restraining the act's performance after that time, the timing provision is usually directory. *Lewis,* 540 S.W.2d at 310; *Markowsky v. Newman,* 134 Tex. 440, 136 S.W.2d 808, 812 (1940). Here, the Act states that a purchaser's complaint must be filed "within the time necessary to permit effective inspection of the plants under field conditions." TEX. AGRIC. CODE § 64.006(a). However, the Act has no corresponding provision dictating dismissal for noncompliance. *State v. $435,000,* 842 S.W.2d 642, 644 (Tex.1992) ("If the Legislature had intended dismissal to be the conse-

quence of a failure to hear a forfeiture case within the prescribed period, it could easily have said so."); *see also Sinclair,* 984 S.W.2d at 962 ("[T]hat section 410.253 does not dictate the consequence of noncompliance is significant when considering the entire statute."). To the contrary, the Act expressly provides nonjurisdictional consequences by allowing the Board to make findings about any delay and allowing the trial court to consider these findings. *See* TEX. AGRIC. CODE § 64.004. Thus, we conclude the Act's silence about dismissal, coupled with its provision for other consequences, weighs in favor of a nonjurisdictional interpretation.

When deciding whether the Legislature intended a particular provision to be jurisdictional, we must also consider the consequences that result from each possible construction. *Chisholm,* 287 S.W.2d at 945–46. Under Helena's interpretation, a delay in submitting a claim to arbitration precludes any consideration of the claim—by the Board or a trial court. Because the Board's arbitration is nonbinding and the trial court is not required to consider the Board's findings, we conclude that Helena's jurisdictional interpretation of section 64.006's timing requirement leads to an absurd result. *See Barshop,* 925 S.W.2d at 629.

Helena urges that our adopting a nonjurisdictional interpretation allows purchasers to bypass the Act and thwart its underlying purpose of providing for an unbiased, independent Board investigation. *See* HOUSE COMM. ON AGRICULTURE **\*496** AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989). We disagree.

The Act permits the Board to independently investigate and assess the purchaser's claims. TEX. AGRIC. CODE § 64.006(d). But, while the Act *requires* the Board to consider any field inspection or other data either party submits, nowhere does it require the Board itself to conduct a field inspection; nor does it expressly mention the Board conducting such

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
(Cite as: 47 S.W.3d 486)

an inspection. *See* TEX. AGRIC. CODE § 64.006(f)-(h). Instead, by the Act's express terms, the Board can carry out its investigation in a number of ways that do not necessarily require it to conduct its own field inspection. For example, the Act authorizes the Board to delegate all or any part of its investigation to its members. TEX. AGRIC. CODE § 64.006(g). And the Board may grow representative samples, conduct hearings, and examine the parties. TEX. AGRIC. CODE § 64.006(f). In fact, here both parties' experts conducted field inspections that they could have submitted to the Board to aid it in fulfilling its duties. *See* TEX. AGRIC. CODE § 64.006(h) ("The arbitration board *shall* consider any field inspection or other data submitted by either party.") (emphasis added). Thus, because the Board can conduct an investigation despite a delay in submission to arbitration, concluding that section 64.006(a)'s timing requirement is nonjurisdictional does not thwart the Act's purpose of providing for a Board investigation. *See Hines,* 843 S.W.2d at 469 (holding statute's purpose could be furthered without jurisdictional interpretation of mandatory timing requirement).

Further, our interpretation does not render a delay in submitting a claim to arbitration without consequence. Indeed, if a purchaser does not submit a claim in time for the Board or the seller to conduct an effective field inspection, it does so at its own peril. The Board may make findings adverse to the purchaser on this basis. TEX. AGRIC. CODE § 64.004. If the purchaser then sues, the Board's findings and recommendations are admissible, and the Act expressly authorizes the court to both "give such weight to the arbitration board's findings of fact, conclusions of law, and recommendations as to damages and costs as the court determines advisable" and "take into account any findings ... with respect to the failure of any party to cooperate in the arbitration proceedings, including any finding as to the effect of delay in filing the arbitration claim." TEX. AGRIC. CODE § 64.004. We conclude that these consequences—not the complete deprival of any right to have the claims heard in any

forum—are the consequences the Legislature contemplated under the Act.

The dissent disagrees with this conclusion, asserting that the Act absolutely forecloses a purchaser's action if the purchaser does not comply with section 64.006(a)'s timing requirement. 47 S.W.3d at 507. The dissent notes section 64.006's language that the complaint "must" be filed within the time necessary to permit effective crop inspection. 47 S.W.3d at 507. It then reconciles this language with section 64.004 by interpreting section 64.004 to permit Board findings about a purchaser's delay only while the crops are still in the ground. 47 S.W.3d at 507. It explains that "[a] purchaser could certainly delay filing an arbitration complaint for many months yet still file while the seeds are under field conditions." 47 S.W.3d at 508. Thus, it reasons, submitting a claim while the seeds are in the ground, but after a hot summer season, could "affect the Board's investigation." 47 S.W.3d at 511.

However, while purporting to apply a plain-language analysis to *497section 64.006(a), the dissent glosses over the section's actual language and ignores the maxim that we must presume that every word in a statute is included purposefully. *See Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540 (Tex.1981). First, the dissent's interpretation assumes the Board itself must conduct the field inspection referenced in section 64.006(a). The Act's text does not support this assumption. Instead, the Act provides that a complaint must be filed in time to "permit effective inspection of the plants under field conditions," TEX. AGRIC. CODE § 64.006(a), thus permitting the parties to inspect under field conditions and provide their reports to the Board. TEX. AGRIC. CODE § 64.006(h). Second, the dissent's interpretation presumes that any claim submitted while crops are still in the ground will satisfy section 64.006(a)'s language. 47 S.W.3d at 511. However, section 64.006 does not only require that a claim be submitted while the crops are available for inspection "under field conditions." Rather, it states a claim must be filed in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
(Cite as: 47 S.W.3d 486)

time to permit an "*effective* inspection of the plants under field conditions." TEX. AGRIC. CODE § 64.006(a) (emphasis added). We must presume the word "effective" has meaning. *See Cameron,* 618 S.W.2d at 540. Thus, under the dissent's interpretation of 64.006(a), any claim brought while the crops are in the ground *but after* an *effective* inspection could be accomplished would *already be barred* under 64.006(a)—rendering section 64.004's provision for the Board to make findings about delay in submitting the claim meaningless.

The dissent also urges us to adopt the Florida Supreme Court's interpretation of a prior version of its Seed Act because our statute's legislative history indicates that our statute was modeled in part after Florida's. *See Ferry–Morse Seed Co. v. Hitchcock,* 426 So.2d 958, 961 (Fla.1983) (holding Florida Seed Act's arbitration submission timing requirement jurisdictional). There is only one reference to Florida in our Act's bill analysis. The background section notes that "[f]or many years the state of Florida has used a method of arbitration with an unbiased third party investigation and opinion" and that "[t]he American Seed Trade Association has recommended to each of its member states that they work to pass measures similar to Florida's." HOUSE COMM. ON AGRI-CULTURE AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989).

[12][13] We recognize that when a Texas statute is modeled after another jurisdiction's, that jurisdiction's interpretation before the Legislature enacts our statute may be given weight. *City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 360 (Tex.2000). However, when the Legislature looks to another jurisdiction's statute, but modifies rather than adopts some of its provisions, it does so purposefully. *See Sharifi v. Young Bros., Inc.,* 835 S.W.2d 221, 223 (Tex.App.—Waco 1992, writ denied).

When the Legislature enacted the Texas Act, the Florida Seed Act provided that a purchaser must submit its claim to arbitration "within such time as to permit inspection of the crops, plants, or trees by the seed investigation and conciliation council or its representatives *and* by the dealer from whom the deed was purchased." FLA. STAT. ANN.. § 578.026(1)(a) (emphasis added). In *Ferry–Morse Seed Co.,* the case upon which the dissent relies, the Florida Supreme Court interpreted a prior version's timing requirement to be jurisdictional. 426 So.2d at 961. This prior version required a claim be filed "within ten days after the defect or violation becomes apparent." *See Ferry–Morse Seed Co.,* 426 So.2d at 960. There are two important differences between the Texas *498 and Florida Acts. First, the Florida Act's current version specifies that the Board and the seed seller must *both* be able to conduct an independent field inspection. The Texas Act has no such language. Second, and more significant, neither version of Florida's Act provides for the Board to make findings about the effect of the purchaser's delay in submitting a claim to arbitration as section 64.004 of the Texas Act does. Thus, while we might be inclined to adopt Florida's interpretation that timely submitting to arbitration is jurisdictional if its statute were identical to ours, we are not bound to interpret one similar provision of our Act in a way that conflicts with other provisions that differ from Florida's statute.

Finally, while we base our interpretation on the Act's language and the Legislature's intent, we note that one other court has had occasion to interpret its Seed Act's similar arbitration provisions. Illinois' Seed Act provides:

A purchaser of seed *cannot maintain a civil action against the seller* for failure of the seed to produce or perform (i) as represented by a label attached to the seed or furnished under the Illinois Seed Law, (ii) as represented by warranty, or (iii) because of negligence, *unless the buyer has first submitted the claim to arbitration.*

....

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
(Cite as: 47 S.W.3d 486)

Except in case of seed that has not been planted, *the claim shall be filed within a time that will permit effective inspection of the plants under field conditions* and in no case later than 90 days after completion of harvest.

701 ILL. COMP. STAT.. 25/10, 25/20 (emphasis added). In *Presley v. P & S Grain Co.,* the Illinois court of appeals held this timing requirement to be directory rather than mandatory. 289 Ill.App.3d 453, 225 Ill.Dec. 398, 683 N.E.2d 901, 910 (1997). It reasoned, as we have here, that the statute's failure to provide for dismissal as a consequence for noncompliance with its arbitration provisions weighs in favor of a directory interpretation. *Presley,* 225 Ill.Dec. 398, 683 N.E.2d at 909. Likewise, it concluded that interpreting the nonbinding arbitration procedures as jurisdictional would lead to an absurd result. *Presley,* 225 Ill.Dec. 398, 683 N.E.2d at 909.

[14][15] We agree with the Florida Supreme Court's observation that seed arbitration laws are "established to protect the farmer." *Ferry–Morse Seed Co.,* 426 So.2d at 961. Thus, when, as here, we are faced with two competing interpretations, we must choose the one most harmonious with the Act's objectives and other provisions. Accordingly, we conclude that while submission to arbitration under the Act is mandatory if not waived by the seller, the Act's timing requirement is not. *See Hines,* 843 S.W.2d at 469; *$435,000,* 842 S.W.2d at 644. Because the Wilkinses submitted their claims to arbitration and thus complied with the Act's mandatory requirements, the trial court correctly concluded that it had jurisdiction over their claims.

### III. EXPERT TESTIMONY

Helena argues that the trial court abused its discretion by admitting the Wilkinses' expert's testimony. The expert, Dr. Pleunneke, testified that in his opinion, Cherokee seed is not appropriate for dryland farming

and thus did not perform as represented. Helena contends that Pleunneke lacked the required qualifications and that his testimony lacked the "indicia of reliability" required for admission. The court of appeals held the trial court did not abuse its discretion by admitting Pleunneke's testimony. 18 S.W.3d at 754. We agree with the court of appeals.

### *499 A. APPLICABLE LAW

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of opinion or otherwise. TEX.R. EVID. 702. Otherwise admissible opinion testimony is not objectionable because it embraces an ultimate issue of fact. TEX.R. EVID. 704.

[16][17][18] A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified; and (2) the testimony must be relevant and be based on a reliable foundation. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995). The trial court makes the initial determination about whether the expert and the proffered testimony meet these requirements. *Robinson,* 923 S.W.2d at 556. The trial court has broad discretion to determine admissibility, and we will reverse only if there is an abuse of that discretion. *Robinson,* 923 S.W.2d at 558.

[19][20][21] In deciding if an expert is qualified, trial courts "must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 719 (Tex.1998) (quoting *Broders v. Heise,* 924 S.W.2d 148, 152 (Tex.1996)). To gauge reliability, we have explained:

*Daubert* and Rule 702 demand that the district court

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

evaluate the methods, analysis, and principles relied upon in reaching the opinion. The court should ensure that the opinion comports with applicable professional standards outside the courtroom and that it will have a reliable basis in the knowledge and experience of the discipline.

*Gammill,* 972 S.W.2d at 725–26 (quotations omitted). In *Robinson,* we identified six nonexclusive factors to determine whether an expert's testimony is reliable and thus admissible. *Robinson,* 923 S.W.2d at 557. But in *Gammill* we recognized that the *Robinson* factors may not apply to certain testimony. *Gammill,* 972 S.W.2d at 726. In those instances, there still must be some basis for the opinion offered to show its reliability, and, ultimately, the trial court must determine how to assess reliability. *Gammill,* 972 S.W.2d at 726. If an expert relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 714 (Tex.1997). Further, an expert's testimony is unreliable even when the underlying data is sound if the expert's methodology is flawed. *Havner,* 953 S.W.2d at 714.

**B. ANALYSIS**
**1. Qualifications**

[22] Pleunneke testified that he grew up on a ranch. He earned a bachelor's degree in wildlife management from Texas A & M University. He then worked in a bank's trust department managing farm and ranch lands in Texas and Louisiana. During this time he worked with many different types of crops, including grain sorghum. He then returned to school and finished a doctorate in plant physiology. Afterwards, he worked with crops for Mississippi State University's Agronomy and Biochemistry Department. At this job, he conducted crop-variety testing, predominantly on soybean crops, and he was "quite familiar with setting up tests and so forth and see[ing] which varieties are best." For the past twenty years he has worked in Texas as a plant scientist and consultant. He characterized some of his functions*500 as "work[ing] on different problems related to plant science, science pertaining to the physiology of plants, malnutrition, the way the environment affects them and so forth." In fact, the Wilkinses initially hired him, not as a litigation expert, but as a consultant to help them identify the source of their crop problems.

Helena notes that Pleunneke is not a plant pathologist and argues that his testimony does not establish he is an expert about charcoal rot. However, this argument incorrectly frames the issue. The Wilkinses allege Helena misrepresented Cherokee seed's fitness for use in a nonirrigated environment. Accordingly, the factual issue is not solely whether Cherokee is susceptible to charcoal rot. Also at issue is whether Cherokee is particularly suited for dryland farming as Helena represented.

The causation evidence in this case included: seed performance trial results, the Wilkinses' farm's current and past performance, the current and past performance of the Wilkinses' neighbor's farm, and weather and soil statistics. In response to this evidence, Helena contended that environmental factors, not Cherokee seed's drought intolerance, led to the Wilkinses' poor crop. Thus, to determine whether Pleunneke is a qualified expert, the question is whether Pleunneke has scientific, technical, or other specialized knowledge that would assist the jury to understand this evidence and determine if Cherokee seed is suitable for dryland farming as represented. *See* TEX.R. EVID. 702.

We conclude that Pleunneke's knowledge would aid the jury in understanding the evidence. Several grain performance trial results were entered into evidence. Pleunneke has experience conducting crop trials, and, presumably, experience interpreting and comparing those results. Also, as a plant-science consultant, he works on "different problems related to plant science, science pertaining to the physiology of plants, malnutrition, the way the environment affects them and so forth." Because Helena contends envi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
(Cite as: 47 S.W.3d 486)

ronmental factors caused the Wilkinses' crop failure rather than Cherokee seed's drought intolerance, Pleunneke's experience identifying environmental factors affecting crops could have been helpful to the jury. Accordingly, we conclude that the court of appeals correctly held that the trial court's finding Pleunneke qualified was not an abuse of discretion.

### 2. Reliability

[23] Helena also contends that Pleunneke's testimony is unreliable because he is not qualified to testify about charcoal rot and because he does not state the basis and the methodology behind his opinion. Again, Helena fails to recognize that the issue here is whether Cherokee seed is suitable for dryland farming as Helena represented. And it ignores the numerous bases underlying Pleunneke's opinion and his qualifications.

Pleunneke testified that, in forming his opinions, he relied on a number of things: a physical inspection of the Wilkinses' Cherokee crop; photographs and videotape of the Wilkinses' field; samples of the Wilkinses' soil and plants; samples of the Wilkinses' neighbors' soil and plants; lab analysis results from his field samples; South Texas rainfall statistics during the relevant period; Texas A & M grain-sorghum trials; Texas A & M grain-sorghum literature; publications by Dr. Fredrickson, a Texas A & M plant pathologist who is a grain-sorghum expert; Helena's soil and plant samples and analyses; and Helena's marketing literature. Helena does not argue that this foundational data underlying Pleunneke's opinion testimony is unreliable.

*501 Moreover, Pleunneke has twenty years experience as a plant scientist and conducting and interpreting crop trials. While testifying, Pleunneke explained the results of several grain trials, why he found those to be significant, and how they supported his opinions. He also explained the other factors that contributed to his opinion, and why they were significant to his conclusions. These other factors included

weather and weed-control reports, disease publications, testing, and comparison with crops adjacent to the Wilkinses' farm. Thus, Pleunneke's experience, coupled with his thorough testimony about the methodology he employed, demonstrate that the opinions he drew from the underlying data are reliable. *See Gammill,* 972 S.W.2d at 726. Thus, we conclude that the court of appeals correctly held that the trial court did not abuse its discretion by admitting Pleunneke's testimony.

## IV. DTPA CLAIMS

Helena argues that the Wilkinses' failure to timely submit their claims to arbitration under the Act also precludes the trial court from considering their DTPA claims. In the alternative, it argues that there is no evidence to support the jury's DTPA liability and causation findings. Specifically, Helena argues that any representations it made amounted to nonactionable puffing.

### A. RELATIONSHIP BETWEEN THE DTPA AND THE TEXAS SEED ARBITRATION ACT

Helena argues that if the Act governs any part of a suit, then all the purchaser's claims must be arbitrated, regardless of the theory of recovery. The dissent agrees, concluding that all the Wilkinses' theories are "factually intertwined," and thus that their DTPA claims cannot provide an alternative basis for the trial court's judgment. Because we conclude that the Wilkinses complied with the Act and hold that their delay in submitting their claims to arbitration did not bar their suit, determining whether the DTPA claims are within the Act's purview is not necessary here.

### B. EVIDENCE TO SUPPORT DTPA JURY QUESTIONS

The trial court submitted two DTPA questions to the jury. The first question asked, in the disjunctive, whether Helena had violated three DTPA laundry-list provisions: sections 17.46(b)(5) (misrepresentations about a product's characteristics), 17.46(b)(7) (misrepresentations about a product's standard, quality, or

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

grade), or 17.46(b)(23) (failure to disclose information with intent to induce another to enter transaction). *See* TEX. BUS. & COM.CODE § 17.46. The second question asked only whether Helena violated section 17.50(a)(3) (unconscionable action or course of action). *See* TEX. BUS. & COM.CODE § 17.50. The jury answered both questions "yes."

Helena argues that there is no evidence to support the jury's answers. Specifically, it argues that any representations made to the Wilkinses amounted to nonactionable puffing and that there is no causation evidence. The court of appeals held there was some evidence to support the jury's answers to both questions. 18 S.W.3d at 755–57. We agree with the court of appeals.

### 1. Applicable Law

[24][25] The DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." TEX. BUS. & COM.CODE § 17.46(a). Section 17.46(b) is a laundry list of specifically prohibited acts. Sections 17.46(b)(5) and 17.46(b)(7) prohibit "false, misleading, or deceptive acts or practices includ[ing] ... representing that goods and services have *502 ... characteristics, ingredients, uses, [or] benefits ... which they do not have" and "representing that goods or services are of a particular standard, quality, or grade ... if they are of another." Section 17.46(b)(23) prohibits "the failure to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." Section 17.50 provides the remedy for violations of the laundry-list provisions of 17.46(b) and for "any unconscionable action or course of action by any person." Actionable representations may be oral or written. *Hedley Feedlot, Inc. v. Weatherly Trust,* 855 S.W.2d 826, 838 (Tex.App.—Amarillo 1993, writ denied). A party need not prove intent to make a misrepresentation under sections 17.46(b)(5)

or 17.46(b)(7)—making the false representation is itself actionable. *Smith v. Baldwin,* 611 S.W.2d 611, 616–17 (Tex.1980).

[26][27] To recover under the DTPA, the plaintiff must also show that the defendant's actions were the "producing cause" of actual damages. *See* TEX. BUS. & COM.CODE § 17.50(a). This showing requires some evidence that the defendant's act or omission was a cause in fact of the plaintiff's injury. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 481 (Tex.1995). Under this standard, it is not necessary to show that the harm was foreseeable. *Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d at 481.

The DTPA does not mention "puffing" as a defense. However, this Court has recognized that "mere puffing" statements are not actionable under sections 17.46(b)(5) or 17.46(b)(7). *Pennington v. Singleton,* 606 S.W.2d 682, 687 (Tex.1980). Neither this Court nor any court of appeals has extended the puffing defense to violations of sections 17.46(b)(23) (failure to disclose) or 17.50(a)(3) (unconscionable conduct).

[28][29] In conducting a no-evidence review, we must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992). If more than a scintilla of evidence exists, the evidence is legally sufficient to support the finding. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993).

### 2. Analysis

The Wilkinses offered the following evidence to support their DTPA claims:

(1) Kenny Wilkins' testimony that he read Helena's seed brochure (PX–25) before purchasing Cherokee seed and that he would not have planted Cherokee in 1993 and 1994 had the brochure not represented

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
(Cite as: 47 S.W.3d 486)

Cherokee was a good dryland variety.

(2) The PX–25 brochure's description of Cherokee seed as "one of the most durable, top yielding hybrids" with an "outstanding disease tolerance package."

(3) The PX–25 brochure's "grain sorghum lineup" chart stating that Cherokee seed has "good" head exertion, "very good" standability, "excellent" yield potential in drylands, and that it is "FD [field] tolerant" to charcoal rot.

(4) Helena's written representation that its sorghum hybrids "constitute our best research and development efforts," that Cherokee seed has "excellent weatherability," that Cherokee seed is "the tough performer," and that it has "the stamina and *503 hardiness to withstand the harsh conditions from the Texas coastal bend across the lower south to the Carolinas."

(5) Testimony that the Wilkinses did not expect a "FD tolerant" plant would be affected by charcoal rot and that they understood "tolerant" to mean that "if there was an acceptable level of something out in the field it would be tolerant to it."

(6) The American Seed Association's (of which Helena is a member) definition of "tolerant" as "the ability of plants to endure a specified pest or an adverse environmental condition, performing and producing in spite of the disorder."

(7) A Helena agent's testimony that "tolerance to charcoal rot is known to occur in grain sorghum. In this case the plant may develop a disease but may escape the full development of symptoms and produce some level of harvestable yield which it could not otherwise do in the absence of the tolerance phenomenon."

(8) The Wilkinses' testimony that they relied upon the Helena agent's oral representations.

(9) Testimony indicating that it is reasonable and customary for farmers to rely on oral representations and advice from seed companies' representatives and that, in fact, the neighboring farm's owner also relies on advice from his seed company representative.

(10) Another Helena agent's representations that Cherokee seed was a "good dry land variety and that it would hold up well under the dry land conditions," and his recommendation that the Wilkinses plant Cherokee seed.

(11) A Helena representative's statement that the Wilkinses had planted "too thick" and that if they would plant Cherokee on the whole lot, but with greater spacing, "the plant[s] will go ahead and perform."

Helena argues that its "alleged misleading statements are not statements of 'fact,' but constitute, if anything, nonactionable opinion or puffing." It relies extensively on *Autohaus, Inc. v. Aguilar,* where the court of appeals held that an automobile salesman's stating that Mercedes is the best-engineered automobile in the world and "jok[ing]" that the car would "probably" only need to be brought in for oil changes every 7,500 miles was nonactionable puffing. 794 S.W.2d 459, 464 (Tex.App.—Dallas 1990), *writ denied per curiam,* 800 S.W.2d 853 (Tex.1991). The court noted that these two sentences were "the extent of the evidence presented to show the misrepresentation by the salesman." *Aguilar,* 794 S.W.2d at 464. It also noted that the terms "probably" and "joked" demonstrated the generality of the statements. *Aguilar,* 794 S.W.2d at 464.

[30] Here, the Wilkinses' evidence reflects specific representations about Cherokee seed's charac-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

teristics and specific representations about how the Wilkinses' crop in particular would perform. We conclude some of the representations in this case are much more specific than those in *Aguilar* and are more analogous to representations held actionable in other cases. *See, e.g., Pennington,* 606 S.W.2d at 687 (holding representations that used boat and motor were in "excellent condition," "perfect condition," and "just like new" were actionable misrepresentations about characteristics and benefits); *Hedley Feedlot, Inc.,* 855 S.W.2d at 831, 838–39 (holding cattle seller's representations to a buyer about "the type of cattle, weight, projected cost of feeding, the length of *504 time on feed, and the projected gain of the cattle" were actionable under the DTPA); *Gold Kist, Inc. v. Massey,* 609 S.W.2d 645, 646–47 (Tex.App.—Fort Worth 1980, no writ) (holding representations about seed-germination rate were actionable under the DTPA). Thus, viewing the evidence in a light most favorable to the jury's findings, we conclude that there is some evidence of misrepresentations about Cherokee seed's characteristics, quality, and grade amounting to more than mere puffing.

[31] Helena also argues that there is no evidence that its actions were the producing cause of the Wilkinses' injuries because the Wilkinses did not exclude other possible causes for the crop failure. Specifically, Helena contends that the Wilkinses depleted their soil by planting cotton the prior year.

The Wilkinses presented evidence about Cherokee's unsuitability for dryland farming. This evidence included their crop's performance, their neighbor's crop performance, several seed performance trial results, and South Texas rainfall statistics. The Wilkinses' expert, Dr. Pleunneke, testified that Cherokee seed does not produce a good yield in a nonirrigated environment.

The Wilkinses also presented evidence excluding other causes. The court of appeals summarized this evidence:

Wilkins explained that the cotton-grain rotation is required by the local crop-management office; his neighbor rotated cotton and grain on certain portions of his acreage without adverse effects; and the alleged "over planting" occurred because the Wilkins[es] followed the recommendations of Helena in planting their 1993 crop.

18 S.W.3d at 756. Thus, we conclude the Wilkinses presented some evidence of producing cause.

In sum, there is some evidence to support a finding that Helena violated sections 17.46(b)(5) and 17.46(b)(7). This finding is sufficient to support the jury's verdict. Thus, the court of appeals correctly held that there is some evidence of DTPA violations and that Helena's puffing defense did not defeat liability under the DTPA.

## V. DAMAGES

Finally, Helena argues that there is no evidence to support the jury's $360,000 damages award. The court of appeals held there was evidence to support this amount. 18 S.W.3d at 759. We agree with the court of appeals.

### A. APPLICABLE LAW

[32][33][34][35] Recovery for lost profits does not require that the loss be susceptible to exact calculation. *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994). However, the injured party must do more than show that it suffered some lost profits. *Teletron Energy Mgmt., Inc.,* 877 S.W.2d at 279. The loss amount must be shown by competent evidence with reasonable certainty. *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994); *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992). This is a fact-intensive determination. *Heine,* 835 S.W.2d at 84. At a minimum, opinions or lost-profit estimates must be based on objective facts, figures, or data from

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

which the lost-profits amount may be ascertained. *Szczepanik*, 883 S.W.2d at 649; *Heine*, 835 S.W.2d at 84.

[36][37] Texas' general rule for assessing damages for crop loss is the market value of the lost part of the crop, as measured at maturity, less the cost of harvesting and marketing the lost part. *International Harvester Co. v. Kesey*, 507 S.W.2d 195, 197 (Tex.1974). The law does not demand perfect proof of damages for crop *505 loss but liberally permits estimates of crop value and probable yield, as well as cultivating and marketing expenses. *International Harvester Co.*, 507 S.W.2d at 197.

### B. ANALYSIS

[38] Helena argues that the Wilkinses' damages should have been limited to the Cherokee seed's purchase price. Helena relies upon the "limitation of liability and remedies" clause printed on its invoices, delivery tickets, and seed label. The DTPA provides that "[a]ny waiver by a consumer of the provisions of this subchapter is contrary to public policy and is unenforceable and void." TEX. BUS. & COM.CODE § 17.42(a). We have held that a clause limiting recovery for breach of warranty is effective, even when brought under the DTPA, because the DTPA did not create warranty claims. *Southwestern Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 576–77 (Tex.1991). However, the same does not hold true for other DTPA claims. *FDP Corp.*, 811 S.W.2d at 576–77. Thus, Helena's liability-limitation clauses cannot preclude the Wilkinses' lost-profit recovery for nonwarranty representations or unconscionability.

[39] Alternatively, Helena argues that there is no evidence to support the jury's damage award because prior losses cannot establish lost profits and because the Wilkinses did not prove their damages with reasonable certainty. Specifically, Helena argues that deducting government subsides and disaster relief from the Wilkinses' income results in a history of losses rather than profits.

The Wilkinses first planted grain in 1992 and brought this suit to recover for crop damages sustained in 1993 and 1994. Thus, they only had one year to establish a profit history.

[40][41] We have held that past profits, coupled with other facts and circumstances, *may* establish a lost-profits amount with reasonable certainty. *See Teletron Energy Mgmt., Inc.*, 877 S.W.2d at 279. However, lack of a profit history does not, by itself, preclude a new business from recovering lost future profits. *See, e.g., Orchid Software, Inc. v. Prentice–Hall, Inc.*, 804 S.W.2d 208, 211 (Tex.App.—Austin 1991, writ denied). Rather, our focus is on whether damages can be shown with reasonable certainty. *E.g., Szczepanik*, 883 S.W.2d at 649. This can be accomplished with a profit history *or* some other objective data, such as future contracts, from which lost profits can be calculated with reasonable certainty. *See, e.g., Szczepanik*, 883 S.W.2d at 649; *Allied Bank W. Loop v. C.B.D. & Assocs., Inc.*, 728 S.W.2d 49, 54–55 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e).

To establish their lost profits with reasonable certainty, the Wilkinses had to show: (1) the lost crop's market value, and (2) the harvesting and marketing expenses they would have incurred on that lost part. *International Harvester Co.*, 507 S.W.2d at 197. To calculate their lost crop's market value, the Wilkinses relied upon the United States Agriculture Stabilization and Conservation Service's farm-yield data. Each year the USASC measurement service gathers crop yield information from sorghum growers. The Wilkinses took the average sorghum yield per acre and subtracted their actual per acre yield, as evidenced by sales receipts. Then they multiplied this resulting deficit by the number of acres planted and multiplied this figure by the market price. The result was $129,170.95 for 1993 and $361,684.63 for 1994. They submitted the $490,855.58 total to the jury as their estimated damages.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
(Cite as: 47 S.W.3d 486)

**\*506** To reach an estimated lost-profits figure, the cost of harvesting and marketing the lost crop must be deducted from the $490,855.58 value of the lost crop. These costs include additional lease payments, grain-elevator costs, and transportation charges. *See International Harvester Co.,* 507 S.W.2d at 197. Harvesting and marketing expenses can be liberally estimated. *International Harvester Co.,* 507 S.W.2d at 197.

Here, the Wilkinses' neighbor testified about average transportation costs to move grain between his farm and the grain elevator in McCook, Texas, where both the neighbor and the Wilkinses sent their crops. Kenneth Wilkins testified about how the grain-elevator company calculates drying charges and provided the jury with the Wilkinses' 1993 and 1994 grain-elevator receipts. The Wilkinses' leases containing the percentage of profits that the Wilkinses' were required to pay their landlord were entered into evidence. Finally, there was some evidence presented to the jury about the seed's actual price and some evidence that Helena may have "written off" a part of the price. With this evidence, the jury assessed the Wilkinses' net lost profits at $360,000. We agree with the court of appeals that the jury's damages award was within the range of evidence the Wilkinses presented and that this award is supported with evidence establishing damages with reasonable certainty. 18 S.W.3d at 759. Thus, we hold that there is some evidence to support the jury's damage award.

## VI. CONCLUSION

We conclude that the Wilkinses' delay in submitting their claims to arbitration did not jurisdictionally bar their suit. We also conclude that the trial court did not abuse its discretion in admitting the Wilkinses' expert's testimony. Finally, we conclude that there is some evidence to support the jury's liability, causation, and damages findings. Accordingly, we affirm the court of appeals' judgment.

Justice ABBOTT, joined by Justice HECHT and Justice OWEN, dissenting.

Although he knew about both the alleged problem with the seed and the Act's requirement that seed complaints be submitted to arbitration, Wilkins delayed submitting his complaint to arbitration until years after he first discovered the problem. Because of this delay, it was too late for the State Seed and Plant Board to conduct a meaningful investigation, and the Board appropriately concluded that the complaint did not qualify for arbitration. Despite the Act's plain requirement that seed complaints be timely submitted to arbitration as a prerequisite to maintaining a legal action, the Court sidesteps this requirement and permits Wilkins to maintain his suit. In doing so, the Court encourages all seed buyers who wish to circumvent the Act's arbitration requirement to simply delay submitting the complaint to arbitration until it is too late for the Board to investigate. Because the Court ignores the Act's plain language and undermines the Act's purpose by permitting seed purchasers to completely circumvent the Act's arbitration requirement, I dissent.

## I

The Act's purpose is to "provide[ ] for an unbiased third party investigation by the State Seed and Plant Board of the Texas Department of Agriculture of complaints concerning seed performance." HOUSE COMM. ON AGRIC. AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989). To achieve this purpose, the Act requires that a seed purchaser who "claims to have been damaged by the failure of the **\*507** seed to produce or perform as represented by warranty or by the label required to be attached to the seed ... or as a result of negligence ... must submit the claim to arbitration" before the Board *"as a prerequisite to the exercise of the purchaser's right to maintain a legal action."* TEX. AGRIC. CODE § 64.002 (emphasis added).

In order for the Board to be able to conduct a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

meaningful investigation, the Act expressly provides that the arbitration complaint must be submitted "within the time necessary to permit effective inspection of the plants under field conditions." *Id.* § 64.006(a). The question the Court must answer today is: When the seed purchaser does not file the arbitration complaint within the time necessary to permit effective inspection of the plants under field conditions (even though he is aware of the problem during that time and conducts his own inspection), and the Board concludes that the complaint does not qualify for arbitration because of the delay, is the purchaser's legal action based on the seller's alleged misrepresentations barred? Simple rules of statutory construction require that this question be answered yes.

First, the Act provides both that the seed purchaser "*must* submit the claim to arbitration as provided by [Chapter 64]" and that "the complaint *must* be filed within the time necessary to permit effective inspection of the plants under field conditions." *Id.* §§ 64.002, 64.006(a) (emphasis added). According to the Code Construction Act, "must" creates or recognizes a condition precedent. TEX. GOV'T CODE § 311.016(3). A condition precedent is "an event that must happen or be performed before a right can accrue to enforce an obligation." *Centex Corp. v. Dalton,* 840 S.W.2d 952, 956 (Tex.1992). Thus, before a seed purchaser may maintain his suit, he must submit his claim to arbitration *and* he must do so within the time necessary to permit effective inspection of the plants under field conditions—it is not enough to "submit" the claim when no inspection is possible. Because the Board "shall conduct arbitration as provided by [Chapter 64]," *id.* § 64.005(b), if the seed purchaser fails to timely submit the claim as directed by Chapter 64, the Board cannot arbitrate and the sole purpose of the Act is thwarted.

Second, the Legislature expressly indicated that the Act was based on a similar Florida statute. The bill analysis recognizes that "[f]or many years the state of Florida has used a method of arbitration with an un-

biased third party investigation and opinion" and the "American Seed Trade Association has recommended to each of its member states that they work to pass measures similar to Florida's." *See* HOUSE COMM. ON AGRIC. AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989). At the time the Texas Seed Arbitration Act was enacted, the Florida statute provided that:

[w]hen any farmer is damaged by the failure of ... seed to produce or perform as represented by the label ..., *as a prerequisite to his right to maintain a legal action* against the dealer from whom such seed was purchased, such farmer shall make a sworn complaint.... The *complaint shall be filed with the department,* and a copy of the complaint shall be served on the dealer by certified mail, *within such time as to permit inspection of the crops, plants, or trees* by the seed investigation and conciliation council or its representatives and by the dealer from whom the seed was purchased.

FLA. STAT. ANN.. § 578.26(1)(a) (1989) (emphasis added).

The Florida and Texas statutes are substantially similar—both provide that the *508 seed purchaser or farmer must file a complaint or submit the claim to arbitration "as a prerequisite to [the purchaser's] right to maintain a legal action" against the dealer or labeler. Both statutes require the complaint to be filed in a timely manner so that it can be appropriately investigated and the crops can be inspected.

"[I]t is a generally accepted rule of statutory construction that when the Legislature adopts a 'foreign' statute it also adopts the construction of that statute by the foreign jurisdiction occurring prior to the Texas enactment." *State v. Moreno,* 807 S.W.2d 327, 332 n. 5 (Tex.Crim.App.1991); *see also City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 360 (Tex.2000); *Tex. Dep't of Pub. Safety v. Gilbreath,*

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
(Cite as: 47 S.W.3d 486)

842 S.W.2d 408, 412 (Tex.App.—Austin 1992, no writ). The Florida Supreme Court construed Florida's seed act in 1983 in *Ferry–Morse Seed Co. v. Hitchcock,* 426 So.2d 958 (Fla.1983). [FN1] Just as in this case, the farmer in *Hitchcock* waited over two years after discovering the problem to bring suit alleging breach of warranty and negligence, and made no attempt to comply with the statutory requirements. The Florida Supreme Court held that the farmer's claims were inextricably bound to the statute's labeling requirements, and that by failing to comply with the statutory requirements, the farmer was barred from bringing suit for damages. *Id.* at 961.

> FN1. Florida's 1977 Act, which was at issue in *Ferry–Morse,* was similar to its 1989 version except that it required the farmer to file a sworn complaint with the department of agriculture within 10 days after the problem became apparent. FLA. STAT. ANN.. § 578.26(1) (1977).

The Texas Legislature enacted Chapter 64 in 1989, well after the Florida Supreme Court issued its decision construing Florida's seed act. Accordingly, we should presume that the Legislature intended to adopt Florida's construction of its statute, so long as the Florida and Texas statutes are substantially similar and our statute does not reflect a contrary intent. *See Sharifi v. Young Bros.,* 835 S.W.2d 221, 223 (Tex.App.—Waco 1992, writ denied). As noted, the acts are substantially similar, and neither the Texas statute itself nor the available legislative history indicates a contrary intent.

The only notable difference between the Texas and Florida statutes is the provision in section 64.004 that:

> [t]he court may ... take into account any findings of the board of arbitration with respect to the failure of any party to cooperate in the arbitration proceed-

ings, including any finding as to the effect of delay in filing the arbitration claim or the arbitration board's ability to determine the facts of the case.

TEX. AGRIC. CODE § 64.004. Both the Court and Wilkins contend that Wilkins's delay in filing his arbitration complaint does not bar his suit because the statute specifically addresses this problem by allowing the trial court to take such delays into account. However, because that interpretation allows Wilkins to completely circumvent Chapter 64's arbitration requirement, it simply cannot be an accurate application of section 64.004.

To the contrary, section 64.004 deals with the situation in which the complaint *is* filed within the time necessary to permit effective inspection under field conditions, but the seed purchaser's delay in filing nevertheless affects the investigation. A purchaser could certainly delay filing an arbitration complaint for many months yet still file while the seeds are under field conditions. For example, if the problem became apparent early in the season but *509 the farmer delayed submitting the claim to arbitration until after the heat of the summer, the delay could affect the Board's investigation. Section 64.004 allows the trial court to consider such a delay; it does not allow the court to completely ignore the statute's timeliness requirements. Moreover, section 64.004, by its terms, applies only to a complaint "that has been the subject of arbitration under [Chapter 64]." Because Wilkins's complaint was not arbitrated—and could not have been under the terms of the statute—section 64.004 does not apply.

Construed in this manner, section 64.004 is consistent with the Act's purpose and with the conclusion that a purchaser's failure to file an arbitration complaint within the time necessary to permit inspection during field conditions is a bar to suit. But the Court would rather rely on this one provision to gut the purpose of the Act. Rather than interpreting this single sentence in a manner entirely inconsistent with the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

Act's purpose of allowing an independent third-party investigation, we should interpret it consistently with the Act as a whole. *See Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc.,* 35 S.W.3d 591, 593 (Tex.2000) (stating that we do not construe statutory language in isolation but in the context of the entire statutory scheme). And, when two constructions are possible, we should choose the one most consistent with the Act's purpose over the construction completely at odds with it.

The Court's construction of the Act renders meaningless section 64.006(a)'s requirement that the arbitration complaint be submitted within the time necessary to permit effective inspection of the plants under field conditions. Relying on the fact that the Act does not expressly state that *the Board* must conduct the field inspection, the Court reasons that "the Act provides that a complaint must be filed in time to 'permit an effective inspection of the plants under field conditions,' thus permitting the parties to inspect under field conditions and provide their reports to the Board." 47 S.W.3d at 507 (citations omitted). But this reasoning makes no sense. The timing requirement must have been intended to allow *someone* to conduct a field inspection. According to the Court, that someone is simply "the parties." But surely the Act's timeliness requirement was not included to allow the farmer to conduct a field inspection, since the farmer has access to his fields and can conduct an inspection at any time. Accordingly, the requirement must have been intended to permit the Board or the seed seller to conduct an inspection. Since the Act's purpose is to allow a third party investigation and the Board employs its own field inspectors, the only conclusion is that the Legislature intended to permit the Board to conduct an inspection. But under the Court's interpretation, there would be no problem even if *no one* conducted a field inspection and the farmer waited until well after the crops had been harvested to file the arbitration complaint so that no field inspection could be performed. Or, the farmer could conduct a field inspection but then wait until after field conditions to

file the arbitration complaint so that the *only* field inspection the Board could consider would be the farmer's.

The Court's construction reads section 64.006(a)'s timeliness requirement right out of the Act. To be consistent with both the Act's language and its purpose, I would hold that Wilkins's failure to submit his claim to arbitration within the requisite time period bars him from maintaining a legal action against Helena.

**II**

Wilkins argues that, regardless of whether the Act bars certain claims that *510 have not been arbitrated, the jury's verdict can be sustained on the basis of the DTPA unconscionability and misrepresentation causes of action, which he contends are not subject to the Act's arbitration requirement. Wilkins obtained favorable jury findings on his claims for breach of warranty, DTPA unconscionability, and DTPA oral misrepresentations. Wilkins argues that, even if the breach of warranty claim is barred by his failure to arbitrate, the Act does not bar his DTPA unconscionability and misrepresentation claims because the statute requires only claims based on the label, warranty, or negligence to be submitted to arbitration, and his DTPA claims are not based on the label, warranty, or negligence.

If Wilkins is correct, plaintiffs could easily circumvent the Act simply by recharacterizing their claims as DTPA claims. This would render the Act wholly ineffective and would undermine the legislative intent. *Cf. Sorokolit v. Rhodes,* 889 S.W.2d 239, 242 (Tex.1994) ("Claims that a physician or health care provider was negligent may not be recast as DTPA actions to avoid the standards set forth in the Medical Liability and Insurance Improvement Act."). The Act's language is broad—it applies whenever a seed purchaser claims to have been damaged "by the failure of the seed to produce or perform as represented by warranty or by the label required to be at-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

tached ... or as a result of negligence." TEX. AGRIC. CODE § 64.002(a). The Business and Commerce Code—the same code in which the DTPA is found—defines warranties to include "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" and "[a]ny description of the goods which is made part of the basis of the bargain." TEX. BUS. & COM.CODE § 2.313(a)(1),(2). Wilkins's claims for DTPA misrepresentation and unconscionability fall within the scope of this definition.

In the jury charge, the DTPA misrepresentation claim defined "false, misleading, or deceptive act or practice" as "representing that Cherokee seed had or would have characteristics that it did not have" or "representing that Cherokee seed was of a particular quality if it was of another." These representations fall within the definition of warranty, and, although couched as a DTPA misrepresentation claim, the underlying nature of the complaint is that the seeds did not produce or perform as represented. *See Sorokolit,* 889 S.W.2d at 242 (holding that the underlying nature of the claim, not its label, determines whether section 12.01(a) of the Medical Liability and Insurance Improvement Act prevents suit for violation of the DTPA). Wilkins's DTPA unconscionability claims are also predicated on Helena's representations concerning the Cherokee seed. The evidence supporting Wilkins's DTPA misrepresentation and unconscionability claims is the same evidence supporting his breach of warranty claims. Because all of Wilkins's claims are so significantly factually intertwined, they should be arbitrated together. *Cf. Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 271 (Tex.1992) (requiring arbitration of factually intertwined contract and misrepresentation claims in contractual arbitration context). Accordingly, Wilkins's DTPA claims are included within the Act's arbitration requirement.

### III

Wilkins argued in the trial court that construing the Act to bar his legal action would violate the Open

Courts provision of the Texas Constitution. *See* TEX. CONST. art. I, § 13. We should, if possible, interpret statutes in a manner that avoids constitutional infirmities. *Owens Corning v. Carter,* 997 S.W.2d 560, 577 (Tex.1999). ***511** The Attorney General has concluded, and I agree, that Chapter 64's arbitration requirements do not on their face violate the Open Courts provision of the Texas Constitution. Op. Tex. Att'y Gen. No. DM–3 (1991). As noted in that decision, Chapter 64 does not purport to abolish the right of seed performance disputants to obtain redress in court. *Id.* The arbitration is non-binding, and seed purchasers are free to pursue their claims in court after the arbitration. Moreover, Chapter 64's arbitration requirements are certainly not unreasonable or arbitrary when balanced against the purpose and basis of the statute. *Id.; see Carter,* 997 S.W.2d at 573; *Sax v. Votteler,* 648 S.W.2d 661, 666 (Tex.1983).

The Attorney General did caution, however, that the Act could raise Open Courts questions as applied to some cases. Op. Tex. Att'y Gen. No. DM–3 (1991). In particular, the Attorney General pointed out that the Open Courts provision could limit the application of section 64.006(a)'s requirement that the arbitration complaint be filed in time to permit inspection of the plants under field conditions. *Id.* I agree that this requirement might arguably violate the Open Courts provision as applied to cases in which the Act's complaint-filing time period has expired before the seed purchaser has a reasonable opportunity to discover the problem. But where, as here, the seed purchaser discovers the problem while the seeds are under field conditions (and conducts his own independent investigation of the crops in the field), is aware of the arbitration requirement, and has ample opportunity to file his complaint in a timely manner but simply fails to do so, the Open Courts provision is satisfied.

\* \* \* \* \*

Wilkins knew of the potential problem with the Cherokee seed within plenty of time to file a com-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675
**(Cite as: 47 S.W.3d 486)**

plaint with the Board during the requisite time period. Although he allowed some experts to investigate his crops under field conditions, he failed to file a complaint with the Board to allow the neutral third-party investigation required by the Act. Because Wilkins failed to submit his complaint within the requisite time period, the Board properly concluded that the complaint did not qualify for arbitration under the Act's plain language. And because arbitration is a prerequisite to Wilkins's right to maintain a legal action for his claims that he has been damaged by the failure of the seed to produce or perform as represented, Wilkins's claims are barred. The Court nevertheless decides that they are not. Because that decision contradicts the Act's plain language and undermines its purpose, I dissent.

Tex.,2001.
Helena Chemical Co. v. Wilkins
47 S.W.3d 486, 44 Tex. Sup. Ct. J. 675

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Appendix 12

*Texas Utilities Electric Co. v. Public Utility Commission,*
881 S.W.2d 387 (Tex. App. – Austin 1994)
*aff'd in part, rev'd in part on other grounds,*
935 S.W.2d 109 (Tex. 1997)

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

▶

Court of Appeals of Texas,
Austin.

TEXAS UTILITIES ELECTRIC COMPANY, Public
Utility Commission, Office of Public Utility Counsel, and
Cities of Arlington, et al., Appellants,
v.
PUBLIC UTILITY COMMISSION, Texas Utilities Electric Company, Office of Public Utility Counsel, and Cities
of Arlington, et al., Appellees.

No. 3–92–548–CV.
June 15, 1994.
Rehearings Overruled Aug. 31 and Oct. 12, 1994.

Final order by Public Utility Commission in electric
rate case conducted under Public Utility Regulatory Act
(PURA) was reversed and remanded in part when reviewed by the 250th Judicial District Court, Travis County,
John K. Dietz, J. Appeals were taken. The Court of Appeals, Bea Ann Smith, J., held that: (1) commissioner's
financial interest in gas industry was not prejudicial; (2)
Commission lacked authority to review costs associated
with reacquiring minority interests in nuclear power plant;
(3) using hypothetical tax method was error; (4) Commission had authority to allow utility to implement bonded
rates; (5) disallowing some revalidation expenses for nuclear power plant as imprudent was not error; and (6) setting rate of return on common equity at 13.2% was within
Commission's discretion.

Reversed and remanded with instructions.

West Headnotes

[1] Administrative Law and Procedure 15A ⬅314

15A Administrative Law and Procedure
15AIV Powers and Proceedings of Administrative
Agencies, Officers and Agents
15AIV(A) In General
15Ak314 k. Bias, prejudice or other disqualification to exercise powers. Most Cited Cases

Adjudicators involved in administrative proceedings
are presumed to be honest and act with integrity but presumption may be overcome by demonstrating that decision
maker's mind was irrevocably closed on matters at issue.

[2] Electricity 145 ⬅11.3(6)

145 Electricity
145k11.3 Regulation of Charges
145k11.3(6) k. Proceedings before commissions.
Most Cited Cases

Public Utility Commission chairperson's pecuniary
interest in natural gas industry did not invalidate Commission's decision in electric rate case which decided
whether costs of nuclear power plant construction should
be included in utilities' rate base costs; chairperson's pecuniary interest was not shown to have deprived parties of
impartial and fair hearing. V.T.C.A., Government Code §
2001.174; Vernon's Ann.Texas Civ.St. art. 1446c, § 1 et
seq.

[3] Administrative Law and Procedure 15A ⬅314

15A Administrative Law and Procedure
15AIV Powers and Proceedings of Administrative
Agencies, Officers and Agents
15AIV(A) In General
15Ak314 k. Bias, prejudice or other disqualification to exercise powers. Most Cited Cases

Administrative officer is not disqualified simply be-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

cause officer has previously taken position, even in public, on policy issue related to particular dispute absent showing of incapability to decide particular controversy fairly. V.T.C.A., Government Code § 2001.174.

**[4] Administrative Law and Procedure 15A ⬦305**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(A) In General
           15Ak303 Powers in General
             15Ak305 k. Statutory basis and limitation. Most Cited Cases

**Administrative Law and Procedure 15A ⬦325**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(A) In General
           15Ak325 k. Implied powers. Most Cited Cases

Administrative agencies have only those powers that are expressly conferred by statute, together with those necessarily implied from authority conferred or duties imposed.

**[5] Administrative Law and Procedure 15A ⬦447.1**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(D) Hearings and Adjudications
           15Ak447 Jurisdiction
             15Ak447.1 k. In general. Most Cited Cases

Jurisdiction cannot be conferred upon administrative agencies by parties before it, but rather must emanate from statute itself.

**[6] Administrative Law and Procedure 15A ⬦431**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(C) Rules, Regulations, and Other Policy-making
           15Ak428 Administrative Construction of Statutes
             15Ak431 k. Deference to agency in general. Most Cited Cases
    (Formerly 361k219(1))

Reviewing court has power and duty to consider agency's interpretation and application of statute.

**[7] Electricity 145 ⬦11.3(7)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(7) k. Judicial review and enforcement. Most Cited Cases

Section of Public Utility Regulatory Act (PURA) authorizing Public Utility Commission to review changes in public utility ownership did not apply to electric utility's repurchase of minority joint ownership interests in nuclear power plant given that ownership of plant did not change hands as result of repurchase; utility's decision to purchase minority interest was limited to review under prudent investment standard. Vernon's Ann.Texas Civ.St. art. 1446c, § 63.

**[8] Electricity 145 ⬦11.3(4)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating expenses. Most Cited Cases

Public Utility Commission erred in electric rate case

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

by calculating utility's federal income tax liability using hypothetical rather than actual-tax method; utility's rates must reflect tax liability actually incurred. Vernon's Ann.Texas Civ.St. art. 1446c, § 1 et seq.

**[9] Electricity 145 ⚷11.3(4)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating expenses. Most Cited Cases

Electric rates must be set based on utility's actual tax liability and, thus, utility's tax expense will be adjusted to reflect tax savings which would result from filing consolidated tax return, regardless of whether utility did in fact file consolidated return. Vernon's Ann.Texas Civ.St. art. 1446c, § 41(c)(2).

**[10] Electricity 145 ⚷11.3(4)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating expenses. Most Cited Cases

The Public Utility Commission's refusal to allocate to electric utility tax savings resulting from affiliate's losses violated actual-tax doctrine, requiring that rates be based on utility's actual tax liability, even if utility did not bear risks associated with tax savings attributed to affiliates. Vernon's Ann.Texas Civ.St. art. 1446c, § 41(c)(2).

**[11] Public Utilities 317A ⚷128**

317A Public Utilities
    317AII Regulation
        317Ak119 Regulation of Charges
            317Ak128 k. Operating expenses. Most Cited Cases

If utility enjoys tax deduction based on interest expense, benefits of deduction must be passed on to ratepayers, rather than to shareholders. Vernon's Ann.Texas Civ.St. art. 1446c, § 41(c)(2).

**[12] Electricity 145 ⚷11.3(4)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating expenses. Most Cited Cases

Allocation of tax benefits to electric utility from interest expense and deduction between present and future ratepayers is matter within Public Utility Commission's discretion. Vernon's Ann.Texas Civ.St. art. 1446c, § 41(c)(2).

**[13] Electricity 145 ⚷11.3(4)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating expenses. Most Cited Cases

Electric utility's income tax expense must be reduced by amount of tax deductions, even if associated with disallowed capital expenses. Vernon's Ann.Texas Civ.St. art. 1446c, § 1 et seq.

**[14] Public Utilities 317A ⚷119.1**

317A Public Utilities
    317AII Regulation
        317Ak119 Regulation of Charges
            317Ak119.1 k. In general. Most Cited Cases

Utility may implement bonded rates in municipal areas when underlying rate increase is subject to appellate jurisdiction of Public Utility Commission. Vernon's Ann.Texas Civ.St. art. 1446c, § 43(e).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

[15] Administrative Law and Procedure 15A
⬤⟶438(26)

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative
Agencies, Officers and Agents
        15AIV(C) Rules, Regulations, and Other Policy-
making
            15Ak428 Administrative Construction of Stat-
utes
                15Ak438 Particular Statutes and Contexts
                    15Ak438(26) k. Carriers and public utili-
ties. Most Cited Cases
    (Formerly 361k219(9.1))

Public Utilities 317A ⬤⟶194

317A Public Utilities
    317AIII Public Service Commissions or Boards
        317AIII(C) Judicial Review or Intervention
            317Ak188 Appeal from Orders of Commission
                317Ak194 k. Review and determination in
general. Most Cited Cases
    (Formerly 361k219(9.1))

Public Utility Commission's interpretation of Public Utility Regulatory Act (PURA) is entitled to great weight, provided that interpretation is reasonable and does not contradict plain language of statute. Vernon's Ann.Texas Civ.St. art. 1446c, § 1 et seq.

[16] Administrative Law and Procedure 15A ⬤⟶791

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
            15Ak784 Fact Questions
                15Ak791 k. Substantial evidence. Most Cited
Cases

In conducting substantial evidence review, court must determine whether evidence as whole is such that reasonable minds could have reached conclusion agency must have reached in order to take disputed action.

[17] Administrative Law and Procedure 15A ⬤⟶793

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
            15Ak784 Fact Questions
                15Ak793 k. Weight of evidence. Most Cited
Cases

Reviewing court may not substitute its judgment for that of agency and must consider only record on which agency based its decision while conducting substantial evidence review.

[18] Administrative Law and Procedure 15A ⬤⟶750

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak750 k. Burden of showing error. Most
Cited Cases

Party bringing appeal bears burden of showing that decision by administrative agency lacks substantial evidence.

[19] Administrative Law and Procedure 15A ⬤⟶791

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(E) Particular Questions, Review of
            15Ak784 Fact Questions
                15Ak791 k. Substantial evidence. Most Cited
Cases

Agency's order must be upheld despite substantial

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

evidence challenge, if evidence would support either affirmative or negative findings.

**[20] Electricity 145 🔑11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings before commissions.
Most Cited Cases

Substantial evidence supported decision by Public Utility Commission that electric utility's imprudence caused some but not all of increased costs incurred by revalidation and reinspection program during construction of nuclear power plant; costs to respond to concerns by federal Nuclear Regulatory Commission were necessitated in part because of utility imprudence and in part because of higher safety and inspection standards. Vernon's Ann.Texas Civ.St. art. 1446c, §§ 39, 41.

**[21] Public Utilities 317A 🔑124**

317A Public Utilities
    317AII Regulation
        317Ak119 Regulation of Charges
            317Ak124 k. Value of property; rate base. Most Cited Cases

**Public Utilities 317A 🔑168**

317A Public Utilities
    317AIII Public Service Commissions or Boards
        317AIII(B) Proceedings Before Commissions
            317Ak168 k. Findings. Most Cited Cases

Determination that expenditure is imprudent carries legal consequence of its exclusion from rate base and must be supported by underlying findings. V.T.C.A., Government Code § 2001.141(d).

**[22] Electricity 145 🔑11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings before commissions.
Most Cited Cases

Underlying findings supported finding of fact by Public Utility Commission that some but not all costs of complying with increased inspection standards and procedures during construction of nuclear power plant were caused by imprudence, warranting exclusion from rate base. V.T.C.A., Government Code § 2001.141(d).

**[23] Public Utilities 317A 🔑194**

317A Public Utilities
    317AIII Public Service Commissions or Boards
        317AIII(C) Judicial Review or Intervention
            317Ak188 Appeal from Orders of Commission
                317Ak194 k. Review and determination in general. Most Cited Cases

Reviewing court is bound by determinations of Public Utility Commission as to weight and credibility of evidence as long as there is substantial evidence in record supporting Commission's decision.

**[24] Electricity 145 🔑11.3(6)**

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(6) k. Proceedings before commissions.
Most Cited Cases

**Public Utilities 317A 🔑164**

317A Public Utilities
    317AIII Public Service Commissions or Boards
        317AIII(B) Proceedings Before Commissions
            317Ak164 k. Pleading. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

Utility's conditional request to include construction work in progress costs (CWIP) in rate base if proposed rate increase were materially disallowed provided adequate notice of utility's intent to seek inclusion of CWIP in rate base in rate-making proceeding. Vernon's Ann.Texas Civ.St. art. 1446c, §§ 39(a), 41(a).

[25] Electricity 145 €═══11.3(4)

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating expenses. Most Cited Cases

Public Utility Commission may either make contract by contract determination of reasonableness of contracts for purchase of alternate energy sources or group contracts together and declare them all to be reasonable when reconciling fuel costs as part of rate case. Vernon's Ann.Texas Civ.St. art. 1446c, § 41(c)(1).

[26] Electricity 145 €═══11.3(4)

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating expenses. Most Cited Cases

Disallowing excessive price for natural gas as alternative fuel by electric utility, during rate case, was supported by utility's accounting records indicating that purchase was made pursuant to spot contract with unreasonably high price, despite utility's later contention that purchase was made part of separate short-term commercial contract for which purchase price would be reasonable. Vernon's Ann.Texas Civ.St. art. 1446c, § 41(c)(1).

[27] Electricity 145 €═══11.3(4)

145 Electricity
    145k11.3 Regulation of Charges

        145k11.3(4) k. Operating expenses. Most Cited Cases

Natural gas purchase contract which set upper limit on electric utility's right to purchase gas at contract price did not obligate utility to purchase gas under contract and, thus, supported determination by Public Utility Commission in rate case that utility violated its obligation to purchase fuel at lowest reasonable cost to ratepayers. Vernon's Ann.Texas Civ.St. art. 1446c, § 41(c)(1).

[28] Electricity 145 €═══11.3(4)

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating expenses. Most Cited Cases

Limiting electric utility's fuel inventory level based on utility's actual experience over several years was not arbitrary and capricious, despite utility's request in rate case for increased fuel inventory level. V.T.C.A., Government Code § 2001.174(2)(E, F).

[29] Administrative Law and Procedure 15A €═══753

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
            15Ak753 k. Theory and grounds of administrative decision. Most Cited Cases

Mental processes of individual administrators are immaterial to judicial review of agency order; order is reviewed in light of record on which it purports to rest.

[30] Electricity 145 €═══11.3(5)

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(5) k. Reasonableness of charges. Most

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

Cited Cases

Public Utility Commission has discretion in electric rate case to decide whether imprudence by utility's management warrants reduction in overall rate of return on common equity. Vernon's Ann.Texas Civ.St. art. 1446c, § 39(a).

[31] Electricity 145 ⬤⤳11.3(5)

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(5) k. Reasonableness of charges. Most Cited Cases

Setting electric utility's return on common equity at 13.2% in rate case was not abuse of discretion. Vernon's Ann.Texas Civ.St. art. 1446c, § 39(b).

*389 Roy Q. Minton, Minton Burton Foster & Collins, Austin, for Texas Utilities Elec. Co.

Dan Morales, Atty. Gen., Susan Bergen, Asst. Atty. Gen., Austin, for Public Utility Com'n.

Stephen Fogel, Austin, for Office of Public Utility Counsel.

*390 Geoffrey M. Gay, Buter Porter Gay & Day, Austin, for Cities of Arlington, et al.

David C. Duggins, Clark Thomas & Winters, Austin, for Texas Utilities Elec. Co.

Dan Morales, Atty. Gen., Steven Baron, Asst. Atty. Gen., Austin, for Public Utility Com'n.

Yolanda L. Woods, Asst. Public Counsel, Austin, for Office of Public Utility Counsel.

Steven A. Porter, Butler Porter Gay & Day, Austin, for

Cities of Arlington, et al.

David C. Duggins, Clark Thomas & Winters, Austin, for Texas Utilities Elec. Co.

Before CARROLL, C.J., and ABOUSSIE and B.A. SMITH, JJ.

BEA ANN SMITH, Justice.
    Texas Utilities Electric Company, the Public Utility Commission, the Office of Public Utility Counsel, and the Cities of Arlington, et al. appeal from a district-court judgment rendered in a suit for judicial review of the Commission's final order in an electric utility rate case conducted under the Public Utility Regulatory Act (PURA), Tex.Rev.Civ.Stat.Ann. art. 1446c (West Supp.1994).[FN1] The district-court judgment reverses and remands certain aspects of the Commission's final order, and affirms the remainder. We will reverse the district-court judgment and remand the cause to the district court with instructions that the cause be remanded to the Commission for further proceedings consistent with our opinion. *See* Administrative Procedure Act (APA), Tex. Gov't Code Ann. § 2001.174 (West 1994).[FN2]

> FN1. Cities of Arlington, et al. includes the municipalities of Addison, Allen, Azle, Belton, Breckenridge, Bridgeport, Burkburnett, Burleson, Carrollton, Celina, Centerville, Cleburne, Colleyville, Copperas Cove, Corinth, Crowley, Dalworthington Gardens, De Leon, Denison, Euless, Farmers Branch, Forest Hill, Fort Worth, Glen Heights, Grand Prairie, Granger, Hewitt, Howe, Hurst, Irving, Keller, Lindale, Luella, McKinney, Milford, Murchison, New Chapel Hill, Ovilla, Pantego, Plano, Ranger, Richardson, Roanoke, Rockwall, Rosser, Rowlett, Sherman, Sunnyvale, The Colony, Tyler, University Park, Venus, Waco, White Settlement, and Wichita Falls. In addition to bringing individual appeals, each of the appellants is also an appellee with respect to certain parts of the district-court

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

judgment.

FN2. All citations in this opinion are to the current Administrative Procedure Act rather than the former Administrative Procedure and Texas Register Act because the recent recodification did not substantively change the law. Act of May 4, 1993, 73d Leg., R.S., ch. 268, § 47, 1993 Tex.Gen.Laws 583, 986.

## THE CONTROVERSY

Texas Utilities filed its application for a rate increase in January 1990 seeking to include in its rate base costs associated with Comanche Peak, a newly constructed nuclear power plant. The utility sought an agency adjudication regarding what portion of its costs it could include in its rate base as being a "prudent" investment, public interest findings on its reacquisition of a 12.2 percent ownership interest in the plant, final reconciliation of its fuel costs and revenues for the period April 1983 to June 1989, and a reduction of its fuel factor for the period May 1990 to April 1991. After the Commission issued its order, motions for rehearing were filed and the Commission issued a second order on rehearing. Subsequent motions for rehearing were overruled by operation of law, and five parties to the rate-making proceeding filed suit for judicial review in district court. *See* PURA § 69; APA § 2001.171. The district court affirmed the Commission order in part and reversed it in part, after which Texas Utilities, Public Utility Counsel, the Cities, and the Commission each appealed the district-court judgment.[FN3] For clarity, we will provide additional facts germane to the various points of error throughout the opinion.

FN3. With one exception, the Cities and Public Utility Counsel jointly raised their points of error.

## CONFLICT OF INTEREST

In their first point of error, the Cities and Public Utility Counsel argue that the chairman of the Commission, Paul Meek, was biased because he had a pecuniary interest in the outcome of the proceedings, and because he was prejudiced in favor of the gas industry. The allegations of impermissible bias center around Meek's ties with American *391 Petrofina ("Fina"). During the rate-making proceedings, Meek served as chairman of Fina's board, received retirement benefits from Fina, and held shares of its publicly traded common stock. Fina's direct sales of natural gas to Texas Utilities from 1989 to 1991 totalled $60,782; indirect revenue from sales to other Texas Utilities suppliers approximated $104 million. Because of his connections with Fina, the Cities and Public Utility Counsel claim that Meek's participation in the hearings precluded the Commission from making impartial findings. The district court found the evidence insufficient to show that Meek's service on the Commission led to unfair proceedings or prejudiced substantial rights of the parties. We agree.

PURA provides that no commissioner may, during a period of service with the Commission, "have any pecuniary interest ... in any person or corporation or other business entity a significant portion of whose business consists of furnishing goods or services to public utilities or affiliated interests...." PURA § 6(b)(1). It is grounds for removal from the Commission if a member has interests in violation of section 6(b) at the time of his or her appointment. PURA § 6A. However, "the validity of an action of the commission is not affected by the fact that it was taken when a ground for removal of a member of the commission existed." PURA § 6A(b). Meek resigned from the Commission effective April 20, 1992, after the Attorney General requested that he either sever all ties with Fina or resign from the Commission. Although Meek was not *removed* from the Commission because of a conflict of interest pursuant to PURA section 6A, he did resign in the face of a perceived conflict. Meek's conflict, however, has no effect on the Commission's order in Docket 9300. PURA § 6A(b). This Court is left, therefore, with the power to reverse and remand the Commission's order only if Meek's participation resulted in an order that prejudices substantial rights of the appellants. *See* APA § 2001.174.[FN4] We understand appellants to contend that this Court should reverse the Commission's order because Meek's interests in Fina resulted in an order that is arbitrary and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

capricious and a violation of their constitutional right to a fair and impartial hearing.

> FN4. APA section 2001.174 directs this Court to reverse and remand a cause for further proceedings only if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of a constitutional or statutory provision, (2) in excess of the agency's statutory authority, (3) made through unlawful procedure, (4) affected by error of law, (5) not reasonably supported by substantial evidence, or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

[1][2] In order to prevail, appellants must overcome the presumption that agency members are persons of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances. *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). Following the United States Supreme Court, we recognize a presumption of honesty and integrity in those serving as adjudicators. *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). One may overcome this presumption by demonstrating that the decisionmaker's mind is "irrevocably closed" on the matters at issue. *Federal Trade Comm'n v. Cement Inst.,* 333 U.S. 683, 701, 68 S.Ct. 793, 803–04, 92 L.Ed. 1010 (1948). During confirmation hearings conducted in May 1990, the Texas Senate fully explored the issue of Meek's conflict. At that time, aware of Meek's connections with Fina, the Senate satisfied itself that Meek could execute his duties as commissioner impartially and without prejudice in favor of the gas industry. Additionally, Meek promised to recuse himself from voting on any contested issue regarding contracts between public utilities and Fina, a promise he upheld by not reviewing contracts between Texas Utilities and Fina.[FN5]

> FN5. Meek recused himself from voting on three issues: (1) finding of fact 172 relating to the reasonableness of Texas Utilities' fuel oil inventory,

(2) finding of fact 379 relating to the reasonableness of Texas Utilities' fuel expenditures during the reconciliation period insofar as such expenditures relate to gas contracts between the utility and Fina, and (3) finding of fact 389 relating to the reasonableness of Texas Utilities' fuel oil expenditures during the reconciliation period.

*392 [3] It is well established that absent a showing of incapability to decide a particular controversy fairly, an administrative officer is not disqualified simply because he or she has previously taken a position, even in public, on a policy issue related to a particular dispute. *Morgan,* 313 U.S. at 421, 61 S.Ct. at 1004. In *Morgan,* the Supreme Court held that the Secretary of Agriculture's strong views on a particular issue did not make him unfit to exercise his duties in administrative proceedings relating to those matters. *Id.* Similarly, in *Cement Institute* the Court held that members of the Federal Trade Commission were not disqualified from participating in adjudicatory proceedings simply because they had previously expressed their opinions that a pricing system at issue in the proceeding was illegal. *Cement Institute,* 333 U.S. at 700–01, 68 S.Ct. at 803–04.

In this appeal, the Cities and Public Utility Counsel question Meek's impartiality because of a newspaper interview in which he expressed his disappointment with the Commission's decision to disallow $1.3 billion of Comanche Peak costs. The Supreme Court has decided, however, that public criticism "is a practice familiar in the long history of ... litigation," and that while an administrator may have an underlying philosophy in approaching a specific case, he or she may still be assumed to be a person of conscience and intellectual discipline, capable of judging a particular controversy fairly. *Morgan,* 313 U.S. at 421, 61 S.Ct. at 1004.

The Cities and Public Utility Counsel argue that this order should be invalidated, relying on *American Cyanamid Co. v. Federal Trade Commission,* 363 F.2d 757 (6th Cir.1966). In *American Cyanamid,* the court invalidated a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

commission order because one of the commissioners had previously served as counsel for a Senate subcommittee investigating many of the same facts and issues that later came before the commission. The court found that the commissioner's dual investigative and adjudicative experiences with the issues involved in the hearing created a risk that commission decisions might be based on evidence outside the record. It was the presentation of nonrecord evidence, not the commissioner's personal viewpoints, that led the court to invalidate the order. *American Cyanamid,* 363 F.2d at 767. In this case, however, appellants base their request for invalidation of the order on assertions that Meek's personal views about the gas industry made it impossible for him to decide the issues fairly. Under the circumstances of this proceeding, we cannot agree.

We do not express any opinion regarding whether Meek should have been removed from the Commission had he not resigned. This Court is limited to the judicial review enumerated in APA section 2001.174. We conclude that Meek's involvement with Fina and his opinions about the gas industry have not been shown by the complaining parties to have resulted in a deprivation of the right to an impartial and fair hearing before the Commission, nor has it been shown that he exhibited bias such that his votes were necessarily arbitrary and capricious. The Cities and Public Utility Counsel's first point of error is overruled.

## REACQUISITION OF MINORITY INTERESTS

All appellants bring points of error related to the district court's disposition of the Commission order disallowing more than $908 million spent to repurchase 12.2 percent of Comanche Peak from minority interest owners and to settle litigation arising from the joint ownership of the project. Section 63 of PURA permits the Commission to disallow certain expenses associated with transactions involving changes in public utility ownership. The Commission's authority to make disallowances under section 63 is limited to three specific types of transactions: (1) the acquisition, sale or lease of any plant as an operating unit in the state of Texas for a total consideration in excess of $100,000; (2) a public utility's merger or consolidation with another public utility operating in the state; and (3) the

sale of fifty percent or more of a public utility's stock.[FN6] When any one of these transactions takes place, the utility *393 must file a report with the Commission, which then investigates the transaction to determine whether it is in the public interest. In making this determination, the Commission is to consider the reasonable value of the property, facilities or securities involved. If the Commission finds that the transaction was not in the public interest, it must "disallow the effect of such transaction if it will unreasonably affect rates or service." PURA § 63.

> FN6. Section 63 expressly provides that it shall not be construed as applying to the purchase of units of property for replacement or to additions to the public utility's facilities by construction.

In reviewing the costs associated with the construction of Comanche Peak, the Commission exercised its authority under section 63 to make a disallowance of $908,688,938. The Commission asserted that it had jurisdiction to make disallowances pursuant to section 63 because Texas Utilities' repurchase of certain minority interests in the Comanche Peak project constituted the purchase of a plant or unit as an operating system for consideration in excess of $100,000. Texas Utilities' second motion for rehearing filed with the Commission included an assignment of error stating:

> The Commission erred in concluding that PURA § 63 controls this Commission's review of [Texas Utilities'] reacquisition of minority owner interests in Comanche Peak, for the reason that, as a matter of law, PURA § 63 does not apply to the transfer between joint owners of partial, undivided interests in a plant and does not apply to a plant under construction that is not operating.

When this second motion for rehearing was overruled by operation of law, Texas Utilities sought review in the district court, and continued to maintain that the Commission had improperly applied section 63 to the repurchase of minority interests in the project. As part of its appeal to this Court, Texas Utilities contends in its second point of error

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

that the Commission's section 63 review was an error of law.

[4][5] The Cities, Public Utility Counsel, and the Commission each argue that Texas Utilities has waived its right to challenge the Commission's decision to proceed under section 63 because it was the utility that initially identified section 63 as one of the provisions giving the Commission jurisdiction over the rate-making proceeding.[FN7] Administrative agencies, however, have only those powers that are expressly conferred by statute, together with those necessarily implied from the authority conferred or the duties imposed. *State v. Jackson,* 376 S.W.2d 341, 344 (Tex.1964) (citing *Stauffer v. City of San Antonio,* 162 Tex. 13, 344 S.W.2d 158, 160 (1961)); *Sexton v. Mount Olivet Cemetery Ass'n,* 720 S.W.2d 129, 142 (Tex.App.—Austin 1986, writ ref'd n.r.e.). Jurisdiction cannot be conferred upon the agency by the parties before it, but rather must emanate from the statute itself. *See Nueces County Water Control & Improvement Dist. v. Texas Water Rights Comm'n,* 481 S.W.2d 924, 929 (Tex.Civ.App.—Austin 1972, writ ref'd n.r.e.) ("If the statutes do not grant the board the power to do a thing, then it has no such power."). If the utility's reacquisition of minority interests in Comanche Peak is not one of the specific transactions identified in section 63 of PURA, the Commission has no jurisdiction to make disallowances based on *394 the standards set forth in that section; such jurisdiction cannot be conferred on the Commission simply because the parties have requested or agreed to it.

FN7. The Examiners' Report notes:

In the petition and statement of intent initiating this docket, [Texas Utilities] requested that "the public interest and other findings be made favorably" with respect to its repurchases of the minority owner interests. [Texas Utilities'] pleading also cited § 63 as one of the statutory provisions granting the Commission jurisdiction over [Texas Utilities'] application. [Texas Utilities] now contends that § 63 does not apply to its reacquisition of the minority owners' in-

terests in Comanche Peak. It instead argues that the Commission should determine the prudent cost of 100 percent of Comanche Peak, rather than just 87.8 percent of the plant, in determining the extent to which the costs of the 12.2 percent repurchased plant are included in rate base.

The Report goes on to state:

The relevant precedent [for applying § 63] ... is found in the three dockets in which the Commission approved the CCN amendments reflecting the Company's reacquisition of the minority owners' interests: Docket Nos. 8015, 8236, and 8736.

In each of those dockets' final orders, the Commission envisioned a future § 63 review of [Texas Utilities'] buyback of a minority owner's interest.... [Texas Utilities] did not file a motion for rehearing in any of the final orders in the CCN dockets related to the repurchases of the minority owners' interests, even though each of the final orders envisioned a future § 63 review.

[6] This Court has the power, as well as the duty, to review the agency's interpretation and application of a statute. *See Railroad Comm'n v. Lone Star Gas Co.,* 599 S.W.2d 659, 662 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.) (stating that an agency's duty is to carry forward the directives of statutes, and the courts review agency orders to ensure that statutes are enforced). In reviewing the Commission's order, we are therefore obliged to determine whether the repurchase of minority ownership interests is a transaction contemplated by section 63 of PURA. If it is not, the Commission had no authority to conduct a section 63 review, and we may not uphold that portion of the order. Accordingly, we first examine the repurchase at issue in this case to determine if it falls within the scope of transactions the Commission is directed to review under PURA section 63.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

[7] In August 1973, Texas Utilities' corporate predecessors, Dallas Power & Light Company, Texas Power & Light Company, and Texas Electric Service Company, signed a memorandum of agreement to design, construct, and operate the Comanche Peak nuclear power plant.[FN8] Texas Utilities originally intended to own the entire plant, but was required to sell ownership interests in the project in order to receive construction permits from the Nuclear Regulatory Commission (NRC). In 1974, Texas Utilities agreed to allow participation in the ownership of Comanche Peak, thereby eliminating antitrust concerns associated with the issuance of the construction permits. By 1979, Texas Municipal Power Agency and Brazos Electrical Power Cooperative had acquired ownership shares of 6.2 percent and 3.8 percent respectively. [FN9] In 1982, Tex–La Electric Cooperative of Texas became another co-owner of the Comanche Peak project. Because Tex–La had raised antitrust issues with the Department of Justice and had filed a petition to intervene in the Comanche Peak antitrust review related to its application for an operating license, Texas Utilities agreed to sell Tex–La a 4.3 percent interest in the project. Before the closing, however, Tex–La reduced its purchase to 2.2 percent of the project. The joint operating agreement was amended to reflect this sale.[FN10] The Commission granted certificates of public convenience and necessity for all three sales of ownership interests in the project. [FN11]

> FN8. Texas Utilities Electric Company ("Texas Utilities") is the principal subsidiary of Texas Utilities Company (the "Holding Company"), an investor-owned holding company. Texas Utilities was created in 1984 after the merger of Dallas Power & Light Company, Texas Electric Service Company, and Texas Power & Light Company—all Holding Company subsidiaries.

> FN9. Joint ownership agreements executed with Texas Municipal Power Agency and Brazos Electrical Power Cooperative described the ownership of Comanche Peak as follows:

3.01 Ownership: The Parties shall have title to the Project and Fuel as *tenants in common* and shall, as co-tenants with an *undivided interest* therein, subject to the terms of this Agreement, own the Project and Fuel and have the related rights and obligations.... (emphasis added).

The agreement also contains a provision whereby the parties to the agreement waive the right to partition their interest in the project.

> FN10. In exchange for the ownership interest, each minority interest owner agreed to advance sufficient funds to pay its ownership interest share of the project's construction and operation costs. Additionally, each minority interest owner agreed to pay its percentage share plus interest of the accumulated costs of fuel and construction paid by Texas Utilities before the applicable date of closing. The minority interest owners essentially agreed to assume financial responsibility for a percentage of the cost of building the plant in exchange for a corresponding percentage undivided interest in the completed plant. Once the plant was operating, the minority interest owner was entitled to capacity equal to its percentage share of Comanche Peak's net effective generation.

> FN11. For example, in Docket No. 3589, the Commission reviewed the transfer of a four and one-third percent ownership interest in Comanche Peak from Texas Utilities' corporate predecessors to Tex–La Electric Cooperative. Though PURA section 63 was cited as one of the statutory provisions giving the Commission jurisdiction to review the sale, the Examiners' Report states, "Because only a portion of [a] joint interest is being conveyed, it may not be necessary to comply with § 63 of the Act because it speaks to the transfer of ' ... any plant as an operating unit or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

system....' "

*395 The joint ownership agreement began to deteriorate over time. In May 1985, Brazos Electrical Power Cooperative ceased making its contractual payments to Texas Utilities. In early 1985, Tex–La Electric Cooperative made several late payments, and thereafter stopped making payments altogether. Texas Municipal Power Agency continued to make payments, but it made them under protest. Thereafter, the minority interest owners claimed that Texas Utilities had failed to meet its responsibilities under the joint ownership agreement, resulting in rising costs, schedule delays, and licensing problems. The three minority interest owners contended that they were therefore relieved of any obligation to pay their percentage costs of the construction and operation of the project.

Texas Utilities sued for breach of contract, seeking monetary damages and a declaratory judgment affirming the minority interest owners' continuing obligation to pay their share of the plant's remaining costs. The minority interest owners filed counterclaims alleging mismanagement of the project, breach of contract, and deceptive trade practices. Faced with mounting litigation costs, Texas

As part of Docket 9300, the Commission did in fact conduct the section 63 review. The Commission determined that the repurchase was in the public interest "to the extent that [Texas Utilities] paid a reasonable value for the repurchased capacity." The Commission found that the utility had reacquired the minority interests by paying $4,765 per kilowatt—the cost of building Comanche Peak. By contrast, the Commission decided that a "reasonable value" would be $1,865 per kilowatt, the cost of building a stand-alone "generic coal plant" with 12.2 percent of Comanche Peak's capacity. As a result, the Commission determined that Texas Utilities had paid $2,900 more per

Utilities settled with the minority interest owners by repurchasing their undivided interests in the project.[FN12] The settlement agreements ended all litigation between Texas Utilities and the minority interest owners. The repurchases were approved by the Commission which, as previously noted, indicated its intention to review the repurchase of these minority interests under PURA section 63 in the future rate-making proceedings.

FN12. The repurchase prices were based on the cost of building the percentage of the plant owned by each seller. Therefore, it appears that Texas Utilities reacquired the interests by reimbursing each minority interest owner the money each had contributed to the construction and operation of the plant. Additionally, Texas Utilities agreed to repurchase nuclear fuel and transmission facilities, and to reimburse the minority interest owners' litigation expenses. These payments together constitute the settlement costs paid by Texas Utilities to the minority interest owners. The Commission reviewed these settlement costs under PURA section 63 and made the following disallowances:

| | |
|---|---|
| Repurchase of 12.2% Ownership Interest | $811,342,938 |
| Reimbursement of Litigation Expenses | $ 72,684,000 |
| Repurchase of Nuclear Fuel | $ 24,662,000 |
| Total | $908,688,938 |

kilowatt than was "reasonable." [FN13] Accordingly, the Commission disallowed the excess purchase price amounting to almost $812 million. The Commission also disallowed the utility's reimbursement of the minority interest owners' litigation costs, amounting to $72.684 million, and $24.662 million of the total consideration paid for the nuclear fuel.

FN13. It does not appear, however, that purchasing a stand-alone coal plant was an option available to the utility in its attempts to resolve the litigation quagmire that threatened the entire project. The utility was required to obtain a li-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

cense for the Comanche Peak power plant; it could not choose to license 87.8 percent of the capacity and turn to alternative power sources for more capacity. The 12.2 percent was part of the whole project, and until the dispute with the minority interest owners was resolved, the entire plant would remain inoperative.

The district court concluded that although review under section 63 of PURA was appropriate, the Commission made disallowances that were arbitrary and capricious and not supported by substantial evidence. In two jointly raised points of error, the Cities and Public Utility Counsel assert that the district court erred in remanding some of the Commission's findings of fact and that the Commission properly carried out its section 63 review. They do not challenge the propriety of the section 63 review. The Commission *396 also brings two separate points of error relating to its section 63 review, contending that it properly applied section 63 and that its findings of fact were supported by substantial evidence. We do not address these points of error because our conclusion that the repurchase of the undivided minority interests in the plant are not transactions reviewable under section 63 renders moot any further controversy about what would constitute a proper disallowance under that provision.[FN14]

> FN14. The Cities and Public Utility Counsel argue that the standard applied by the Commission in its section 63 review is identical to the standard employed in the typical "prudence review" of a rate-making proceeding, and for that reason the Commission's findings should be affirmed even if this Court determines that section 63 is inapplicable to this transaction. Assuming, without deciding, that the standards are the same, we would still reverse the Commission's disallowances because they are arbitrary and capricious. In Docket 9300, the Commission adopted the following prudence standard:
>
> The exercise of that judgment and the choosing of one of that select range of options which a reasonable utility manager would exercise or choose in the same or similar circumstances given the information or alternatives available at the point in time such judgment is exercised or option is chosen.

If the Commission indeed applied a prudence standard when evaluating the repurchase, the resulting findings of fact are arbitrary and capricious because they reflect consideration of a factor legally irrelevant to a review of expenditures under the prudent investment standard. *See Public Util. Comm'n v. South Plains Elec. Coop., Inc.,* 635 S.W.2d 954, 957 (Tex.App.—Austin 1982, writ ref'd n.r.e.) (citing *Starr County v. Starr Indus. Servs., Inc.,* 584 S.W.2d 352 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.), for the proposition that an agency's consideration of a non-statutory factor amounts to arbitrary and capricious action requiring reversal); John E. Powers, *Agency Adjudications* 165 (1990). The Commission disallowed the purchase price to the extent that it exceeded the cost of building a stand-alone coal plant with capacity equivalent to 12.2 percent of Comanche Peak's. Building a stand-alone coal plant was not, however, one of the options available to the utility at the time it made the repurchase. The purpose of repurchasing the minority interests was not to obtain capacity, but to eliminate expensive and time-consuming litigation that jeopardized licensing of the entire project; building or buying a coal plant would not achieve that objective.

As previously noted, section 63 applies to three types of transactions: (1) the purchase, sale or lease of a plant or unit as an operating system for consideration in excess of $100,000; (2) sales of more than fifty percent of the stock of a public utility; and (3) a merger or consolidation of two public utilities. Texas Utilities' repurchase of the undivided ownership interests sold to Texas Municipal Power Agency, Brazos Electrical Power Cooperative, and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

Tex–La Electric Cooperative falls into none of these categories. Rather than repurchasing a "plant or unit," Texas Utilities acquired the undivided ownership interests of three tenants-in-common. Under the joint ownership agreement, the co-tenants had waived any right to partition the interests, thereby foreclosing the possibility of identifying any part of the plant as belonging specifically to any co-tenant. The fallacy in the Commission's analysis is its assumption that the minority interests translate into a complete and independently operable portion of Comanche Peak, ownership of which changed hands when the repurchase took place.

The Cities and Public Utility Counsel argue that excluding the repurchase of the undivided interests from the scope of a section 63 review renders the provision meaningless. They contend that it is illogical to conclude that "a statute concerned with transactions of at least $100,000 would not apply to a transaction 1,000 times greater than that amount." This argument fails because the element that triggers section 63 review is not the amount of money involved in the transaction, although the legislature has set a $100,000 minimum presumably to exclude transactions so small that there is no real risk they will unreasonably affect rates or service. Rather, section 63 is concerned with certain *types* of transactions that result in changes of ownership of the utility or its operating units to ensure that the costs of transactions inconsistent with the public interest are not assessed against the ratepayers. We conclude that the Commission erred in reviewing the costs associated with the minority interests under PURA section 63.

In its final judgment, the district court reversed and remanded for reconsideration on the existing record the following specific *397 findings of fact related to the minority interest repurchases:

149. For the reasons discussed in Section VII.C.2. of this Report, [Texas Utilities] failed to prove that the consideration it paid for the repurchased 12.2 percent interest in the plant was reasonable.

150. For the reasons discussed in Section VII.C. of this Report, [Texas Utilities'] repurchases of the minority owners' interests in Comanche Peak are consistent with the public interest to the extent that [Texas Utilities] paid a reasonable value for the repurchased capacity.

151. For the reasons discussed in Section VII.C. of this Report, all amounts in excess of the reasonable value of the repurchased interests should be disallowed from invested capital as unreasonably affecting rates.

152. For the reasons discussed in Section VII.B.2.d. and Section VII.D. of this Report, a reasonable value of the repurchased interests in Comanche Peak is $1,856 per kW.

153. For the reasons discussed in Section VII.D. of this Report, the reasonable value of $1,856 per kW should apply to valuating the repurchased interests in Unit 1 and Unit 2.

153A. Consistent with an estimated fuel cost for Comanche Peak of $11 billion, the test-year-end cost of $5.938 billion should be used to value the repurchased 12.2 percent interest in Unit 1 and an estimated cost of $5.0 billion should be used to value the repurchased 12.2 percent interest in Unit 2.

153B. The plant disallowances related to the repurchased 12.2 percent interest in Unit 1 is $462,764,691; the plant disallowance related to the repurchased 12.2 percent interest in Unit 2 is $348,578,247. Taken together, the total plant disallowance related to the repurchased 12.2 percent interest in the entire plant is $811,342,938.

154. For the reasons discussed in Section VII.E. of this Report, the $72.684 million in minority owners' litigation expenses reimbursed by [Texas Utilities] as part of the settlement agreements should be disallowed.

* * * * * *

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

156. As modified by Findings of Fact 153A and 153B, Section VII.F. of this Report indicates the disallowances for Unit 1 and Unit 2, as calculated in Section VI. (Prudence) and Section VII. (Reacquisition of Minority Owner Interests). The total Unit 1 disallowance is $847,004,966; the total Unit 2 disallowance is $534,139,597. Taken together, the total disallowance is $1,381,144,563.

The purpose of remanding these findings was to allow the Commission to reconsider the "reasonable value" it assigned the repurchased interests, presumably to make an upward adjustment in its $1,856 per kilowatt valuation to reflect the "intangible" benefits of repurchasing the minority interests. The district court instructed the Commission to consider not only the "economic value" of the property and facilities acquired, but also benefits gained from terminating expensive and time-consuming litigation that jeopardized the entire project. We affirm the district court's rejection of these findings of fact based on our conclusion that the Commission erroneously reviewed the repurchases under PURA section 63 and failed to evaluate the repurchase price in light of the relevant statutory considerations. We reverse that portion of the district court's judgment affirming the Commission's disallowance of $24,662,000 of the cost to Texas Utilities of repurchasing nuclear fuel from the minority interest owners. This payment was part of the overall settlement cost and should be reviewed under the prudent investment standard along with all other costs related to the repurchase. The Commission has already approved the utility's decision to settle the dispute with the minority interest owners;[FN15] on remand, we *398 direct the Commission to consider, under the prudent investment standard, the price paid for the repurchase, including the litigation costs and repurchase of nuclear fuel at its original cost.[FN16]

FN15. Finding of fact 148 states:

For the reasons discussed in Section VII.C.1. of this Report, settling the minority owner litiga-

tion was reasonable from [Texas Utilities'] perspective.

The Report noted that "it is clear that the minority owner litigation potentially threatened the Company's licensing efforts, which in turn threatened further schedule delays and cost overruns on the project. At the time of the settlements with the minority owners, the project was incurring approximately $60 to $70 million a month in case requirements and carrying costs. Consequently, a settlement of the minority owner litigation was reasonable in order to avoid the possibility of any further project delay and unnecessary expenditures of these amounts."

FN16. We realize the Commission has already conducted an overall prudence review of the costs associated with the original construction of Comanche Peak resulting in a disallowance of approximately $537 million. Rather than hold that this figure is the appropriate disallowance, we note that the question on remand is not whether the original construction costs of the 12.2% at issue here were prudently incurred, but rather whether it was prudent for the utility to repurchase that portion of the plant at its original cost.

**FEDERAL INCOME TAX EXPENSE**

In points of error seven through ten, the Cities and Public Utility Counsel complain that the district court erred in affirming the Commission's calculation of the utility's federal income tax expense. They contend that the Commission's calculation (1) improperly employed the hypothetical rather than the actual-tax method, (2) failed to account for tax savings resulting from the utility's consolidated tax return, (3) did not reflect deductions for actual interest expense, and (4) failed to reflect deductions taken for below-the-line expenses, including disallowed Comanche Peak plant costs.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

[8] We sustain the seventh point of error complaining of the Commission's use of the hypothetical tax method. The mandate from the supreme court is clear: "The utility's rates must reflect the tax liability actually incurred." *Public Util. Comm'n v. Houston Lighting & Power Co.*, 748 S.W.2d 439, 442 (Tex.1987). This Court has repeatedly affirmed that statement by consistently requiring the Commission to employ the actual-taxes-paid doctrine. *See City of Alvin v. Public Util. Comm'n*, 876 S.W.2d 346, 359–60 (Tex.App.—Austin 1994, no writ h.); *Cities of Abilene v. Public Util. Comm'n*, 854 S.W.2d 932, 944 (Tex.App.—Austin 1993, writ requested); *Public Util. Comm'n v. GTE–SW*, 833 S.W.2d 153, 159 (Tex.App.—Austin 1992, writ granted). Furthermore, under the actual-taxes-paid test, "*any utility tax savings must benefit ratepayers.*" *Cities of Abilene*, 854 S.W.2d at 945 (emphasis added). In this case, as well, we reject the Commission's refusal to adhere to binding precedent.

[9] The Cities and Public Utility Counsel's eighth point of error asserts that the Commission erred when it failed to adjust its calculation of the utility's tax expense to reflect savings that resulted from the utility's filing a consolidated tax return. The Commission rejoins that its decision not to allocate any of the savings to the utility was consistent with PURA section 41(c)(2) and cases construing that statutory provision. Section 41(c)(2) states:

> If the public utility is a member of an affiliated group that is eligible to file a consolidated income tax return, and if it is advantageous to the public utility to do so, income taxes shall be computed as though a consolidated return had been so filed and the utility had realized its fair share of the savings resulting from the consolidated return, unless it is shown to the satisfaction of the regulatory authority that it was reasonable to choose not to consolidate returns.

Texas Utilities argues that this statute only applies when the utility has *not* filed a consolidated return. We disagree. The statute provides that, regardless of whether the utility actually filed a consolidated return, the Commission must calculate the utility's income tax expense as though it had received any tax benefits a consolidated return would provide. Once the Commission determines that a consolidated filing would have been, or was, advantageous to the utility, the Commission must adjust the utility's tax expense to reflect those savings. If the Commission does not reduce the utility's tax expense to reflect the utility's tax savings, it violates the actual-tax doctrine's underlying principle *399 that rates must be set based on the utility's actual tax liability. *GTE–SW*, 833 S.W.2d at 166.

[10] The Commission argues that it was not required to allocate any of the tax savings from the consolidated filing to the utility because it specifically found that the consolidated filing was not advantageous to the utility. *See* Finding of Fact 331A. In *Cities of Abilene* we held that no adjustment to income tax expense is necessary under PURA section 41(c)(2) if the Commission finds either (1) that it was not advantageous to the utility to consolidate returns, or (2) that the Commission has computed taxes as though a consolidated return were filed and the utility has received its fair share of the savings from the consolidated return. *Cities of Abilene*, 854 S.W.2d at 944. In this case, the Commission relied on its own conclusion that the utility's fair share of the savings was zero to support its finding that the consolidated return was not advantageous to the utility. We will uphold the Commission's decision only if it properly found that the utility's fair share of the tax savings was zero.

Finding of fact 331D states:

> The federal income tax savings resulting from the filing of a consolidated federal income tax return should accrue to the entity that provided the tax attributes that allowed for such savings, and [Texas Utilities] was not the entity that provided such tax attributes.

This Court has previously decided that even when it is the utility's affiliates that have suffered losses and provided "the tax attributes that allowed for savings," those savings must be passed on to the ratepayers. *GTE–SW*, 833 S.W.2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

at 167. In finding of fact 331F, the Commission asserts that it would be unfair to allocate to the utility tax savings resulting from the affiliates' losses because the utility will never be responsible for paying the affiliates' taxes when "timing differences reverse and those affiliates have taxable income." Again, this Court has rejected that argument. *GTE–SW,* 833 S.W.2d at 167 n. 16 (inequity resulting from ratepayers' benefitting from tax savings not offset by obligation to pay higher rates in the event of affiliates' gains is a matter for the legislature to remedy by amending PURA section 41(c)(2)). Similarly, finding of fact 331H, that Texas Utilities should not benefit from tax savings attributed to affiliates because it bears none of the risks associated with those entities, conflicts with existing caselaw. The Commission's finding that the consolidated tax return was not advantageous cannot rest upon its own improper refusal to allocate any savings to the utility. Having rejected several of the findings supporting the Commission's conclusion that the utility's fair share of the tax savings is zero, we are unable to uphold that conclusion. There is no indication that each finding is independently sufficient to support the conclusion. We therefore sustain the Cities and Public Utility Counsel's eighth point of error.

[11][12] The ninth point of error objects to the Commission's failure to adjust the tax expense calculation to reflect actual-interest-expense deductions. The Commission is required to allocate tax savings to ratepayers rather than to shareholders. The actual-tax doctrine requires that the ratepayers be held accountable only for "those tax expenses that are *actually* incurred by a utility." *Houston Lighting & Power,* 748 S.W.2d at 442. If the utility enjoys a tax deduction based on interest expense, the benefits of that deduction must be passed on to the ratepayers. In *City of Alvin,* however, we rejected the argument that the Commission must pass on *immediately* the entire savings related to a utility's tax deductions. *City of Alvin,* No. 3–92–459–CV, slip op. at 18 ("Section 27(e) of PURA directs the Commission to distribute [tax savings benefits] to *all* ratepayers, however, both present and future. We will not interpret *Houston Lighting* as mandating that present ratepayers receive all the benefits of accelerated deprecia-

tion."). We sustain the point of error to the extent that we continue to require the Commission to pass through to ratepayers any tax benefits from interest expense deductions. However, the Commission must allocate those savings between present and future ratepayers, and the proper allocation is within the Commission's discretion.

*400 [13] The Cities and Public Utility Counsel's tenth point of error contends that the Commission erroneously excluded tax benefits resulting from below-the-line expenses, including tax deductions related to expenses disallowed as imprudently incurred. This Court has already decided that PURA requires that the Commission reduce the utility's income tax expense by the amount of tax deductions, even if they are associated with disallowed capital expenses. *City of Alvin,* No. 3–92–459–CV, slip op. at 17 (citing *GTE–SW,* 833 S.W.2d at 169). We remain unpersuaded by the Commission's argument that the actual-tax doctrine conflicts with the normalization rules. *See City of Alvin,* No. 3–92–459–CV, slip op. at 18. We sustain the tenth point of error.

**BONDED RATES**

In their twenty-first point of error, the Cities challenge the Commission's authority to allow Texas Utilities to implement bonded rates in both the municipal and non-municipal sections of its service area.[FN17] Disposition of this point of error requires an interpretation of PURA section 43(e). This appeal presents the first opportunity for this Court to consider the bonded-rate provision of the statute since its amendment in 1983.

FN17. Public Utility Counsel does not join the Cities in bringing this point of error.

When an electric utility wishes to change its rates it must follow the procedures outlined in PURA section 43.[FN18] The utility initiates rate proceedings by filing a statement of intent to change rates with the regulatory authority having original jurisdiction. PURA § 43(a). [FN19] In all proceedings involving major rate changes,[FN20] the regulatory authority having original jurisdiction must hold

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

a hearing on the proposed rate schedule. PURA § 43(c). Pending the hearing, the regulatory authority may suspend implementation of the new rate schedule. If the original proceeding involves a proposed increase in the rates charged in municipal areas, the municipality holds the hearing and has ninety days in which to come to a final decision. If the municipality has made no final disposition of the rate proceeding at the expiration of ninety days, the proposed rate schedule is deemed to have been approved and the municipality loses jurisdiction over the proceeding. PURA § 43(d). If an order is issued, any party to the proceeding may seek *de novo* appellate review in the Commission. PURA § 26(a), (g).

> FN18. This discussion focuses on the more typical situation in which a utility requests a rate increase rather than a decrease.

> FN19. Original jurisdiction over rate proceedings is divided between the governing body of each municipality ("the municipality") and the Commission. Each municipality exercises exclusive original jurisdiction over electric rates and services within its corporate limits ("municipal areas"), whereas the Commission exercises exclusive original jurisdiction over rates and services in all other areas ("non-municipal areas"). PURA § 17(a), (e). In addition, the Commission has exclusive appellate jurisdiction to review each municipality's order in any rate proceeding. PURA § 17(d).

> FN20. The statute defines a "major change" as an increase in rates that will augment the aggregate revenues of the utility making the rate application by more than $100,000 or two and one-half percent, whichever is greater. PURA § 43(b).

Because most utilities provide services in both municipal and non-municipal areas, there is usually a parallel proceeding originating in the Commission to consider the same proposed rate increase as it affects non-municipal areas. The Commission, however, has a 150–day period of original jurisdiction over its portion of the rate proceeding. In addition, the Commission is allowed two days for each day of hearings in excess of fifteen days. The practical result of allowing the Commission a longer period of original jurisdiction is that it can wait for the municipality to issue a final appealable order and then consolidate *de novo* appellate review with its own consideration of the same proposed rate increase in non-municipal areas. Therefore, the Commission typically exercises its original and appellate jurisdiction concurrently.

In these consolidated rate proceedings, the Commission has 150 days plus two days for each day of hearings in excess of fifteen days in which to make a final determination. When the Commission is faced with a particularly complex rate proceeding, protracted *401 hearings can mean a utility's proposed rate schedule may not take effect for a long period of time.[FN21] The term "regulatory lag" is used to describe the economic consequences of this delay. [FN22] In order to protect utilities from the financial harm engendered by prolonged regulatory lag, PURA section 43(e) provides that in cases in which the Commission has failed to render a final order within 150 days of the proposed effective date of the rate increase, the utility

> FN21. In this case, for example, there were 203 days of hearings. This means the utility might not be allowed to increase its rates for as many as 526 days.

> FN22. "Regulatory lag arises from the loss in revenue experienced by a utility whose rates are in need of upward adjustment during the period between filing an application for a rate increase and the date when relief is granted." *Railroad Comm'n v. Lone Star Gas Co.,* 656 S.W.2d 421, 423 (Tex.1983).

may put a changed rate, not to exceed the proposed rate, into effect upon the filing with the regulatory authority of a bond.... The utility concerned shall refund or credit

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

against future bills all sums collected ... in excess of the rate finally ordered plus interest at the current rate as finally determined by the regulatory authority.[FN23]

> FN23. PURA section 3(g) provides that the term "regulatory authority" means either the governing body of any municipality or the Commission, depending upon the context in which the word is used.

PURA § 43(e). This practice is known as "bonding in" rates and is used to relieve the potential financial hardship imposed on a utility while it awaits a final Commission order on its requested rate increase.

[14] In Docket 9300, Texas Utilities requested the same rate increase throughout its entire service area, encompassing both municipal and non-municipal areas. As permitted by the 1983 amendments to PURA, the Commission reviewed the proposed rate increase in municipal areas under its appellate jurisdiction at the same time it considered the increase in non-municipal areas under its original jurisdiction. When 150 days had passed without the Commission's having reached a final determination, the utility decided to implement bonded rates throughout its entire service area, and pursuant to PURA 43(e) requested that the Commission approve its bond. The Cities objected to Texas Utilities' request for bonded rates in municipal areas, maintaining that PURA prohibits bonded rates in municipal areas once the municipality has lost its original jurisdiction over the rate proceeding.[FN24] The Commission rejected this argument and determined that PURA's bonding provision does not prohibit a utility from implementing bonded rates in municipal areas when the underlying rate increase is subject to the Commission's appellate jurisdiction. We conclude that the Commission's interpretation of PURA section 43(e) is correct.

> FN24. When considered in conjunction with other provisions of PURA, the Cities' interpretation of section 43(e) leads to the result that a utility will *never* be able to implement bonded rates in mu-

nicipal areas. Section 43(e) specifically states that a utility may not put bonded rates into effect until 150 days have passed. Because the municipality loses its jurisdiction after only ninety days, a utility's right to bonded rates will always arise *after* the municipality has lost its original jurisdiction over the rate proceeding.

Section 43(e) contains no language that limits the bonding provisions to rates being considered under the Commission's *original* jurisdiction:

> If the 150–day period has been extended, ... and the commission fails to make its final determination of rates within 150 days from the date that the proposed change would have gone into effect, the utility concerned may put a changed rate, not to exceed the proposed rate, into effect upon the filing with the regulatory authority of a bond....

PURA § 43(e). In support of its contention that the utility may implement bonded rates only for those rates subject to the Commission's original jurisdiction, the Cities rely on two pre–1983 cases holding that the *former* version of section 43(e) did not permit bonded rates in areas under the Commission's appellate jurisdiction. *See Lone Star Gas,* 656 S.W.2d at 425; *402Arkansas Louisiana Gas Co. (Arkla) v. Railroad Comm'n,* 586 S.W.2d 643 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.). We conclude that the reasoning of those cases is so closely tied to the wording of PURA before the 1983 amendments that they do not support the Cities' interpretation of amended section 43(e).[FN25]

> FN25. Moreover, the supreme court expressly limited the effect of its decision in *Lone Star Gas* to cases arising before September 1, 1983, the effective date of significant amendments to PURA. *Lone Star Gas,* 656 S.W.2d at 427.

In *Lone Star Gas* the supreme court recognized the hardship created by PURA's failure to provide for bonded

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

rates during an extended period of appellate review, but commented that "any changes in the protection afforded the utility should be made by the legislature." 656 S.W.2d at 425. Perhaps responding to the court's invitation to act, in 1983 the legislature significantly amended PURA and apparently cured this particular hardship. *See GTE–SW,* 833 S.W.2d at 173 (noting that an almost identical bonded rate provision in the new Gas Utility Regulatory Act cured the problems caused by the utility's inability to implement bonded rates in municipal areas pending review *de novo* by the Commission).

Without the ability to bond in rates, a utility's only avenue for relief from regulatory lag in city rates, traditionally the lion's share of its service area, would be to request interim rates. *See* PURA § 26(g) (allowing the Commission to authorize interim rates if "necessary to effect uniform system-wide rates"). This would necessitate a bifurcated process of considering the request for interim city rates while contemporaneously implementing bonded rates outside city limits. Such an inefficient and unwieldy process undermines the amended statutory scheme designed to consolidate consideration of system-wide rates in one proceeding. Furthermore, interim rates that require a hearing do not provide relief from regulatory lag equivalent to the bonding provision which permits implementation of new rates without Commission approval, subject only to a bond adequate to ensure possible refunds. We see no suggestion in the amended version of section 43(e) that utilities should be limited to seeking interim rates to cure regulatory lag in areas servicing cities.[FN26]

> FN26. It is more sensible to view interim rates and bonded rates as separate and independent methods by which a utility may obtain rate relief in its *entire* service area, rather than alternative procedures for setting rates inside and outside city limits. A utility might first request interim rates in order to avoid posting a large bond. If the Commission did not approve the interim rates, the utility could then post a bond, which it would risk losing entirely or in part if final rates set by the Commission were lower than the bonded rates.

[15] The Commission's interpretation of section 43(e) is entitled to great weight, provided it is reasonable and does not contradict the plain language of the statute. *Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993). The Commission's construction of the bonding provision is consistent with the statutory scheme embodied in the 1983 amendments designed to facilitate contemporaneous disposition of system-wide rates in a single proceeding. It also affords the utility protection from regulatory lag through bonded rates, whether inside or outside city limits. Nothing in the statute itself or the relevant case law supports the Cities' restricted reading of section 43(e). We overrule the Cities' twenty-first point of error.

## RATE BASE ALLOWANCES

In points of error two through four, the Cities and Public Utility Counsel complain that the district court improperly upheld various aspects of the Commission's order on rehearing relating to the prudence phase of the rate-making proceeding. Specifically, they contend that the Commission's disallowance of Comanche Peak costs is contrary to substantial evidence and inconsistent with the Commission's factual determinations regarding the insufficiency of Texas Utilities' proof and with Texas law regarding the burden of proof. The Cities and Public Utility Counsel assert that reasonable minds could not reach the decision arrived at by the Commission regarding the reasonable cost of Comanche Peak, and that the Commission failed to disallow imprudent project costs as required by statute. *See* PURA §§ 39, 41.

In August 1972, Texas Utilities announced its plan to build Comanche Peak, its first *403 nuclear power plant. In 1977, the utility estimated that Comanche Peak Unit 1 would be commercially operable in 1981, and Unit 2 would achieve commercial operation in 1983. The total estimated cost of the project was $1.7 billion, including an allowance for funds used during construction (AFUDC). However, Unit 1 did not become commercially operable until August 1990. At the rate-making proceeding, the examiners attributed this substantial delay to Texas Utilities' inability to obtain an operating license from the NRC.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

*See* Examiners' Report at 5.[FN27]

> FN27. In March 1984, the NRC formed a Technical Review Team to identify and resolve all regulatory issues raised by Texas Utilities' attempt to obtain an operating license. The utility, in turn, created the Comanche Peak Response Team to assess and resolve any issues raised by the Technical Review Team. In January 1985, the Technical Review Team issued a letter suggesting that Comanche Peak was deficient in the areas of quality assurance and quality control. In response, the utility formed the Design Adequacy Program and the Corrective Action Program to address the NRC's concerns and ensure that Comanche Peak received an operating license. The NRC issued a license for Comanche Peak Unit 1 in February 1990.

Docket 9300 addressed the prudence of costs incurred by the utility in responding to the NRC's concerns; the utility engaged in an unprecedented revalidation and reinspection program which caused Comanche Peak costs to nearly double. The Commission, which heard three explanations for these costs, was charged with determining which costs were prudent. Texas Utilities contended that the NRC unforeseeably and unreasonably applied stricter licensing standards to Comanche Peak, forcing the utility to implement an expensive and time-consuming revalidation and reinspection program in order to obtain an operating license. The utility took the position that all of these were regulatory costs that should be included in rate base. At the other end of the spectrum, the Cities and Public Utility Counsel argued that imprudent project management caused the NRC to lose confidence in Comanche Peak's safety, and that all post–1984 costs incurred in responding to these concerns should be disallowed as imprudent. The Commission's general counsel, supported by an evaluation conducted by the Nielsen–Wurster Group, an independent auditor, concluded that Texas Utilities' inability to obtain an operating license resulted from the NRC's significant, but unfounded, quality concerns. The general counsel maintained that certain costs should, however, be disal-

lowed based on Nielsen–Wurster's findings that the utility acted imprudently in discrete instances during the life of the project. The Commission reviewed the evidence presented by the parties and general counsel and determined that $537.90 million of Comanche Peak costs were imprudently incurred and should be disallowed.

To support the assertion that the Commission erred in the prudence phase of Docket 9300, the Cities and Public Utility Counsel make three basic points: (1) Texas Utilities did not sustain its burden of proof on the prudence of its Comanche Peak expenditures, (2) Texas Utilities did not properly quantify its imprudent Comanche Peak costs, and (3) the Nielsen–Wurster report does not constitute substantial evidence to support the Commission's determination of which Comanche Peak costs were imprudently incurred. Taken together, these points assert that the evidence presented during 203 days of hearings cannot support the Commission's final order with respect to disallowances. *See* APA § 2001.174(2)(E); *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 452–53 (Tex.1984).

[16][17][18][19] In conducting a substantial evidence review, we must determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action. *Charter Medical,* 665 S.W.2d at 453. We may not substitute our judgment for that of the agency and may consider only the record on which the agency based its decision. *Texas State Bd. of Dental Examiners v. Sizemore,* 759 S.W.2d 114, 116 (Tex.1988), *cert. denied,* 490 U.S. 1080, 109 S.Ct. 2100, 104 L.Ed.2d 662 (1989). The party bringing the appeal bears the burden of showing a lack of substantial evidence. *Charter Medical,* 665 S.W.2d at 453. If substantial evidence would support either affirmative or negative findings, we must uphold the agency's order, resolving any conflict in *404 favor of the agency's decision. *Auto Convoy Co. v. Railroad Comm'n,* 507 S.W.2d 718, 722 (Tex.1974).

[20] The Cities and Public Utility Counsel essentially argue that because the Commission was not persuaded by

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

the utility's argument that all Comanche Peak costs were prudent, and because the utility then failed to quantify the impact of its imprudence by identifying costs related to imprudent management, the Commission was required to disallow *all* of these expenditures.[FN28] We do not agree. The Commission determined the evidence presented by the parties did not provide an accurate foundation on which to base its disallowance decisions. It therefore turned to the report prepared by the Nielsen–Wurster Group. Nielsen–Wurster had previously performed twelve comprehensive prudence reviews of other nuclear plants, eight for commissions and four on behalf of utilities, before it was retained by the Commission to evaluate the planning and management of Comanche Peak. After an extensive investigation, Nielsen–Wurster offered its findings in ten days of testimony presented by five expert witnesses.

> FN28. The Commission rejected several of Texas Utilities' attempts to justify costs associated with Comanche Peak. For example, the Commission found: (1) the plant cost comparisons tendered by the parties were not credible for purposes of establishing a reasonable cost, (2) the cost variance analysis tendered by the utility had limited, if any, value in a prudence review of Comanche Peak, (3) the schedule variance analysis tendered by the utility did not credibly evaluate the post-March 1985 schedule extensions, and (4) the present value revenue requirements analysis and capital cost correction analysis tendered by Texas Utilities were improper methodologies for quantifying the impact of a seven-month delay. However, the Commission's final order shows that it did accept much of Texas Utilities' and the Nielsen–Wurster Group's evidence supporting the prudence of a variety of decisions related to the overall construction and management of Comanche Peak.

The Cities and Public Utility Counsel argue that the evidence presented by Nielsen–Wurster cannot serve as a proper foundation for Commission decision-making because it does not provide a sufficiently detailed breakdown of all Texas Utilities' expenditures identifying those related to utility imprudence and those that would have been necessary absent any imprudence. They assert that in order to provide evidence sufficient to support the Commission's order, either the utility or Nielsen–Wurster was required to "produce a breakdown of the Company's post-March 1985 expenditures, disaggregated between those that were 're-medial' and those that would have been incurred even absent the prolonged licensing delay." The argument urged on appeal is that once the Commission has determined the utility's evidence is insufficient to demonstrate that all expenditures were prudently incurred, the utility must then "isolate out the costs associated with its imprudent conduct" in order to avoid having the Commission disallow *all* the costs incurred.[FN29] In support of their argument, the Cities and Public Utility Counsel direct this Court to *Coalition of Cities v. Public Utility Commission,* 798 S.W.2d 560, 563–64 (Tex.1990), *cert. denied,* 499 U.S. 983, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991), in which the supreme court stated that "[a] party who fails to meet its burden of proof loses." In *Coalition of Cities,* the utility "lost" because neither the utility nor any other party satisfied the Commission that $1.453 billion in expenditures were prudently incurred. Nowhere does the supreme court state that a utility must segregate imprudent costs. When a utility fails to persuade the Commission of the wisdom of all its expenditures, that does not preclude the Commission from considering the other evidence presented in the rate-making proceeding. Indeed, it is the Commission that is charged with sifting through the evidence and deciding whether imprudent conduct caused certain expenditures. Having reviewed the utility's evidence and the Nielsen–Wurster report, *405 the Commission determined that $90.5 million of the Comanche Peak Response Team expenses and $79.9 million of the Corrective Action Program expenses were imprudent. The Commission made further disallowances for other imprudent conduct associated with the delay in licensing; it disallowed $54.1 million in time-driven indirect costs and $167.3 million in AFUDC.

> FN29. This Court has previously rejected similar arguments. In *City of El Paso v. Public Utility Commission* we held:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

Requiring the Commission to adopt or reject witnesses' testimony in toto, especially when the testimony concerns a multi-faceted issue such as [prudence], would hobble the Commission's ability to assess each witness and render its decision based solely on the testimony it found credible.

*City of El Paso v. Public Util. Comm'n,* 839 S.W.2d 895, 906–07 (Tex.App.—Austin 1992, writ granted).

The Commission rejected Texas Utilities' claim that the costs associated with the reinspection and revalidation program were entirely due to higher regulatory standards; it similarly rejected the Cities and Public Utility Counsel's contentions that all such costs should be disallowed as imprudent. The Commission accepted the Nielsen–Wurster study as evidence that some, but not all, of the expenditures were imprudently incurred. The Commission found that the NRC's Technical Review Team findings on the plant's condition were partly unfounded, although they did identify weaknesses in the pre–1985 quality assurance program. The Commission also concluded that the growth of regulatory requirements increased the cost and extended the construction schedule beyond Texas Utilities' control. These findings are supported by testimony adduced during the rate-making proceeding and provide substantial evidence upon which the Commission could base its decision to examine all the costs in detail and make discrete disallowances associated with imprudent conduct.

The Cities and Public Utility Counsel vigorously assert that the Commission erred in not making any disallowance for the costs of executing the Corrective Action Program. However, the Commission determined that although the imprudence of the utility was partially responsible for the need to carry out the Corrective Action Program, the changed regulatory climate would have made such a program necessary even in the absence of utility imprudence. The Commission's findings are presumed to be supported by substantial evidence, and the Cities and Public Utility Counsel have failed to demonstrate that

reasonable minds could not have come to that decision based on this record. *Charter Medical,* 665 S.W.2d at 453.

The Cities and Public Utility Counsel also complain that the Commission improperly applied a "sliding" standard of prudence, assigning degrees of imprudence to utility decisions and making disallowances only when the imprudence reached a certain level or degree. After reviewing the record we believe this criticism is unfounded.[FN30] The Commission determined that the costs associated with responding to NRC concerns were necessary *in part* because of utility imprudence and *in part* because of the NRC's application of higher safety and inspection standards in the face of mounting concerns about the safety of nuclear power plants in general. The Commission's finding of fact 138 expresses this conclusion.[FN31] The Examiners' Report notes that Texas Utilities' conduct was not the sole reason for the expenditures necessary to regain the NRC's confidence. The Commission then made partial disallowances for the costs of the remedial action program, not the wholesale disallowances recommended by the intervenors. After a careful and thorough review of all the evidence presented in 203 days of hearings, the Commission made findings of fact and conclusions of law based on that review. For each finding of imprudence in the construction and management of Comanche Peak, the Commission *406 made a disallowance for the associated costs.[FN32] The Commission also made significant disallowances for the cost of the delay in licensing, reflecting its opinion that the utility's imprudence was partially responsible for that delay.

FN30. The Cities and Public Utility Counsel base their argument on the following statement contained in the Examiners' Report: "Although the examiners conclude that certain [Texas Utilities] management decisions were imprudent and undoubtedly contributed to the Company's licensing problems, they do not find that those practices rise to the level of imprudence which would justify a substantial disallowance of Comanche Peak costs." That the Report expresses only the view that not all costs should be disallowed because

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

they were not all occasioned by utility imprudence is clarified by the examiners' careful explanation of their position:

True, certain unreasonable conduct unquestionably contributed to the NRC staff's shift in position with respect to its expectation of proof, as reflected in the Third Technical Team letter, but other circumstances also contributed to this change in position. In other words, the imprudent conduct of [Texas Utilities] did not result

in the necessity to incur *all* of the post–1984 costs.

FN31. Finding of fact 138 states: "As discussed in Section VI.Q.2. of this Report, the evidence does not support imprudence disallowances of the magnitude proposed by the intervenors."

FN32. The Commission made the following disallowances:

| Item | Amount (Millions of Dollars) |
| --- | --- |
| Electrical Labor | 51.3 |
| Electrical Penetration Assemblies | 16.2 |
| Electrical Switchgear | 4.1 |
| Heating, Ventilation & Air Conditioning | 60.1 |
| Reactor Pressure Vessel Supports | .4 |
| Diesel Generators | 10.6 |
| DAP Root Cause Analysis | 3.2 |
| CPRT Start–Up Costs | 90.5 |
| CAP Start–Up Costs | 79.9 |
| Construction Permit Lapse | .2 |
| TOTAL | $316.5 |

The Cities and Public Utility Counsel next contend that the Commission's order is improper because it is not supported by underlying findings of fact. We understand their complaint to be that the findings of fact do not meet the requirements of the APA. *See* APA § 2001.141(d) ( "Findings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings.") The supreme court has concluded that an agency's findings of fact need the additional support of findings of underlying facts only when the findings are stated in terms taken directly from the enabling legislation or when they "represent the criteria that the legislature has directed the agency to consider in performing its function." *Charter Medical,* 665 S.W.2d at

451. The Cities and Public Utility Counsel contend that findings of fact 138 through 152 are "ultimate" findings by which the Commission fulfills its statutory obligation to exclude from rate base all imprudently incurred post–1985 remedial costs, and as such they require underlying findings of fact. [FN33]

FN33. We limit our discussion to findings of fact 138, 139, and 140. The Cities and Public Utility Counsel waive any separate attack on findings of fact 141 and 142 in their brief, stating that they consist primarily of calculations that "fall out" of the three previous findings. We understand this to mean that if the three preceding findings are sufficient, there is no independent reason that find-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

ings of fact 141 and 142 are improper. Findings of fact 143 through 152 are addressed separately in this opinion.

[21] We first consider whether the findings of fact at issue are indeed "ultimate findings." In *City of El Paso,* this Court stated that although PURA does not expressly require the Commission to make a finding of prudence before including costs in rate base, once the Commission finds a major project to have been imprudently planned or managed, it should generally disallow project costs to the extent of the imprudence. *City of El Paso,* 839 S.W.2d at 908.[FN34] A determination that an expenditure is imprudent carries the legal consequence of its exclusion from rate base. Such a finding must be supported by underlying findings because it embodies one of the criteria the Commission must consider in deciding whether to include the particular expenditure in rate base.

FN34. This Court held:

> The "statutory language" to which [APA § 2001.141(d) ] refers is the language in the statute that confers authority on the agency to take the complained-of action. In PURA, the legislature authorized the Commission to make orders setting rates. A number of PURA's sections also detail the criteria the Commission is to consider in setting rates. Therefore, only when the Commission's findings are stated in PURA's express terms, or *when they represent criteria the legislature has directed the Commission to consider,* must the Commission also make findings of underlying fact.

> *City of El Paso,* 839 S.W.2d at 908 (citations omitted) (emphasis added).

[22] The following findings of fact are here at issue:

138. As discussed in Section VI.Q.2. of this Report, the evidence does not support imprudence disallowances of

the magnitude proposed by the intervenors.

**\*407** 139. As discussed in Section VI.Q.2. of this Report, the costs of executing the Comanche Peak Response Team and Corrective Action Program were prudent.

140. As calculated in Section VI.Q.2. of this Report, the total imprudent costs incurred by [Texas Utilities] through the end of the test year is $537.9 million, which allocates $382.05 million to Unit 1 and $155.85 million to Unit 2.

To meet the criteria set forth in *Charter Medical* and *City of El Paso,* these findings must be accompanied by underlying findings connecting evidence to the conclusions expressed in the Commission's ultimate findings. In support of finding of fact 138, the Examiners' Report explains that the utility should not be prohibited from including any of the costs of the remedial action program in rate base because other factors contributed to the NRC's application of stricter regulatory standards. *See* Examiners' Report at 169. Those other factors are also identified in the Report: "On balance, although the inspection standards and procedures applied by the Technical Review Team were the same as those previously used by the project's quality control inspectors, the Technical Review Team conducted its inspections and scrutinized its inspection results at Comanche Peak in a manner as never before." *See id.* at 124. These findings support the Commission's decision not to make the wholesale disallowances proposed by the intervenors. Nielsen–Wurster did not recommend disallowing any costs related to the post-effective date execution of the response team or the corrective action program. *See* Examiners' Report at 139.[FN35] Finding of fact 140 expresses the Commission's final calculation of total imprudent costs incurred by the utility through the end of the test year. These calculations are supported by extensive explanations in the Examiners' Report as well as specific findings of fact in the order on rehearing for each element of the total disallowance. We reject the Cities and Public Utility Counsel's contention that findings of fact 138, 139, and 140 are not adequately supported by underlying find-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

ings of fact.

> FN35. The Report also provides several references to the administrative record including pages 28200–28204 of the statement of facts.

Finally the Cities and Public Utility Counsel challenge the Commission's failure to impose specific disallowances flowing from its finding that the utility imprudently failed to infuse its senior management with personnel having the appropriate nuclear experience. During the rate-making proceedings the examiners determined that it was impossible to state generally the effect of this lack of nuclear experience; rather, as in the entire prudence review, the examiners proposed an examination of the utility's discrete actions and decisions throughout the project. The Commission adopted the examiners' reasoning and made disallowances for costs associated with imprudent management.[FN36] These disallowances represent the Commission's exercise of its discretion in determining rate base; the findings are not arbitrary or capricious or unsupported by substantial evidence.

> FN36. For example, the Commission found that Texas Utilities management's lack of nuclear experience caused the imprudent decision to discontinue the integrated cube schedule and implement a start-up driven schedule in May 1980. This led to reduced productivity in electrical craft labor from June 1980 to September 1981. *See* Findings of Fact 40, 41, 42. Accordingly, the Commission disallowed $51.3 million in electrical craft labor costs. The Commission also disallowed $90.5 in costs expended in developing an effective Comanche Peak Response Team program plan and $79.9 million in start-up costs associated with the Corrective Action Program, having concluded that these costs arose from management's imprudent decision to discontinue its comprehensive policy of updating original design drawings. *See* Findings of Fact 78, 79.

After careful review and consideration of all the arguments raised by the Cities and the Office of Public Utility Counsel, we overrule points of error two through four.

## COMANCHE PEAK RESPONSE TEAM DELAY

In its first point of error, Texas Utilities complains of the Commission's disallowance of $194.4 million representing costs associated with an imprudent seven-month delay in Comanche Peak construction. Each of the utility's arguments advanced under this point of error, however, was presented to the Commission*408 during the rate-making proceeding and rejected with adequate accompanying findings supported by substantial evidence. We decline to substitute our judgment for that of the Commission, and will overrule the point of error.

The utility first argues that there is not substantial evidence to support the Commission's finding that Revision 2 to the Comanche Peak Response Team Program Plan was not a reasonable licensing response. To the contrary, the Commission relied on evidence that the NRC Technical Review Team letter, issued on January 8, 1985, marked a distinct departure from the NRC staff's previous position on Comanche Peak's licensability, and that the Comanche Peak Response Team did not adequately address the outstanding licensing issues raised by the Technical Review Team until the issuance of Revision 3 in January 1986. Findings of Fact 105, 109. The Commission further found that Revision 2 should have included a sampling methodology equivalent to that ultimately included in Revision 3. Finding of Fact 111. The Commission relies on the Examiners' Report to further explain its finding:

> [Texas Utilities'] contention that it could not anticipate the unacceptability of the Revision 2 sampling methodology until after it filed Revision 2 is a red herring. The strongly worded third Technical Review Team letter suggested a possible programmatic quality assurance/quality control breakdown, a position never before expressed by the NRC staff.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

Examiners' Report at 133. The utility simply failed to convince the Commission that, as it reasserts in its brief, "it had every reason to believe that the entire program under Revision 2 ... would be acceptable to the NRC." The Examiners' Report outlines many of the same arguments the utility now makes on appeal and explains its rejection of those arguments in light of conflicting evidence and proposals and recommendations made by the Commission's staff.

[23] The utility next argues that even if there was a delay in preparing an adequate response plan to NRC concerns, the delay had no impact on project duration because the project schedule was controlled by a design validation of piping and pipe supports that began in mid–1985. Again, the Commission specifically rejected this argument when it was presented at the rate-making proceeding.

[T]he examiners reject [Texas Utilities'] argument that the delay in formulating an adequate Comanche Peak Review Team Program Plan did not delay the completion of Units 1 and 2. First, the Comanche Peak Review Team—the initial vehicle by which the Company sought to assure licensability—constituted the critical path activity for both units during this period. Therefore, any imprudent delay in formulating an acceptable Comanche Peak Review Team Program Plan delayed fuel load.... [Texas Utilities] argues that the 100 percent design revalidation of large bore pipe and pipe supports, which commenced sometime in mid–1985, constituted the critical path activity with respect to Unit 1 at this time. *This argument, however, is contradicted by the direct testimony of [Texas Utilities] witness Mr. Manzi, who stated the Comanche Peak Review Team's activities paced the project's schedule through early 1987.*

Examiners' Report at 134 (emphasis added). Again, the Commission's decision is supported by record evidence. In its brief, the utility asserts: "The Commission improperly rejected the [utility's] evidence that the critical path activity during this period was not the sampling-based CPRT activities but instead was the 100 percent design validation of piping and pipe supports...." This Court is bound by the Commission's determination as to the weight and credibility of the evidence. As long as there is substantial evidence in the record supporting the Commission's decision, we will not disturb its findings. *Suburban Util. Corp. v. Public Util. Comm'n,* 652 S.W.2d 358, 364 (Tex.1983) (holding that the agency's action will be sustained if the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action).

The utility next argues that the work performed pursuant to Revision 2 would have *409 been necessary under Revision 3, and thus failure to adopt Revision 3 until January 1986 had no effect on the project schedule. To support this argument, the utility asserts: "There is no evidence in the record that [work performed pursuant to Revision 2] was not necessary under Revision 3." They point to record evidence that work performed in accordance with Revision 2 during the seven-month period was productive, useful, and necessary under the subsequent Revision 3. The fact that work performed was productive, useful, and necessary does not, however, foreclose the possibility that activities dictated by Revision 3 could have, and should have, been carried out contemporaneously with the necessary Revision 2 activities. In other words, nothing in the record states that the Revision 3 work could not have begun until all the work done under Revision 2 was completed. The Commission specifically found that Revision 3 greatly expanded the scope of the Comanche Peak Review Team effort. This supports a finding that the failure to expand the scope sooner caused delay in completing the project.

Finally, the utility argues that even if the failure to implement Revision 3 until January 1986 caused delay in completing Comanche Peak Unit 1, it had no effect on the completion of Unit 2. Again, we need look no further than the Examiners' Report for references to evidence supporting the Commission's decision: "Unit 2 delay costs occurred in the same manner as those for Unit 1; both were

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

equally affected by the licensing quagmire in which the entire project found itself. [Texas Utilities] witness Mr. Nace agreed that the licensing issues facing Unit 1 also faced Unit 2." Examiners' Report at 134. The substantial evidence standard is well established. *Charter Medical,* 665 S.W.2d at 452. We may not reweigh the evidence in order to come to a conclusion different from the Commission's. Texas Utilities' arguments on appeal are nothing more than a restatement of arguments and evidence considered by the Commission and rejected in favor of other evidence and recommendations. We will not presume to substitute our judgment for that of the agency, but rather uphold its findings that are reasonably supported by substantial evidence. Texas Utilities' first point of error is overruled.

## INCLUSION OF CWIP IN RATE BASE

[24] As part of Docket 9300, the Commission determined that the utility should be allowed to include some "construction-work-in progress" (CWIP) costs in rate base. The term "CWIP" refers to money dedicated to facilities that are currently under construction. Because it is a state-regulated monopoly, a utility has the responsibility to provide utility service that meets public demand. In a growing market, therefore, a utility must continually expand to create greater capacity and must replace existing facilities as they wear out or become obsolete. Although these projects require huge capital outlays, PURA does not allow a utility to include these costs in rate base until the completed facility becomes "used and useful in rendering service to the public." PURA § 39(a). Before completion of a project, the utility includes these construction costs in a separate CWIP account. A utility may be permitted to include some CWIP costs in rate base as an exceptional form of rate relief upon a showing that their inclusion is necessary to the utility's financial integrity. PURA § 41(a). In its order on rehearing, the Commission allowed the utility to include $695,177,625 of CWIP in rate base. In three points of error, the Cities and Office of Public Utility Counsel challenge this decision.

In its eleventh point of error, the Cities contend that the Commission violated Rule 21.69(a) when it allowed the utility to present evidence in the rate-making proceeding to justify the inclusion of CWIP in rate base.[FN37] Rule 21.69(a) provided:

> FN37. Public Utility Counsel attempts to join the Cities in bringing this point of error. However, because its motion for rehearing filed with the Commission does not raise this claim, it has waived the right to raise it on appeal. APA § 2001.171 (requiring a party to a contested case to exhaust administrative remedies before seeking judicial review).

Any utility filing an application, petition, or statement of intent to change its rates in a major rate proceeding must file all of its evidence, including the prepared testimony of all of its witnesses and exhibits, on the *410 same date that such application, petition, or statement of intent to change its rates is filed with the commission.... A utility filing for a change in rates shall be prepared to go forward at a hearing on the data which have been previously submitted and sustain the burden of proof of establishing that its proposed changes are just and reasonable, and the material submitted as the filing and supporting work papers shall be of such composition, scope, and format so as to serve as the utility's completed case.

16 Tex.Admin.Code § 21.69(a) (1993) (since amended).[FN38] The Cities argue that Texas Utilities did not include CWIP as a basis for rate relief in its request for a rate increase filed on January 16, 1990. They assert that, in fact, the utility affirmatively disavowed an intention to request CWIP in the upcoming rate-making proceeding. The Cities allege that the utility's testimony regarding the amount of CWIP necessary to maintain its financial integrity in the face of proposed disallowances came as a complete surprise to the Cities and other parties to the proceeding and was tantamount to the utility changing the basis of its request for a rate increase in contravention of Rule 21.69(a).

> FN38. The Commission established this rule pursuant to PURA section 43(a) which provides:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

The statement of intent [to change rates] shall include proposed revisions of tariffs and schedules and a statement specifying in detail each proposed change, the effect the proposed change is expected to have on the revenues of the company, the classes and numbers of utility customers affected, and *such other information as may be required by the regulatory authority's rules and regulations.*

PURA § 43(a) (emphasis added).

We disagree with the Cities' characterization of the utility's position on CWIP presented in its rate filing package. Schedule C–4.1, included in the rate filing package, stated, "The Company is not requesting any construction work in progress in rate base, as discussed in the testimony of Mr. H. Dan Farell." Through Mr. Farell's testimony, the utility explains:

In this particular case ... a relatively large level of CWIP attributable to Comanche Peak Unit 1 as of June 30, 1989, is being transferred to rate base as electric plant in service. *Provided the Company's requested rate base and cost of service levels are approved, the Company will have a reasonable opportunity to reverse the negative trends and begin to restore the previously discussed financial integrity measures to acceptable levels without the inclusion of CWIP in rate base.* However, as discussed subsequently in conjunction with the overall cost of capital, any material reductions in the Company's requested rate base or cost of service will require reconsideration of the issue, and may well make inclusion of some level of CWIP in rate base necessary.

(emphasis added). We are satisfied that the utility provided adequate notice of its intent to seek inclusion of CWIP in rate base in the rate-making proceeding. The utility did not represent that it would not request CWIP at all, but rather that it would seek to include CWIP in the event the Commission materially disallowed its proposed

rate increase, a very likely occurrence in any rate-making proceeding. Even though the utility's conditional request for inclusion of CWIP in rate base appears to improperly treat CWIP as a means to offset the Commission's disallowance of imprudent expenditures, it nevertheless satisfies the notice requirement of Rule 21.69(a) by announcing that the utility intended to request inclusion of CWIP in rate base if disallowances were recommended. Though the utility did not indicate what level of CWIP it would seek, it was hardly in a position to do so before the rate-making proceeding began. We reject the Cities' contention that they did not know the utility would seek inclusion of CWIP in rate base until the final stages of the proceeding. The Cities' eleventh point of error is overruled.

In their twelfth point of error, the Cities and Public Utility Counsel assert that the Commission rewarded the utility's imprudence by making CWIP allowances to offset the disallowances of imprudent expenditures. Although the utility announced its decision to seek CWIP only if its rate request was substantially disallowed, we believe the Commission applied the proper standard for including CWIP in rate base. The Commission *411 determined that over $2 billion of Comanche Peak Unit 2 CWIP was prudent and could be included in rate base to the extent necessary to preserve the utility's financial integrity. Finding of Fact 169. The examiners recommended that sufficient CWIP be included in rate base to allow the utility to recover up to 80 percent of its requested rate increase. In their report the examiners explained:

Including CWIP in rate base may appear to offset any prudence disallowance and require the ratepayers to indemnify the shareholders. However, in reality, the inclusion of CWIP in rate base does not offset a prudence disallowance. Instead, it reflects a policy determination that in order to save the Company's financial integrity so that the utility may continue to provide reliable service, the ratepayers should pay now what they would soon pay anyway but in greater amounts.

Examiners' Report at 218. The Commission based its decision to allow CWIP in rate base on this reasoning

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

along with the utility's testimony regarding the need for CWIP in rate base to preserve the company's financial integrity. Conclusion of Law 59. We conclude that the Commission included CWIP in rate base to accomplish its proper purpose, consistent with the statutory requirements. *See* PURA § 41(a).[FN39] Consequently, we overrule the Cities and Public Utility Counsel's twelfth point of error.

> FN39. That CWIP allowances were not made as a direct dollar-for-dollar offset of imprudence disallowances is clear when comparing the total disallowance for Comanche Peak Units 1 and 2, $1,381,144,563, with the amount of CWIP included in rate base, $695,177,625. This is consistent with the Commission's obligation to include CWIP in rate base only to the extent necessary to ensure the utility's financial integrity.

The thirteenth point of error asserts that the Commission failed to make proper underlying findings of fact to support its decision to include $695,177,625 of CWIP in rate base. The Commission set this figure based on its conclusion that the utility required a rate increase of 10.1 percent, or $442,353,160, to maintain financial stability. We have already determined that this order must be remanded to the Commission to reconsider disallowances associated with the 12.2 percent of the project repurchased from the minority interest owners. The Commission will be required to reevaluate the utility's CWIP requirements in light of the level of disallowance on remand. In making this determination, the Commission may only consider the financial condition of the utility at the time of the hearing; it may not consider subsequent positive or negative changes in the utility's financial integrity. Therefore, though we agree that the Commission could properly consider including CWIP in rate base, we recognize that its decision as to the appropriate amount of CWIP will change, and is dependent upon the disallowances it makes on remand. We do not, therefore, review the findings related to CWIP allowances, as they will be superseded by the Commission's findings when it reexamines the utility's need for CWIP on remand. The Commission will be required to reconsider whether the 10.1 percent rate increase

it found necessary to maintain financial integrity remains the benchmark in light of this reexamination. A consequence of our remand is to moot the Commission's CWIP findings because they were calculated pursuant to erroneous disallowances. We do not, therefore, address the thirteenth point of error challenging the adequacy of the Commission's findings to support a CWIP allowance that is now immaterial. Similarly, we do not address the Cities and Public Utility Counsel's fourteenth and fifteenth points of error which attack a specific finding of fact regarding the CWIP allowance.

### GAS RECONCILIATION

[25] In their sixteenth and seventeenth points of error, the Cities and Public Utility Counsel complain of error in the Commission's determination of the proper measure of imprudent costs associated with Texas Utilities' purchases of gas from Texas Utilities Fuel Company (the "Fuel Company").

Part of Docket 9300 involved the reconciliation of fuel costs incurred by Texas Utilities during the period from April 1, 1983, to June 30, 1989. Fuel reconciliation is a term used to describe periodic adjustments to a utility's *412 fuel costs made to account for the difference between previously anticipated costs and actual, reasonable costs incurred. The Commission makes these adjustments on a periodic basis because of the practical difficulty of deciding a new rate case with each variation in fuel prices. In a hearing on fuel reconciliation, the utility has the burden of proving that its fuel expenses during the reconciliation period were reasonable and necessary expenses incurred to provide reliable service. *See* 16 Tex.Admin.Code 23.23(3)(B) (1994). If the fuel is purchased from or provided by an affiliate, the utility must also show that the price to the utility is no higher than prices charged by the supplying affiliate to its other affiliates or divisions for the same item or class of items, or to unaffiliated persons or corporations. PURA § 41(c)(1).

As part of the fuel reconciliation proceedings in Docket No. 9300, Texas Utilities sought to establish the reasonableness and necessity of $7,167,233,745 in natural

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

gas costs incurred during the six year reconciliation period. Upon reviewing the evidence, the Commission disallowed $29,173,090 of those costs and determined that the remainder were reasonable and necessary expenditures. There is no dispute that the gas purchase transactions reviewed by the Commission were affiliate transactions; the Fuel Company, an affiliate of Texas Utilities, supplies all the utility's gas requirements. In addition, because Texas Utilities is the Fuel Company's only customer, whether the Fuel Company charged Texas Utilities prices commensurate with those charged to other affiliates or to unaffiliated entities is not an issue. The Commission's only task was to determine the extent to which the affiliate fuel expenses were reasonable and necessary costs that could be included in Texas Utilities' rate base. At issue in the Cities and Public Utility Counsel's sixteenth and seventeenth points of error is the Commission's decision to disallow only $29,173,090 in gas costs as unreasonable expenditures.

The Commission arrived at this figure in the following way. First, it heard evidence from Texas Utilities regarding the reasonableness of the approximately 900 gas contracts subject to the reconciliation proceedings. Then it heard evidence presented by the Reed Consulting Group, which reviewed 100 of the 900 contracts representing eighty percent of the gas purchases made during the reconciliation period. In their report, the examiners reviewed sixty-four contracts, and after considering disallowances suggested by both Texas Utilities and the Reed Consulting Group, made their own recommendations for disallowances for each contract. A chart included in the Examiners' Report sets forth the disallowances recommended by Texas Utilities, the Reed Consulting Group, and the examiners with respect to thirty-seven production contracts, six long-term commercial contracts, thirteen short-term commercial contracts, and eight spot contracts. *See* Examiners' Report at 448–51. [FN40] The Examiners' Report then includes a summary section which states:

FN40. There is no explanation in the Examiners'

Report as to why the Examiners did not include all 100 contracts reviewed by the Reed Consulting Group in their chart.

The examiners recommend a total disallowance for unreasonable expenditures for gas purchases by [Texas Utilities] from its affiliate, [the Fuel Company], of $78,504,776. The remainder of the Company's requested reconcilable gas costs, $7,088,728,967, are reasonable and should be approved. [FN41]

> FN41. We note that a chart entitled *Summary of Recommended Disallowances—Gas Contracts* appearing on page 434 of the Examiners' Report shows an additional recommended disallowance for open access transportation. The total recommended disallowance on this chart is therefore $81,504,776. Without explanation, in the summary section on page 479, the examiners dropped this $3 million disallowance leaving a recommended total disallowance of $78,504,776.

Examiners' Report at 479. The chart and summary imply that the examiners accepted Texas Utilities' evidence regarding the reasonableness of all the gas contracts not represented in the chart, and allowed all costs related to those contracts in rate base.

In its final order, the Commission made specific findings of fact for each gas contract that appeared in the examiners' chart, rejecting **\*413** the examiners' recommended disallowance in only five instances.[FN42] Like the examiners, the Commission only disallowed costs associated with the contracts that appear in the examiners' chart. The Commission allowed all costs associated with all other gas contracts.

> FN42. The Commission disallowed less than the examiners recommended in four instances:

| Contract No. | Examiners' Recommendation | Commission's Disallowance |
| --- | --- | --- |

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

| | | |
|---|---|---|
| 1690 (Empire) | $19,222,738 | $ 0 |
| 3205 (PG & E) | $13,453,686 | $ 0 |
| 3697 (Coronado) | $ 1,916,756 | $1,455,193 |
| 3011, 3701, 3707 (Houston Pipeline, Panhandle) | $16,721,007 | $ 0 |

The Commission disallowed more than the examiners recommended in one instance:

| Contract No. | Examiners' Recommendation | Commission's Disallowance |
|---|---|---|
| 3076 (Amalgamated) | $ 0 | $ 527,308 |

In points of error sixteen and seventeen, the Cities and Public Utility Counsel challenge the Commission's gas contract disallowances on two grounds: (1) the Commission did not review all the affiliate gas costs associated with approximately 800 contracts making up twenty percent of Texas Utilities' gas costs and as a result included unreasonable costs in rate base, and (2) the Commission did not make the specific findings required by PURA section 41(c)(1) to support the costs it did allow. Because we find both arguments to be without merit, we overrule the sixteenth and seventeenth points of error.

The Cities and Public Utility Counsel essentially argue that because the Reed Consulting Group did not review the smaller and more numerous gas contracts making up approximately twenty percent of Texas Utilities' gas costs, the Commission did not review the contracts. Simply because the Reed Consulting Group did not include these contracts in its sample does not mean that the Commission did not review those expenses or that there was no evidence that the contracts met the requirements of PURA section 41(c)(1).

Texas Utilities presented evidence as to the reasonableness of all of the approximately 900 gas contracts subject to the reconciliation proceeding. As part of its evidence of reasonableness, the utility presented testimony justifying its decisions to enter into the various gas contracts.[FN43] Opposing the reasonableness of Texas Utilities'

gas contracts, the Cities' witness, Richard S. Morey, recommended a disallowance of $452 million in gas-related expenditures. This amount represented fuel costs for the years 1985 through 1988. The examiners determined that Mr. Morey's quantification technique was seriously flawed because it relied on comparisons with utilities not comparable to Texas Utilities. The examiners recommended that the Commission reject Mr. Morey's analysis and his recommended disallowance, which the Commission did. If that had been the whole of the evidence presented to the Commission, it would have been within the Commission's discretion to allow all the costs requested by Texas Utilities if it found they were supported by substantial evidence. However, the Commission also considered the evidence presented by its own auditor and, as a result, disallowed some of the expenses associated with the larger gas contracts. While the Commission *may* consider evidence such as that presented by the Reed Consulting Group, it is not required to do so. In the absence of such evidence, it may accept or reject the evidence presented by the utility, the party bearing the burden of proof of reasonableness. With respect to the smaller *414 gas contracts, the Commission apparently accepted the evidence of reasonableness presented by Texas Utilities. If substantial evidence supports the Commission's findings, which we conclude it does, we must uphold the order. *See Auto Convoy,* 507 S.W.2d at 722.

FN43. Texas Utilities asserted that its three major gas contracts expired between late 1980 and 1983, at a time when its forecasts showed a con-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

tinuing increase in the cost of natural gas and when prices were still escalating. The utility entered into new contracts during a sellers' market with the result that the new contracts were less favorable to the utility than they would have been if they had entered into them at another time. Texas Utilities attributes its failure to obtain gas in an interstate market to a desire to remain free from burdensome and expensive federal regulation.

The Cities and Public Utility Counsel also maintain that the Commission did not make the findings of fact required by PURA section 41(c)(1) to support an allowance of all gas costs related to those contracts not included in the chart. The following are the portions of the Commission order relating to its determination of gas disallowances:

Finding of Fact 379: The Company's fuel expenditures during the reconciliation period of April 1983 through June 1989 should be approved to the extent of $10,488,044,993.

Conclusion of Law 82: Except to the extent of the disallowed reconciliation period gas costs (reflected in the Findings of Fact attached to the order), Texas Utilities met its burden of proof under PURA § 41(c)(1), regarding affiliate transactions.

Conclusion of Law 83: Except to the extent of the disallowed reconciliation period gas costs (reflected in the findings of fact attached to the order), the Company's fuel expenditures during the reconciliation period comply with the requirements of P.U.C.SUBST.R. 23.23(b)(2)(H).

The question for this Court is whether these findings satisfy the requirements of PURA section 41(c)(1) that "[a]ny such finding shall include specific findings of the reasonableness and necessity of each item or class of items allowed." The Cities and Public Utility Counsel assert that

this statute demands specific findings of reasonableness for each contract. We disagree. The statute allows the Commission to address its specific findings either to "each item" or "each class of items." The Commission may either make a contract-by-contract determination of reasonableness, or it may group the contracts together and declare them all to be reasonable.

The Commission made a specific finding that, with the exceptions set forth in findings of fact 383A–383AAA, Texas Utilities had established the reasonableness and necessity of its gas costs. We conclude that these findings meet the requirements of PURA section 41(c)(1).

## AMOCO CONTRACT NUMBER 1627

[26] In its sixth point of error, Texas Utilities claims that the trial court incorrectly affirmed the Commission's decision to disallow $447,972 as imprudent gas expenditures pursuant to Amoco contract number 1627. At the Commission hearing, Texas Utilities initially offered evidence indicating that it had purchased fuel in March 1989 from Amoco pursuant to contract number 1627, a spot contract. The Commission determined that the price paid for this gas was unreasonably high given the spot price of gas at the time, and disallowed the excess purchase price from rate base. During "surrebuttal testimony," the utility's fourth opportunity to file testimony on fuel issues, it asserted that the gas purchase was not actually made pursuant to a spot contract, but rather pursuant to a separate short-term commercial contract under which the price paid would be reasonable. The utility explained that it had made an accounting error, forgetting to reform its ledger to credit the purchases to the short-term contract.[FN44] The Commission treated the gas as purchased pursuant to the spot contract and disallowed the $447,972 it believed to be in excess of a reasonable spot price for gas.

FN44. The utility's testimony was that it had for a short time credited purchases made pursuant to a short-term commercial contract with Amoco to contract number 1627 because of delay in setting up the short-term contract for payment. Presumably, the utility only realized its failure to change

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

its records after the rate-making proceeding had been under way for some time.

We do not agree with Texas Utilities that its testimony of an accounting error is uncontroverted or that it necessarily established that the gas was purchased under a short-term commercial contract as a matter of law. The Commission, rather, was presented with conflicting evidence: the utility's own records showing the gas purchased pursuant to a spot contract and its contradictory testimony that in fact the gas was purchased under a short-term commercial contract. The utility *415 characterizes the Commission's decision to rely on the utility's records rather than the testimony provided by the utility as arbitrary and capricious. We come to the opposite conclusion. The Commission is the judge of the weight to be accorded witnesses' testimony and is free to accept part of the testimony of one witness and disregard the remainder. *Southern Union Gas Co. v. Railroad Comm'n*, 692 S.W.2d 137, 141–42 (Tex.App.—Austin 1985, writ ref'd n.r.e.). The Commission was not required to accept the utility's eleventh-hour accounting error explanation, but was free to rely on the utility's own records. It is the utility that carries the burden of proof at a rate-making proceeding; the utility that submits records to the Commission that do not accurately reflect its expenditures does so at its own peril. The point of error is overruled.

## DELHI CONTRACT NUMBER 1659

[27] In the rate proceeding, Texas Utilities asserted that Delhi gas contract number 1659 contained a take-or-pay clause which obligated the utility to purchase a certain amount of gas under the contract. The Commission considered the contract and determined that it imposed no take-or-pay obligation and that Texas Utilities had purchased gas at a price higher than necessary. The Commission concluded that Texas Utilities' gas purchases pursuant to this contract violated its obligation to purchase fuel at the lowest reasonable cost to ratepayers and disallowed $2,509,810 in fuel costs incurred under the contract. *See* PURA § 41(c)(1); 16 Tex.Admin.Code § 23.23(b)(2)(H) (1993) (since amended). In its third point of error, the Commission contends that the district court incorrectly

reversed this conclusion. Because we agree with the Commission that the contract contained no take-or-pay provision, we will sustain this point of error.

The pertinent contract provision provides:

Delhi hereby grants [the Fuel Company] the option to purchase up to fifty percent (50%) (calculated in terms of heating value) of the Schlensker–Texas Crude Gas, purchased by Delhi, at Delhi's cost of such gas plus 5 cents/MMBtu. Such option to purchase may be exercised by [the Fuel Company] at any time and from time to time during the term of Delhi's respective gas purchase agreements for such gas in blocks of ten percent (10%) of Delhi's purchases, and until [the Fuel Company] has exercised completely its option to purchase such fifty percent (50%). Each such exercise of its option to purchase by [the Fuel Company] shall be evidenced by not less than thirty (30) days prior written notice to Delhi and shall be effective on the first day of the month following that month in which the said thirty (30) day period expires.

Contrary to Texas Utilities' assertions, this contract embodies no take-or-pay obligations. It is apparent from its unambiguous terms that the contract gives Texas Utilities the option to buy, in ten percent blocks and at a fixed price, up to fifty percent of any Schlenker–Texas crude gas purchased by Delhi. We are not persuaded by Texas Utilities' argument that the phrase "and until TUFCO has exercised completely its option to purchase such fifty percent" means that once the utility has purchased at that level it must continue to do so. The contract contemplates that whenever Delhi purchases Schlenker–Texas crude gas the Fuel Company may purchase up to fifty percent of that gas at Delhi's cost plus five cents per MMBtu. The phrase "and until [the Fuel Company] has exercised completely its option to purchase such fifty percent" sets an upper, rather than a lower, limit on the utility's right to purchase this gas at the contract price; it does not operate to convert the option to purchase gas into an obligation. We sustain the Commission's third point of error.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

### FUEL OIL INVENTORY

[28] In its fourth point of error, Texas Utilities challenges the Commission's decision to set fuel oil inventory at 1.7 million barrels. The utility contends that this finding is arbitrary and capricious, and not supported by substantial evidence. *See* APA § 2001.174(2)(E), (F). We disagree.

Texas Utilities requested a fuel inventory level of 2,031,540 barrels, an increase of 331,540 barrels from the previously authorized level of 1.7 million barrels. *See* *416*Application _of Texas Utilities Electric Company for a Rate Increase,* 10 P.U.C.Bull. at 954. The higher figure was based on the utility's test-year end thirteen-month average inventory of fuel oil. The Cities argued that the utility needed a fuel oil inventory of only 1,279,363 barrels, suggesting that access to nuclear-generated power from Comanche Peak Unit 1 reduced the utility's need for fuel oil. Additionally, the Cites contended that increased levels of non-oil/gas fired generation caused a decrease, rather than an increase, in the necessary fuel oil inventory level. Texas Utilities countered that it burned 1,201,008 barrels of oil in December 1983 and 1,249,952 barrels during two cold weather periods in February and March 1989. The utility hoped to demonstrate that the Cities had miscalculated its needs in the event of cold weather.

The Commission rejected both the Cities' and the utility's requests, adopting instead the examiners' recommendation that the "level of fuel oil inventory established in Docket No. 5640 of 1.7 million barrels should be left in place." This decision was not arbitrary and capricious or unsupported by substantial evidence. The examiners based their recommendation on an evaluation of the utility's actual needs since the 1.7 million barrel inventory level was established in 1984. The examiners stated, "[I]n light of the Company's experience, the examiners find that the level of fuel oil inventory established in Docket No. 5640 of 1.7 million barrels should be left in place by the Commission." The utility's actual experience over the past several years provides probative evidence from which the agency could conclude what the utility's future needs will be. If the utility could convince the Commission of the need to increase that level, then such an increase would be in order. The burden, however, was on the utility. Texas Utilities' fourth point of error is overruled.

### RETURN ON COMMON EQUITY [FN45]

> FN45. We understand "common equity" to mean the utility's common stock. We refer to the utility's common stock as "common equity" so as not to deviate from the terminology used by the Commission in the proceeding below. *See* *GTE–SW,* 833 S.W.2d at 157 n. 3.

In points of error eighteen through twenty, the Cities and Public Utility Counsel challenge the trial court's affirmance of the Commission's decision to set the utility's return on common equity at 13.2 percent. [FN46] Specifically, they contend that the Commission (1) did not identify the methodology it used to arrive at this figure; (2) failed to consider the statutory factors set out in PURA section 39(a); and (3) did not make adequate findings of fact.

> FN46. Return on equity is one element of the rate of return on a utility's invested capital. Other elements include long-term and short-term debt and preferred stock.

[29] During the rate-making proceeding, all the presentations regarding the appropriate return on common equity used some form of a discounted cash-flow methodology. Because this methodology was the only one presented, the Commission's adoption of any of the range of figures presented as the appropriate return on common equity in itself entails adoption of the discounted cash-flow methodology. The Commission's order is presumed to be based on substantial evidence and we will not require the Commission to make a separate finding simply to confirm that it has based its decision on the only method of calculating return on common equity presented during the rate-making proceeding. *See Charter Medical,* 665 S.W.2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

881 S.W.2d 387
(Cite as: 881 S.W.2d 387)

at 451; *see also GTE–SW,* 833 S.W.2d at 159 (holding that a return on equity falling within the range presented by expert testimony meets the substantial evidence test). We reject the Cities and Public Utility Counsel's attempts to look to the transcript of the Commission's final order meeting to show that the Commission based its decision regarding return on common equity on something other than record evidence. We judge the agency order on the basis on which it purports to rest, and the mental processes of individual commissioners are immaterial to judicial review. *Pedernales Elec. Coop., Inc. v. Public Util. Comm'n,* 809 S.W.2d 332, 341 (Tex.App.—Austin 1991, no writ); *see also \*417City of Frisco v. Texas Water Rights Comm'n,* 579 S.W.2d 66, 72 (Tex.Civ.App.— Austin 1979, writ ref'd n.r.e.) ("The thought processes or motivations of an administrator are irrelevant in the judicial determination whether the agency order is reasonably sustained by appropriate findings and conclusions that have support in the evidence.").

The Cities and Public Utility Counsel next argue that the Commission failed to consider the necessary statutory criteria in choosing the appropriate return on common equity. The statute directs the Commission to consider, among other things, the utility's efforts to comply with the statewide energy plan, its efforts and achievements in the conservation of resources, the quality of its services, the efficiency of its operations, and the quality of its management. PURA § 39(b). Our examination of the order reveals findings of fact and conclusions of law addressing each of these criteria. The Commission addressed the utility's operational efficiency, finding that the utility generated electricity efficiently and reliably during the reconciliation period and that the energy efficiency plan satisfied the Commission's substantive rules. Findings of Fact 396, 398. Conclusion of law 58 states that Texas Utilities' generation, transmission, and distribution facilities are safe, adequate, efficient, and reasonable. Regarding the quality of management, the Commission found that, with limited exceptions, the quality of management was adequate. Finding of Fact 12. The Commission also considered the utility's efforts and achievements in conservation and compliance with the statewide energy plan. *See* Finding of

Fact 215 ("Staff's recommended 15–basis–point upward adjustment to recognize the Company's exceptional achievement in conservation and load management is reasonable."); Finding of Fact 401 ("[Texas Utilities'] demand side management achievements have been remarkable, commendable, and clearly far above those of other utilities.").

[30][31] The chief complaint appears to be the Cities and Public Utility Counsel's perception that the Commission made no downward adjustment to the return on common equity to penalize the utility for instances of imprudent management. While the statute instructs the Commission to consider the quality of the utility's management, it does not require that the Commission lower the return on common equity if it finds *any* imprudence. We understand the statute to leave to the Commission's discretion the decision whether the utility's management warrants a reduction in the overall rate of return. We also reject the assertion that the Commission's chosen rate of return is not supported by adequate findings. The utility testified to a recommended range of return from 13 to 14.25 percent. The staff's recommendation ranged from 12.36 to 13.4 percent. The Examiners' Report summarizes extensive testimony supporting the various ranges sponsored by the parties and the staff. The Commission made a specific finding that a 13.2 percent return on common equity is reasonable and appropriate for the utility. Finding of Fact 213. This Court has already decided that a finding regarding the appropriate cost of equity is not a finding set forth in statutory language, and therefore needs no underlying findings. *City of Alvin,* No. 3–92–459–CV, slip op. at 28; *see also GTE–SW,* 833 S.W.2d at 158 (approving a finding on return on equity that was "the Commission's own estimate converted into a finding" so long as the estimate was "within the range made by the testimony of the various expert witnesses"). Choosing a rate of return is a proper exercise of the Commission's discretion in setting the rate of return, and we will not require any more specific findings than its selection from a range of rates all supported by credible expert testimony. The Cities and Public Utility Counsel's points of error eighteen through twenty are overruled.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

### CASH WORKING CAPITAL

Texas Utilities' fifth point of error complains of the district court's decision to remand the Commission's cash working capital allowance. The district court found, and the Commission agreed, that the Commission made a mathematical error in its calculation of the cash working capital. On appeal, Texas Utilities argues that there is no evidence that the Commission made a mathematical error and that in any case the district court could not address the issue because it was not raised in the motions for rehearing filed with the Commission. *See* APA § 2001.145. We do not address this point of error. On *418 remand the Commission will have an opportunity to recalculate the cash working capital and correct its mathematical error or make other changes to cash working capital in light of its decisions on remand.

### CONCLUSION

For the reasons stated in this opinion, we reverse the district-court judgment and remand the cause to the district court with instructions that it be remanded to the Commission for further proceedings consistent with this opinion.

Tex.App.–Austin,1994.
Texas Utilities Elec. Co. v. Public Utility Com'n
881 S.W.2d 387

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

935 S.W.2d 109, 39 Tex. Sup. Ct. J. 267, 40 Tex. Sup. Ct. J. 238
(Cite as: 935 S.W.2d 109)

H

Supreme Court of Texas.
PUBLIC UTILITY COMMISSION OF TEXAS et al.,
Petitioners,
v.
TEXAS UTILITIES ELECTRIC COMPANY et al.,
Respondents.

No. 94–1071.
Feb. 9, 1996.
Rehearing Overruled Jan. 10, 1997.

Judicial review was sought of Public Utility Commission (PUC) order in electric utility rate case. The 250th Judicial District Court, Travis County, John K. Dietz, J., reversed and remanded in part. Appeals were taken. The Austin Court of Appeals, Bea Ann Smith, J., 881 S.W.2d 387, reversed and remanded with instructions. Utility applied for writ of error. The Supreme Court held that, in setting electric utility rates, PUC is not required to recognize utility's available tax deductions for disallowed capital costs.

Reversed in part and affirmed in part.

West Headnotes

Electricity 145 ⬅➡11.3(4)

145 Electricity
    145k11.3 Regulation of Charges
        145k11.3(4) k. Operating Expenses. Most Cited Cases

In setting electric utility rates, Public Utility Commission (PUC) is not required to recognize utility's available tax deductions for disallowed capital costs. Vernon's Ann.Texas Civ.St. art. 1446c (Re-

pealed).

*109 Appealed From Austin Court of Appeals, Third Judicial District; Bea Ann Smith, Judge.Geoffrey M. Gay, Steven A. Porter, Dan Morales, Steven Baron, Susan Bergen Schultz, Elizabeth R.B. Sterling, Austin, for Petitioners.

Stephen Gardner, Ellen Greer, Stefan H. Krieger, Brad Sutera, Patrick Gattari, Dallas, Alan Holman, James W. Checkley, Jr., Mark W. Smith, Austin, Peggy Wells Dobbins, Coral Gables, FL, Dick Terrell Brown, Walter Washington, Stephen Fogel, Marion Taylor–Drew, Jack W. Smith, Mark R. Davis, Austin, William H. Burchette, A. Hewitt Rose, Washington, DC, Jonathan Day, Houston, Michael G. Shirley, Rupaco T. Gonzalez, David C. Duggins, Fernando Rodriguez, Roy Q. Minton, John L. Foster, Austin, J. Dan Bohannan, Dallas, Walter Demond, Austin, Robert M. Fillmore, Howard V. Fisher, Robert A. Wooldridge, Dallas, for Respondents.

PER CURIAM.
    This is an appeal from a final order of the Public Utility Commission in a ratemaking proceeding initiated by Texas Utilities. The district court reversed the Commission's order in certain respects and remanded the case for further proceedings. The court of appeals reversed the district court's judgment but also remanded the case to the Commission. 881 S.W.2d 387. We find but one error in the court of appeals' opinion warranting our review.

    The Commission refused to reduce Texas Utility's income tax expenses by potential savings from consolidated tax returns with the Texas Utilities' affiliates, by savings from available deductions for disallowed capital and operating expenses, and by savings from available deductions for interest expense. The court of appeals held that the Commission should have used an

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

935 S.W.2d 109, 39 Tex. Sup. Ct. J. 267, 40 Tex. Sup. Ct. J. 238
**(Cite as: 935 S.W.2d 109)**

"actual taxes paid" and not a "hypothetical tax" standard in applying Section 41(c)(2) of the Public Utility Regulatory Act, Act of June 2, 1975, 64th Leg., R.S., ch. 721, § 41(c)(2), 1975 Tex.Gen.Laws (formerly TEX.REV.CIV.STAT.ANN. art. 1446c, § 41(c)(2), recodified without change as Section 41(c)(2) of the Public Utility Regulatory Act of 1995, *id.* art. 1446c–0, § 2.208(c)). From this the court of appeals concluded that the Commission should have reduced Texas Utility's estimated income tax expense by: (1) the utility's "fair share" of savings from consolidated tax returns with the utility's affiliates; (2) the utility's available deductions for disallowed capital and noncapital expenses; and (3) available deductions for interest expense "to the extent that we continue to require the Commission to pass through to ratepayers any tax benefits from interest expense deductions", but not necessarily immediately. The latter saving, *110 the court explained, must be allocated between present and future ratepayers, in the Commission's discretion. 881 S.W.2d at 398–400.

The appeals court's opinion preceded and conflicts with our decision in *Public Utility Commission v. GTE–Southwest, Inc.,* 901 S.W.2d 401 (Tex.1995). There we held that neither PURA § 41(c)(2) nor the reference to taxes "actually incurred" in *Public Utility Commission v. Houston Lighting & Power Co.,* 748 S.W.2d 439, 442 (Tex.1987), required the Commission to apply an "actual-taxes-paid" methodology to estimate a utility's income tax expense. We held that the Commission "has neither the power nor the discretion to consider expenses disallowed under section 43(c)(3)." 901 S.W.2d at 411. Although we did not directly address whether the Commission is required to recognize available deductions for disallowed capital costs, as opposed to noncapital costs, *id.* at 411–12, our reasoning applies equally to both.

Regarding deductions for interest expenses, Texas Utilities argues that the court of appeals erred "to the extent" it required that tax deductions related to assets not included in rate base be passed on to ratepayers. If Texas Utilities refers to assets that are not *currently* included in the rate base but will be in the future, its argument may be that related interest deductions should be allotted to future ratepayers. All such matters are within the Commission's discretion, which was properly exercised in this case. If Texas Utilities refers to assets that will *never* be included in the rate base because they have been disallowed, then its argument may be that related interest deductions should be treated consistently with other deductions for disallowed capital expenses. We agree.

Because the opinion of the court of appeals conflicts with our decision in *GTE–Southwest,* we grant Texas Utilities' application for writ of error, and without hearing oral argument, reverse the judgment of the court of appeals to the extent that it conflicts with this opinion. TEX.R.APP.P. 170. Texas Utilities' application does not complain of any other error in the court of appeals' opinion that requires reversal. We deny the applications of the Public Utility Commission, the Office of Public Utility Counsel, and the Cities of Arlington, et al. *Id.* Rule 133. Thus, the judgment of the court of appeals is, in all other respects, affirmed.

Tex.,1996.
Public Utility Com'n of Texas v. Texas Utilities Elec. Co.
935 S.W.2d 109, 39 Tex. Sup. Ct. J. 267, 40 Tex. Sup. Ct. J. 238

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Appendix 13

*Gilmore v. State,*
744 S.W.2d 630
(Tex. App.—Dallas 1987, pet. ref'd)



744 S.W.2d 630
(Cite as: 744 S.W.2d 630)

**H**

Court of Appeals of Texas,
Dallas.

Kenneth GILMORE, Appellant,
v.
The STATE of Texas, Appellee.

No. 05–87–00230–CR.
Dec. 16, 1987.

Defendant was convicted in the 282nd Criminal District Court, Dallas County, Tom Price, J., of murder. Defendant appealed. The Court of Appeals, Baker, J., held that defendant was not prejudiced when State offered for all purposes defendant's handwritten confession with two portions deleted and offered whole confession for record purposes only.

Affirmed.

West Headnotes

**[1] Criminal Law 110 ⟀396(2)**

110 Criminal Law
　110XVII Evidence
　　110XVII(I) Competency in General
　　　110k396 Evidence Admissible by Reason of Admission of Similar Evidence of Adverse Party
　　　　110k396(2) k. Admission of Whole Conversation, Transaction, or Instrument Because of Admission of Part or Reference Thereto. Most Cited Cases

Criminal rule providing that if writing or a part thereof is introduced by party, adverse party may at that time introduce any other part of writing, which ought in fairness to be considered contemporaneously with it, is not mandatory. Rules of Crim.Evid., Rule 106.

**[2] Criminal Law 110 ⟀1170(3)**

110 Criminal Law
　110XXIV Review
　　110XXIV(Q) Harmless and Reversible Error
　　　110k1170 Exclusion of Evidence
　　　　110k1170(3) k. Prior or Subsequent Admission of Same Evidence. Most Cited Cases

Defendant was not prejudiced when State offered for all purposes defendant's handwritten confession with two portions deleted and offered for record purposes only the whole confession and when trial court did not allow defendant to contemporaneously admit whole confession, although defendant contended that rule provides that when writing or part thereof is introduced, adverse party may introduce any other part of writing which ought in fairness to be considered contemporaneously with it; rule was not mandatory, and State eventually withdrew objection to whole confession, and it was admitted for all purposes. Rules of Crim.Evid., Rule 106.

*631 Lawrence B. Mitchell, Dallas, for appellant.

Karen R. Wise, Dallas, for appellee.

Before DEVANY, BAKER and LAGARDE, JJ.

BAKER, Justice.
　Appealing from his murder conviction, Kenneth Gilmore is contending that the trial court erred in failing to admit evidence he offered contemporaneously with the admission of evidence offered by the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

744 S.W.2d 630
(Cite as: 744 S.W.2d 630)

State. Finding no merit in this contention, we affirm the trial court's judgment.

During direct examination of Dallas Police Officer Stan McNear, the State sought to offer into evidence appellant's written confession. State's Exhibit 14 was a handwritten judicial confession by appellant. State's Exhibit 15 was a copy of the same handwritten confession with two portions deleted. The State offered Exhibit 14 for record purposes only and Exhibit 15 for all purposes. Appellant moved the trial court to require introduction of Exhibit 14 for all purposes. The court overruled this motion. However, shortly thereafter, during the State's continuation of its direct examination of Officer McNear, the State withdrew its objection to Exhibit 14, and it was admitted for all purposes.

[1] Appellant contends that the trial court's failure to admit the document in its entirety at the time he made the request is a violation of Rule 106 of the Texas Rules of Criminal Evidence. This rule provides that when a writing or part thereof is introduced by a party, the adverse party may at that time introduce any other part of the writing which ought in fairness to be considered contemporaneously with it. Appellant contends the terms of this rule are mandatory. Although the document was admitted shortly after the appellant first requested its admission, appellant argues that the failure to enter the same contemporaneously with the State's Exhibit was error because it was critical for the defense that the jury understand that the completed confession introduced originally before them was in fact consistent with the version of events *subsequently* presented by appellant in his testimony. Appellant argues that the circumstances establish harm to him from the violation of the mandatory terms of Rule 106 of the Texas Rules of Criminal Evidence. We disagree.

Rule 106 of the Texas Rules of Criminal Evidence is not written in mandatory terms. This rule is a narrow modification of the doctrine of optional completeness, controlling the time an adversary can introduce certain kinds of remainder evidence. The language of the rule is a permissive grant and not a requirement. As noted in the comment to the rule, this rule does not in any way circumscribe the right of a party to develop fully the matter on cross-examination or as part of his own case. Since it is a permissive grant, not a requirement, the adversary may introduce the remainder evidence contemporaneously with the presentation of the incomplete evidence, he can wait to do so during cross-examination, or during the development of his own case. TEX.R.CRIM.EVID. 106. We hold that the terms of this rule are not mandatory.

The underlying purpose for both rules 106 and 107 of the Texas Rules of Criminal Evidence is to reduce the possibility of the fact finder receiving a false impression from hearing the evidence of only a part of a writing. The theory is that by allowing the jury to have the benefit of the rest of the writing on the same subject, the whole picture will be presented removing any misleading effect which may have occurred from introducing only a portion of the writing. *See Roman v. State,* 503 S.W.2d 252, 253 (Tex.Crim.App.1974). The *Roman* case was construing article 38.24 of the Texas Code of Criminal Procedure which in part is the predecessor to Rule 106.

[2] In this case, the writing that appellant requested to be admitted was in fact admitted by the trial court during the remainder of the direct examination by the State of Officer McNear; therefore, both documents were before the jury prior to appellant's subsequent testimony concerning his version of the facts. We conclude *632 that circumstances in this case do not demonstrate that the appellant was harmed or otherwise prejudiced by the trial court's action. TEX.R.APP.P. 81(b)(2); *Prior v. State,* 647 S.W.2d 956, 959 (Tex.Crim.App.1983); *Rezac v. State,* 722 S.W.2d 32, 33 (Tex.App.—Dallas 1986, no pet.).

Appellant's point of error is overruled and the trial court's judgment is affirmed.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

744 S.W.2d 630
**(Cite as: 744 S.W.2d 630)**

Tex.App.–Dallas,1987.
Gilmore v. State
744 S.W.2d 630

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Appendix 14

*Crosby v. Minyard Food Stores,*
122 S.W.3d 899
(Tex. App. – Dallas 2003, no pet.)



122 S.W.3d 899
(Cite as: 122 S.W.3d 899)

▷

Court of Appeals of Texas,
Dallas.
Maerene CROSBY, Appellant,
v.
MINYARD FOOD STORES, INC. d/b/a Sack N'
Save a/k/a Sack N' Save # 206, Appellee.

No. 05–02–01766–CV.
Nov. 26, 2003.
Rehearing Overruled Jan. 13, 2004.

**Background:** Grocery store patron brought negligence action, alleging that she tripped and fell on buckled floor mat near entrance of store. The County Court at Law No. 5, Dallas County, Don Metcalfe, J., entered judgment on jury verdict for patron. Appeal was taken.

**Holdings:** The Court of Appeals, Joseph B. Morris, J., held that:
(1) evidence that store knew that mat regularly buckled created jury question on negligence;
(2) admission of affidavit from store's expert witness physician was error; but
(3) error was harmless.

Affirmed.

West Headnotes

**[1] Negligence 272 ⟜1708**

272 Negligence
    272XVIII Actions
        272XVIII(D) Questions for Jury and Directed Verdicts
            272k1705 Premises Liability
                272k1708 k. Buildings and other structures. Most Cited Cases
Evidence that grocery store knew that mat at entrance had a tendency to buckle and required frequent straightening raised fact issue of store's negligence for jury, in patron's personal injury action.

**[2] Evidence 157 ⟜155(1)**

157 Evidence
    157IV Admissibility in General
        157IV(E) Competency
            157k155 Evidence Admissible by Reason of Admission of Similar Evidence of Adverse Party
                157k155(1) k. In general. Most Cited Cases
Affidavit by grocery store's expert doctor was not admissible in patron's slip-and-fall negligence action, under rule of optional completeness, which allowed inquiry into the whole of an act, declaration, conversation, writing, or recorded statement if the opposite party had introduced a portion of it; it was not necessary to admit affidavit to explain or understand portions of it referred to in testimony by shopper's chiropractor. Rules of Evid., Rule 107.

**[3] Evidence 157 ⟜155(1)**

157 Evidence
    157IV Admissibility in General
        157IV(E) Competency
            157k155 Evidence Admissible by Reason of Admission of Similar Evidence of Adverse Party
                157k155(1) k. In general. Most Cited Cases
Rule of optional completeness, under which the whole of an act, declaration, conversation, writing, or recorded statement may be inquired into if the opposite party had introduced a portion of it, is designed to guard against the possibility of confusion, distortion, or false impression that could be created when only a portion of evidence is introduced. Rules of Evid., Rule 107.

**[4] Evidence 157 ⟜155(1)**

157 Evidence
    157IV Admissibility in General
        157IV(E) Competency
            157k155 Evidence Admissible by Reason of Admission of Similar Evidence of Adverse Party

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

122 S.W.3d 899
(Cite as: 122 S.W.3d 899)

157k155(1) k. In general. Most Cited Cases

There are two threshold requirements for the application of the rule of optional completeness, under which the whole of an act, declaration, conversation, writing, or recorded statement may be inquired into if the opposite party has introduced a portion of it: (1) some portion of the matter sought to be "completed" must have actually been introduced into evidence, and (2) the party seeking to complete the matter must show that the remainder being offered is on the same subject and is necessary to fully understand or explain the matter. Rules of Evid., Rule 107.

**[5] Evidence 157 €⟶155(1)**

157 Evidence
   157IV Admissibility in General
      157IV(E) Competency
         157k155 Evidence Admissible by Reason of Admission of Similar Evidence of Adverse Party
            157k155(1) k. In general. Most Cited Cases

Merely referring to a statement does not invoke the rule of optional completeness, under which the whole of an act, declaration, conversation, writing, or recorded statement may be inquired into if the opposite party had introduced a portion. Rules of Evid., Rule 107.

**[6] Appeal and Error 30 €⟶1051.1(1)**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error
         30XVI(J)10 Admission of Evidence
            30k1051.1 Same or Similar Evidence Otherwise Admitted
               30k1051.1(1) k. In general. Most Cited Cases

Erroneous rulings on the admissibility of evidence are ordinarily not reversible where the evidence is cumulative and not controlling on a material issue dispositive of the case.

**[7] Appeal and Error 30 €⟶1051(1)**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error
         30XVI(J)10 Admission of Evidence
            30k1051 Facts Otherwise Established
               30k1051(1) k. By other evidence in general. Most Cited Cases

An error in admitting evidence is harmless if other competent evidence of the fact in question appears elsewhere in the record.

**[8] Appeal and Error 30 €⟶1050.1(12)**

30 Appeal and Error
   30XVI Review
      30XVI(J) Harmless Error
         30XVI(J)10 Admission of Evidence
            30k1050 Prejudicial Effect in General
               30k1050.1 Evidence in General
                  30k1050.1(8) Particular Types of Evidence
                    30k1050.1(12) k. Opinions and conclusions. Most Cited Cases

Even though admission of affidavit from grocery store's expert doctor, in which he disputed the extent of shopper's injuries, was error, in shopper's slip-and-fall negligence action, there was no harm; shopper's chiropractor testified that his treatment of patron was appropriate, and that grocery store's expert's diagnosis was not consistent with her injuries.

*900 Anjel Kerrigan Avant, Kondos & Kondos Law Office, Richardson, for Appellant.

Jerry Fazio, Jason Eric Kipness, Owen & Fazio, P.C., Dallas, for Appellee.

Before Justices MORRIS, O'NEILL, and LANG.

**OPINION**
Opinion by Justice MORRIS.

In this trip and fall case, Maerene Crosby sued Minyard Food Stores, Inc. for injuries she allegedly

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

sustained after tripping on a mat at the entrance of a grocery store. Although she prevailed at trial, Crosby appeals the jury's verdict finding her 50% negligent and awarding her $488.75 for past medical care. Crosby contends the trial court erred by admitting into evidence the affidavit of Minyard's expert doctor because the contents of the affidavit were hearsay. Crosby further contends the trial court's admission of the affidavit probably caused the rendition of an improper judgment.

In a single cross issue, Minyard contends the trial court erred in refusing to grant it a directed verdict on the ground that Crosby submitted no evidence that Minyard had actual or constructive knowledge of the allegedly dangerous condition that caused her injuries. After reviewing the evidence, we conclude the trial court properly refused to grant Minyard's motion for directed verdict because there was some evidence of probative force to show that Minyard had knowledge of a condition on the premises that posed an unreasonable risk of harm. We also conclude the trial court erred in admitting the affidavit of Minyard's expert doctor. After reviewing the record, however, we conclude the erroneous admission of the affidavit was harmless. Accordingly, we affirm the trial court's judgment.

[1] We first address the issue of the trial court's ruling on Minyard's motion for directed verdict. Minyard claims it was entitled to a directed verdict because the evidence was insufficient to raise a fact issue on an essential element of Crosby's claim. *See Cano v. North Tex. Nephrology Assocs., P.A.,* 99 S.W.3d 330, 338 (Tex.App.-Fort Worth 2003, no pet. h.). To succeed on her claims, Crosby was required to show that Minyard had actual or constructive knowledge of a condition on its premises that posed an unreasonable risk of harm. *See CMH Homes, Inc. v. Daenen,* 15 S.W.3d 97, 99 (Tex.2000). Crosby claimed in her suit that she tripped because a mat at the entrance of the store was buckled and had a bump in it. According to Minyard, Crosby presented no evidence the store

knew or should have known about the bump in the entry mat that caused Crosby to fall. Minyard's focus on the bump in the mat as the dangerous condition is misplaced, however.

**\*901** Crosby testified at trial that she fell on the mat in the entry of the grocery store. According to Crosby, the mat was buckled causing her to trip. Crosby presented evidence that the mat frequently became buckled due to heavy foot traffic in and out of the store. An employee of the store testified he had to straighten the mat between 48 and 86 times during an eight hour shift. Finally, Crosby submitted accident reports signed by the store's managers showing that several people had tripped and fallen on the mat within a few weeks before Crosby's accident.

The Texas Supreme Court has held that "even in the absence of evidence showing the storeowner's actual or constructive knowledge of the presence on the floor of the specific object causing the fall," the storeowner may be liable if the invitee can show the storeowner was aware of a high risk that the dangerous condition would occur. *See Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 295 (Tex.1983). In *Corbin,* evidence showed grapes recurringly fell from a grape display and posed a high risk of customer falls. The supreme court held the store owner's knowledge about the display and the risk the fallen grapes posed was sufficient to allow the issue of negligence to go to the jury despite the fact there was no evidence to show the storeowner knew there were grapes on the floor at the time the plaintiff fell. *Id.* at 297. Similarly, in *National Convenience Stores, Inc. v. Erevia,* the evidence was held sufficient to support the jury's finding of liability where it was shown the storeowner was aware that ice on the floor was a common problem associated with its drink display even though there was no showing the storeowner was aware of the ice on the floor at the time of the accident at issue. *Nat'l Convenience Stores, Inc. v. Erevia,* 73 S.W.3d 518, 523 (Tex.App.-Houston [1st Dist.] 2002, pet. denied).

In this case, Crosby presented evidence that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Minyard was aware of the fact that the mat at the entry to the store was often buckled and caused customers to fall. Because Crosby presented evidence that the mat itself was a problem creating a frequent risk of injury, it was not necessary for her to show that Minyard was aware or should have been aware of the specific bump in the mat that caused her to fall. *See Corbin,* 648 S.W.2d at 297; *Erevia,* 73 S.W.3d at 523.

Although Minyard attempts to analogize the facts of this case to cases in which property owners were found not liable because they were unaware of the unsafe condition at the time the accident occurred, the cases cited by Minyard address a storeowner's knowledge of a specific, non-recurring condition rather than claims based on a continuing hazard of which the storeowner was aware. *See Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934 (Tex.1998); *Brookshire Food Stores, L.L.C. v. Allen,* 93 S.W.3d 897 (Tex.App.-Texarkana 2002, no pet.); *Wal–Mart Stores, Inc. v. Bolado,* 54 S.W.3d 837 (Tex.App.-Corpus Christi 2001, no pet.). A claim that something used by the storeowner is inherently dangerous is fundamentally different than a claim that a dangerous condition arose in the store and caused injuries.

In *CMH Homes v. Daenen,* the Texas Supreme Court addressed the legal consequences of a premises owner's awareness that the premises, although originally safe, would become unsafe over time. *See CMH Homes,* 15 S.W.3d at 101. The court specifically distinguished the facts before it from those cases such as *Corbin* in which the injury-causing instrument was unsafe from the moment it was used. *Id.* In the case before us, the mat did not become unsafe over time but was unsafe from the moment it was put on the floor *902 because of its tendency to buckle frequently when subjected to foot traffic.

In *Wal–Mart Stores, Inc. v. Reece,* a customer slipped in a puddle of clear liquid by the store's snack-bar. The snack-bar contained a self-service drink and ice machine. *See Wal–Mart Stores, Inc. v.*

*Reece,* 81 S.W.3d 812, 813 (Tex.2002). Although the store manager conceded at trial that the self-service drink and ice machine generally increased the likelihood of spills in the snack bar area, there was no evidence that the spilled liquid causing the customer to fall was a drink or ice. *Id.* at 817. Furthermore, in contrast to the case before us, there does not appear to have been any evidence of a history of falls in the snack bar caused by spilled drinks or ice that would have put the store on notice that the self-service machine itself posed an unreasonable risk of injury.

All the evidence in this case showed that the mat at the entrance of the store had a tendency to buckle and required frequent straightening. The evidence also showed that Minyard was aware that the recurrent bumps in the mat were causing customers to fall. This evidence was sufficient to allow the issue of Minyard's negligence to be presented to the jury. The trial court did not err in denying Minyard's motion for directed verdict. We resolve Minyard's cross issue against it.

We turn now to Crosby's issue relating to the trial court's admission of an affidavit created by Minyard's expert physician, Dr. Jack Kern. Kern's affidavit sets forth his opinions about Crosby's medical condition and her treatment by Dr. Mark Rayshell, a chiropractor. During Crosby's direct examination of Rayshell at trial, Rayshell was asked if he had read Kern's affidavit. Rayshell said he had. Rayshell was then asked to go over the affidavit.

In response to Crosby's direct examination about the affidavit, Rayshell testified he did not know whether Kern knew anything about chiropractic care or the orthopedic tests performed on Crosby. Rayshell further testified he concluded from reading the affidavit that Kern never examined Crosby personally and it did not appear that he had read her medical records closely. In Rayshell's opinion, a doctor could be found to say whatever the person hiring him wanted him to say, including that the treatment the patient received

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

was not necessary. Rayshell admitted Kern stated in his affidavit that he approved of some of the treatment Crosby had received from Rayshell. Kern's affidavit also stated, however, that Crosby should have reached maximum medical improvement within six to nine months. Rayshell noted that Crosby released herself from his care less than six months after he began treating her. According to Rayshell, Kern's affidavit stated there was no evidence Crosby suffered from anything other than a self-limiting, soft tissue injury. Rayshell disputed this opinion and referred to tests showing Crosby had herniated discs. Rayshell stated that Kern's diagnosis of Crosby was an example of how expert doctors write things with a jury in mind.

After the close of Crosby's direct examination of Rayshell, Minyard moved to admit Kern's affidavit into evidence. Crosby objected on the ground that the affidavit was hearsay. The trial court overruled the objection and admitted the affidavit.

During Minyard's cross-examination of Rayshell, Minyard asked about Crosby's general medical condition. Rayshell stated Crosby suffered from degenerative spinal problems such as spondylosis and osteoporosis due to advanced age. It was also noted that Crosby suffered from spinal stenosis and disc desiccation. When asked whether the spinal manipulation treatments Crosby received from him were *903 standard for a seventy-three year old woman, Rayshell responded they were if they were medically necessary. Although Rayshell did not specifically refer to Kern's affidavit during cross-examination, the affidavit states that Crosby suffered from "multi-level degenerative changes and problems throughout the spine of a structural nature" and, in Kern's opinion, "manipulative care is contraindicated" at Crosby's age.

[2][3][4][5] Crosby contends the trial court erred in admitting Kern's affidavit because the statements made in the document are hearsay. *See* Lewallen v. Hardin, 563 S.W.2d 356, 357 (Tex.Civ.App.-Dallas 1978, no writ) (affidavits are inadmissible hearsay upon final trial of a case).

Minyard does not dispute that the affidavit contains hearsay but argues the document, though otherwise inadmissible, was properly admitted under rule 107 of the Texas Rules of Evidence. Rule 107, entitled the "Rule of Optional Completeness," states that "[w]hen part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence...." TEX.R. EVID. 107. Rule 107 is designed to guard against the possibility of confusion, distortion, or false impression that could be created when only a portion of evidence is introduced. *See Grunsfeld v. State,* 813 S.W.2d 158, 163 (Tex.App.-Dallas 1991), *aff'd,* 843 S.W.2d 521 (Tex.Crim.App.1992). There are two threshold requirements for the application of the rule. First, some portion of the matter sought to be "completed" must have actually been introduced into evidence. *See Washington v. State,* 856 S.W.2d 184, 186 (Tex.Crim.App.1993); *Mendiola v. State,* 61 S.W.3d 541, 545 (Tex.App.-San Antonio 2001, no pet.). Merely referring to a statement does not invoke the rule. *See Goldberg v. State,* 95 S.W.3d 345, 386 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd). Second, the party seeking to complete the matter must show that the remainder being offered under rule 107 is on the same subject and is necessary to fully understand or explain the matter. *See Mendiola,* 61 S.W.3d at 545.

Even assuming Rayshell's testimony about the contents of Kern's affidavit was sufficient to meet the first requirement for the application of rule 107, we conclude Minyard clearly failed to meet the second requirement. Minyard has not shown why it was necessary to admit the affidavit to explain or understand the portions referred to by Rayshell. Although Rayshell discussed many of the opinions set forth in the affidavit and his reasons for disagreeing with them, Minyard has made no attempt to show how Rayshell's testimony could have confused or misled the jury regarding the contents of Kern's af-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

fidavit or its meaning. Furthermore, Minyard has not contended that Rayshell misrepresented the statements in the affidavit in any way. Because Minyard failed to meet the second requirement for the application of rule 107, the trial court erred in admitting the document.

[6][7] Having concluded the trial court erred in admitting the affidavit, we must now determine whether the error was harmful. In other words, we must determine whether the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). Erroneous rulings on the admissibility of evidence are ordinarily not reversible where the evidence is cumulative and not controlling on a material issue dispositive of the case. *904 *Id.* The error is harmless if other competent evidence of the fact in question appears elsewhere in the record. *Id.* at 397; *Cash America Intern., Inc. v. Hampton Place, Inc.*, 955 S.W.2d 459, 463 (Tex.App.-Fort Worth 1997, pet. denied).

[8] In her appeal, Crosby contends the affidavit's admission was harmful because it was the only evidence refuting the reasonableness and necessity of her medical care and it was allowed to go unchallenged. Kern's opinions were directly challenged by Rayshell, however, when he stated that his treatment of Crosby was appropriate and Kern's diagnosis of Crosby was not consistent with her test results. Indeed, the jury could not have relied on Kern's assessment of Crosby's medical condition when it rendered its verdict because it awarded her even less money for past medical care than what Kern stated was reasonable and necessary.

Crosby also complains she had no opportunity to cross-examine Kern about his credibility, bias, motive, education, training, and experience. All of these topics, however, were discussed by Rayshell either directly or by implication. Moreover, because Kern was never called as a witness, he had no opportunity to dispute Rayshell's statements that, as an expert hired for trial, Kern was careless and

merely stated the opinions he was hired to say.

Before Kern's affidavit was admitted into evidence, Crosby elicited testimony from her own medical care provider, Rayshell, about a substantial amount of the affidavit's content. During Rayshell's cross-examination after the trial court erroneously admitted the affidavit, Rayshell testified without objection about the degenerative problems in Crosby's spine noted by Kern in the affidavit. In examining the record as a whole, we conclude the trial court's error in admitting Kern's affidavit did not contribute to or cause the rendition of an improper judgment. We resolve Crosby's issue against her.

We affirm the trial court's judgment.

Tex.App.–Dallas,2003.
Crosby v. Minyard Food Stores, Inc.
122 S.W.3d 899

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.